## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### Evansville Division

| | |
|---|---|
| ROBERT W. SIMPKINS and LYNNETTE J. KAISER, on behalf of themselves and all other persons similarly situated; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC; and ALUMINUM TRADES COUNCIL OF WENATCHEE, WASHINGTON AFL-CIO, <br><br>       Plaintiffs, <br><br>   v. <br><br> ALCOA USA CORP.; RETIREES GROUP BENEFIT PLAN FOR CERTAIN HOURLY EMPLOYEES OF ALCOA USA CORP.; MEDICARE EXCHANGE HEALTHCARE REIMBURSEMENT PLAN FOR CERTAIN MEDICARE ELIGIBLE RETIREES OF ALCOA; and ALCOA MEDICARE PART B REIMBURSEMENT PLAN FOR CERTAIN MEDICARE ELIGIBLE RETIREES OF ALCOA USA, <br><br>       Defendants. | Case No.: 3:20-cv-278 <br><br> **CLASS ACTION COMPLAINT** <br><br> Demand for Jury Trial |

### CLASS ACTION COMPLAINT

### I.      INTRODUCTION

1.      Plaintiffs bring this action to challenge Defendant Alcoa USA Corp.'s decision to breach its longstanding labor agreements by terminating the retiree healthcare benefits of more than 3,000 retired hourly workers ("Retirees"), spouses, disabled adult children, and surviving spouses on January 1, 2021. These Retirees—whose average age is 85, with a number in their 100s—worked for Alcoa or its predecessors (collectively, "Alcoa" or "Company") for decades

under contracts that provided lifetime healthcare benefits to retirees and their dependents.  The great majority of these Retirees retired before June 1, 1993.

2.     Plaintiff Robert W. Simpkins worked for Alcoa at its Warrick Operations facility in Newburgh, Indiana.  Plaintiff Lynnette J. Kaiser (collectively with Mr. Simpkins, "Class Representatives") is the surviving spouse of an Alcoa retiree who worked at the Warrick Operations facility.  The Class Representatives bring this action as a class action on behalf of similarly situated Alcoa retirees and their surviving spouses and other dependents ("Class Members").

3.     Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC and its predecessors ("USW") is a labor union that served as the collective bargaining agent for Class Representative Simpkins and the vast majority of the Retirees while they were employed by Alcoa.

4.     Plaintiff Aluminum Trades Council of Wenatchee, Washington AFL-CIO ("ATC") is a labor union that served as the collective bargaining agent for Retirees from Alcoa's Wenatchee Works facility in Malaga, Washington while they were employed by Alcoa.  The USW and ATC, along with another union that negotiated with Alcoa, the Longview Federated Aluminum Council, are referred to collectively in this Complaint as the "Unions."

5.     The Unions and Alcoa negotiated a series of collectively bargained agreements which establish the Company's obligation to provide retiree healthcare coverage to Medicare-eligible Class Members and preclude the Company from unilaterally terminating this coverage. For decades, the parties have understood that Alcoa was not free to unilaterally reduce or eliminate this coverage, and have acted consistently with this understanding.  The parties'

decades-long understanding about the duration of retiree healthcare benefits was consistent with the customs, practices, and usages in the aluminum industry.

6. Retirees earned the right to Company-provided retiree healthcare coverage for themselves and their eligible dependents through decades of employment.

7. Class Members rely on their right to receive Company-provided retiree healthcare coverage for their healthcare needs.

8. Despite the collectively bargained contract provisions, as well as other promises to provide continuing coverage to Class Members, Alcoa has announced that, effective January 1, 2021, it will unilaterally terminate the retiree healthcare coverage it has provided to Medicare-eligible Class Members for decades. For Retirees and spouses but not for disabled adult children, Alcoa will replace the comprehensive medical and prescription drug benefits it contracted to provide with limited funds conveyed through a "Health Reimbursement Arrangement" or "HRA". Disabled adult children who have long received healthcare coverage from Alcoa will not receive even an HRA contribution.

9. Because Class Members' retiree healthcare coverage is the result of bargaining between labor organizations and an employer, Alcoa's actions are actionable in this Court under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).

10. Alcoa's conduct also violates the Class Members' rights and Alcoa's obligations under one or more employee benefit plans, and is therefore actionable in this Court under Sections 502(a)(1)(B) and 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).

## II.    JURISDICTION AND VENUE

11.    This Court has jurisdiction under 28 U.S.C. § 1331, as both counts raise federal questions.

12.    This Court also has jurisdiction over Count One under LMRA § 301, 29 U.S.C. § 185, and over Count Two under ERISA §§ 502(e)(1) and (f), 29 U.S.C. §§ 1132(e)(1) and (f).

13.    Venue in this judicial district is proper under LMRA § 301, 29 U.S.C. § 185, and ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because, *inter alia*, Alcoa is qualified and registered to do business in Indiana and has such extensive contacts within this judicial district that it "may be found" in this district within the meaning of 29 U.S.C. § 1132(e)(2). Further, Alcoa operates an aluminum smelter and rolling mill at the Warrick Operations facility, from which hundreds of the affected Retirees within the putative class retired.

## III.    PARTIES

14.    Plaintiff Robert W. Simpkins is an adult resident of Elberfeld, Indiana. Mr. Simpkins worked for Alcoa at its Warrick Operations facility in Newburgh, Indiana for approximately 27 years until he retired on or about May 1, 1993, and he was represented by USW predecessors during his employment. Mr. Simpkins has been eligible for and entitled to Company-provided healthcare coverage for himself and his wife since his retirement. He was born in 1937 and is Medicare-eligible. His wife was born in 1939 and is also Medicare-eligible.

