# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### Evansville Division

| | |
|---|---|
| ROBERT W. SIMPKINS and LYNNETTE J. KAISER, on behalf of themselves and all other persons similarly situated; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC; and ALUMINUM TRADES COUNCIL OF WENATCHEE, WASHINGTON AFL-CIO, | No.: 3:20-cv-00278-RLY-MPB<br><br>Demand for Jury Trial |
| Plaintiffs, | |
| v. | |
| ALCOA USA CORP.; RETIREES GROUP BENEFIT PLAN FOR CERTAIN HOURLY EMPLOYEES OF ALCOA USA CORP.; MEDICARE EXCHANGE HEALTHCARE REIMBURSEMENT PLAN FOR CERTAIN MEDICARE ELIGIBLE RETIREES OF ALCOA; and ALCOA MEDICARE PART B REIMBURSEMENT PLAN FOR CERTAIN MEDICARE ELIGIBLE RETIREES OF ALCOA USA, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**FEINSTEIN DOYLE PAYNE
  & KRAVEC, LLC**
Pamina Ewing *(Admitted pro hac vice)*
Joel R. Hurt *(Motion for admission pro hac vice* forthcoming)
Ruairi McDonnell *(Motion for Admission pro hac vice* forthcoming)
429 Fourth Avenue, Suite 1300
Pittsburgh, PA  15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007
pewing@fdpklaw.com
jhurt@fdpklaw.com
rmcdonnell@fdpklaw.com

**MACEY SWANSON LLP**
Barry A. Macey
Jeffrey A. Macey
445 N. Pennsylvania Street, Suite 401
Indianapolis, IN  46204
Telephone: (317) 637-2345
Facsimile: (317) 637-2369
bmacey@maceylaw.com
jmacey@maceylaw.com

*Attorneys for Plaintiffs*

David R. Jury, General Counsel
(Motion for Admission *pro hac vice*
forthcoming)
United Steelworkers
60 Boulevard of the Allies, Room 807
Pittsburgh, PA  15222
Telephone: (412) 562-2549
Facsimile: (412) 562-2574
djury@usw.org

***Attorney for Plaintiff United Steelworkers***

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

I.     INTRODUCTION ............................................................................................1

II.    RELEVANT BACKGROUND ........................................................................4

     A.     The Controlling Labor Agreements ....................................................4

           1.   The Master Agreements ...........................................................4
           2.   The Sixth Circuit's Interpretation of the 1988 Agreements.............7
           3.   The Bargained Summary Plan Descriptions ("SPDs").....................8

     B.     Class Members ...................................................................................11

     C.     Alcoa's Termination of Healthcare Coverage and Part B Reimbursement ..........12

     D.     Challenges Faced By Class Members in Obtaining Qualifying Individual
          Coverage .........................................................................................14

           1.   The difficulties posed by the modes of communication that Alcoa
              and Via Benefits require of the elderly retirees .............................14
           2.   The myriad of plan options available to class members ...................15
           3.   Difficulties in obtaining coverage faced by the Class Representatives
              and the son of a surviving spouse class member with dementia.....................17
           4.   The experience of a union representative attempting to assist
               Retirees in acquiring individual coverage.....................................20

     E.     Impact on Class Members of Loss of Alcoa Benefits...........................21

           1.   Overall Impact ......................................................................21
            2.   Impact as to prescription drug benefits........................................22
           3.   Class members' small fixed pensions ...........................................24

     F.     Plaintiffs' Commencement of this Class Action...................................25

III.   ARGUMENT...................................................................................................25

     A.     Introduction.......................................................................................25

     B.     Preliminary Injunction Standards ......................................................25

     C.     Plaintiffs Have More Than "Some Likelihood of Success on The Merits"..........26

D.      Absent an Injunction, Class Members Will Suffer Irreparable Harm, and There is No Adequate Remedy at Law ...........................................................30

E.      Balancing of Harms and the Public Interest Strongly Favor an Injunction ..........33

CONCLUSION....................................................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*CNH Indus. N.V. v. Reese*,
　　138 S.Ct. 761 (2018) ........................................................................27

*Cole v. ArvinMeritor, Inc.*,
　　516 F.Supp.2d 850 (E.D.Mich. 2005) .................................................35

*Common Cause Indiana*,
　　2020 WL 5671506 (S.D.Ind. 2020)......................................25, 29, 30, 33

*Cooper v. Salazar*,
　　196 F.3d 809 (7th Cir. 1999) .............................................................26

*Courthouse News Serv. v. Brown*,
　　908 F.3d 1063 (7th Cir. 2018) ...........................................................25

*Curtis v. Alcoa, Inc,.*
　　525 Fed.Appx. 371, 2013 WL 1908913 (6th Cir. May 9, 2013)...............5, 7, 8, 27

*Curtis v. Alcoa, Inc.*,
　　2011 WL 850410 (E.D.Tenn. March 9, 2011) ........................................7

*Daniel De Jesus Lopez, v. Ice Field Office Director*, Respondent.,
　　2020 WL 7075213 (W.D.Wash. Dec, 3, 2020)......................................33

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am.*
　　*Inc.*, 549 F.3d 1079 (7th Cir. 2008) .......................................................25

*International Union v. Consol Energy, Inc.*,
　　243 F.Supp.3d 755 (S.D.W.Va. 2017) .................................................31

*Litton Financial Printing Div., Litton Business Systems, Inc. v. NLRB*,
　　501 U.S. 190 (1991) ........................................................................26, 27

*M&G Polymers USA, LLC v. Tackett*,
　　574 U.S. 427 135 S. Ct. 926 (2014) ....................................................26

*People for Ethical Treatment of Animals, Inc. v. Wildlife in Need and Wildlife*
　　*in Deed, Inc.*, 2018 WL 828461(S.D.Ind. Feb. 12, 2018)......................26

*Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner, Indiana*
    *State State Department of Health*, 2018 WL 10580407
    (S.D.Ind. June 2018) ............................................................................. 35

*Stone v. Signode Industrial Group LLC*, 943 F.3d 381 (7th Cir. 2019), *cert.*
    *denied*, 2020 WL 5882283 (Oct. 5, 2020)............................................... 26

*Temme v. Bemis Co.*,
    2011 WL 1498584 (E.D.Wis. April 18, 2011)................................... 31, 34

*United Steelworkers of Am., AFL-CIO v. Textron, Inc.*,
    836 F.2d 6 (1st Cir. 1987) ...................................................................... 30

*Wayne Chemical, Inc. v. Columbus Agency Services Corp.*,
    567 F.2d 692 (7th Cir. 1977).................................................................. 35

*Whitaker v. Kenosha Unified School District* (7th Cir. 2017),
    858 F.3d 1034......................................................................................... 26

# I.    INTRODUCTION

On January 1, 2021, Defendant Alcoa USA Corp. ("Alcoa" or the "Company") will terminate the retiree healthcare coverage that more than 3,300 union retirees and their family members have received for decades.  Alcoa also will stop reimbursing the Medicare Part B premiums the retirees must pay to the federal government each month.  The retirees' unions negotiated these benefits through the years in collective bargaining, and Plaintiffs demonstrate below that the governing agreements preclude Alcoa from unilaterally terminating them.

The average age of the retirees and family members who will lose their coverage ("class members") is 84.  Twenty-five class members 100 or older.  Unless these class members manage to successfully select and sign up for individual healthcare coverage by Alcoa's December 31, 2020 deadline, they will be left this winter and beyond with no healthcare benefits supplemental to Medicare, during the depths of the ever-worsening COVID-19 crisis.  This could be catastrophic, because, among other things, Medicare limits coverage for extended hospitalization and generally provides no prescription drug benefits.

Alcoa has advised that as to retirees and spouses, it will replace the healthcare coverage and Medicare Part B reimbursement it contracted to provide with limited funds conveyed through a health reimbursement arrangement or "HRA".[1]  Class members must take a number of strictly circumscribed steps to qualify for the contribution, notably signing up for individual coverage through Via Benefits, a "Medicare marketplace."  Furthermore, Alcoa has taken the position that unless class members successfully acquire individual coverage as proscribed before January 1, 2021, they will forever lose even the limited HRA contribution.

---

[1] Alcoa has determined that disabled adult children now dependent on Alcoa for supplemental healthcare coverage are ineligible even for the HRA contribution.

Plaintiffs filed this class action to establish that Alcoa has no right to unilaterally terminate class members' bargained benefits.  Because available replacement coverage is inferior to these benefits, class members will likely suffer even if they manage to take all necessary steps, acquire individual coverage, and qualify for the HRA contribution.  Moreover, many class members will likely fail to obtain new coverage before the Alcoa coverage terminates on January 1.  According to information from Alcoa, as of December 9, 2020, more than 1,100 retirees and surviving spouses – approximately 39 percent – had not obtained coverage through Via Benefits. This does not include the retirees' dependent spouses, which means the true number of impacted class members is actually much higher.

