**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION**

| | |
|---|---|
| ROBERT W. SIMPKINS et al., | |
| Plaintiffs, | |
| v. | No. 3:20-cv-278-RLY-MPB |
| ALCOA USA CORP. et al., | |
| Defendants. | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

Over one year ago, after analysis of the improvements to coverage that would be available to virtually all of its retirees due to the robust private market for supplemental Medicare insurance, on December 9, 2019, Defendant Alcoa USA Corp. ("Alcoa") notified certain hourly retirees (including Plaintiffs and the putative class) that Alcoa intended to change the arrangement by which supplemental Medicare benefits would be provided to them.  Under the new arrangement, which would go into effect on January 1, 2021, Alcoa would provide Medicare-eligible retirees and their eligible spouses an annual healthcare reimbursement account ("HRA") with funds to purchase their own healthcare plan from an insurance exchange secured and identified by Alcoa.  Retirees could use the tax-free HRA funds to pay for any qualified medical expense, such as their healthcare premiums or out-of-pocket medical costs such as a deductible or copayment.  Alcoa engaged the Medicare healthcare exchange "Via Benefits" to assist retirees with the transition and the process of selecting insurance plans with funds through the HRA accounts.   The new HRA program presents Alcoa's retirees with an opportunity to take advantage of the individual healthcare marketplace to obtain substantially similar—and in most

cases, superior—Medicare coverage that better meets their needs at a lower cost.  Simply put, this is ***not*** a termination of benefits case, as much as Plaintiffs strain to paint it as one.

Plaintiffs are two Unions and two individuals that claim the new HRA program violates a series of expired collective bargaining agreements ("CBAs") between Alcoa and the Unions. Plaintiffs are seeking the extraordinary and drastic remedy of a preliminary injunction to (1) dismantle the transition to the HRA program scheduled to take place on January 1, 2021, and (2) revert the retirees to the prior fixed group plan that is being replaced by the HRA program. However, by the time Plaintiffs brought this case (December 10, 2020) and asked for a preliminary injunction (December 16, 2020) to stop the transition to the new HRA program, the transition had already begun occurring months earlier—and will be complete by the time briefing on Plaintiffs' motion is complete.  To date, 67% of the putative class retirees and eligible spouses have already selected and enrolled in new individual plans through Via Benefits and an additional 9% are actively engaged with Via Benefits to enroll.  Mailings announcing the change and laying out the process and timetable for the transition to the HRA program were first made to the retirees (including Plaintiffs) over one year ago.  This was followed by a series of communications from Alcoa and Via Benefits from August 2020 to the present—including thousands of phone calls—providing assistance to retirees as they began enrolling in new individual plans between October and December.  Now, Plaintiffs are asking the Court to preliminarily unwind the selections of over 1,500 retirees who have already enrolled in new plans and force them to return to the fixed group plan while this litigation proceeds, a logistical nightmare that cannot be accomplished without causing the confusion, stress, and harm to retirees that Plaintiffs claim they aim to avoid.

Plaintiffs cannot complain about this sequence of events, given that they waited to file their motion seeking an emergency preliminary injunction until just *15 days* before the HRA program enrollment deadline on December 31, 2020 (and over *one year* after Alcoa informed the retirees about the change).  The "emergency" claimed by Plaintiffs is of their own making, despite their arguments of ongoing irreparable harm.  This inexcusable delay alone warrants denial of their motion.  *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence.").

Additionally, Plaintiffs have not established—and cannot establish—any of the elements necessary for preliminary injunctive relief.  Plaintiffs have no likelihood of success on the merits because the CBAs on which they base their claims do not promise lifetime retiree medical benefits under ordinary principles of contract law, as required by the Supreme Court and the Seventh Circuit.  Nor do Plaintiffs' vague and speculative allegations of irreparable harm (which in any event constitute money damages) warrant issuance of a preliminary injunction. Preliminarily ordering the dismantling of the HRA program and forcing thousands of retirees to cancel their individual insurance plans—with potentially unavoidable gaps in coverage and financial loss—would harm the retirees, Alcoa, and the public interest.  Plaintiffs' last-minute attempt to obtain an overbroad preliminary injunction without a full record should be denied.

## BACKGROUND

The details of Alcoa's HRA program are explained in declarations attached to this brief as Exhibit A, Declaration of Kerry Allen ("Allen Decl."), and Exhibit B, Declaration of Matt Ebbott ("Ebbott Decl.").

I.      **Alcoa decides to transition certain Medicare-eligible hourly retirees and eligible spouses from a group fixed plan to individual plans.**

Alcoa is a producer of bauxite, alumina, and aluminum products based in Pittsburgh, Pennsylvania.  Like most Americans, the primary source of health insurance for Alcoa's retirees who are age 65 or older is Medicare, but it does not cover all health-related expenses, resulting in a robust private insurance market for supplemental Medicare coverage.  Allen Decl. ¶ 2, Ex. A. For years, Alcoa sponsored a fixed group healthcare plan that offered Medicare-eligible retirees and their eligible spouses and dependents supplemental Medicare coverage.  *Id.*  The plan included both medical and prescription drug coverage, as well as reimbursement of all or a portion of Medicare Part B premiums for certain retirees depending on their years of service with Alcoa (collectively, the "Plan").[1]  *Id.*

In recent years, the individual Medicare market has undergone profound changes, resulting in increasing options and savings for both retirees and former employers compared to fixed group plans.  *Id.* ¶ 3.  In light of these benefits, Alcoa retained a global consulting firm to determine whether Alcoa could provide its retirees substantially equivalent, if not superior, benefits that take advantage of the cost savings, additional flexibility, and greater options in the individual Medicare market.  *Id.*  Alcoa determined that the vast majority of retirees could receive substantially equivalent, and in most cases better, healthcare coverage at lower costs by transitioning to individual plans and taking advantage of the opportunity to tailor their coverage based on their particular needs and circumstances, depending on where they live and what plans are offered in their area.  *Id.* ¶ 4.

---

[1] Medicare is split into several parts.  Medicare Part B covers certain doctors' services, outpatient care, medical suppliers, and preventive services.  Most people do not pay a premium for Part A, but everyone pays a monthly premium to the federal government for Part B.  Allen Decl. ¶ 2 n.1, Ex. A.

Under the new arrangement, Alcoa provides each Medicare-eligible retiree and eligible spouse funds through an annual healthcare reimbursement account ("HRA"). *Id.* Retirees then use the HRA funds, which are tax-free, to purchase their own individual healthcare plan from an insurance exchange secured and identified by Alcoa. *Id.* The retirees can use the funds to pay for any qualified medical expense, such as their healthcare and prescription drug premiums or out-of-pocket medical costs such as a deductible or copayment.[2] *Id.* Any unused HRA funds roll-over each year and can be used by the individual in the future. *Id.* These types of transitions from fixed group plans to individual plans are part of a growing trend in company benefits due to the increasingly robust private insurance market. *Id.*

## II.  Alcoa begins implementing the HRA funding program and engages Via Benefits to assist retirees.

Alcoa currently plans to transition certain hourly retirees (including the individual Plaintiffs and putative class) to the HRA program on January 1, 2021. *Id.* ¶ 5. The annual HRA funding amounts vary from $840 to $3,400, depending on where the retiree was employed and the year they retired. *Id.* These amounts were derived from Alcoa's prior costs under the fixed group Plan. *Id.* The enrollment period for the new individual plans ends on December 31, 2020, but there is a "grace period" under Medicare whereby retirees enrolled in the group Plan can still

---

[2] In their supporting brief, Plaintiffs claim that "[r]etirees will receive information on reimbursable expenses only *after* new coverage starts," and they "thus must select from a large range of plans with varying expenses for varying items with no knowledge of which expenses Alcoa will unilaterally decide to reimburse." Pls.' Mem. of Law Supp. Pls.' Mot. Prelim. Injunction 14, ECF No. 9 (emphasis in original). In fact, the HRA program covers premiums and out-of-pocket medical costs such as a deductible or copayment for all of the individual healthcare and prescription drug plans available for enrollment by the retirees and eligible spouses on Via Benefits. *See* Allen Decl. ¶ 4, Ex. A. Plaintiffs' claim that retirees have to select individual plans with "no knowledge of which expenses Alcoa will unilaterally decide to reimburse" is false.