15.    Plaintiff Lynnette J. Kaiser is an adult resident of Boonville, Indiana. Mrs. Kaiser's husband worked for Alcoa at its Warrick Operations facility in Newburgh, Indiana for approximately 16 years until he retired on or about April 30, 1993, and Mr. Kaiser was represented by USW predecessors during his employment. He died in 2016. Mrs. Kaiser has been eligible for and entitled to Company-provided retiree healthcare coverage through her

husband since his retirement, first as his spouse and then as his surviving spouse.  Mrs. Kaiser was born in 1941 and is Medicare-eligible.

16.    Plaintiff USW is a labor organization headquartered in Pittsburgh, Pennsylvania. The USW employs personnel in the Southern District of Indiana, where it serves as an exclusive bargaining representative for several units of employees.  For decades, the USW—including predecessor unions and unions with which it has merged—has served as the exclusive bargaining representative for certain groups of Alcoa employees and has negotiated collectively bargained agreements with Alcoa and its predecessors relating to, *inter alia*, Company-provided healthcare coverage for retired hourly employees and their eligible dependents.

17.    Plaintiff ATC is a labor organization headquartered in East Wenatchee, Washington and serves as an exclusive bargaining representative for hourly employees at Alcoa's Wenatchee Works facility in Malaga, Washington.  For decades, the ATC has negotiated collectively bargained agreements with Alcoa and its predecessors relating to, *inter alia*, Company-provided healthcare coverage for retired hourly employees and their eligible dependents.

18.    Defendant Alcoa USA Corp. is a Delaware Corporation and a wholly-owned subsidiary of Alcoa Corporation, which identifies itself as "a global industry leader in the production of bauxite, alumina and aluminum, enhanced by a strong portfolio of value-added cast and rolled products and select energy assets."  Alcoa Corporation was spun-off from Alcoa Inc. on November 1, 2016, and Alcoa Inc. was then renamed Arconic Inc.

19.    Defendant Alcoa USA Corp. is an employer engaged in commerce and is sued in its capacities as employer, and as plan sponsor and plan administrator of the employee benefit plan through which it currently provides healthcare coverage to Class Members.  Throughout this

Complaint, Defendant Alcoa USA Corp. and its predecessor companies are referred to collectively as "Alcoa" or the "Company".

20.    Defendant Retirees Group Benefit Plan for Certain Hourly Employees of Alcoa USA Corp ("Group Benefit Plan") is an "employee benefit plan" within the meaning of ERISA, and the plan through which Alcoa currently provides healthcare coverage to Class Members. Alcoa is the plan sponsor and plan administrator of this plan.

21.    Defendant Alcoa Medicare Part B Reimbursement Plan for Certain Medicare Eligible Retirees of Alcoa USA ("Medicare Part B Reimbursement Plan") is an "employee benefit plan" within the meaning of ERISA, and, upon information and belief, is the plan through which Alcoa currently provides reimbursements to Class Members of their Medicare Part B premiums.  Alcoa is the plan sponsor and plan administrator of this plan.

22.    Defendant Medicare Exchange Healthcare Reimbursement Plan for Certain Medicare Eligible Retirees of Alcoa ("HRA Reimbursement Plan") is an "employee benefit plan" within the meaning of ERISA, and, on information and belief, is the plan through which, beginning in January 2021, Alcoa will provide HRA reimbursements to those Class Members – and only those Class Members – who satisfy all of Alcoa's unilaterally determined requirements for receiving those reimbursements.  Alcoa is the plan sponsor and plan administrator of this Plan.

## IV.    STATEMENT OF FACTS

**Controlling Bargained Documents**

23.    Each Class Member's right to Company-provided retiree healthcare coverage is governed by the collective bargaining agreements ("CBAs") in place when the Class Member retired, or, in the case of dependents, when the employee through whom the dependent receives

their coverage retired or died.  These rights are also governed by bargained summary plan descriptions ("SPDs").

24.     Alcoa negotiated "Master Agreements" in each round of bargaining.  One such Master Agreement was negotiated with the USW and generally covered the employees from Alcoa's facilities in Alcoa, Tennessee; Badin, North Carolina; Bauxite, Arkansas; Mobile, Alabama; New Kensington, Pennsylvania; Point Comfort, Texas; Richmond, Indiana; and Rockdale, Texas.  Another was negotiated with predecessors to the USW[1] and generally covered employees from Alcoa's facilities in Warrick, Indiana; Massena, New York; and seven other facilities.[2]  As it concerns retiree healthcare benefits, the provisions of these Master Agreements are substantively identical.

25.     For example, the 1988 versions of these Master Agreements are the governing CBAs as to those retiring from the above Alcoa facilities during the period from November 1, 1988 and May 31, 1993,[3] other than the facility in Richmond, Indiana.[4]  Copies of the 1988 Master Agreements are attached hereto as Exhibits 1 and 2.

26.     The 1988 Master Agreements contain the same or substantively the same operative language as a number of other Alcoa CBAs that govern as to prior time periods and/or as to other facilities, such as the facility in Wenatachee, Washington.  Other CBAs differ.  While

---

[1] Alcoa negotiated this master agreement initially with the Aluminum Workers International Union, and later with the Aluminum, Brick & Glass Workers International Union ("ABG"). ABG merged into the USW in 1996.