Most class members who will lose coverage are old, and, given data concerning the elderly, many likely suffer from dementia or other debilitating conditions or illnesses, including COVID-19.  Selecting and acquiring appropriate individual coverage is a daunting task even for healthy younger retirees with ready access to available plans through the internet and the cognitive skills needed to evaluate those plans.  For older class members, and even for younger class members who might be challenged by technology or cognitive deficits, this undertaking could prove prohibitively difficult.  Moreover, some class members may not even know they must obtain new coverage.  On this last point, one Plaintiff received no notice from Alcoa about the impending benefit termination, learning of this only through the happenstance of encountering others who informed him, which we anticipate is common to other class members.

Plaintiffs now seek a preliminary injunction to enjoin Alcoa from terminating the retiree healthcare benefits, including the reimbursement of Medicare Part B premiums, that it has provided to class members for decades.  Plaintiffs show the irreparable harm that at least some class members will likely suffer absent an injunction.  For example, a retiree who fails to sign up for new coverage and is left with no prescription drug coverage may be unable to pay for

expensive life-sustaining medicines on which he now depends.  Or a surviving spouse hospitalized for months with COVID-19 complications may have no ability to pay for the portion of her hospitalization not covered by Medicare.  Injunctive relief is appropriate because there is no adequate remedy at law to protect class members from risks such as these.

In addition to establishing irreparable harm, Plaintiffs also show that they are likely to succeed on the merits.  Controlling collective bargaining agreements ("CBAs") identify the specific and limited circumstances when Alcoa **is** permitted to unilaterally reduce or terminate healthcare benefits and Part B reimbursement, and neither the CBAs nor the negotiated summary plan descriptions ("SPDs") reserve a more general right for Alcoa to act unilaterally.  Further, the SPDs provide that so long as dependents maintain dependent status, their healthcare coverage terminates only upon the death of the retiree through whom they receive benefits.  The SPDs similarly provide that coverage for eligible surviving spouses continues until death.

Finally, the balance of harms unquestionably favors entry of an injunction.  A global corporation, Alcoa has provided this bargained-for healthcare coverage to thousands of class members for decades.  The harm to Alcoa in continuing class members' benefits during the worst pandemic in a century is plainly less than the risks faced by class members who are left with either inferior or no replacement coverage.

Class members' Alcoa coverage will terminate in two weeks, on January 1, 2021.  Time is of the essence, and Plaintiffs herewith file a motion requesting a telephonic status conference to be scheduled as soon as possible.  This will allow the Court and parties to address how the important matters raised by Plaintiffs' injunction motion might best be resolved.

## II.    RELEVANT BACKGROUND

### A.    The Controlling Labor Agreements

#### 1.    The Master Agreements

The vast majority of retirees impacted by Alcoa's benefit termination retired on or before May 31, 1993.  Declaration of Cary Burnell ("Burnell Decl.") (filed herewith) ¶ 15.  The Unions[2] served as the retirees' collective bargaining agents when they were employed by Alcoa.  *Id.* ¶ 2.

Alcoa and the USW negotiated so-called "Master Agreements" in successive rounds of bargaining, including in 1980, 1983, 1986 and 1988.[3]  Alcoa negotiated one set of Master Agreements with the USW and one set with the Aluminum, Brick and Glass Workers ("ABG"), which merged into the USW in 1996.  *Id.*  The USW Master Agreements generally apply to employees from facilities in Richmond, Indiana; Alcoa, Tennessee; Badin, North Carolina; Bauxite, Arkansas; Mobile, Alabama; New Kensington, Pennsylvania; Point Comfort, Texas; and Rockdale, Texas.  *See id.* Ex. 1, 3, 5, 7 (references to "Ex." are to exhibits to the Burnell Decl.).  The ABG Master Agreements generally apply to employees from Alcoa facilities in Warrick, Indiana; Massena, New York; and several other facilities not at issue.  Ex. 2, 4, 6, 8.

As shown below, these eight Master Agreements all include substantively the same operative language as to the retiree healthcare benefits at issue.  For ease of reference, Plaintiffs

---

[2] "Unions" refers to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC and its predecessors ("USW") and Aluminum Trades Council of Wenatchee, Washington AFL-CIO ("ATC"), both Plaintiffs in this litigation, together with Longview Federated Aluminum Council, which formerly represented employees at Alcoa's closed facility in Longview, Washington.

[3] Excerpts from these Master Agreements are attached to the Burnell Decl. at Ex. 1-8.

quote from the 1988 USW Master Agreement, but all quoted and referenced contract language

appears in substantively the same form in the other seven Master Agreements.[4]

The Master Agreements provide:

ARTICLE XXII — GROUP INSURANCE

the Company will provide the following coverages for retired employees (and
eligible dependents) and surviving spouses of active and retired employees (and
eligible dependents) who are receiving a pension under the Pension Agreement:

*\*\**

(2) For persons eligible for Medicare — Supplemental Hospital Expense,
Supplemental Surgical-Medical Expense and Supplemental Extended Medical
Expense Coverages.

*\*\**

All of the above benefits will be provided without cost to employees and retirees
except as otherwise provided.  Separate booklets describing these benefits are
incorporated herein and made a part of this Agreement.

*\*\**

No employee covered by this Article shall suffer any reduction in the level of any
of the several healthcare benefits of this Article.

Ex. 7, 1988 USW Master Agreement, Art. XXII.[5]

The Master Agreements include six "General Provisions" that identify specific

circumstances in which Alcoa and the USW agreed that Alcoa could reduce or terminate aspects

of the bargained retiree healthcare coverage, in some cases automatically upon the occurrence of

an event and in some case only through further negotiations.  *Id.*  Just one of the six General

---

[4] Retirees from Alcoa facilities other than these Master Agreement facilities, including those who
were employed by Reynolds Metal Company ("Reynolds"), which Alcoa acquired in 2000,
retired under different CBAs.  *See* Burnell Decl. ¶ 8; *see also Curtis v. Alcoa, Inc.*, 525
Fed.Appx. 371, 374, 2013 WL 1908913, at *2 (6th Cir. 2013) ("In 2000, Alcoa bought Reynolds
and assumed Reynolds's retiree-healthcare obligations").  Plaintiffs do not have a comprehensive
set of the non-Master Agreement CBAs.  Burnell Decl. ¶ 8.

[5] This provision appears in Article XXII of the 1988 USW Master Agreement.  The same or
substantively the same language also appears in Article XXII of the 1980, 1983 and 1986 USW
Master Agreements, and in Article XXIII of the 1980, 1983, 1986, and 1988 ABG Master
Agreements.  References to "*id.*" refer to each of these Master Agreements.

Provisions, the sixth, specifies that it applies only for "the term of the agreement".  None of the other five General Provisions include any durational limitation.  *Id.*

The first "General Provision" addresses when Alcoa is permitted to reduce or eliminate its reimbursement of class members' Medicare Part B premiums.

> It is agreed that if subsequent governmental legislation provides for the reduction or elimination of the premium for Medicare Part B for any person, the Company shall make a corresponding reduction or elimination to the benefit payment for such Medicare premiums for that person and such governmental action shall not require further modification or adjustment in this Article XXII.

*Id.*  The second "General Provision" allows Alcoa to reduce or adjust amounts it pays for healthcare benefits when it separately pays for similar benefits pursuant to law:

> It is intended that the provisions for benefits in this Article XXII shall comply with and be in substitution for provisions for similar benefits which are, or shall be, made by any law or laws.  Amounts paid by the Company for such similar benefits either as contributions, taxes, or benefits under any law or laws providing non-occupational insurance benefits shall reduce to that extent the amounts the Company shall pay under this Article XXII and appropriate readjustment shall likewise be made in the benefits.

*Id.*  The third "General Provision" does not apply to retirees.  *Id.*  The fourth obliges the parties to bargain over—*i.e.*, to "meet and agree" on—plan modifications should subsequent legislation create a duplication of the benefits provided to class members:

> Unless otherwise provided in this Article XXII, the parties will meet, and agree on a modification of this plan to eliminate duplication of benefits and the disposition of any savings to the Company if subsequent governmental legislation should provide any of the benefits described herein.

*Id.*  The fifth "General Provision" provides for a second category of negotiated benefit changes, allowing the parties to seek "mutual agreement" as to including a group practice plan with healthcare offerings.  *Id.* The sixth "General Provision" is the only one that by its terms is limited to "the duration of the agreement," but this provision applies only to employees.  *Id.*

The Master Agreements include no reservation of rights language that purports to provide Alcoa with a general right to unilaterally reduce or terminate healthcare coverage or Part B reimbursement.  Further, none of the Master Agreements contain any non-General Provision language stating or implying that Alcoa may unilaterally modify or terminate these benefits.

### 2.    The Sixth Circuit's Interpretation of the 1988 Agreements

In *Curtis v. Alcoa, Inc.*, the Sixth Circuit construed the 1988 USW and ABG Master Agreements, as well as a 1988 CBA between Reynolds and the USW.  525 Fed.Appx. 371, 2013 WL 1908913 (6th Cir. May 9, 2013).  *Curtis* addressed the retiree healthcare benefits of certain Alcoa and Reynolds employees who retired after May 31, 1993, non-class members here, and whether the parties agreed in 1993 to cap the companies' payment obligations for the healthcare benefits of the post-1993 retirees.  The district court held that the various CBAs promised "lifetime healthcare benefits" but that this promise had to be read along with the cap agreements agreed to in 1993.  *Curtis v. Alcoa, Inc.*, 2011 WL 850410, at \*52 (E.D.Tenn. March 9, 2011). The district court concluded: "Taking all of the agreements together, **the only coherent reading is that plaintiffs are entitled to lifetime, capped healthcare benefits**." *Id.* (emphasis added).