enroll in the new HRA program through the end of February 2021.[3]  *Id.*  However, if a retiree enrolls after December 31, 2020, they will not have supplemental coverage until the first day of the following month.  *Id.*  Thus, retirees must enroll in an individual plan by December 31, 2020 to ensure that there is no gap in supplemental Medicare coverage.  *Id.*

To assist retirees with the transition and the process of selecting individual plans with funds available through their HRA accounts, Alcoa engaged "Via Benefits," the nation's largest private Medicare exchange that helps retirees find and purchase benefits.  *Id.* ¶ 6.  Via Benefits has substantial experience assisting elderly individuals and their families, and offers retirees one-on-one counseling to help them enroll in an individual Medicare plan that best fits their needs and budget.  *Id.*  Via Benefits has achieved industry certifications (including the National Council on Aging Standards of Excellence for Medicare Brokerage Services), and its representatives are licensed and participate in frequent training programs.  *Id.*

On December 9, 2019, Alcoa sent a letter (the "December 9, 2019 Letter") to all of its affected hourly retirees and their spouses describing the proposed benefit changes.  *Id.* ¶ 7.  A true and correct copy of a representative sample[4] of the December 9, 2019 Letter is attached as Exhibit C.  The affected retirees and spouses number approximately 5,586 individuals, most of whom had previously been represented by various unions (including but not limited to the Plaintiff-unions) and were covered while active employees under various CBAs between various unions and Alcoa (and its predecessors and subsidiaries).  *Id.* ¶ 14.  The letter specifies the annual amount of the retiree's respective HRA fund and explains that Alcoa has engaged Via

---

[3] The Medicare "grace period" is not available to those retirees who are not already enrolled in the prior fixed group Plan, or any other group plan.  To date, approximately 146 such individuals have not enrolled in the HRA program.  *See* Allen Decl. ¶ 14, Ex. A.

[4] The December 9, 2019 Letters were identical in all respects except for their reference to the dollar amount of the HRA fund, which varied from recipient to recipient.

Benefits to assist them with the process of selecting and enrolling in a new individual healthcare plan. *Id.* ¶ 7. The letter states in bold, underlined text that "**there is no change to your 2020 plan; this letter is merely meant to inform you of upcoming changes**," and that "detailed information from Via Benefits will be sent in the Fall of 2020 to help you plan for this change in 2021." *Id.* The letter also states that "if you decline coverage through this program in 2021 or at any time in the future, you will not be able to enroll and receive the Alcoa contribution at a later date." *Id.*

Prior to this mailing, on December 4, 2019, Alcoa provided a copy of the December 9, 2019 Letter to Michael Millsap, the District 7 Director for Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("USW") via email (the "December 4 Email"). Ebbott Decl. ¶ 3, Ex. B. A true and correct copy of the December 4 Email is attached as <u>Exhibit D</u>. In the email, Nicolaas Storm of Alcoa (formerly Director of Industrial Relations, now retired) wrote that "Alcoa will be announcing the attached changes after the market closes today that will impact former bargaining unit retirees and their spouses." *Id.* At the time, Alcoa and USW had agreed to jointly study the possibility of implementing a Medicare Advantage plan for retirees covered under the current master CBA between Alcoa and the USW. *Id.* In his email, Mr. Storm wrote to Mr. Millsap that "it is possible" that Alcoa would consider extending the Medicare Advantage plan to the hourly retirees under expired CBAs as well, in lieu of the planned HRA program. *Id.*

In July 2020, after an agreement had been reached between Alcoa and USW to implement the Medicare Advantage plan for retirees covered under the current master CBA, Mr. Millsap asked Alcoa whether it would agree to extend the Medicare Advantage plan to the hourly retirees under expired CBAs. *Id.* ¶ 4. On August 18, 2020, Matt Ebbott of Alcoa replied

that Alcoa would discuss the matter internally (the "August 18, 2020 Email"). *Id.* He also stated

that Via Benefits planned to send a communication to the retirees that week regarding the

transition to the HRA program (discussed further below), a copy of which he provided to Mr.

Millsap. *Id.* A true and correct copy of the August 18, 2020 Email is attached as <u>Exhibit L</u>. On

September 9, 2020, at Mr. Millsap's request, Mr. Ebbott provided a list of the names and

addresses for the retirees who were scheduled to be moved to the HRA program. *Id.* ¶ 5. On

September 11, 2020, Mr. Ebbott told Mr. Millsap via phone that Alcoa would continue its

planned transition to the HRA program.[5] *Id.*

### III.   Alcoa implements the HRA funding program and retirees enroll in individual plans.

Beginning in August 2020, Via Benefits and Alcoa sent multiple communications to

retirees and eligible spouses explaining in detail the changes to their healthcare benefits, urging

them to take action and work with Via Benefits to transition to the new HRA program, and

providing them with information to help them evaluate, choose, and enroll in new individual

plans. These communications, copies of which are attached as exhibits, are discussed in detail in

the Declaration of Kerry Allen (Exhibit A) and are summarized below:

- **<u>August 17, 2020 Letter (Exhibit F).</u>** Via Benefits mailed a 4-page letter to all retirees
  with the heading "**Important Information About Your Health Care Plan, Please Read
  Carefully**." The letter states that "[i]n December 2019, Alcoa announced that beginning
  January 2021, your health care will be delivered through Via Benefits," and that "[o]ver
  the next few months, you will receive several communications from Via Benefits that
  will explain everything you need to know to help you through the transition." The letter
  states in bold text that "**you must take action during the enrollment period, which
  runs between October and December**" and explains in detail the changes to the
  program, the nature of Alcoa's HRA contribution, and the additional information the
  retiree would receive from Via Benefits (and when). The letter states that a 90-minute
  online presentation could be viewed at any time (or listened to via telephone), and
  repeatedly instructs retirees with any questions to contact Via Benefits either by phone
  Monday-Friday 8:00 am – 9:00 pm ET, or through its website. The letter also states

---

[5] A true and correct copy of an email dated September 12, 2020 reflecting this conversation is
attached as <u>Exhibit E</u>.

several times that "if you decline coverage and do not enroll, you will not be able to enroll and receive the Alcoa HRA contribution at a later date."

- **October 1, 2020 Letter (Exhibit G).**  Via Benefits mailed an "Enrollment Guide" to the retirees currently enrolled in the fixed group Plan.  The second page of the Enrollment Guide states in clear, bold text:  "**IMPORTANT! Your Current Health plan ends on December 31, 2020**," along with instructions to contact Via Benefits for assistance via telephone or online.  The Enrollment Guide provides information on the new coverage options, how to enroll either online or over the phone, and what to expect after enrollment.

- **October 15, 2020 Letter (Exhibit H).**  Via Benefits mailed an "Advantage Guide" to the hourly retirees not currently enrolled in the fixed group Plan.  The letter contains similar content as the Enrollment Guide, but also instructs the retirees to contact Via Benefits by December 7, 2020 if they wished to enroll in the new individual plans.

- **October 26, 2020 Letter (Exhibit I).**  Alcoa mailed a letter to all retirees and spouses that its records showed had not yet enrolled in an individual plan with Via Benefits.  The top of the letter states in clear, bold text:  "IMPORTANT INFORMATION REGARDING YOUR HEALTHCARE PLAN, **ACTION REQUIRED**."  The letter states that "you have been receiving information from Alcoa and its partner, Via Benefits, regarding changes to your Medicare coverage," and in bold text that "**[i]f you are receiving this letter, it is critical that you contact *Via Benefits* as shown below and enroll in coverage or you will not have coverage in 2021.**"  The letter further states that "if you do not enroll for coverage in 2021, you will not be able to enroll in the future."