[2] Retirees from these seven other facilities are not involved in this action as they continue to receive their retiree healthcare benefits from Arconic, Inc.

[3] The CBAs were extended past their original expiration date by a May 5, 1992 Extension Agreement.

[4] The Richmond, Indiana facility had its own 1990 CBA, which has substantively the same language as to retiree healthcare as the 1988 Master Agreements.

Plaintiffs at this time lack a comprehensive set of these other CBAs, including the CBAs of

Alcoa predecessor Reynolds Metal Company ("Reynolds"), which Alcoa acquired in 2000, the

CBAs Plaintiffs have reviewed, like the 1988 Master Agreements, incorporate common

controlling and bargained SPDs, which are addressed below.

27.     The 1988 Master Agreements require that Alcoa provide retiree healthcare

coverage both to retirees and their dependents who are not yet eligible for Medicare, and to

Medicare-eligible retirees and dependents.  As explained, this case concerns the retiree

healthcare coverage for Medicare-eligible retirees and dependents.

28.     These 1988 Master Agreements state as follows as to Class Members' Company-

provided retiree healthcare coverage for Medicare-eligible retirees and dependents:

ARTICLE XXII — GROUP INSURANCE

the Company will provide the following coverages for retired employees (and eligible
dependents) and surviving spouses of active and retired employees (and eligible
dependents) who are receiving a pension under the Pension Agreement:

***

(2) For persons eligible for Medicare — Supplemental Hospital Expense, Supplemental
Surgical-Medical Expense and Supplemental Extended Medical Expense Coverages.

***

All of the above benefits will be provided without cost to employees and retirees except
as otherwise provided.  Separate booklets describing these benefits are incorporated
herein and made a part of this Agreement.

29.     In addition, the 1988 Master Agreements provide as follows in the same CBA

Article that includes the above-quoted provision:  "No employee covered by this Article shall

suffer any reduction in the level of any of the several health care benefits of this Article."

30.     The 1988 Master Agreements also include six "General Provisions" that identify

specific circumstances when Alcoa is permitted to reduce or terminate aspects of Company-

provided retiree healthcare coverage, in some cases unilaterally and in some case only through negotiations with the Unions.

31.     Just one of the six Alcoa CBA General Provisions, the sixth, specifies that it applies only for "the term of the agreement".  None of the other five General Provisions include any durational limitation.

32.     The first "General Provision" addresses when Alcoa is permitted to unilaterally reduce or eliminate its reimbursement of Class Members' premiums for Medicare Part B.  As averred below, Part B premium reimbursement is mandated by the SPDs incorporated into the CBAs.  General Provision 1 states:

> It is agreed that if subsequent governmental legislation provides for the reduction or elimination of the premium for Medicare Part B for any person, the Company shall make a corresponding reduction or elimination to the benefit payment for such Medicare premiums for that person and such governmental action shall not require further modification or adjustment in this Article XXII.

33.     The second "General Provision" addresses when Alcoa is permitted to unilaterally reduce or adjust healthcare benefits when Alcoa separately pays for similar benefits under any law.  General Provision 2 states:

> It is intended that the provisions for benefits in this Article XXII shall comply with and be in substitution for provisions for similar benefits which are, or shall be, made by any law or laws.  Amounts paid by the Company for such similar benefits either as contributions, taxes, or benefits under any law or laws providing non-occupational insurance benefits shall reduce to that extent the amounts the Company shall pay under this Article XXII and appropriate readjustment shall likewise be made in the benefits.

34.     The third "General Provision" applies only to employees.

35.     The fourth "General Provision" addresses the parties' obligation to "meet and agree" on plan modifications occasioned by duplication of benefits in subsequent government legislation.  General Provision 4 states:

Unless otherwise provided in this Article XXII, the parties will meet, and agree on a modification of this plan to eliminate duplication of benefits and the disposition of any savings to the Company if subsequent governmental legislation should provide any of the benefits described herein.

36.     The fifth "General Provision" allows the parties to seek a "mutual agreement" as to "the desirability of providing at no additional cost to the Company an individual choice between an employee's Hospital-Surgical-Medical Coverage under this Article XXll and similar coverages" provided by a group practice plan.

37.      The sixth "General Provision", which applies only to employees, is by its terms limited to "the term of the agreement".  As noted, none of the other General Provisions include a durational limitation.

38.     The 1988 Master Agreements do not include any reservation of rights language or any other language apart from that contained in the "General Provisions" that allows Alcoa to unilaterally modify or terminate Company-provided retiree healthcare coverage without further negotiation with the Unions.  As described, the General Provisions set forth strictly circumscribed circumstances in which the parties agreed that unilateral modifications by Alcoa would be permissible.

39.     As addressed in more detail below, the Court of Appeals for the Sixth Circuit in 2013 addressed the 1988 Master Agreements and 1988 Reynolds CBAs.  Affirming the district court in a case involving the retiree healthcare benefits of Alcoa and Reynolds retirees who retired **after** May 31, 1993, the Sixth Circuit held:

Between June 1993 and June 2006, appellants retired from Alcoa and Reynolds (collectively, "the companies") under collective bargaining agreements (CBA) jointly negotiated between the companies and appellants' unions, the United Steelworkers of America (USW) and the Aluminum, Brick and Glass Workers International (ABG).

**Under the parties' 1988 CBA that expired in 1992, the companies provided lifetime, uncapped retiree-healthcare benefits**

*Curtis v. Alcoa, Inc.*, 525 Fed.Appx. 371, 373, 2013 WL 1908913, at *1 (6th Cir. May 9, 2013) (emphasis added).