The Sixth Circuit affirmed the district court and held specifically as follows as to the same 1988 USW and ABG Master Agreements and 1988 Reynolds CBA  at issue here:

> Between June 1993 and June 2006, appellants retired from Alcoa and Reynolds (collectively, "the companies") under collective bargaining agreements (CBA) jointly negotiated between the companies and appellants' unions, the United Steelworkers of America (USW) and the Aluminum, Brick and Glass Workers International (ABG).
>
> **Under the parties' 1988 CBA that expired in 1992, the companies provided lifetime, uncapped retiree-healthcare benefits.**

*Curtis*, 525 Fed.Appx. 371, 373, 2013 WL 1908913, at \*1 (emphasis added).  Addressing the effect of the district court's judgment, the Sixth Circuit further ruled:

The court's Judgment Order did nothing more than deny Retirees the relief they
requested—vested, lifetime, and *uncapped* healthcare benefits.  **The district
court's findings and conclusions clarified that Retirees possess lifetime health
benefits:** "In conclusion, the court finds that under the cap agreements ...
plaintiffs are entitled to *lifetime,* capped *healthcare benefits.*"

*Id.* at *9–10 (bold emphasis added, and citations omitted).

### 3.      The Bargained Summary Plan Descriptions ("SPDs")

The Master Agreements state that the retiree healthcare benefits provided for therein are

described in "[s]eparate booklets…incorporated herein and made a part of this Agreement."  *See,*

*e.g.*, Ex. 7, Art. XXII.  One such booklet is Alcoa's 1979 SPD for Retired Employees who retired

prior to June 1, 1979 ("1979 Retiree SPD").  *See* id. Ex. 10.  The 1979 Retiree SPD provides:

> The Employees Group Benefits Plan is provided for your protection and family
> security.  This Plan is designed to help you and your Dependents meet the threats
> to security that are brought about through costs of medical services incurred by
> you and your Dependents.
>
> In this booklet, you will find information about Hospital-Surgical-Medical Coverage.
> The Employees Group Benefits Plan will be revised to provide Supplemental
> Extended Medical Expense Coverage and improved Supplemental Hospital Expense
> Coverage for individuals who are eligible for Medicare.  These benefit improvements
> are an important addition to your protection and family security.

*Id.* at p. 1.  Further: "All benefits described in this booklet are provided directly by Alcoa.  No

contributions by participants are required to provide the benefits under the Plan."  *Id.* at p. 2.

The SPD defines categories of dependent children with rights to healthcare coverage, including

retirees' "unmarried child(ren) after attainment of age 19, while incapable of self support

because of a disabling sickness or injury that commenced prior to age 19…".  *Id.* at p. 43.[6]

"Part II" of the SPD addresses effective date.  As to retirees:  "A Retired Employee shall

have coverage under this Part II…on 1979 June 01 or on the date of the Retired Employee's

---

[6] As discussed below, a 1979 SPD for active employees addresses the healthcare benefits
provided to surviving spouses and children of deceased active employees.

retirement or on the date the Retired Employee is eligible for Medicare, whichever occurs latest."
*Id.* at p. 23.  As to dependents: "A Retired Employee shall have coverage on account of each Dependent under this Part II on 1979 June 01 or on the date of the Retired Employee's retirement or on the date such Dependent is eligible for Medicare, whichever occurs latest."  *Id.*

The 1979 Retiree SPD also addresses "CESSATION OF COVERAGE."  *Id.* at p. 37-38. This provision identifies no circumstances when healthcare coverage may be modified or terminated as to retirees; nor does any other provision in the 1979 Retiree SPD.  *Id.*  As to dependents, the CESSATION OF COVERAGE provision ties benefit termination to the lifetime of retirees, stating that coverage shall cease under either of two circumstances:

> The Retired Employee's coverage on account of any Dependent shall automatically cease on the date of death of the Retired Employee or the day preceding the date such person ceases to be a Dependent of such Retired Employee, whichever occurs first.

*Id.* at p. 37.  Further confirming that dependents but not Retirees are subject to benefit termination, and that dependents lose coverage only on losing dependency status, the SPD also establishes the right to an "individual policy" but solely for dependents who lose their dependency status and hence their healthcare coverage.  A provision titled "PRIVILEGE OF OBTAINING AN INDIVIDUAL POLICY", applicable only to pre-Medicare benefits, states:

> In the event of (i) the cessation of such Coverages on account of any Dependent because such person ceases to be a Dependent, as defined herein, an individual policy of hospital and surgical expense insurance may be obtained…

*Id.* at p. 38.  Just as the SPD identifies no circumstances when coverage for retirees may be terminated, in the CESSESATION OF COVERAGE provision or otherwise, the SPD similarly does not grant retirees any right to obtain an individual policy, either in the PRIVILEGE OF OBTAINING AN INDIVIDUAL POLICY provision or otherwise.  *See id.* at pp. 38-39.

The SPD also requires that Alcoa reimburse class members' Medicare Part B premiums:

> MEDICARE PART B PREMIUM REIMBURSEMENT BENEFIT—If the
> Retired Employee, while covered under the Hospital Surgical-Medical Coverages,
> or a Dependent on whose account the Retired Employee is covered, shall have
> become eligible and enrolled for Medicare Part B under the provisions of the
> Federal Social Security Act (Medicare Part B), **the Employer shall provide a
> benefit payment to reimburse the Retired Employee for the actual premium
> for such Medicare coverage.**

*Id.* at p. 33-34 (emphasis added).  Reiterating the similar provision in the Master Agreements, the

SPD identifies when Alcoa may reduce or eliminate the mandated reimbursement:

> If subsequent governmental legislation provides for the reduction or elimination
> of the premium for Medicare Part B for any person, the Employer shall make a
> corresponding reduction or elimination of the benefit payment for such Medicare
> premium for that person.  The benefit otherwise payable under this provision shall
> be reduced by the amount of any Medicare Part B premium reimbursement
> provided by any other employer.

*Id.* at p. 34.

The SPD has no reservation of rights provision.  Apart from the quoted language

addressing Part B reimbursement, the SPD nowhere provides or implies that Alcoa may

unilaterally modify or terminate retiree healthcare coverage or Part B premium reimbursement.

A 1979 "Active Hourly Employees" SPD ("1979 Active SPD") (excerpted at Ex. 14)

addresses healthcare coverage for surviving spouses and children of deceased active employees:

> A surviving spouse receiving Surviving Spouse Pension benefits under the
> Employees' Retirement Plan at the time of cessation of coverage under this Plan is
> eligible for Hospital-Surgical-Medical Coverage under the Employees Group Benefits
> Plan applicable to retired Employees.  Such coverage is provided for such spouse and
> Dependent children who were covered for Hospital Expense and Surgical-Medical
> Expense coverage at the time of the Employee's death.  **Such coverage shall
> automatically cease on** whichever of the following dates first occurs:
>
> 1. With respect to the coverage on account of any Dependent, the date as of which
> such person ceases to be a Dependent…;
>
> 2. With respect to the coverage on account of all Dependents **the date of the
> surviving spouse's death.**

*Id*. at pp 11-12 (emphasis added).

A 1981 Retiree SPD includes substantively the same above-quoted provisions as those in the 1979 Retiree SPD, and provision addressing benefits for surviving spouses and children of deceased active employees substantively the same as the above-quoted provision in the 1979 Active SPD.  Ex. 11 at pp. 1, 11, 49-50, 54-55, 62.  A 1986 Retiree SPD includes substantially the same provisions as the 1981 Retiree SPD.[7]  Ex. 12 at pp. 1, 11, 49-50, 54-55, 62.

Like the Alcoa SPDs, a 1990 SPD applicable to Reynolds retirees includes a requirement that the company reimburse the cost of Medicare Part B premiums.  *See* Ex. 13 at p. 60.  Also echoing a provision in the Alcoa SPDs, the Reynolds SPD states as to the cessation date for medical coverage for surviving spouses and dependents of deceased employees:

1.  With respect to the coverage on account of any Dependent, the date as of which such person ceases to be a Dependent…

2.  With respect to the coverage on account of all Dependents, the date of the Surviving Spouse's death.

*Id*. at pp. 61-62.  The Reynolds SPD also has a provision addressing "Continuation of Health Care Coverage (COBRA) for Retirees":  "As a retiree, you are entitled to elect continuation of health care coverage only in the unlikely event that you lose your Company-paid coverage because the Company is in reorganization or liquidation."  *Id*. at p. 62.

## B.    Class Members

Alcoa has provided the USW with information as to each retiree, spouse, eligible dependent, and surviving spouse whose benefits will be terminated, a total of 3,341 individuals.