- **November 6, 2020 Postcard (Exhibit J).**  Via Benefits mailed a postcard to all retirees and their spouses currently enrolled in the fixed group Plan that its records showed had not yet enrolled in an individual plan with Via Benefits.  The postcard states "**IMPORTANT! Your group health care coverage is ending.  Time is running out**," with instructions to contact Via Benefits as soon as possible to enroll in a new plan.

- **December 7, 2020 Letter (Exhibit K).**  Via Benefits mailed a letter to all retirees and their spouses currently enrolled in the fixed group Plan that its records showed had not yet enrolled in an individual plan with Via Benefits.  The letter states that "[y]our group health care coverage from Alcoa will end on December 31, 2020" and that "[o]ur records indicate you have not enrolled in individual Medicare coverage through Via Benefits Insurance Services."  Again, the letter urges the retiree to contact Via Benefits as soon as possible by phone or online to enroll in a new plan.

In addition to these mailings, representatives for Via Benefits have not been simply

waiting for retirees to call, but have been actively calling retirees (multiple times if necessary)

who have not yet enrolled in an individual plan in order to ensure that every retiree who wants to

enroll in a new Medicare plan is able to do so.  Allen Decl. ¶ 13, Ex. A.  There is no time limit on the length of the one-on-one consultations, and representatives are trained to stay on the line with the retiree for as long as it takes to answer all of their questions and help them understand the options available to them.  *Id.* ¶ 15.  To date, Via Benefits representatives have handled over 12,000 inbound calls and over 7,000 outbound calls with the retirees.  *Id.*  The average length of these calls has been approximately 40 minutes.  *Id.*

The total affected hourly retirees and eligible spouses (including but not limited to the putative class) number approximately 5,586 individuals.  *Id.* ¶ 14.  At the time of this writing, 4,001 individuals (72%) have already enrolled in a new individual Medicare plan through Via Benefits, while an additional 444 individuals (8%) are currently working with Via Benefits to do so.  *Id.*  362 individuals (6%) have elected not to enroll.  *Id.*  Thus, 779 individuals (14%) have not taken action or expressed any intention of doing so.  *Id.*  Of these 779 individuals, 146 are not currently enrolled in the fixed group Plan.  *Id.*

The affected putative-class retirees and eligible spouses number approximately 2,439 individuals.[6]  *Id.*  Of these, 1,634 individuals (67%) have enrolled in new Medicare plans through Via Benefits, while an additional 224 (9%) are currently working with Via Benefits to do so.  *Id.*  175 individuals (7%) have elected not to enroll, and 406 individuals (17%) have not taken action or expressed the intention of doing so.  *Id.*  Via Benefits continues to reach out to and work with these retirees to ensure that they understand the options available to them and are making informed decisions.  *Id.*

---

[6] Due to the holiday season, the specific putative class enrollment figures do not include dependent spouses.  Alcoa is currently working to identify the enrollment numbers for these additional individuals and expects to have them available by the January 21, 2021 hearing.

IV.   **Plaintiffs wait until the last minute to file this lawsuit and move for a preliminary injunction.**

Plaintiffs initiated this putative class action against Defendants[7] on December 10, 2020—more than a year after Alcoa first notified the retirees and USW about the transition to the new HRA program.  They allege that the HRA program violates a series of expired CBAs between Alcoa and the Unions, and bring Labor Management Relations Act ("LMRA") and Employment Retirement Income Security Act ("ERISA") claims.  ECF No. 1 at 24-25.  On December 16, 2020, Plaintiffs moved for a preliminary injunction to enjoin Alcoa from transitioning to the new HRA program—just 15 days before the December 31, 2020 enrollment deadline and after the majority of retirees have transitioned to new plans.  ECF No. 8.

## ARGUMENT

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, ***by a clear showing***, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (internal quotation omitted); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) ("[T]he granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.").  The Supreme Court has directed that a party "seeking a preliminary injunction must establish that he is ***likely*** to succeed on the merits, that he is ***likely*** to suffer irreparable harm in the absence of preliminary relief, that the balance of

---

[7] Plaintiffs have named Defendants as Alcoa USA Corp., Retirees Group Benefit Plan for Certain Hourly Employees of Alcoa USA Corp., Medicare Exchange Healthcare Reimbursement Plan for Certain Medicare Eligible Retirees of Alcoa, and Alcoa Medicare Part B Reimbursement Plan for Certain Medicare Eligible Retirees of Alcoa USA.  This response brief is submitted on behalf of all Defendants without prejudice to their right to raise issues as to the proper parties to this lawsuit.

equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (emphases added).

In the Seventh Circuit, "a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 965 (7th Cir. 2018). In the threshold phase, a plaintiff seeking a preliminary injunction must show that: "(1) its case has a likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003). "If the plaintiff fails to meet any of these threshold requirements, the court ***must*** deny the injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (emphasis added) (internal quotation omitted). But "if the plaintiff passes that threshold, the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Id.* (internal quotation omitted).

Here, Plaintiffs have failed to meet their burden to affirmatively demonstrate that the circumstances clearly demand a preliminary injunction, and the Court should deny Plaintiffs' motion accordingly.

## I.   Plaintiffs have no likelihood of success on the merits.

As an initial matter, Plaintiffs misstate their burden of establishing the likelihood of success on the merits, claiming that they need only show that their chances at success are "better than negligible." Pls.' Mem. of Law Supp. Pls.' Mot. Prelim. Injunction "(Pls.' Br.") 26, ECF No. 9 (quoting *PETA, Inc. v. Wildlife in Need & Wildlife in Deed, Inc.*, 4:17-cv-186, 2018 WL 828461, at *5 (S.D. Ind. Feb. 12, 2018)). Recent decisions by the Seventh Circuit have clarified, however, that the "better than negligible" standard is "incorrect" and is not the law of the

Seventh Circuit. *See Mays v. Dart*, 974 F.3d 810, 821-22 (7th Cir. 2020) (noting that Supreme Court precedent requires plaintiffs to make a "strong showing" that they are "likely" to succeed on the merits, and therefore "a plaintiff must demonstrate that its claim has some likelihood of success on the merits, not merely a 'better than negligible' chance." (citing *Nken v. Holder*, 556 U.S. 418, 425-26 (2009), and *Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits[.]"))).

Plaintiffs are not likely to succeed on their LMRA and ERISA claims because the retiree healthcare benefits at issue are not vested under the expired CBAs and therefore can be terminated or modified at Alcoa's discretion. According to the Supreme Court and Seventh Circuit, healthcare benefits are not vested beyond the term of the CBAs that created them unless the CBAs specifically state that the retiree healthcare obligations do not expire when the CBAs expire. Here, the CBAs referenced by Plaintiffs contain no such promise.[8] Each CBA contains a general durational clause and no CBA contains a promise that retiree benefits will continue beyond expiration of the agreement. Without a contractual right to vested benefits, Plaintiffs have no likelihood of success on the merits.

In two recently decided cases—*M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015) and *CNH Industrial N.V. v. Reese*, 138 S. Ct. 761 (2018)—the Supreme Court set forth the analytic framework for determining whether retiree healthcare benefits are vested under ERISA. Unlike pension benefits, welfare benefits—including retiree healthcare benefits—are not subject to the statutory vesting requirements of ERISA, which means that "employers . . . are

---

[8] There are a number of CBAs not mentioned by Plaintiffs that may control the analysis for particular retirees, but the present analysis can only be made based on those CBAs actually referenced by Plaintiffs, none of which contain language supporting vesting beyond the expiration of the CBA as explained below.

generally free under ERISA, for any reason at any time, to adopt, modify or terminate welfare plans." *Tackett*, 574 U.S. at 434-35 (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)).