40.     As set forth in the 1988 Master Agreements and other governing CBAs, retiree healthcare benefits as well as the other benefits agreed to in the CBAs are described in "[s]eparate booklets" which are "incorporated herein and made a part of this Agreement."  One such operative booklet is a 1979 Summary Plan Description for Retired Employees who retired prior to June 1, 1979 ("1979 Retiree SPD").  A copy of the 1979 Retiree SPD is attached hereto as Exhibit 3.

41.     The 1979 Retiree SPD provides:

The Employees Group Benefits Plan is provided for your protection and family security.  This Plan is designed to help you and your Dependents meet the threats to security that are brought about through costs of medical services incurred by you and your Dependents.

In this booklet, you will find information about Hospital-Surgical-Medical Coverage.  The Employees Group Benefits Plan will be revised to provide Supplemental Extended Medical Expense Coverage and improved Supplemental Hospital Expense Coverage for individuals who are eligible for Medicare.  These benefit improvements are an important addition to your protection and family security.

***

This booklet replaces all previous booklets and certificates of insurance issued to you under the Employees Group Insurance Plan and Employees Group Benefits Plan.

42.     The 1979 Retiree SPD defines "Dependent" with particularity but generally this term covers spouses and certain categories of unmarried children, including disabled adult children of any age.  The 1979 Retiree SPD does not address the retiree healthcare benefits provided to surviving spouses and other dependents of deceased active employees, which are described in a 1979 SPD for active employees (which is addressed separately below).

43.     The 1979 Retiree SPD provides: "All benefits described in this booklet are provided directly by Alcoa.  No contributions by participants are required to provide the benefits under the Plan."

44.     "Part II" of the 1979 Retiree SPD addresses retiree healthcare benefits for Medicare-eligible retirees and dependents.  The 1979 Retiree SPD provides: "A Retired Employee shall have coverage under this Part II … on 1979 June 01 or on the date of the Retired Employee's retirement or on the date the Retired Employee is eligible for Medicare, whichever occurs latest."  Addressing the effective date for dependents, the SPD provides: "A Retired Employee shall have coverage on account of each Dependent under this Part II on 1979 June 01 or on the date of the Retired Employee's retirement or on the date such Dependent is eligible for Medicare, whichever occurs latest."

45.     In addition to defining when retiree healthcare coverage becomes effective, the 1979 Retiree SPD also includes a provision addressing "CESSATION OF COVERAGE."  The CESSATION OF COVERAGE provision identifies no circumstances under which retiree healthcare coverage may be modified or terminated as to the retirees themselves.  Nor does any other provision in the 1979 Retiree SPD identify any circumstances when coverage may be modified or terminated as to the retirees.

46.     As to dependents, the CESSATION OF COVERAGE provision in the 1979 Retiree SPD states that coverage shall cease under either one of two circumstances:

> The Retired Employee's coverage on account of any Dependent shall automatically cease on the date of death of the Retired Employee or the day preceding the date such person ceases to be a Dependent of such Retired Employee, whichever occurs first.

47.     The 1979 Retiree SPD also establishes the right to an "individual policy" under certain circumstances for dependents who lose their healthcare coverage and are not yet eligible

for Medicare.  A provision titled "PRIVILEGE OF OBTAINING AN INDIVIDUAL POLICY" states as to pre-Medicare benefits:

> In the event of (i) the cessation of such Coverages on account of any Dependent because such person ceases to be a Dependent, as defined herein, an individual policy of hospital and surgical expense insurance may be obtained, without furnishing evidence of insurability, upon written application and payment of the appropriate premium to the Claim Administrator within 31 days after such cessation of Coverage.

48.      Just as the 1979 Retiree SPD identifies no circumstances when Company-provided healthcare coverage for retirees may be terminated, either in the CESSATION OF COVERAGE provision or otherwise, it similarly does not give Retirees any right to obtain an individual policy, either in the PRIVILEGE OF OBTAINING AN INDIVIDUAL POLICY provision or otherwise.  Of course, Retirees would only need a right to obtain an individual policy if their coverage was subject to termination during their lifetimes.

49.      In addition to requiring Company-provided retiree healthcare coverage for Medicare-eligible retirees and dependents, the 1979 Retiree SPD also requires that Alcoa reimburse retirees and dependents for Medicare Part B premiums:

> MEDICARE PART B PREMIUM REIMBURSEMENT BENEFIT—If the Retired Employee, while covered under the Hospital Surgical-Medical Coverages, or a Dependent on whose account the Retired Employee is covered, shall have become eligible and enrolled for Medicare Part B under the provisions of the Federal Social Security Act (Medicare Part B), **the Employer shall provide a benefit payment to reimburse the Retired Employee for the actual premium for such Medicare coverage.**

(Emphasis added).

50.      Like the 1988 Master Agreements and other applicable CBAs, the 1979 Retiree SPD identifies circumstances that would allow Alcoa to reduce or eliminate the mandated reimbursement for Medicare Part B premiums:

If subsequent governmental legislation provides for the reduction or elimination of the premium for Medicare Part B for any person, the Employer shall make a corresponding reduction or elimination of the benefit payment for such Medicare premium for that person.  The benefit otherwise payable under this provision shall be reduced by the amount of any Medicare Part B premium reimbursement provided by any other employer.