---

[7] The 1979 SPD states as follows in prefatory language: "If you are covered by a collective bargaining agreement, the Plan is maintained in accordance with the Agreement."  The 1981 and 1986 SPDs state on their covers: "Pursuant to Agreement With United Steelworkers of America."  All these SPDs state: "This booklet replaces all previous booklets and certificates of insurance issued to you under the Employees Group Insurance Plan and Employees Group Benefits Plan."  While this last provision  arguably may mean that the 1986 Retiree SPD supplants the earlier SPDs as to those retiring under those earlier SPDs, this point is immaterial here given that all three SPDs contain materially the same operative terms.

Burnell Decl. ¶ 16.  The spreadsheet reflects that class members' average age is 84.3; 887 are in their nineties; and 25 are 100 or older.  *Id.*  Further, at least seven impaired adult non-spouse dependents appear to receive Alcoa retiree healthcare benefits.  *Id.*  As addressed below, Alcoa has decided that impaired non-spouse dependents are not eligible even for the HRA contribution.

Pertinent to class members' advanced ages, an Alzheimer's Association report cites an American Academy of Neurology study and states: "The percentage of people with Alzheimer's dementia increases with age:  3 percent of people age 65-74, 17 percent of people age 75 to 84, and 32 percent of people age 85 and older..."  Ex. 19 at 17.  Applying these percentages to class members, approximately 783, or 23%, may suffer from Alzheimer's.  Burnell Decl. ¶ 17.

On December 10, 2020, Alcoa provided the USW with a spreadsheet reflecting that 1,101 retirees and surviving spouses (39% of the total) had not enrolled in coverage through Via Benefits as of December 9, 2020. .*Id.* ¶ 27. The spreadsheet appears to exclude approximately 557 dependent spouses who will also lose Alcoa coverage.  *Id.*  Of the 1,101 individuals listed, the spreadsheet indicates that 229 had "no contact attempt"; 56 "no phone on file"; and 28 a "bad phone number."  *Id.*  Hundreds of Retirees, surviving spouses, and eligible dependents may not secure coverage through Via Benefits before Alcoa's December 31, 2020 deadline.

**C.    Alcoa's Termination Of Healthcare Coverage And Part B Reimbursement**

According to Alcoa's 2019 Annual Report, it expects to save $108 million by terminating retiree healthcare benefits for approximately 6,000 participants in 2021.  *See* Ex. 15.  There are 3,300 class members here, suggesting that Alcoa expects to save considerably more than $50 million as a result of its termination of class members' benefits and the failure of some of those class members to obtain reimbursable coverage through Via Benefits.

An undated communication to class members from Alcoa and Via Benefits describes the impending termination of healthcare benefits and Part B reimbursements.  *See* Burnell Decl. ¶ 12

and Ex. 16.  The communication advises that Medicare-eligible retirees, spouses, and dependent children will lose their Company-provided retiree healthcare benefits on January 1, 2021 and that Alcoa will no longer provide direct reimbursement for Medicare Part B premiums.[8]  *Id.*

In order to receive an HRA contribution, retirees and eligible spouses must, among other things, "evaluate, choose, and enroll in new Medicare coverage" through Via Benefits.  *Id.*  If they fail to successfully complete this process, they will lose not only the healthcare benefits and Part B reimbursements they have depended on for decades, but they will also permanently lose any right to receive future contribution from Alcoa for any aspect of their healthcare costs.  *Id.* Retirees and spouses must enroll by December 7, 2020 for those not currently enrolled in an Alcoa plan and by December 31, 2020 for those now enrolled.  *Id.*  No representation is made as to how long Alcoa will provide a contribution, suggesting that Alcoa could elect to terminate the contribution at any time without limit, even in the immediate future.  Further, the communication advises that dependent children—including adult children incapable of self-support—are ineligible even for the HRA contribution.  *Id.*  As represented above, at least seven such impaired adult children currently receive healthcare coverage through Alcoa.  Burnell Decl. ¶ 16.

---

[8] The standard Part B monthly premium cost for 2021 is $148.50, for an annual cost of $1,782.00.  *See* https://www.cms.gov/newsroom/fact-sheets/2021-medicare-parts-b-premiums-and-deductibles (last checked December 8, 2020); Burnell Decl. ¶ 35.

**D.      Challenges Faced By Class Members In Obtaining Qualifying Individual Coverage**

**1.      The difficulties posed by the modes of communication that Alcoa and Via Benefits require of the elderly retirees**

Two Via Benefits communications illustrate challenges faced by class members who must obtain individual coverage from Via Benefits by December 31 in order to receive an HRA contribution.  The afore-mentioned communication opens as follows:

> Alcoa has selected Via Benefits Insurance Services to help you decide whether the individual coverage offered in our Medicare marketplace might suit your needs better than your current coverage.

> Via Benefits offers a wide variety of Medicare coverage from national and regional insurance carriers.  Even if you are satisfied with your current plan, you may discover a plan that is similar to or better than your current coverage, often with significant savings.

Ex. 16.  While this communication deceptively suggests the retirees have a choice about retaining existing programs, it is immaterial whether they are "satisfied with [their] current plan" or if current coverage best "suits [their] needs."  Alcoa is terminating current coverage regardless of retirees' preferences, and suggesting otherwise can only cause confusion.

The communication also states that while Alcoa will provide reimbursement "[a]fter you pay your health care provider", no information would be provided as to what expenses qualify for reimbursement: "Alcoa determines reimbursable expenses, which vary by program.  That is why we don't provide you a list in this guide." *Id.*  Retirees will receive information on reimbursable expenses only **after** new coverage starts. *Id.*  Retirees thus must select from a large range of plans with varying expenses for varying items with no knowledge of which expenses Alcoa will unilaterally decide to reimburse.  Finally, as for obtaining reimbursement, class members are advised to use the "Via Benefits Accounts mobile app or your online account." *Id.*

A Via Benefits "2021 Enrollment Guide" (Ex. 17) repeatedly urges the elderly retirees to "go online."  They are told to "[c]reate or update your online account" online, provide an email

address, and create a username and password, and that "Via Benefits uses a multi-factor

authentication (MFA)" that "requires you to provide two or more credentials to authenticate your

identity." *Id.* After creating an online account, retirees must "gather and enter" their Medicare

number; medication names, dosages and frequency; and provider names and addresses "for all

the doctors and hospitals/outpatient facilities you wish to continue using." *Id.* Retirees must

also watch a "webinar" or read a technical description of coverage options addressing such

points as guaranteed issue rights for Medigap versus Medicare Advantage plans. *Id.*

Cary Burnell, a Senior Technician in the USW's Collective Bargaining, Research and

Benefits Department, regularly interacts with retirees about their healthcare benefits. Burnell

Decl. ¶ 24. Mr. Burnell reviewed Via Benefits' instructions and avers as follows:

> Based on my years of experience with elderly retired USW members, many Retirees
> here will likely struggle to comply with the Enrollment Guide instructions. In my
> experience, many older USW retirees do not have an email address, computer,
> and/or internet access. Even if they have these things, in my experience, older
> retirees may struggle with concepts such as "multi-factor authentication" and
> "guaranteed issue rights," or with simply creating an online account.

Burnell Decl. ¶ 18. Telephone communication poses its own challenges. Because many retirees

involuntarily shifted to an Exchange tend to be older, confused about coverage changes, and

often suffer from hearing loss, the telephone can be a difficult mode of communication for them.

Burnell Decl. ¶ 24. Mr. Burnell has observed that many if not most of Medicare-eligible retirees

from manufacturing sector jobs are not computer literate or comfortable with online enrollment

or providing personal information to strangers online or over the phone. *Id*.

### 2. The myriad of plan options available to class members

Following all of the above, Retirees are directed to an "online marketplace" to "search,

compare, and select plans..." Ex. 17. The rare class member with a computer, internet

connection, and the capacity to follow these instructions would encounter the following on Via

Benefits' website; we use information pertinent to Class Representative Simpkins as an illustrative example.  As of December 9, 2020, 26 Medicare Advantage plans were available to him through Via Benefits.  *See* Ex. 20 (print-out of Medicare Advantage plans available to Mr. Simpkins as of this date).  These plans do not have standardized plan designs, and they replace rather than supplement the benefits provided by traditional Medicare.  Burnell Decl. ¶ 20.  It is important for anyone switching to a Medicare Advantage plan to determine if their current providers and pharmacy are in-network, and whether their prescription drugs are included in the plan's formulary, and, if so, what tier they are on (*e.g.*, preferred or non-preferred).  *Id.*

Also, as of December 9, 2020, 26 Medigap plans were available to Mr. Simpkins.  Ex. 21 (available Medigap plans).  Medigap plans supplement traditional Medicare, have various standard plan designs, and do not include drug coverage.  Burnell Decl. ¶ 21.  Ten Medigap plan designs were available to Mr. Simpkins, as well as high deductible and standard-deductible alternatives and three premium structures: attained age premiums which increase with age; issue-age premiums based on age when first issued; and community-rated premiums, which are the same for everyone regardless of age.  *Id.*  It is crucial to understand these premiums structures when selecting a Medigap plan because these plans are subject to medical underwriting except in specific circumstances, and limit one's ability to change plans from year-to-year.  *Id.*

Finally, 21 Medicare Part D prescription drug plans were available to Mr. Simpkins as of December 9.  *See* Ex. 22 (available prescription drug plans).  These plans do not have a standard design.  Burnell Decl. ¶ 22.  Once any deductible is satisfied, they impose varying copayments or coinsurance for prescriptions based on the formulary tier into which a particular drug falls.  *Id.*  These plans are subject to the "coverage gap" or "donut hole": once an individual and the plan spend $4,130 combined on drugs, most Part D plans charge 25% of the cost of prescription drugs until out-of-pocket spending reaches $6,550.  *Id.*  As with Medicare Advantage plans, Medicare

Part D plans generally require the use of network pharmacies and it is important to determine if an individual's own pharmacy is in-network, whether the individual's prescription drugs are included in the plan's formulary, and, if so, what tier they are on. *Id.* Further, many Medicare Advantage and Medicare Part D plans may be unsuitable for people who split their time between two states, as do many retired people. See detailed discussion in Burnell Decl. ¶ 23.