In determining whether, and the extent to which, an employer has agreed to provide retirees with vested healthcare benefits, the written terms of the plan under which those benefits are provided control. Only when an employer contractually commits to providing vested retiree healthcare benefits is the employer prevented from terminating or altering said benefits. In this regard, CBAs, including those establishing ERISA plans, are interpreted "according to ordinary principles of contract law." *Id.* at 435. "[A]s with any other contract, the parties' intentions control" and "[w]here the words of a contract are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (quoting *Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) and 11 R. Lord, *Williston on Contracts* § 30.6, p. 108 (4th ed. 2012)). In determining whether a CBA has provided for vested benefits, a court may not infer vesting from silence. *Id.* at 442. Extrinsic evidence may be used to determine intent only where the CBA is ambiguous. *See Reese*, 138 S. Ct. at 765. Further, even where there exists ambiguity, a court "should not construe ambiguous writings to create lifetime promises." *Tackett*, 574 U.S. at 441 (quoting 3 A. Corbin, *Corbin on Contracts* § 553, p. 216 (1960)).

In *Reese*, the Supreme Court emphasized the importance of a general durational clause in a CBA (*i.e.*, a clause specifying that the agreement terminates on a specified date): where, as here, a CBA includes a general durational clause, that clause applies to all benefits under the CBA unless the CBA specifies otherwise. 138 S. Ct. at 766. Employees retiring under such an agreement have no right to continued benefits unless other provisions of the CBA specify that

retiree healthcare benefits "were subject to a different durational clause." *Id.* If there is no such provision, the CBA is unambiguous and extrinsic evidence cannot be used to conclude that specific benefits under the CBA are vested, as in the ordinary course, contractual obligations cease upon termination of the CBA. *Id.* at 763.

Since the Supreme Court's decision in *Reese* in 2018, the Seventh Circuit has decided only one case involving whether collectively bargained retiree welfare benefits have vested under ERISA—*Stone v. Signode Industrial Group LLC*, 943 F.3d 381 (7th Cir. 2019). In *Stone*, retirees challenged an employer's termination of retiree healthcare benefits under a CBA that included a general durational clause. In accordance with *Reese*, the Seventh Circuit concluded that the retirees had a vested right to lifetime healthcare benefits because the CBA under consideration expressly stated that healthcare benefits could not be terminated or reduced "notwithstanding the expiration of [the] Agreement." *Stone*, 943 F.3d at 386 (quoting the CBA). The court stated that this provision "said as plainly as possible that coverage would survive expiration of the Agreement." *Id.* In contrast, no such plain statement of an intent for benefits to survive contract expiration is present in the CBAs between Alcoa and the Unions here, and Plaintiffs have cited no other valid basis to determine that their healthcare benefits survived contract expiration.[9]

---

[9] *Reese* and *Stone* both indicate that a vesting analysis should generally take into account the express and implied terms of a CBA. *See Reese*, 138 S. Ct. at 765; *Stone*, 943 F.3d at 381. However, *Reese* makes clear that if a CBA has a general durational clause then retiree healthcare benefits do not vest unless the CBA specifies a different durational clause. 138 S. Ct. at 766. This is consistent with Seventh Circuit precedent. *See Vallone v. CAN Fin. Corp.*, 375 F.3d 623, 632-33 (7th Cir. 2004) (concluding that any agreement for the vesting of welfare benefits under ERISA must be contained in the plan documents and must be stated in clear and express language); *Rossetto v. Pabst Brewing Company*, 217 F.3d 539, 543 (7th Cir. 2000) (finding that where a contract of set duration is silent on the issue of vesting, it is presumed that benefits were not intended to vest). Other circuits have interpreted *Reese* consistent with this Seventh Circuit precedent as well. *See, e.g.*, *Fletcher v. Honeywell*, 892 F.3d 217, 223 (6th Cir. 2018) ("Thus, from all of this circuit's precedent and the Supreme Court's holdings in *Tackett*

Plaintiffs claim that retiree healthcare benefits have vested based on one selected CBA that covered certain members of the putative class at the time of their retirements—the November 1, 1988 Agreement between Alcoa and the USW (the "1988 USW CBA").[10]   While the 1988 USW CBA is not applicable to all members of the putative class, even if it is assumed that all of the CBAs applicable to all members of the purported class contained substantially similar provisions, Plaintiffs have not identified any provisions in that CBA providing for continuation of retiree healthcare benefits after its termination.  To the contrary, as in *Reese*, the 1988 USW CBA includes a general durational clause at Article XXIX:

> [T]his Agreement shall terminate 60 days after either party shall give written notice of termination to the other party, but in any event shall not terminate earlier than 12:00 midnight, or the end of the shift starting before midnight, whichever is later, May 31, 1992.

Ex. 1 at 105, Pls.' Compl., ECF No. 1-1.  It is undisputed that the 1988 USW CBA was terminated pursuant to this provision.  Other CBAs between Alcoa and the Unions covering other purported class members contain similar provisions and would have been similarly terminated.  Pursuant to *Reese*, Alcoa's obligation to provide retiree healthcare benefits to

---

and *Reese*, we can distill a clear rule--a CBA's general durational clause applies to healthcare benefits unless it contains clear, affirmative language indicating the contrary.").  As the *Stone* CBA included an express statement that the retiree healthcare benefits survived the termination of the CBA, *Stone* is consistent with these authorities.  Accordingly, if a CBA has a general durational clause, vesting of retiree healthcare benefits cannot be implied from the remaining terms of the CBA.  *See Reese*, 138 S. Ct. at 766 (rejecting the Sixth Circuit's use of inferences when the CBA includes a general durational clause).  In order for retiree healthcare benefits to vest, the CBA must specify—that is, affirmatively state in clear and express language—that retiree healthcare benefits are subject to a different durational clause.  Plaintiffs have not identified any such provision.  Even if a general durational clause could be overcome based upon implied terms, as further set forth herein, Plaintiffs have not identified any provision in any CBA that implies that retiree healthcare benefits survive termination of the CBA.

[10] Plaintiffs' motion for preliminary injunction attaches only excerpts of the 1988 USW CBA. *See* Pls.' Ex. 7, ECF No. 10-7.  However, a complete copy of the 1988 USW CBA is attached to Plaintiffs' Complaint as Exhibit 1.  *See* Ex. 1, Pls.' Compl., ECF No. 1-1.

individuals who retired while covered by those CBAs unambiguously terminated when the CBAs terminated, unless Plaintiffs can identify provisions of the CBAs that specify that retiree healthcare benefits "were subject to a different durational clause." 138 S. Ct. at 766. Plaintiffs fail to do so and their other arguments are unavailing.

*First*, Plaintiffs argue that Alcoa has provided putative class members with healthcare coverage for decades, with no interruption in its provision of such benefits. Pls.' Br. at 27. But Alcoa's course of conduct with respect to retiree healthcare benefits is not itself a term of the CBAs and is, therefore, irrelevant in determining whether the CBAs are ambiguous regarding the vesting of retiree healthcare benefits. *See Vallone v. CAN Fin. Corp.*, 375 F.3d 623, 632-33 (7th Cir. 2004) (concluding that any agreement for the vesting of welfare benefits under ERISA must be contained in the plan documents and must be stated in clear and express language). Even if the CBAs between Alcoa and the Unions were considered ambiguous and Alcoa's course of conduct were permitted to be taken into account as extrinsic evidence, the fact that Alcoa has provided uninterrupted retiree healthcare benefits for years says nothing about whether Alcoa did so voluntarily or pursuant to an *obligation* under the CBAs. Employers frequently provide retiree healthcare benefits to former employees without any legal obligation to do so.