51.     The 1979 Retiree SPD does not include any reservation of rights provision or otherwise purport to give Alcoa any right to unilaterally modify or terminate Company-provided retiree healthcare coverage.

52.     A 1979 SPD for "Active Hourly Employees" ("1979 Active SPD") addresses healthcare coverage for the surviving spouses and other dependents of deceased active employees, and permits termination of this coverage only when the surviving spouse dies or a dependent ceases being a dependent:

A surviving spouse receiving Surviving Spouse Pension benefits under the Employees' Retirement Plan at the time of cessation of coverage under this Plan is eligible for Hospital-Surgical-Medical Coverage under the Employees Group Benefits Plan applicable to retired Employees.  Such coverage is provided for such spouse and Dependent children who were covered for Hospital Expense and Surgical-Medical Expense coverage at the time of the Employee's death.  **Such coverage shall automatically cease on** whichever of the following dates first occurs:

1. With respect to the coverage on account of any Dependent, the date as of which such person ceases to be a Dependent…;

2. With respect to the coverage on account of all Dependents **the date of the surviving spouse's death.**

(Emphasis added).

53.     A 1981 Retiree SPD includes substantively the same above-quoted provisions as those in the 1979 Retiree SPD.  The 1981 Retiree SPD also includes a provision addressing the surviving spouses and other dependents of deceased active employees which is substantively the

same as the above-quoted provision from the 1979 Alcoa Active SPD.  A copy of the 1981

Retiree SPD is attached hereto as Exhibit 4.

54.     A 1986 Retiree SPD includes substantially the same provisions as the above-

quoted provisions in the 1979 Alcoa Retiree SPD and the 1979 Alcoa Active SPD.  A copy of

the 1986 Retiree SPD is attached hereto as Exhibit 5.

55.     Not surprisingly, since the Reynolds provisions were negotiated by the same

unions during the same time periods, an SPD applicable to Class Members retiring from

Reynolds includes provisions similar to the above-quoted provisions in the Retiree SPDs,

including a requirement that the Company reimburse retirees and other beneficiaries for the cost

of Medicare Part B premiums.  *See* 1990 Reynolds Retiree SPD attached hereto as Exhibit 6.  In

addition, like the "CESSATION OF COVERAGE" provision in the Retiree SPDs, a Reynolds

provision states: "The retired employee's coverage on account of a dependent shall cancel on the

date such person is no longer an eligible dependent as defined or upon the death of the retired

employee, whichever occurs first."  Also echoing a provision from the Retiree SPDs, another

Reynolds provision states as follows as to the cessation date for medical coverage for surviving

spouses and dependents of deceased employees:

1.     With respect to the coverage on account of any Dependent, the date as of
       which such person ceases to be a Dependent…

2.     With respect to the coverage on account of all Dependents, the date of the
       Surviving Spouse's death.

56.     The 1990 Reynolds Retiree SPD also has a provision addressing continuation of

coverage, stating as follows as to "Continuation of Health Care Coverage (COBRA) for

Retirees":

As a retiree, you are entitled to elect continuation of health care coverage only in the unlikely event that you lose your Company-paid coverage because the Company is in reorganization or liquidation.

**Pertinent Developments 1992-2019**

57.     In the *Curtis* litigation, the Court of Appeals for the Sixth Circuit affirmed factual findings from the 1992 and 1993 timeframe that are pertinent here.  Referring to the 1988 Master Agreements and the 1988 Reynolds CBAs and citing findings of the district court which it affirmed, the Sixth Circuit ruled:

> **Under the parties' 1988 CBA that expired in 1992, the companies provided lifetime, uncapped retiree-healthcare benefits**.  As the expiration date of the CBA approached, two factors fueled an increase in the companies' total retiree-healthcare costs:  First, higher payments to healthcare providers.  Second, a new public accounting obligation, Financial Accounting Standard 106 (FAS 106), that required public companies to recognize a liability for the present value of all projected retiree-healthcare costs, rather than including these costs on the company's balance sheet on a pay-as-you-go basis….Facing these mounting healthcare costs, the companies focused on negotiating an annual healthcare-contribution limit, or "cap," on retiree-healthcare benefits into the next CBA.

*Curtis*, 525 Fed.Appx. 371, 373, 2013 WL 1908913, at *1 (citing district court ruling in *Curtis*) (emphasis added).

58.     As further found in the *Curtis* litigation, Alcoa, Reynolds, USW and ABG after contentious joint bargaining agreed in 1993 to a deferred cap on Alcoa's contribution to retiree healthcare costs, but **only** as to employees retiring in the future, *i.e.*, **after** May 31, 1993.  The 1993 cap, memorialized in a letter, deferred cap implementation until 1998.  The parties further deferred cap implementation in subsequent bargaining, and ultimately agreed to implement the cap beginning in 2007.  *See Curtis*, 525 Fed.Appx. 371, 373, 2013 WL 1908913, at *1.

59.     For at least one facility, in Frederick, Maryland, Alcoa and the USW did not negotiate a cap until 2001.  Accordingly, the caps negotiated in 1993 did not apply to the retiree

healthcare benefits of a small number of employees who retired after May 31, 1993.  Alcoa is

terminating benefits for such uncapped post-May 31, 1993 retirees and their dependents effective

January 1, 2021, and they accordingly are Class Members here.