### 3. Difficulties in obtaining coverage faced by the Class Representatives and the son of a surviving spouse class member with dementia

While the two Class Representatives, retiree Robert Simpkins and surviving spouse Lynnette Kaiser, ultimately acquired individual coverage, their struggles in so doing highlight some of the challenges faced by class members generally. Most notably, both required outside assistance from resources other than Via Benefits, resources that many other class members may not be able to access. The son of a surviving spouse class member himself struggled to obtain coverage for his mother, who has dementia, and still has not obtained coverage.

Mr. Simpkins is 84 and worked at Alcoa's Warrick Operations facility for 27 years before retiring in 1993. Declaration of Robert W. Simpkins (filed herewith) ¶¶ 3-4. Although he knows Alcoa has his correct address, he has never received any notification that healthcare benefits for he and his wife will terminate on January 1, 2021. *Id*. ¶ 6. Instead, he happened to run into two people who told him this – if he had not, he still would not know anything about it. *Id*. Upon learning of the upcoming benefit termination, he went to the USW union hall for assistance. There, with help from USW representatives, he made several calls over the course of several days in attempts to sign up for alternate coverage. *Id*. ¶¶ 7-8. He attests as follows about this experience: "I'm not sure who we were talking to and I was confused by all of this." *Id*. ¶ 8.

Mr. Simpkins then called Via Benefits by himself. *Id*. ¶ 9. His first such call lasted seven hours; he knows this because he was sitting next to a clock. Some people he spoke with

did not speak English well, and he could not understand a lot of what they were saying.  After seven hours, he was told he needed his wife on the call or Via Benefits could not do anything for him.  A subsequent call with his wife lasted another three hours, and they were still unable to sign up for benefits.  He explains:  "I could not understand what they were talking about.  My wife could not understand either.  We were both very confused and frustrated."  *Id*.

Mr. Simpkins gave up on obtaining benefits from Via Benefits, and instead visited an establishment called Senior Solutions in Evansville, Indiana.  *Id*. ¶ 10.  There, he was able to sign up for new benefits.  While he could not understand the Via Benefits representatives while talking on the phone with them, he was able to understand the gentleman at Senior Solutions.  *Id.*

Mrs. Kaiser, who receives Alcoa coverage through her deceased husband, also struggled to obtain benefits.  Declaration of Lynnette J. Kaiser (attached to accompanying Declaration of Pamina Ewing) ¶¶ 3-4.  She was fortunate to receive assistance from her son, who has a computer, and from a friend who understands plans; as to the friend, Mrs. Kaiser attests:  "Without her help, I'm not sure how I would have been able to select a plan."  *Id*. ¶ 5.  After three hours on the phone with Via Benefits, she attempted to set up a required account online.  *Id*. ¶ 6.  She attests:  "I could not get an account ID – it would not work no matter what I did."  She then went to the union hall, and over the course of three hours with assistance from a USW representative attempted to resolve this problem with Via Benefits, to no avail.  *Id*.  The next day, she called the insurer directly, and the person there resolved the problem in about ten minutes; Mrs. Kaiser believes she was told that the problem was that Via Benefits failed to complete one of the questions on her application.  *Id*.

Thereafter, Mrs. Kaiser received a voicemail stating that her application was pending and that if she did not get ahold of them that day, she could not get Alcoa's contribution.  *Id*. ¶ 7.  No phone number was left in the voicemail, and after two unsuccessful calls trying to track this

person down, she was finally told by Via Benefits that Alcoa had been notified of her application but it had not been approved. *Id.* Asked why, the person at Via Benefits had no answer. Mrs. Kaiser later received a confusing notice that her application had been received but not yet accepted and that the amount of her premium could change. She sums up her experience: "I found this whole process to be confusing and very frustrating. At this point, I still am not completely sure that I have successfully enrolled to receive the Alcoa contribution." *Id.* ¶ 9,

Douglas Rapp, who has power of attorney for his 92-year-old mother, Delores Rapp, describes challenges faced even by younger persons trying to assist class members. *See* Declaration of Douglas Rapp ("Rapp Decl.") (filed herewith). Mrs. Rapp has dementia and lives in a nursing home. *Id.* ¶ 2. Mr. Rapp knew nothing about her loss of coverage before receiving notice in the mail between November 15 and 20. *Id.* ¶ 3. Unsure what the notice meant, he sought assistance from the USW. *Id.* He then called Via Benefits and was told they not would speak to him without a power of attorney form; he was later told it would take 14 days for Via Benefits' legal department to review the form and authorize communications. *Id.* ¶ 4. When Mr. Rapp finally spoke with Via Benefits on December 9, the representative cited several plans and he asked for emailed descriptions he could review. *Id.* ¶ 5. She said no, and they then spent a long time on the phone making little progress, before he had to end the call to go to work. *Id.* He then sought more assistance from the USW, and has started gathering the requisite information. *Id.* ¶ 6. 8. On December 11, he received a recorded message from Alcoa stating that he had to take steps concerning his mother's coverage because the coverage terminated on **December 1, 2020**. He was extremely surprised by this message as December 1 had already passed. Because the message was recorded, there was no one he could question about it, and he still has not been able to acquire coverage for his mother. *Id.* ¶ 8.

### 4. The experience of a union representative attempting to assist Retirees in acquiring individual coverage

George Barnett of USW Local 104 in Newburgh, Indiana serves as the Local's benefits representative.  Declaration of George Barnett ("Barnett Decl.") (filed herewith).  He has talked to over sixteen class members who contacted the USW about the impending benefit termination.  He has also reviewed the information provided to class members by Via Benefits.  He attests:

> From my personal observation based on my interactions with these retirees, I have found that the retirees face several problems that make enrollment in the new Medicare Exchange program extremely difficult for them.  First, they are overwhelmed by the volume of information that they need to understand in order to make the transition in benefits.  Those retirees and spouses with whom I have spoken usually do not understand the written materials that Alcoa and Via Benefits have provided to them and they do not understand how Medicare Supplements, Medicare Advantage, or Health Reimbursement Accounts, which are central to the new health care program, work.  It normally takes about one half hour, depending on how many questions the retiree has, for me to explain to them what the transition is about and what they need to do to complete the process.  If they then want me to assist them in compiling the necessary information that they are required to provide to Via Benefits, that process takes approximately an additional two hours.  Second, most of the retirees lack the necessary computer skills to use the internet to obtain information from Via Benefits or to complete the enrollment process.  They either do not own a computer or, if they own one, they do not have the skills necessary to navigate the internet.  None of the retirees whom I have assisted have watched the Via Benefits on-line webinar.  And third, as most of them are unable to use a computer to enroll, they must enroll via telephone, and this process, which based on my experience takes up to six hours for a retiree and spouse, requires a degree of concentration and stamina that in my experience many of them do not have.
>
> ***
>
> From my direct experience with the enrollment process and from my experience dealing with these retirees and spouses in their 80s and 90s, most of whom do not have computer skills or knowledge concerning Medicare Supplements, Medicare Advantage or Health Reimbursement Accounts, it is apparent to me that those retirees or spouses who cannot obtain the assistance of someone who does have computer skills and who does have knowledge concerning this transition process to an HRA will not be able to successfully complete the enrollment.  I fear that there will be other retirees or spouses who, like Ms. Reed described in paragraph 11, find the process too difficult and give up.  I also fear that other retirees and spouses who have not reached out to the Union may not be equipped to even begin the process.

*Id*. ¶¶ 8, 15.  Ms. Reed is a surviving spouse in her early nineties who told Mr. Barnett the enrollment process was too difficult and she was not going to fool with it.  *Id*. ¶ 11.

Mr. Barnett describes further class member struggles, and details phone calls with Via Benefits; the Court is respectfully referred to his Declaration. Suffice it to say, the entire system frustrates class members' ability to obtain coverage and any Alcoa contribution, providing Alcoa with still more savings, as is borne out by the fact that as of December 9, 2020 more than 1,100 class members had failed to secure coverage through Via Benefits.  Burnell Decl. ¶ 27.

**E.      Impact on Class Members of Loss of Alcoa Benefits**

**1.      Overall impact**

The 1986 Retiree SPD (Ex. 12) reflects the healthcare coverages class members will lose on January 1, 2021 absent an injunction. *See* Burnell Decl. ¶ 13.  It is almost certain that some class members who fail to secure replacement coverage for this Alcoa coverage, and who will have to rely on traditional Medicare alone, will be tremendously harmed as a result.