*Second*, Plaintiffs point to language in the retiree healthcare benefits provisions of the 1988 USW CBA that states that Alcoa "will provide" such benefits and "will do so" without cost. Pls.' Br. at 27. It is well-established that future-tense language regarding retiree healthcare benefits is insufficient to establish that retiree healthcare benefits survive termination of the CBA and are subject to a different durational clause than the general durational clause. *See Tackett*, 574 U.S. at 437 (criticizing a Sixth Circuit conclusion that "will continue" language confers lifetime benefits); *Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 816 (7th Cir. 1992)

(explaining that "it requires more than a statement in a CBA that welfare benefits 'will continue' to create an ambiguity about vesting"); *see also IUE-CWA v. Gen. Elec. Co.*, 745 F. App'x 583, 596 (6th Cir. 2018) (concluding that the use of future tense language without more does not guarantee lifetime benefits); *Gallo v. Moen Inc.*, 813 F.3d 265, 271 (6th Cir. 2017) (same); *Cole v. Meritor*, 855 F.3d 695, 700 (6th Cir. 2017) (same).

*Third*, Plaintiffs point to four provisions in the 1988 USW CBA that describe circumstances under which retiree healthcare benefits may be modified, arguing that these limit Alcoa's right to modify benefits. Pls.' Br. at 5. But provisions setting forth circumstances under which retiree healthcare benefits may be modified during the term of the agreement do not establish that the benefits are subject to a duration distinct from the duration of the CBA itself under the general durational clause. Those provisions simply identify the circumstances under which, during the term of the CBA, retiree healthcare benefits may be modified. Like the provision of retiree healthcare benefits themselves, if the limitations on their modification were meant to survive the termination of the CBA, the CBA needed to say so and it does not. *See Vallone*, 375 F.3d at 632-33 (concluding that any agreement for the vesting of welfare benefits under ERISA must be contained in the plan documents and must be stated in clear and express language); *Rossetto v. Pabst Brewing Company*, 217 F.3d 539, 543 (7th Cir. 2000) (finding that where a contract of set duration is silent on the issue of vesting, it is presumed that benefits were not intended to vest).

*Fourth*, Plaintiffs point to Section 6 of the General Provisions of Article XXII of the 1988 USW CBA, which describes a circumstance under which healthcare benefits for active employees may be modified, and note that the provision applies only "during the term of this Agreement." Pls.' Br. at 27. However, a statement of a durational limit with respect to one

18

benefit does not imply, much less specify, as required by *Reese*, that any other benefit lacks a durational limit. *See Reese*, 138 S. Ct. at 763 (discussing the Sixth Circuit's error in presuming that retiree benefits vested for life where a CBA lacked a termination provision specifically addressing retiree benefits, but contained specific termination provisions for other benefits); *Allied Systems, Ltd. (L.P.) v. Int'l Union, United Auto., Aerospace, & Agricultural Implement Workers of Am.*, No. 10-cv-66, 2011 WL 13359271, at *5 (W.D. Wis. Feb. 18, 2011) (noting that the maxim *expressio unius est exclusion alterius* (the expression of one thing is the exclusion of the other) is undermined as a canon of contract construction by a contrary canon). Here, the fact that the 1988 USW CBA states a durational limit for active employee healthcare benefits (which happens to be the same as the duration of the agreement itself under the general durational clause) says nothing about whether there is a durational limit for retiree healthcare benefits.

*Fifth*, Plaintiffs note that the Summary Plan Descriptions ("SPDs") describing the retiree healthcare benefits do not identify the circumstances under which retiree healthcare coverage may be terminated and that none of the SPDs or CBAs include a "reservation of rights clause" under which Alcoa expressly reserved the right to terminate retiree healthcare benefits. Pls.' Br. at 29. Plaintiffs contend that the absence of such provisions establishes that retiree healthcare benefits have vested under the CBAs. However, as previously described, retirees have vested rights to healthcare benefits only when an employer agrees to provide them under the terms of a particular contract. Where a CBA is silent regarding the employer's right to terminate such benefits, the appropriate conclusion is that the benefits do not vest. *See Reese*, 138 S. Ct. at 766 (reversing summary judgment in favor of retirees without regard to any affirmative statement in CBA of employer's right to amend or terminate retiree healthcare benefits and without regard to a reservation of rights clause); *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006)

(describing the Seventh Circuit's presumption that healthcare benefits do not exceed the life of an agreement).  Alcoa does not derive its right to modify retiree healthcare benefits by reserving the right to do so under the SPDs or CBAs.  It has the right to modify retiree healthcare benefits unless it has agreed pursuant to the terms of the agreements that it will not do so.  *See Pabst Brewing Co., Inc. v. Corrao*, 161 F.3d 434, 439 (7th Cir. 1998) ("ERISA does not require the vesting of welfare benefits; if they vest at all, they do so under the terms of a particular contract").  The absence of modification or termination rights in the SPDs and the CBAs in no way establishes that Alcoa has agreed that its obligation to provide retiree healthcare benefits survives the termination of the agreements and does not satisfy the *Reese* requirement that the CBA *specify* that Alcoa's retiree healthcare obligations are subject to a different duration than the CBA itself.  *See* 138 S. Ct. at 766.

*Sixth*, Plaintiffs point to provisions in the SPDs that provide dependents with a right to obtain an individual conversion policy upon loss of dependent status with respect to pre-Medicare benefits.  Pls.' Br. at 9.  They claim that these provisions indicate that the parties understood that any individual losing coverage would need the "safety net" of an individual conversion policy and that since no comparable protection was afforded to retirees, this indicates that retirees do not need like protection—because, in Plaintiffs' view, Alcoa agreed that its retiree healthcare benefits would not terminate when the CBA terminated.  *Id.* at 28.  The fact that Alcoa and the Unions agreed that dependents would be entitled to individual conversion policies upon ceasing to be eligible dependents (*e.g.*, "ageing out" of dependency status) says nothing about what Alcoa and the Unions may have believed about the need for comparable protection of any other individual upon the loss of coverage for any other reason.  Indeed, similar conversion protection is not extended with respect to post-Medicare benefits (the retirees who

make up the putative class), even though coverage for those dependents can also end prematurely due to loss of dependent status.  There is no reason to believe that just because Alcoa and the Unions agreed to provide individual policy conversion protection for dependents of pre-Medicare eligible retirees who lose coverage, they would have provided similar protection upon termination of all retiree healthcare obligations if only they had contemplated such termination. More fundamentally, dependents' entitlement to individual conversion policies has no bearing on the duration of any other retiree healthcare obligations and does not specify that retiree healthcare benefits are subject to a durational clause that differs from the CBAs' general durational clause, as required by *Reese*.

**Seventh**, Plaintiffs cite provisions in the SPDs that state that dependent coverage terminates on the surviving spouse's death.  Pls.' Br. at 29.  A provision stating that the healthcare benefits of a dependent of a retiree terminate upon the surviving spouse's death does not establish that retiree healthcare benefits survive termination of the CBA.  Such a provision merely states that coverage will terminate ***prior to expiration of the CBA*** if the surviving spouse dies.  That does not provide coverage to a surviving spouse following termination of the CBA and, even if it did, does not provide coverage following termination of the CBA for retirees themselves.  *See Kerns v. Caterpillar Inc.*, 791 F. App'x 568, 572 (6th Cir. 2019) (finding retirees were not entitled to coverage following termination of CBA even where it provided lifetime coverage for surviving spouses of retirees who died during term of the CBA); *Fletcher v. Honeywell Int'l*, 892 F.3d 217, 226 (6th Cir. 2018) (same).

**Eighth**, Plaintiffs cite to an SPD provision that states that retirees are entitled to elect continuation of healthcare coverage only in the event of loss of coverage due to Alcoa's reorganization or bankruptcy.  Pls.' Br. at 29.  Plaintiffs contend that this should be interpreted as

meaning that Alcoa's bankruptcy or reorganization are the only circumstances under which retiree healthcare coverage may be terminated.  *Id*.  But this provision only purports to identify circumstances under which retiree healthcare benefits may be ***continued.***  It does not purport to identify or limit the circumstances under which those benefits may be ***modified or terminated*** (much less state that bankruptcy and reorganization are the ***only*** circumstances under which retiree healthcare benefits may be modified or terminated).  The provision is a simple statement of Alcoa's obligations to provide continuation coverage as required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").  Again, the language fails to state in any manner that retiree healthcare benefits are subject to a different duration than the CBA itself under the general durational clause as required by *Reese*.