60.     At no time in or after 1993 did the parties bargain over SPDs applicable to Class

Members.  The last bargained Alcoa retiree SPD is the 1986 Retiree SPD, and the last bargained

Reynolds retiree SPD is the 1990 Reynolds Retiree SPD.  While Alcoa issued unilateral plan

documents after 1993 that purport to apply to Class Members, these documents were not

negotiated.  Indeed, on information and belief, Alcoa did not even provide the Unions with

copies of these unilateral documents.  These unilateral documents Alcoa issued in or after 1993

have no bearing on the bargained rights of Class Members.

61.     Anticipating the 2007 cap implementation, the *Curtis* retiree plaintiffs filed their

suit in 2006 in the Eastern District of Tennessee against Alcoa and Reynolds, proceeding on

behalf of a class of Alcoa retirees who retired between June 1, 1993 and June 30, 2006 whose

benefits were capped, their eligible spouses and dependents, and surviving spouses.  The Unions

were not parties to this suit.

62.     The *Curtis* retirees argued that the caps on their retiree healthcare benefits were

contrary to the parties' bargained agreements and violated the LMRA and ERISA.   The district

court certified the class and concluded that while the class enjoyed bargained lifetime healthcare

benefits, these lifetime benefits were subject to the negotiated caps:

> the court finds that the CBAs promise of lifetime healthcare benefits must be read along
> with the cap agreements.  Taking all of the agreements together, the only coherent
> reading is that plaintiffs are entitled to lifetime, capped healthcare benefits.

*Curtis v. Alcoa, Inc.*, 2011 WL 850410, at *52 (E.D.Tenn. March 9, 2011).

63.     The Sixth Circuit affirmed the district court, both as to the lifetime nature of the

capped post-1993 retirees' healthcare benefits and as to the negotiated cap on those benefits.  In

17

addition to the findings and holdings set forth above, the Sixth Circuit also ruled as follows as to the declaratory relief sought from the Circuit by the *Curtis* plaintiffs:

> *Declaratory Relief*
>
> Retirees also seek a "declaration that they had vested lifetime healthcare benefits" because the court's Judgment Order stated that Retirees "take nothing." The court's Judgment Order did nothing more than deny Retirees the relief they requested—vested, lifetime, and *uncapped* healthcare benefits. The district court's findings and conclusions clarified that Retirees possess lifetime health benefits: "In conclusion, the court finds that under the cap agreements ... plaintiffs are entitled to *lifetime,* capped *healthcare benefits.*"

525 Fed.Appx. 371, 381, 2013 WL 1908913, at \*9–10 (emphasis in the original and citations omitted).

64.     In 2000, Alcoa acquired Reynolds, including Reynolds' retiree healthcare obligations to those Class Members who retired from Reynolds. *See Curtis*, 525 Fed.Appx. 371, 374, 2013 WL 1908913, at \*2. Since that time, on information and belief, the pre-cap retirees from Alcoa and Reynolds have always received the same Company-provided retiree healthcare benefits and Alcoa has never made any distinction between the two groups of retirees for purposes of these benefits.

65.     On November 1, 2016, Alcoa Corporation was spun-off from Alcoa Inc., and Alcoa Inc. was renamed Arconic Inc. Alcoa Corporation is the parent company of Defendant Alcoa USA Corp. The benefit obligations of Arconic Inc. are not at issue in this action.

66.     As set forth in a negotiated October 6, 2016 Letter of Understanding between Alcoa, Arconic, and the USW regarding "Alcoa Separation and Master Contract Matters," the parties agreed that:

> Except as provided in this letter of agreement, Alcoa Corporation and Arconic separately agree on behalf of themselves and their applicable subsidiaries (specifically including Alcoa USA Corp.) that the applicable Master Agreements will continue in full force and effect at their respective Master Contract plants as

listed below.  This includes the collective bargaining agreements, pension agreements, and benefit agreements and SPDs, as well as past interpretations, practices, and arbitration history unless changed or amended by means afforded each entity (and the respective plants) through mid-term bargaining, arbitration, proper changes to past practice, and/or negotiations at the end of the current term of the agreements.

67.     The Letter of Understanding allocated a number of facilities to Alcoa Corporation "for pension purposes," including the Warrick Operations facility and one in Richmond, Indiana.

68.     The Letter of Understanding then states, under a section titled "Retiree Health Care and Life Insurance Issues", that "retiree health care and life insurance benefits obligations for bargaining unit employees and retirees will be allocated between Alcoa Corporation and Arconic in the same manner as the pension liabilities and assets."

69.     The Letter of Understanding goes on to state that "Alcoa Corporation and Arconic each will provide a program of retiree health care and life insurance benefits **identical** to the retiree programs presently provided by Alcoa, Inc."  (Emphasis added).

70.     From the time of their retirement decades ago through the present date, Class Members have received the Company-provided healthcare benefits provided for in the governing documents described above.

71.     The Unions have never agreed to any unilateral retiree healthcare benefit termination by Alcoa, whether in the announced form describe herein, or in any other form.

**Alcoa's Impending Termination of Company-Provided Retiree Healthcare Coverage**

72.     According to Alcoa's 2019 Annual Report, it is terminating retiree healthcare benefits for approximately 6,000 participants, and expects to save $108 million as a result.  Upon information and belief, approximately 3,300 of these participants fall within the putative class here.