In a 2019 paper addressing "How Much Do Medicare Beneficiaries Spend Out of Pocket on Health Care", the Kaiser Family Foundation (KFF) demonstrates that in 2016, the average person with Medicare coverage spent $5,460 out of their own pocket for healthcare.  Ex. 23. The KFF paper also concludes:

> Beneficiaries with no supplemental insurance spent more out of pocket than beneficiaries with some type of supplemental coverage.  In 2016, nearly one in five (6.1 million) Medicare beneficiaries did not have any source of supplemental coverage, which placed them at greater risk of incurring high medical expenses. People without any source of supplemental coverage were also more likely to have modest incomes and be ages 85 or older. Out-of-pocket spending averaged $7,473 among beneficiaries with no supplemental coverage in 2016, compared to $5,202 among beneficiaries with employer-sponsored coverage…
> Higher out-of-pocket spending among those with no supplemental coverage is due to higher spending on health-related services, because supplemental coverage helps Medicare beneficiaries pay their out-of-pocket costs for Medicare-covered services. For example, beneficiaries with employer-sponsored coverage spent $2,476 on health-related services in 2016, on average, while those with no supplemental coverage spent $5,776.

An inpatient hospital admission serves as one example of the harm to class members here. If a class member is hospitalized, Medicare Part A imposes a $1,484 deductible for up to 60 days of an inpatient stay; daily coinsurance of $371 for days 61 to 90; coinsurance of $742 per "lifetime reserve day" after day 90 of each benefit period (up to 60 days over a lifetime); and all costs for each day after the lifetime reserve days are exhausted. *See* www.medicare.gov/your-medicare-costs/medicare-costs-at-a-glance. Under Alcoa's plan, this same class member would pay nothing out-of-pocket for hospital costs for the first 120 days of hospitalization or the 60 lifetime reserve days under Medicare Part A, and just 20% of the charges after the first 120 days and exhaustion of the 60 lifetime reserve days. 1986 Retiree SPD at p. 37.

### 2. Impact as to prescription drug benefits

Alcoa coverage includes prescription drug coverage, while traditional Medicare generally does not provide any coverage for outpatient prescription drug costs. Burnell Decl. ¶ 14. If a class member now reliant on Alcoa coverage fails to secure new drug coverage, they would end up bearing 100% of the costs for any prescription drugs they take starting in January 1, 2021.

KFF has examined older Americans' experience with prescription medications. *See* Ex. 24, "Data Note: Prescription Drugs and Older Adults". KFF concluded that 89% of adults age 65 and older take prescription medicine; 54% of adults age 65 and older take four or more prescription drugs; 21% of older adults say they did not take their medicines as prescribed at some point in the past year because of the cost; and 28% of older adults report that their plan did not cover a drug prescribed by their doctor. *Id.* Further, according to data published on KFF's website, from 2014 to 2018, the average price for a brand name prescription increased 60%, from

$100.00 in 2014 to $162.10 in 2018, and the average price for a specialty brand drug increased 57%, from $100.00 in 2014 to $157.13 in 2018.[9]

In a 2017 report, the AARP Public Policy Institute addressed pricing trends for prescription drugs widely used by older Americans. *See* Ex. 25, "Trends in Retail Prices of Prescription Drugs Widely Used by Older Americans: 2006 to 2016". According to the AARP report, in 2015, the average annual retail cost of drug therapy for one prescription band drug was almost $13,000 per year, which was four-fifths of the average Social Security retirement benefit ($16,101) and more than half of the median income for Medicare beneficiaries ($25,150). *Id.*

Under the Alcoa prescription coverage class members will lose January 1 absent an injunction, for prescriptions filled at a retail pharmacy, there is an annual deductible of $50 per person or $100 for family. Burnell Decl. ¶ 39. Once this deductible is satisfied, class members who have their prescriptions filled at a network pharmacy have to pay a copayment of $5 for a 30-day supply of generic drugs or a $10 copayment for brand-name drugs. *Id.* When class members use the available mail-order service, there is no deductible and they pay a copayment of $5 for 90-day supply of generic drugs or a $15 copayment for brand-name drugs. *Id.*

Using Plaintiff Kaiser, who has signed up for the AARP MedicareRx Saver Plus prescription drug plan, as an example, she will have a $27.70 monthly premium and an annual cost of $332.40. *Id.* ¶ 40 and Ex. 26. The plan also has a $445deductible, which must be satisfied before benefits are paid. *Id.* After the deductible is satisfied, but before Mrs. Kaiser reaches the Medicare Part D coverage gap, the AARP plan requires a $105 copayment for a 90-

---

[9] *See* https://www.healthsystemtracker.org/chart-collection/recent-forecasted-trends-prescription-drug-spending/#item-prices-for-common-generic-drugs-have-dropped-by-37-since-2014-while-branded-drug-prices-have-increased-by-over-60_2019 (last visited December 14, 2020).

day supply of each preferred brand drug or 40% coinsurance for a 90-day supply of a non-preferred brand-name drug (compared to just $15 through Alcoa's mail-order service). *Id.* As to the coverage gap, once she and the plan spend $4,130 combined, most Part D plans charge 25% of the cost of prescription drugs until out-of-pocket spending reaches $6,550. *Id.* ¶ 22.

### 3.     Class members' small fixed pensions

Class members receive very small fixed pensions. In general, only between 20 and 30 percent of Alcoa retirees have 30 or more years of continuous service at the time of retirement. Burnell Decl. ¶ 32. The middle category of those retiring between 1980 and November 1, 1988 with 30 years of service receive a basic monthly pension of $607.50, before a five percent charge for surviving spouse coverage. *See* explanation at Burnell Decl. ¶ 33. Surviving spouses receive just half of the retirees' benefit (after the charge), or approximately $289. *Id.* The majority of retirees and surviving spouses receive less than $608, since most retirees either have less than 30 years of service, retired under period agreements, which had lower pension multipliers, or they would be surviving spouses and only receive 50% of their deceased spouses' basic benefit.

### F.     Plaintiffs' Commencement of This Class Action

In a Complaint filed December 10, 2020, the Plaintiff Class Representatives, on behalf of themselves and those similarly situated, together with the USW and ATC, commenced this class action against Alcoa and pertinent plan entities. Plaintiffs allege that Alcoa and the Unions negotiated collectively bargained agreements, including plan documents, which establish the Company's obligation to provide retiree healthcare coverage and Medicare Part B premium reimbursement to Medicare-eligible class members and preclude the Company from unilaterally terminating these benefits. Plaintiffs further allege that Alcoa's impending termination violates the parties' agreements under both Section 301 of the Labor Management Relations Act, 29

U.S.C. § 185(a), and Sections 502(a)(1)(B) and 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).

## III.   ARGUMENT

### A.   Introduction

Plaintiffs seek a preliminary injunction.  The Court should enjoin Defendants from terminating class members' healthcare benefits on December 31, 2020.  Plaintiffs show below that they are likely to succeed on the merits, that class members face irreparable harm, and that there is no adequate remedy at law.  As to the balance of harms, the harm some class members may suffer absent an injunction far surpasses any harm Alcoa may suffer with one.

### B.   Preliminary Injunction Standards

This Court recently reiterated preliminary injunction standards as follows:

> The preliminary injunction analysis proceeds in two stages.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am. Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008).  First, the moving party has the burden of making a threshold showing: (1) it has some likelihood of success on the merits; (2) it lacks an adequate remedy at law; and (3) without an injunction, it will suffer irreparable harm before its claim is resolved.  *Id.* at 1086.  If the plaintiff makes this initial showing, the court then weighs the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one.  *Id.* This assessment is made on a sliding scale: "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor."  *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018) (*quoting Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086).  As part of this balancing, the court must also consider whether a preliminary injunction is in the public interest.  *Id.*

*Common Cause Indiana v. Lawson*, 2020 WL 5671506, at *3 (S.D.Ind. 2020) (Young, J.), *rev'd on other grounds*, 938 F.3d 1036 (7th Cir. 2020).  The Seventh Circuit recently articulated substantially the same standards.  *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

C.    **Plaintiffs Have More Than "Some Likelihood of Success on The Merits"**

Expanding on the burden of establishing likelihood of success, this Court has stated:

There is no requirement that the plaintiff show absolute success on the merits, but there must be a showing that the chances at success are "better than negligible." *Whitaker*, 858 F.3d at 1046 (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)).  This is a relatively low standard to meet.

*People for Ethical Treatment of Animals, Inc. v. Wildlife in Need and Wildlife in Deed, Inc.*,

2018 WL 828461, at \*5 (S.D.Ind. Feb. 12, 2018) (Young, J.).  Plaintiffs here are more than likely

to succeed on the merits of their claims, amply satisfying this standard.

In *Stone v. Signode Industrial Group LLC*, 943 F.3d 381 (7th Cir. 2019), *cert. denied*,

2020 WL 5882283 (Oct. 5, 2020), the Seventh Circuit sets forth most if not all of the principles

that govern the merits here, which turn on whether the bargaining parties intended to vest class

members' retiree healthcare benefits and that Alcoa be precluded from unilaterally terminating

them.  In *Stone*, the Seventh Circuit affirmed the district court's entry of summary judgment in

favor of the plaintiff retirees.  Both courts concluded that while the governing contract permitted

the employer to bargain with the retirees' former union and reach agreement as to benefit

reductions or termination, the contract did not allow the employer to take these steps unilaterally.