 **Ninth and finally**, Plaintiffs rely on the unpublished opinion of the Sixth Circuit in *Curtis v. Alcoa, Inc.*, 525 F. App'x 371 (6th Cir. May 9, 2013) to argue that another court interpreted the same language and found that Alcoa retirees have a vested right to healthcare benefits that survives termination of the CBAs between Alcoa and the Unions.  Pls.' Br. at 29.  But Plaintiffs' reliance on *Curtis* is misplaced.  Prior to the Supreme Court's 2015 decision in *Tackett* (when *Curtis* was decided), the Sixth Circuit had established and relied on a presumption that retiree healthcare benefits under a CBA were vested and survived termination of the CBA, even where the CBA contained a general durational clause.  This was referred to as the "*Yard-Man*" presumption, after the case in which the Sixth Circuit first adopted it.  *See Int'l Union, United Auto., Aerospace and Agricultural Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983) ("[R]etiree [welfare] benefits are in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained.").

The Supreme Court expressly rejected the *Yard-Man* presumption in *Tackett*.  *See* 574 U.S. at 442; *Cole*, 855 F.3d at 696 ("The Supreme Court abrogated the *Yard-Man* line of cases in [*Tackett*].").  The *Yard-Man* presumption was so pervasive in the Sixth Circuit's pre-*Tackett* jurisprudence that the Sixth Circuit stated that it would not give preclusive effect to any pre-*Tackett* decision—even where the decision did not expressly rely on the *Yard-Man* presumption.  *See UAW v. Kelsey-Hayes Co.*, 854 F.3d 862, 872 (6th Cir. 2017) ("[G]iven the Court's strong language in *Tackett*, we will not give pre-*Tackett* decisions. . . preclusive effect.").  In the words of the Sixth Circuit itself, "[i]t is hard to overstate how powerful [the *Yard-Man*] inference was, especially in benefits vesting cases."  *Cooper v. Honeywell Int'l, Inc.*, 884 F.3d 612, 616 (6th Cir. 2018).  *Curtis* was decided in 2013—two years prior to *Tackett*—at a time when the Sixth Circuit was improperly applying the *Yard-Man* presumption.  Under the current state of the law and post-*Tackett* principles of contract interpretation—without the *Yard-Man* presumption in favor of vesting and, indeed, with a presumption ***against*** vesting, *see Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 606-08 (7th Cir. 1993) (en banc)—the CBAs between Alcoa and the Unions do not provide retirees with vested rights to healthcare benefits following termination of the applicable CBAs.

The Supreme Court's direction in *Reese* regarding the vesting of retiree healthcare benefits is clear.  Where a CBA contains a general durational clause, the employer's retiree healthcare benefit obligations under the CBA unambiguously terminate with the CBA unless the CBA specifies a different duration for retiree healthcare benefits.  Plaintiffs have not identified any provision of any CBA between Alcoa and the Union that specifies that retiree healthcare benefits are subject to a different duration than the CBA itself.  The CBAs guarantee such

benefits until the agreements expire, nothing more.  Plaintiffs fail to show otherwise, and consequently have no likelihood of success on the merits.

## II.   Plaintiffs fail to demonstrate they will suffer any irreparable harm, and even if they could, money damages would make them whole.

"In every case in which the plaintiff wants a preliminary injunction he must show that he has 'no adequate remedy at law,' and . . . that he will suffer 'irreparable harm' if the preliminary injunction is not granted."  *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984).   "These two requirements—irreparable harm and no adequate remedy at law—tend to merge."  *Holbrook Mfg LLC v. Rhyno Manuf. Inc.*, No. 20-cv-5940, 2020 WL 6343083, at *7 (N.D. Ill. Oct. 29, 2020) (citing *Roland*, 749 F.2d at 386).

"Not every conceivable injury entitles a litigant to a preliminary injunction."  *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005). "[The] frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is ***likely*** in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis in original).  Thus, it is well-settled that "speculative" or "hypothetical" injuries, or the mere "possibility" of harm, are simply not irreparable.  *See id.*  ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.");  *E. St. Louis Laborers' Local 100*, 414 F.3d at 705-06 ("[A] plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries.");  *Singer Co. v. P.R. Mallory & Co., Inc.*, 671 F.2d 232, 236 (7th Cir. 1982) ("[C]ourts have repeatedly held that a 'speculative' injury does not constitute an irreparable injury justifying injunctive relief.").

Furthermore, a preliminary injunction must be denied where the "losses are purely financial, easily measured, and readily compensated." *Praefke Auto Elec. & Battery Co., Inc. v. Tecumseh Prods. Co., Inc.*, 255 F.3d 460, 463 (7th Cir. 2001) (citation omitted); *Covington v. Smith*, No. 05-1204, 2005 WL 8163685, at *8 (C.D. Ill. Dec. 16, 2005) ("[A]n injunction is an equitable remedy that does not issue as a matter of course, but rather a remedy that courts may grant at their discretion in the extraordinary situations where legal remedies such as monetary damages are inadequate.").

In support of their motion, Plaintiffs rely on five declarations and several studies and newspaper articles regarding the general costs of healthcare, disease statistics, and the complexity of shopping for health insurance. Pls.' Br. at 31-32. But none of this satisfies Plaintiffs' burden to clearly show irreparable harm absent an injunction, and Plaintiffs can be made whole by monetary damages and a permanent injunction at the conclusion of the case.

***First***, despite seeking an injunction to preliminarily dismantle the HRA program and revert to the group Plan, Plaintiffs barely attempt to establish irreparable harm on the part of the majority of the retirees and spouses (67%) that have already enrolled in individual healthcare plans through the Via Benefits exchange or are actively engaged with Via Benefits to enroll (an additional 9%) and whose choices will be radically impacted by the relief sought by Plaintiffs. *See* Allen Decl. ¶ 14, Ex. A. Even the named Plaintiffs have already enrolled in new plans. *See* Pls.' Br. at 17. Plaintiffs' arguments as to the harm that retirees may experience if they lose their benefits at the end of the enrollment deadline are simply inapplicable to most of the retirees.

Nor have Plaintiffs established any loss or reduction of healthcare coverage for those that have enrolled. Cary Burnell, a Senior Technician for USW, claims that one type of prescription drug plan offered on the Via Benefits exchange does not provide coverage "anywhere near the

level of benefits" provided under the prior fixed group Plan, but offers few details to substantiate this small sample.  *See* Declaration of Cary Burnell ("Burnell Decl.") ¶ 22, ECF No. 10.  Mr. Burnell also examines the HRA fund amounts provided by Alcoa to the retirees and speculates they are far less than Alcoa's costs under the fixed group Plan, *id.* ¶¶ 34-38, but this comparison is irrelevant because of the inherent differences in healthcare costs between the individual and group plans, which is the entire point of moving to the HRA program and the individual plans. Mr. Burnell further claims that a prescription drug plan selected by one of the retirees results in higher premiums and out-of-pocket costs than the fixed group Plan, *id.* ¶¶ 39-40, but ignores the fact that such premiums and out-of-pocket costs are covered expenses under the HRA program. *See* Allen Decl. ¶ 4, Ex. A.  Indeed, no declarations by individual retirees suggest that their new coverage is inferior to the prior fixed group Plan, and there is no evidence of any contemplated medical procedure by any retiree that would be affected, in any way, by the change to the HRA program.