73.     In or about August or September 2020, Alcoa's agent Via Benefits mailed a notice to Class Member households addressed to "Retired Colleague and Eligible Spouse"; "Eligible Spouse" was not defined.  *See* Exhibit 7 attached hereto.  This notice advised that retirees, eligible spouses AND dependent children who were eligible for Medicare would lose their Company-provided retiree healthcare benefits on January 1, 2021.  This notice further advised retirees and eligible spouses that they would "no longer receive a separate Medicare Part B reimbursement from Alcoa because it is now included in your HRA."[5]  While retirees and eligible spouses could receive a "contribution" from Alcoa toward the cost of alternative benefits provided they took certain steps, the notice advised that "[i]f you have a dependent child … they will not receive a contribution from Alcoa."

74.     Dependent children as defined in the governing documents have always received Company-provided healthcare benefits as required by those documents.  Under the parties' bargained agreements, several categories of dependent children had the right to receive healthcare coverage, including the following, as set forth in the 1979, 1981, and 1986 Retiree SPDs:

> The Retired Employee's unmarried child(ren) after attainment of age 19, while incapable of self support because of a disabling sickness or injury that commenced prior to age 19, provided such child was covered as a Dependent under a plan applicable to the Active or Retired Employee on the day preceding the child's 19th birthday and was then so disabled and therefore incapable of performing any self-sustaining employment and continued to be so disabled until the date services are received.  Such child must be principally supported by the Retired Employee. Special certification shall be required to qualify a Dependent under this provision.

---

[5] The standard Part B monthly premium cost for 2021 is $148.50, for an annual cost of $1,782.00.

75.     At least seven disabled adult children who are eligible for Medicare currently receive their healthcare coverage through Alcoa.  These disabled adult children will lose that coverage on January 1, 2021, and will not be eligible for **any** contribution from Alcoa toward the cost of their healthcare coverage.

76.     In order to receive the Alcoa contribution, which would be placed in an HRA,[6] retirees and eligible spouses must "evaluate, choose, and enroll in new Medicare coverage" through Via Benefits.   Per the notice, if they fail to successfully complete this process, retirees and spouses will lose not only the Company-provided retiree healthcare benefits and Part B reimbursements they had been receiving for decades, but they will also permanently lose any right to receive any future contribution from Alcoa for any aspect of their healthcare costs. Retirees and spouses must enroll by December 7, 2020 for those not currently enrolled in an Alcoa plan and by December 31, 2020 for those currently enrolled.

77.     Another Class Member communication from Via Benefits, in the form of an undated letter captioned "2021 Via Benefits Advantage" (*see* Exhibit 8 attached hereto), confusingly suggests in its opening two paragraphs that retirees and spouses have a choice between either retaining their "current plan" or selecting "individual coverage":

> Alcoa has selected Via Benefits Insurance Services to help you decide whether the individual coverage offered in our Medicare marketplace might suit your needs better than your current coverage.
>
> Via Benefits offers a wide variety of Medicare coverage from national and regional insurance carriers. Even if you are satisfied with your current plan, you may discover a plan that is similar to or better than your current coverage, often with significant savings.

---

[6] HRAs are funded in whole or in part by employers or former employers for the purpose of reimbursing employees or retirees for specified qualified medical expenses.

78.     The Via Benefits Advantage Notice also advises that while Alcoa would provide some unidentified amount of reimbursement "[a]fter you pay your health care provider", no information would be provided at that time about what qualified for reimbursement because: "Alcoa determines reimbursable expenses, which vary by program.  That is why we don't provide you a list in this guide."  Retirees were told that they would receive information on reimbursable expenses only "around two weeks after your coverage starts."  In other words, retirees are obliged to select from a large range of plans with varying expenses for varying items before learning what expenses Alcoa will unilaterally determine to be reimbursable.

79.     Based on information provided by Alcoa to the USW, Retiree Class Members retired from facilities around the country, including hundreds who retired from facilities from within the Southern District of Indiana, and others from facilities in many other states.

## V.     CLASS ACTION ALLEGATIONS

80.     The Class Representatives bring this action on behalf of themselves and the following class ("Class") of similarly situated persons:

> All retirees of Alcoa USA Corp., its predecessors, or affiliated companies (collectively, "Alcoa") who: **(i)** were represented by the USW, the ATC, the Longview Federated Aluminum Council, or a predecessor union while an employee; **(ii)** were upon retirement eligible for uncapped healthcare coverage that continued after becoming eligible for Medicare; and **(iii)** will have their healthcare coverage terminated by Alcoa effective January 1, 2021.

> Also included within the Class are **(i)** the spouses, eligible dependents, and surviving spouses of such retirees where those spouses, eligible dependents, and surviving spouses, were eligible for retiree healthcare coverage from Alcoa upon reaching Medicare eligibility; and **(ii)** the surviving spouses and eligible dependents of pension-eligible Alcoa employees who were represented by the USW, the ATC, the Longview Federated Aluminum Council, or a predecessor union, and who died prior to retiring, where those surviving spouses and eligible dependents were eligible at the time of the employee's death for uncapped retiree healthcare coverage from Alcoa upon reaching Medicare eligibility, and will have their healthcare coverage terminated by Alcoa effective January 1, 2021.

81.     The number of Class Members is in the thousands, and the Class is large enough that joinder of individual members in this action is impracticable.

82.     There are common questions of law and fact that relate to and affect the Class. These include whether Alcoa has the right to unilaterally terminate Class Members' retiree healthcare coverage for Medicare-eligible Class Members.

83.     The relief sought is common to all Class Members as set forth below in the section titled, "Relief Requested."

84.     The claims of the Class Representatives are typical of the claims of all Class Members, namely that under LMRA § 301 and ERISA, Defendants cannot unilaterally terminate Class Members' retiree healthcare coverage for those who are eligible for Medicare.