Citing the Supreme Court's seminal ruling in *M&G Polymers USA, LLC v. Tackett*, 574

U.S. 427 135 S. Ct. 926, 933 (2014), the Seventh Circuit begins in *Stone* with the basic

proposition that vesting of healthcare benefits is determined according to ordinary principles of

contract law.  943 F.3d at 384.  While "contractual obligations will cease, in the ordinary course,

upon termination of the bargaining agreement," *Tackett*, 135 S.Ct. at 937 (*quoting Litton*

*Financial Printing Div., Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190, 207 (1991)),

parties are free to provide that healthcare benefits will survive the underlying agreement.  943

F.3d at 384.  Courts may not infer vesting from silence but should find vesting where a contract

provides for it, either in explicit or implied terms. *Id.* (citing *Tackett*, 135 S.Ct. at 937, and *Litton*, 501 U.S. at 207). On this point, the Seventh Circuit quotes from Justice Ginsburg's *Tackett* concurrence, which in turn quoted *Litton*:

> "'[C]onstraints upon the employer after the expiration date of a collective-bargaining agreement' ... may be derived from the agreement's 'explicit terms,' but they 'may arise as well from ... implied terms of the expired agreement.' "

943 F.3d at 384 (quoting 135 S.Ct. at 938 (Ginsburg, J., concurring), and *Litton*, 501 U.S. at 203, 207). The Seventh Circuit also cited the Supreme Court's observation in *CNH Indus. N.V. v. Reese*, 138 S.Ct. 761, 765 (2018), that courts may look to "explicit terms, implied terms, or industry practice" for indications of vesting. The court explained, "'[w]e interpret collective bargaining agreements in light of "relevant industry-specific 'customs, practices, usages, and terminology.'"" 943 F.3d at 389 (quoting 135 S.Ct. at 937–38 (Ginsburg, J., concurring)).

Alcoa has provided class members with healthcare coverage for decades, with no interruption in its provision. Burnell Decl. ¶ 14. This is unsurprising, because the controlling bargained agreements contain ample language demonstrative of the parties' intent that Alcoa continue to provide these benefits and is not free to unilaterally reduce or terminate them.

As shown, the 1988 Master Agreements construed by the Sixth Circuit in *Curtis* to vest lifetime benefits, like the other Master Agreements, state that Alcoa "will provide" specified retiree health coverages for retirees and dependents, and will do so "without cost to employees and retirees except as otherwise provided." Six Master Agreement "General Provisions" identify specific circumstances when Alcoa **is** permitted to reduce or terminate aspects of coverage, in some cases automatically upon the occurrence of agreed-upon events and in some case only through negotiation with the Unions. Just one of the six General Provisions, not applicable here, specifies that it applies only for "the term of the agreement".

The Master Agreements incorporate bargained SPDs, which include ample additional language demonstrative of the parties' intent. The SPDs require reimbursement of Part B premiums, and, reiterating a similar Master Agreement provision, delineate when Alcoa may unilaterally reduce or eliminate this reimbursement. They also state: "[a]ll benefits described in this booklet are provided directly by Alcoa", and "[n]o contributions by participants are required to provide the benefits under the Plan." A "CESSATION OF COVERAGE" provision identifies no circumstances when coverage may be terminated as to retirees, and provides for termination as to dependents only on loss of dependency status or death of the retiree:

> The Retired Employee's coverage on account of any Dependent shall automatically cease on the date of death of the Retired Employee or the day preceding the date such person ceases to be a Dependent of such Retired Employee, whichever occurs first.

In addition, the SPDs establish a right to obtain an "individual policy" for pre-Medicare benefits for dependents but **only** when dependents lose their dependent status. Retirees have no right to an individual policy under any circumstances. The parties thus memorialized their evident understanding that the only category of beneficiary in need of a safety net for lost coverage is dependents on the occasion of losing dependency status. It would make no sense to solely protect dependents who lose dependency status unless the parties believed that this was the only category of beneficiary in need of protection.

A provision addressing surviving spouses provides additional evidence of the parties' intent to vest benefits and preclude Alcoa from unilaterally terminating them. Surviving spouses and dependent children are to be provided healthcare benefits which:

> shall automatically cease on whichever of the following dates first occurs:
>
> 1. With respect to the coverage on account of any Dependent, the date as of which such person ceases to be a Dependent…;

> 2. With respect to the coverage on account of all Dependents **the date of the surviving spouse's death.**

(Emphasis added).  In other words, absent a change in dependency status, healthcare benefits for surviving spouses and other dependents are to continue for the lifetime of the surviving spouse.

A Reynolds SPD includes similar provisions, as well as this one:  "As a retiree, you are entitled to elect continuation of health care coverage only in the unlikely event that you lose your Company-paid coverage because the Company is in reorganization or liquidation."  The Reynolds parties thus contemplated that retirees may lose their healthcare benefits only if the Company files for bankruptcy protection, and then, only if the Company exercises the rights provided by the Bankruptcy Code to modify or terminate retiree benefits.

Finally, none of the bargained SPDs or CBAs include any purported reservation of rights provision.  When coupled with all the aforementioned contract language, this further shows that the parties did not intend to accord Alcoa any right to unilaterally reduce or terminate benefits.

On their face, the parties' contracts and collectively bargained SPD provide ample evidence that Plaintiffs are likely to succeed on the merits of their claims.  If this were not enough, the Sixth Circuit construed the 1988 Master Agreements at issue here, which contain the same operative language as the other Master Agreements and ruled:  "Under the parties' 1988 CBA that expired in 1992, the companies provided *lifetime, uncapped retiree-healthcare benefits*."  *Curtis*, 525 Fed.Appx. 371, 373, 2013 WL 1908913, at *1 (emphasis added).

Finally, as recognized in *Common Cause Indiana,* 2020 WL 5671506, at *3, the balance of harms assessment is made on a sliding scale, with a guiding principle that the less likely a plaintiff is to win, the more the balance of harms should weigh in its favor to support injunctive relief.  Plaintiffs show below that the balance of harms weighs mightily in Plaintiffs' favor, a point the Court may already have gleaned from the cited evidence.  Given this, even if the Court

were to conclude that Plaintiffs' showing of likelihood of success on the merits were somewhat

wanting, an injunction would be still appropriate given the relative harms.

**D.      Absent an Injunction, Class Members Will Suffer Irreparable Harm, and There is No Adequate Remedy at Law**

The second and third elements, irreparable harm and availability of an adequate remedy

at law, are often examined together.  *See, e.g., Common Cause Indiana*, 2020 WL 5671506, at

*7.  This Court recently expanded on these two elements:

> While there must be more than a mere possibility of harm, the moving party does not need to show that the harm actually occurred or is certain to occur.  Harm is considered irreparable if it "cannot be prevented or fully rectified by the final judgment after trial."  Legal remedies are inadequate if any award would be "seriously deficient as compared to the harm suffered."

*Id.* (citations omitted).  Factors demonstrating that retired former union members like those here

experience irreparable harm on losing their healthcare coverage are self-evident, and include:

> most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life.

*United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987).

The evidence here is consistent with the *Textron* findings.  Class members are far from

rich, subsisting on small, fixed pensions (and social security).  The middle category of those

retiring between 1980 and 1988 with 30 years of service receive a monthly pension of $607.50,

before a five percent charge for surviving spouse coverage.  *See* explanation in Burnell Decl. ¶

33.  Surviving spouses receive just half of this (after the charge), or approximately $289.  *Id.*

The majority of retirees and surviving spouses receive less than $608.  *Id.*

Also consistent with *Textron*, it remains true that healthcare is expensive, and insurance a

necessity.  As shown, a 2019 Kaiser Family Foundation paper shows that the average person

with Medicare coverage in 2016 spent $5,460 from their own pocket for healthcare, and that out-of-pocket spending averaged $7,473 among beneficiaries with no supplemental coverage in 2016.  And according to another Kaiser paper, 89% of adults age 65 and older take prescription medicine, and 54% of such adults age 65 take four or more prescription drugs.

Plaintiffs also have established that most class members are old or very old, a point emphasized in *Temme v. Bemis Co.*, 2011 WL 1498584 (E.D.Wis. April 18, 2011).  In *Temme*, a retiree health case, the court found irreparable harm and entered a preliminary injunction in favor of older retirees.  *Id.* at *5 (finding it significant that "[t]he retirees, having been retired for more than 25 years, are old").  As here as to class members who fail to acquire new coverage, the *Temme* retirees were left with no insurance beyond Medicare:  "Their sole medical coverage is Medicare A & B which provides basic coverage, but exposes them to large co-pays and deductibles in the event they require extensive medical care or hospitalization."  *Id.*  Further, imposition of a new HRA structure can support injunctive relief, since under such schemes "retirees would be encumbered with novel administrative burdens and risk."  *International Union v. Consol Energy, Inc.*, 243 F.Supp.3d 755, 767 (S.D.W.Va. 2017) (citations omitted).