  ***Second***, the evidence submitted by Plaintiffs, including the handful of declarations, does not justify an injunction affecting thousands of retirees, whose circumstances may be quite different.  "[R]esting a preliminary injunction for many on the testimony of a few" requires that "plaintiffs lay an adequate foundation from which one could draw inferences that the testifying plaintiffs are similarly situated—in terms of irreparable harm—to all the other plaintiffs." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487-88 (3d Cir. 2000) (concluding that there was insufficient evidence for the district court to infer that "all the plaintiff-retirees and their spouses (in whose favor the injunction ran) were in such financial straits that they would be forced to choose between medical care and other necessities," and rejecting argument that "proof by 'common sense' will suffice").  The declarations submitted by Plaintiffs discuss various

experiences by several retirees who have been confused about the switch to the HRA program and have had difficulty selecting an individual plan, but these are highly individualized and therefore not properly imputed to all of the retirees, the vast majority of whom have already successfully enrolled in new individual plans.  Of all the affected retirees who received the same communications and options, 72% have successfully enrolled and 8% are actively engaged with Via Benefits to do so; only 14% have not taken any action or expressed an intention of enrolling. *See* Allen Decl. ¶ 14, Ex. A.  Plaintiffs cannot show irreparable harm as to the entire putative class simply because a single retiree chose not to make use of benefits that are indisputably available to her because she grew frustrated after a half hour, *see* Declaration of George Barnett ¶¶ 11, 15, ECF No. 11 ("I fear that there will be other retirees or spouses who, like Ms. Reed described in paragraph 11, find the process too difficult and give up."), or because a single retiree claims that he never received notice from Alcoa of the transition to the HRA program, *see* Declaration of Robert Simpkins ¶ 6, ECF No. 24-1.[11]  Nor can Plaintiffs leap to the conclusion that the fact that a percentage of retirees have not enrolled in an individual plan through Via Benefits means that these individuals lack supplemental Medicare coverage, as they may have alternative coverage through other means (for example, a spouse's policy), or they may have purchased an individual plan without using or informing Via Benefits.

**Third**, Plaintiffs' claims of irreparable harm are irrelevant, unsupported, and are otherwise improperly vague and speculative.  The bulk of the declarations submitted by Plaintiffs discuss the confusion and the time and effort that several retirees have experienced in attempting to transition to the new individual plans, but this does not amount to irreparable harm.  *See Di*

---

[11] Plaintiffs claim that they "anticipate" that lack of notice of the transition to the HRA program "is common to other class members," but offer no basis for this sweeping speculation other than the experience of a single retiree, who is one of the named Plaintiffs.  *See* Pls.' Br. at 2.

*Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017) (finding that while "the retirees had to

expend time and effort to navigate the process" of transitioning from a group health plan to an

HRA account, which may have been "confusing and time-consuming," the defendant provided

assistance with the process and "[a]ny injuries retirees may have suffered in terms of time,

money and energy expended in the absence of an injunction are not enough to support a finding

of irreparable harm").  Similarly, although Plaintiffs contend that "[t]he peace of mind that

accompanies stable and adequate healthcare is a significant benefit" and speculate that "[e]ven

class members who manage to acquire new coverage have no idea how long they can depend on

an Alcoa contribution, or on the amount of that contribution," *see* Pls.' Br. at 32, it is well-settled

that "[i]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the

anxieties of the parties."  *Filter Specialists, Inc. v. Hendi*, No. 3:08-cv-365, 2008 WL 11391139,

at *10 (N.D. Ind. Nov. 17, 2008) (quoting *Eaton Corp. v. Appliance Valves Corp.*, 526 F. Supp.

1172, 1181 (N.D. Ind. 1981)).

    None of the retirees or spouses provides any detail about their finances to show the threat

of an injury absent an injunction, nor do Plaintiffs offer any evidence that alternative options for

medical insurance are not available to the retirees.  Alcoa provided notice of its intent to

implement the HRA program over one year prior, which gave the retirees ample time to look at

other options, be it options provided by Via Benefits or elsewhere.  Plaintiffs make general

statements that "[c]lass members are far from rich, subsisting on small, fixed pensions (and

social security)" and argue that they will not receive healthcare unless Alcoa dismantles the new

HRA program, but they offer no evidence of the financial circumstances of any of the actual

retirees.  *See* Pls.' Br. at 30.  Instead, Plaintiffs rely on the Declaration of Mr. Burnell, a Senior

Technician for USW, who speculates that the "majority of Alcoa retirees and surviving spouses"

have an income of "considerably less" than $7,296 per year. *Id.* (citing Burnell Decl. ¶ 33). But at this level of income, the retirees likely quality for Medicaid and can receive free or low-cost health insurance,[12] and regardless of income would already have access to Medicare benefits.

Plaintiffs also rely on a variety of studies and newspaper articles regarding the costs of healthcare, disease, and the complexity of shopping for health insurance, as well as cases stating that individuals may suffer irreparable harm when their health coverage is reduced or eliminated, relying primarily on *United Steelworkers of America, AFL-CIO v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987). *See* Pls.' Br. at 30-33. According to Plaintiffs, the irreparable harm to the retirees absent injunctive relief is "self-evident" by virtue of the fact that they are retirees and may lose supplemental healthcare insurance. *Id.* at 33. To summarize Plaintiffs' arguments, retirees are generally not rich, they generally need medical care, and obtaining health insurance is generally difficult. This falls woefully short of meeting their burden. Even accepting these principles as true, they offer little more than the vague possibility of irreparable harm and do not constitute the "clear showing" of irreparable harm required to warrant the "extraordinary and drastic" remedy of a preliminary injunction. *See Winter*, 555 U.S. at 22; *see also Adams*, 204 F.3d at 486-88 (denying preliminary injunction sought by plaintiff-retirees and rejecting the "common sense approach of *Textron* to reason that most of the retirees probably cannot afford the premiums," finding that the "elasticity" of such an approach "would essentially shift the burden to the defendant to disprove widely believed facts and would turn the preliminary injunction balancing process on its head"). Plaintiffs' additional speculation as to a myriad of scenarios that could potentially harm retirees does not meet their burden, either. *See, e.g.*, Pls.' Br. at 32 ("Even class

---

[12] *See, e.g.*, Pennsylvania Medicaid Program, BENEFITS.GOV, https://www.benefits.gov/benefit/1148 (stating that the annual income for a two-person household must be below $22,930 to qualify for the Pennsylvania Medicaid Program).

members who manage to acquire new coverage have no idea how long they can depend on an Alcoa contribution, or on the amount of that contribution.  What if Alcoa decides to halve or termination contributions for 2022?").

*Fourth*, Plaintiffs' significant delay in seeking a preliminary injunction belies their claim of irreparable harm.  Had Plaintiffs seen an urgent need to prevent harm that was truly irreparable, they would not have been so dilatory in pursuing preliminary relief.  Despite learning of Alcoa's plans to transition to the HRA program over one year ago and the ongoing enrollment of retirees, Plaintiffs filed their motion for preliminary injunction just 15 days before the enrollment deadline on December 31, 2020.  As a result of Plaintiffs' delay, Alcoa has already transitioned to the HRA program and over 1,500 putative class members have secured alternative coverage, making it impossible to turn back the clock without gaps in coverage, serious frustration and confusion for the retirees, and enormous expense.  *See* Allen Decl. ¶ 16, Ex. A; *Benisek*, 138 S. Ct. at 1944 ("[A] party requesting a preliminary injunction must generally show reasonable diligence."); *Anthony v. Koch Indus., Inc.*, 1:05-cv-806, 2005 WL 3157590, at *1-2 (M.D.N.C. Nov. 25, 2005) (finding no irreparable harm and denying preliminary injunction where retirees delayed seeking to enjoin termination of healthcare benefit subsidies); 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948.1, p. 139 (2d ed. 1995) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). Plaintiffs also repeatedly invoke the COVID-19 pandemic as increasing the risk of irreparable harm, but the pandemic has been ongoing since March 2020.  Plaintiffs waited nine months to bring this case and seek injunctive relief.  Again, this dilatory conduct refutes their assertion of irreparable harm.