85.     There is no conflict between the Class Representatives and any other Class Member with respect to this action.

86.     The Class Representatives will fairly and adequately protect the interests of the Class Members.

87.     Attorneys for the Class Representatives are experienced and capable in the field of labor law and ERISA and have successfully litigated numerous LMRA and ERISA class actions involving the retiree healthcare benefits of former union employees.

88.     This action is properly maintained as a class action under Fed.R.Civ.P. 23(b)(1)(A).  Because of the uniform standards of conduct imposed by ERISA, the prosecution of separate actions by individual Class Members would create a risk of inconsistent adjudications that would establish incompatible standards of conduct for Alcoa.

89.     This action is also properly maintained as a class action under Fed.R.Civ.P. 23(b)(2), in that Alcoa has acted on grounds generally applicable to the class by announcing that

it will unilaterally terminate the Company-provided retiree healthcare coverage for those eligible for Medicare that it is obligated to provide to Class Members, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

90.     Alternatively, this action is maintainable as a class action under Fed.R.Civ.P. 23(b)(3), as the common questions of law and fact described above predominate over any questions affecting only individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT ONE

Violation of Rights to Company-Provided Retiree Healthcare Coverage
Under Collectively Bargained Agreements:
Actionable under LMRA § 301

(Against Defendant Alcoa by All Plaintiffs)

91.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth here.

92.     The collectively bargained agreements described above providing for Company-provided retiree healthcare coverage for those Class Members who are eligible for Medicare are "contract[s] between an employer and a labor organization" within the meaning of LMRA § 301, 29 U.S.C. § 185.

93.     The contracts conferred upon all Class Members a right to be protected from Alcoa's unilateral termination of Company-provided retiree healthcare coverage for those eligible for Medicare.  By announcing that it will terminate this coverage, Alcoa has breached these contracts.

94.     Alcoa's breach of its collectively bargained obligations is actionable under LMRA § 301, 29 U.S.C. § 185.

## COUNT TWO

Violation of Rights to Company-Provided Retiree Healthcare Coverage
Under Employee Benefit Plans:
Actionable under ERISA § 502(a)

(Against All Defendants by Class Representatives)

95.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth here.

96.     Defendants violated the terms of the negotiated plan documents by announcing that they will unilaterally terminate the retiree healthcare coverage for Class Members who are eligible for Medicare and condition Class Members' reimbursement of Medicare Part B premiums on their purchase of an individual Medicare supplement policy from Via Benefits. The collectively bargained agreements described above providing for this coverage are "plan documents" within the meaning of ERISA.

97.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) allows a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

98.     ERISA § 502(a)(3), 29 U.S.C. § 1132 allows a participant or beneficiary to bring a civil action "to enjoin any act or practice which violates [ERISA] or the terms of the plan, or … to obtain other appropriate equitable relief … to redress such violations or … to enforce any provisions of [ERISA] or the terms of the plan."

99.     Defendants' repudiation of negotiated plan terms is actionable under ERISA §§ 502(a)(1)(B) and (a)(3), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).

## VI.    RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Certify this action as a class action, using the Class definition identified above; appoint Robert W. Simpkins and Lynnette J. Kaiser as Class Representatives; and appoint Macey Swanson LLP and Feinstein Doyle Payne & Kravec, LLC as counsel for the Class.

B.    Declare that Defendants cannot unilaterally terminate or modify the contractually-provided retiree healthcare coverage for Class Members who are eligible for Medicare.

C.    Order Defendants to reinstate the retiree healthcare coverage and Medicare Part B premium reimbursement for Class Members who are eligible for Medicare as provided under the terms required by the governing documents.

D.    As necessary, award to the Class Representatives and to Class Members monetary damages or surcharge or restitution or other monetary relief (plus interest), and/or other equitable relief such as reinstatement or reformation, as necessary, to restore them to the position in which they would have been but for Defendants' contractual violations.

E.    Award Plaintiffs their reasonable attorneys' fees and costs incurred in this action.

F.    Grant such further relief as may be deemed necessary and proper.

## VII.   JURY DEMAND

Plaintiffs request a jury trial of all issues so triable.

Dated:  December 10, 2020                   Respectfully submitted,

   /s/  Jeffrey A. Macey                                  .
        Jeffrey A. Macey

**MACEY SWANSON LLP**
Jeffrey A. Macey, Atty No.  28378-49
Barry A. Macey, Atty No. 8964-69
445 N. Pennsylvania Street, Suite 401
Indianapolis, Indiana 46204
Telephone: (317) 637-2345
Facsimile: (317) 637-2369
jmacey@maceylaw.com
bmacey@maceylaw.com

**FEINSTEIN DOYLE PAYNE
   & KRAVEC, LLC**
Pamina Ewing (motion for *pro hac vice* forthcoming)
Joel R. Hurt (motion for *pro hac vice* forthcoming)
Ruairi McDonnell (motion for *pro hac vice*
forthcoming)
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, Pennsylvania 15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007
pewing@fdpklaw.com
jhurt@fdpklaw.com
rmcdonnell@fdpklaw.com

*Attorneys for Plaintiffs*

David R. Jury (motion for *pro hac vice* forthcoming)
General Counsel
United Steelworkers
60 Boulevard of the Allies, Room 807
Pittsburgh, Pennsylvania 15222
Telephone: (412) 562-2549
Facsimile: (412) 562-2574
djury@usw.org

*Attorneys for Plaintiff United Steelworkers*