A December 11, 2020 New York Times article (Ex. 27) cites to sources with supportive underlying data and summarizes the challenges faced by health plan consumers:

> most people are terrible at picking the health plan that is right for them.  Health insurance is a complicated financial product, and study after study has shown that people routinely pick bad plans, even choosing options that leave them worse off financially in every possible scenario….
>
> People struggle to make good choices when it comes to all kinds of financial products, but health insurance is especially confusing, with its mix of technical benefits and fees. Many Americans don't understand terms like "deductible" or "coinsurance" very well.  And few are good at predicting what sort of health care needs they will have in the coming year.  Picking an ideal health plan requires combining all of these features — knowing what you might use, what it might cost you, and how those expenses combine with the plan's monthly premium.

***

The people most likely to make bad choices appear to be those least able to afford it. A recent study in the Netherlands, which offers insurance to everyone through an Obamacare-like marketplace, found that only 5 percent of Dutch customers did a better job at choosing an ideal plan than they would have by choosing a plan at random.  And the people in that top 5 percent tended to have college degrees and jobs in technical fields.  People with less education and income, who tend to be in worse health, were very likely to choose a plan that cost them more to cover their health care — a situation that might leave them skimping on needed medicine or procedures.

Furthermore, the Unions bargained for what ERISA Section 2(a) calls "continued well-being and security," intangibles which cannot be restored after-the-fact.  The SPDs provide:

The Employees Group Benefits Plan is provided for your protection and family security.  This Plan is designed to help you and your Dependents meet the threats to security that are brought about through costs of medical services incurred by you and your Dependents.

The peace of mind that accompanies stable and adequate healthcare is a significant benefit.  Even class members who manage to acquire new coverage have no idea how long they can depend on an Alcoa contribution, or on the amount of that contribution.  What if Alcoa decides to halve or terminate contributions for 2022?  Many in their 80s, 90s, and 100s, class members must, for the first time, grapple with grave insecurity about their healthcare.  The parties bargained for secure, consistent retiree healthcare, not for forcing aging class members to navigate the complex healthcare market, without knowing whether Alcoa will provide any future assistance.

In addition, absent an injunction, class members would face new and difficult—if not insurmountable—remedial burdens.  If, as shown is likely, Plaintiffs prevail and no injunction issues now, remedial responsibilities will be shifted from Alcoa to class members, who must compile medical and pharmacy receipts, Medicare forms, credit card and interest statements, deductible-payment paperwork, supplemental insurance papers, loan papers, and checks to doctors and hospitals in an unanticipated post hoc effort to quantify the financial injuries caused

by being denied their promised healthcare.  The burden of recreating their financial harm will likely be impossible for many if not most class members with an average age of 84.

Finally, the Court may take judicial notice of the COVID-19 pandemic now ravaging the country,[10] leaving older Americans in particular in desperate need of comprehensive healthcare coverage.  Plaintiffs will not belabor the point:  it is never a good time for the elderly to be without adequate healthcare coverage, and now is a particularly bad time.

It is self-evident that there is no adequate remedy of law for the likely harm to at least some class members, whether because any supplemental healthcare coverage they manage to acquire is inadequate or because they fail to acquire any at all.  As just one example, those class members left with no prescription drug coverage who now depend on expensive medications may be forced to choose between paying for those medications and other necessities such as adequate food or utilities.  Damages alone cannot adequately remedy this type of injury.

### E.      Balancing of Harms and the Public Interest Strongly Favor an Injunction

Because Plaintiffs have met their threshold burden as to likelihood of success on the merits, irreparable harm, and availability of an adequate remedy at law, the Court's final task is to balance the harm class members may suffer absent an injunction against the harm Defendants may suffer with one.  *Common Cause Indiana*, 2020 WL 5671506, at *7.  This analysis includes consideration of whether an injunction would be in the public interest.  *Id.*

The balance of harms analysis here is straightforward and leads to a clear conclusion. Alcoa has provided healthcare coverage and Part B reimbursements to class members for

---

[10] See, e.g., *Daniel De Jesus Lopez, v. Ice Field Office Director*, Respondent., 2020 WL 7075213, at *5 (W.D.Wash. Dec, 3, 2020) ("Pursuant to Fed. R. Evid. 201(c)(1), the Court takes judicial notice *sua sponte* of public records related to the COVID-19 health crisis, including documents available through government agency websites.").

decades.  Continuing these benefits for class members should not be administratively challenging.  Nor should continuing coverage be remotely beyond Alcoa's financial capacity: According to the Company's financial results for the third quarter of 2020, it has a cash balance of $1.74 billion.[11]  Any harm to Alcoa from continuing benefits may be easily borne.

Plaintiffs have demonstrated the likelihood of harm to class members, as well as the nature of that harm.  It is potentially devastating.  There is simply no comparison between the relative risks.  Alcoa is a multinational corporation which has been providing the subject benefits in accordance with its bargained obligations for decades.  Impacted class members, retired industrial workers, are old or very old, have modest fixed incomes, and face a winter with inferior or no supplemental healthcare coverage in the midst of an ever-worsening pandemic particularly dangerous for the elderly.

As for the public interest, there is no question that the public has an interest in maintaining adequate healthcare coverage for the elderly.  This is especially true now, given the ravages of COVID-19.  Further, public policy favors enforcing contractual agreements like those here.  *See Temme*, 2011 WL 1498584, at *5 (entering preliminary injunction for retiree healthcare plaintiffs and stating "public interest lies in favor of the plaintiffs").

Beyond this, the public has a keen interest in ensuring that when companies eliminate healthcare coverage when such a right exists (which is not so here), they at least do so in a manner that maximizes the likelihood that those impacted will be able to obtain adequate substitute coverage.  Alcoa has placed class members in an untenable position.  Plaintiffs have demonstrated that even class members with the good fortune of accessing competent help from sources other than Via Benefits have struggled to obtain coverage.  Other class members must

---

[11] *See* https://s26.q4cdn.com/375357455/files/doc_financials/2020/q3/q3-2020-pr.pdf.

make do with Via Benefits, or may not even have received notice of the termination or otherwise understand their predicament.  These class members face a considerable likelihood that they will fail to obtain substitute coverage.  The public has an interest in encouraging companies with resources like Alcoa's to do a much better job of helping vulnerable retirees long dependent on company coverage transition to a suitable alternative.

## IV.    CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion and enjoin Alcoa from terminating extant healthcare coverage and Medicare Part B reimbursement for all class members.[12]  The Court should also award all other relief it deems just and proper.

Dated:  December 16, 2020                    Respectfully submitted,

 s/  Pamina Ewing
                        Pamina Ewing (Admitted *pro hac vice*)

**FEINSTEIN DOYLE PAYNE
   & KRAVEC, LLC**
Joel R. Hurt (Motion for Admission *Pro Hac Vice* forthcoming)
Ruairi McDonnell (Motion for Admission *Pro Hac Vice* forthcoming)
429 Fourth Avenue, Suite 1300
Pittsburgh, Pennsylvania 15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007
pewing@fdpklaw.com
jhurt@fdpklaw.com
rmcdonnell@fdpklaw.com

---

[12] Fed.R.Civ.P. Rule 65(c) addresses bonds in the preliminary injunction context.  Under appropriate circumstances, bond may be excused.  *Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner, Indiana State Department of Health*, 2018 WL 10580407, at *8 (S.D.Ind. June 28, 2018) (Young, J.) (citing *Wayne Chemical, Inc. v. Columbus Agency Services Corp.*, 567 F.2d 692, 701 (7th Cir. 1977)).  Given that Alcoa has been paying for the benefits for decades and that Plaintiffs seek only to maintain the status quo, as well as Alcoa's status as a large multinational corporation, bond should be excused.  *See also Cole v. ArvinMeritor, Inc.*, 516 F.Supp.2d 850, 880 (E.D.Mich. 2005) ("courts may grant preliminary injunctions requiring continuation of collectively-bargained health benefits with no bond or with a nominal bond") (citations omitted).

**MACEY SWANSON LLP**
Barry A. Macey
Jeffrey A. Macey
445 N. Pennsylvania Street, Suite 401
Indianapolis, Indiana 46204
Telephone: (317) 637-2345
Facsimile: (317) 637-2369
bmacey@maceylaw.com
jmacey@maceylaw.com

*Attorneys for Plaintiffs*

David R. Jury, General Counsel
United Steelworkers
60 Boulevard of the Allies, Room 807
Pittsburgh, Pennsylvania 15222
Telephone: (412) 562-2549
Facsimile: (412) 562-2574
djury@usw.org

*Attorney for Plaintiff United Steelworkers*

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 16, 2020, a copy of the foregoing document was filed electronically.  Because one of Plaintiffs' counsel was advised by Mr. Birsic, referenced below, that he will be representing Defendants in this litigation and that he would accept service for Defendants, service of this filing will be made via secure file transfer (notification via email) at the following email addresses:

Thomas Birsic
Jeffrey Richter
K&L Gates
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
Telephone: 412.355.6500
thomas.birsic@klgates.com
jeff.richter@klgates.com

Rosemary Alito
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Telephone: 973.848.4000
rosemary.alito@klgates.com

s/ Pamina Ewing
    Pamina Ewing