***Fifth and finally***, Plaintiffs have adequate legal remedies without an injunction.  If Plaintiffs prevail in their claims and establish that they are entitled to healthcare benefits under the fixed group Plan, or that a particular retiree's HRA contributions are insufficient to pay for his or her healthcare premiums or other qualified medical expenses, then money damages and a permanent injunction can make that retiree whole.  In fact, Plaintiffs themselves characterize the harm they claim the retirees will suffer as "financial injuries caused by being denied their promised healthcare."  Pls.' Br. at 32.  These damages are pecuniary in nature and, therefore, the law could provide a remedy in the form of monetary damages.  Accordingly, Plaintiffs fail to meet their burden of showing that they will suffer irreparable harm without an injunction.

## III.    The balance of harms and the public interest strongly favor denying Plaintiffs' motion.

If the movant successfully shows all of the above three factors, then "the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it."  *Mays*, 974 F.3d at 818.  "This balancing process involves a 'sliding scale' approach:  the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa."  *Id.*  "This balancing process also considers the public interest, or the effects the preliminary injunction—and its denial—would have on nonparties."  *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020).  Here, the balancing of the harms and the public interest overwhelmingly weighs in favor of denying Plaintiffs' motion.

The injunction Plaintiffs are seeking to preliminarily unwind the selections of the majority of retirees who have already enrolled in new plans and force them to return to the fixed group Plan while this litigation proceeds presents not only a logistical nightmare for Alcoa, *see* Allen Decl. ¶ 16, Ex. A, but also cannot be accomplished without causing the confusion, stress,

and harm to retirees that Plaintiffs claim they aim to avoid.  Due to Plaintiffs' delay in bringing

this action, the majority of retirees have already switched over to different plans and the HRA

program will soon commence.   If the retirees are forced to cancel their new individual plans that

go into effect on January 1, 2021, they will experience coverage gaps, potential financial losses,

and confusion.  *Id.*  The retirees will have to take this step themselves, as neither Alcoa nor Via

Benefits can cancel their plans for them.  *Id.*  This process would be even more burdensome and

confusing for retirees given the possibility that they would then have to revert ***back*** to the HRA

accounts if Alcoa prevails in this lawsuit, and reselect and reenroll in individual plans.

Further, forcing the retirees back into the fixed group Plan may result in worse coverage

than the individual plans they are currently enrolled in.  Other than a few retirees who submitted

declarations, Plaintiffs have produced no evidence that the thousands of retirees for whom

Plaintiffs claim to speak actually want the relief they demand and do not prefer their HRAs to the

group Plan.  In these circumstances, Plaintiffs are seeking to ***disturb*** the status quo, not preserve

it—which strongly favors denying preliminary relief.  *See Chicago Untied Indus., Ltd. v. City of

Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) ("[T]he reluctance to disturb the status quo prior to

trial on the merits is an expression of judicial humility … [that] enables the court to stay

relatively neutral in the underlying legal dispute.").

Accordingly, the harm that will ***certainly*** be caused by Plaintiffs' injunction thus far

outweighs the speculative claims of the Plaintiffs.  *See Di Biase*, 872 F.3d at 235-36 ("Granting

the preliminary injunction would require [Defendant] to cancel the current HRA accounts and

reinstate group coverage, which may only be temporary if [Defendant] prevails on the merits. . . .

Given the administrative challenges and confusion for the retirees who must navigate the process

of securing healthcare coverage each time the approach for providing healthcare benefits

changes, . . . the balance of equities and public interest are better served by allowing the underlying litigation to proceed to a decision on the merits."); *Kauffman v. Gen. Elec. Co.*, No. 14-cv-1358, 2014 WL 7405698, at *5 (E.D. Wis. Dec. 30, 2014) (denying motion for preliminary injunction seeking to enjoin defendant from terminating group plans, stating that the court has "concerns about the various forms of relief that plaintiffs suggest" because thousands of participants "had already switched to an exchange," and requiring defendant to reintroduce the prior coverage and participants to return "might well be burdensome and confusing" and could result in harm to the participants).  The public has an overwhelming interest in avoiding a chaotic and complicated unwinding process that would produce greater confusion, stress, and harm for the retirees.

## IV.     If an injunction were to be issued, then Plaintiffs must post a bond.

Federal Rule of Civil Procedure 65(c) requires a bond to be posted before the issuance of an injunction (emphasis added):

> The court may issue a preliminary injunction or a temporary restraining order *only* if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Plaintiffs pay lip service to this rule in a footnote but then gloss over it, offering little reason why they should be excepted from its clear requirement beyond their contention that Alcoa is "a large multinational corporation" that "has been paying for the benefits for decades."  Pls.' Br. at 35 n.12.  The financial losses that Alcoa stands to suffer as a result of a preliminary injunction forcing it to unwind the HRA program and revert back to the group Plan are significant.  Retiree healthcare plans cannot simply be turned on-and-off with the flick of a switch.  Moreover, because Plaintiffs waited until the last minute to file their lawsuit, the HRA program has already gone into effect, and it will require months of administrative work before the program can be

undone and the prior fixed group Plan reinstated.  *See* Allen Decl. ¶ 16, Ex. A.  Alcoa's status as a corporation does not exempt Plaintiffs from having to post injunction bonds.  *See Habitat Educ. Center v. U.S. Forest Serv.*, 607 F.3d 453, 459 (7th Cir. 2010) (stating that the party against whom an injunction runs "may be a private firm or a government agency or a hapless individual . . . , but that doesn't make it or him or her unworthy of the law's protection").

As the Seventh Circuit has explained, "[w]hen setting the amount of security, ***district courts should err on the high side.*** . . . An error in setting the bond too high . . . is not serious. . . .  Unfortunately, an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000) (emphasis added) (citing *W.R. Grace & Co. v. Local Union 755, Int'l Union of United Rubber Workers*, 461 U.S. 757, 770 n.14 (1983) ("A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond.")).  Plaintiffs include an international union, USW, that is more than capable of posting the requisite bond.[13]  For these reasons, were the Court to issue a preliminary injunction, the Court should direct that Plaintiffs post a bond as a condition of such injunction.[14]

---

[13] According to public tax records, for the fiscal year ending December 2017, USW had an annual revenue over $500 million.  *See* United Steelworkers, PROPUBLICA, https://projects.propublica.org/nonprofits/organizations/250818080 (last visited December 29, 2020).

[14] Due to the Christmas holiday, Alcoa has not yet had sufficient time to fully analyze the necessary costs if Plaintiffs' motion is granted, but would be able to do so with additional time and resources after the holidays.  Were the Court to grant Plaintiffs' injunctive relief, Defendants respectfully request that the Court schedule an evidentiary hearing to determine the appropriate bond amount.

## <u>CONCLUSION</u>

The Court should deny Plaintiffs' motion for preliminary injunction.

Respectfully submitted,

Dated:  December 30, 2020
                       /s/ *Mark E. Miller*                   
Mark E. Miller (Attorney No. 10458-82)
The Law Offices of Mark Miller
1 S.E. 9th Street – Suite 101
Evansville, Indiana  47708
Telephone: 812.426.1000
Fax: 812.426.0751
mmiller@danks-danks.com

K&L GATES LLP

Thomas Birsic (*pro hac vice* forthcoming)
Jeffrey Richter (*pro hac vice* forthcoming)
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
Telephone: 412.355.6500
Fax: 412.355.6501
thomas.birsic@klgates.com
jeff.richter@klgates.com

Rosemary Alito (*pro hac vice* forthcoming)
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Telephone: 973.848.4000
Fax: 973.848.4001
rosemary.alito@klgates.com

*Counsel for Defendants Alcoa USA Corporation,
Retirees Group Benefit Plan for Certain Hourly
Employees of Alcoa USA Corp., Medicare
Exchange Healthcare Reimbursement Plan for
Certain Medicare Eligible Retirees of Alcoa, and
Alcoa Medicare Part B Reimbursement Plan for
Certain Medicare Eligible Retirees of Alcoa USA*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that, on December 30, 2020, a true and correct copy of the foregoing document

was filed electronically with the Clerk of Court to be served on all counsel of record by operation

of the Court's CM/ECF filing system.


/s/ *Mark E. Miller*
Mark E. Miller