# Exhibit G

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| **CHARLES CURTIS et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.:  3:06cv448** |
| | ) | |
| **ALCOA INC., Individually and as** | ) | |
| **Fiduciary of the Employees' Group** | ) | |
| **Benefits Plan of Alcoa Inc., Plan II,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT ALCOA INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

Page

Index of Witnesses ................................................................................................ xi

ALCOA'S PROPOSED FINDINGS OF FACT ............................................................... 1

I. THE PARTIES ........................................................................................ 1

II. PROCEDURAL HISTORY ...................................................................... 1

III. 1992-1993 COLLECTIVE BARGAINING NEGOTIATIONS ................. 2

  A. THE COMPANIES' "TWO-PRONGED" HEALTH CARE PROBLEM ........................................................................................ 2

    1. Long-Term Cash Flow Issue ................................................ 2

    2. Balance Sheet Issue ............................................................ 4

  B. THE CONDUCT OF THE COMPANIES AND THE UNIONS LEADING UP TO THE 1992-1993 NEGOTIATIONS DEMONSTRATES THAT THE PARTIES BELIEVED THAT THE CAP WAS REAL. ................. 5

    1. The Companies took significant steps to prepare for their negotiations over health care in the 1992-1993 negotiations. ........................................................................ 5

      a. Internally, the Companies analyzed the cash flow and balance sheet problems and considered possible approaches to mitigate those problems in the 1992-1993 negotiations. ....... 5

      b. The Companies also worked with consultants to determine the best approach to dealing with its two-pronged health care problem of rising health care costs and the issuance of FAS-106. ........ 6

      c. The Companies also investigated what peer companies were doing with respect to health care costs for hourly collectively bargained employees. ............................................................ 7

      d. The Companies worked together to develop a shared approach to their shared problems of rising health care costs and FAS-106 ...................... 8

2.     The Companies informed the Unions that they intended to negotiate for a cap during the upcoming negotiations. .......................................................................9

C.     NEGOTIATIONS PRIOR TO MAY 1993 DID NOT YIELD A NEW CONTRACT, LARGELY BECAUSE OF THE PARTIES' INABILITY TO REACH AN AGREEMENT ON THE HOTLY CONTESTED ISSUE OF HEALTH CARE. ...................................................................12

D.     THE MAY 1993 NEGOTIATIONS ................................................14

1.     The cap agreement was the product of hard-fought, arms-length bargaining between the Companies and the Unions. ........................................................................14

E.     THERE WAS NO ORAL SIDE AGREEMENT BETWEEN THE COMPANIES AND THE UNIONS THAT THE CAP WOULD NEVER ENGAGE. ...........................17

F.     JOHN MURPHY'S TESTIMONY WAS NOT CREDIBLE. ..............................................................................17

1.     John Murphy had limited recollection of the 1993 negotiations. ....................................................................17

2.     Mr. Murphy's testimony was inconsistent with the overwhelming documentary evidence and the testimony of other witnesses. ..........................................18

3.     Allegations by Mr. Murphy that he and Mr. Porter entered into an oral agreement at the 1993 negotiations have previously been rejected. .....................20

G.     THE TESTIMONY OF ERNIE LABAFF SHOULD BE GIVEN NO WEIGHT. ...................................................................20

H.     THE UNIONS DISCLOSED THE CAP AGREEMENTS TO THEIR LOCAL OFFICIALS AND MEMBERS AFTER NEGOTIATIONS. ............................................................21

I.     THE MEMORANDA OF SETTLEMENT AMONG THE COMPANIES AND THE UNIONS DISCLOSED THE CAP AGREEMENT. ...................................................................23

J.     THE UNIONS MADE PRESENTATIONS TO THEIR MEMBERSHIP IN ADVANCE OF THE RATIFICATION VOTES THAT DISCLOSED THE CAP AND DID NOT

MENTION ANY SIDE AGREEMENT OR
UNDERSTANDING THAT THE CAP WOULD NEVER
GO INTO EFFECT...................................................................23

K.    ALCOA DISCLOSED THE CAP AGREEMENT TO ITS
      DIRECTORS, AUDITORS AND PERSONNEL
      MANAGERS. ..................................................................24

L.    THE WRITTEN PLAN DOCUMENTS NEGOTIATED IN
      1993 UNAMBIGUOUSLY ALLOWED ALCOA TO
      IMPLEMENT A RETIREE HEALTH CARE CAP. ...................25

      1.    The CBAs unambiguously allowed Alcoa to
            implement a cap. ...............................................25

      2.    The SPDs clearly disclosed the cap agreement and
            unambiguously allowed Alcoa to implement a cap. ..........26

M.    THE COMPANIES AND THE UNIONS UNDERSTOOD
      THAT THE 1993 CAP AGREEMENT WAS REAL. .................28

N.    THE CAP LETTER CANNOT REASONABLY BE
      INTERPRETED TO COMPARE PER CAPITA COSTS
      AGAINST AN AGGREGATE CAP SUCH THAT PLAN
      COSTS WOULD NEVER EXCEED THE CAP...........................29

O.    NEITHER THE COMPANIES NOR THE UNIONS
      BELIEVED THAT PLAINTIFFS' RETIREMENT
      BENEFITS WERE VESTED IN 1993. .........................................29

      1.    The parties clearly understood that active
            employees were not vested in their retirement
            benefits. ...............................................................29

      2.    The parties also understood that retirement benefits
            were not vested, even for retired employees......................32

IV.   1996 NEGOTIATIONS ...............................................................33

A.    THE CONDUCT OF THE COMPANIES AND THE
      UNIONS LEADING UP TO THE 1996 NEGOTIATIONS
      DEMONSTRATES THAT THE PARTIES BELIEVED
      THAT THE CAP WAS REAL. ....................................................33

      1.    Prior to the 1996 negotiations, the Companies
            communicated to the Unions the importance of the
            retiree health care issue.....................................................33

-iii-

2.      The Companies met several times in advance of negotiations and discussed, among other issues, how they would address the retiree health care cap at the upcoming negotiations. ...............................................34

3.      The Companies recognized that the caps could be deferred, but only as part of the negotiation of the overall economic package....................................................35

4.      The Companies clearly understood that the cap could not be rolled over indefinitely.................................36

5.      In analyses conducted at Alcoa's behest, Alcoa's actuaries recognized Alcoa's plan as capped....................36

B.      THE 1996 NEGOTIATIONS ........................................................36

    1.      The cap was a subject of bargaining during the 1996 negotiations.......................................................................36

    2.      There was no side agreement between the parties in 1996 that the cap letter was not real....................................38

C.      DISCLOSURE OF THE CAP AFTER THE 1996 NEGOTIATIONS ........................................................................38

    1.      The Unions disclosed the cap agreements to their memberships prior to ratification of the 1996 CBA. .........38

    2.      The Unions understood that the caps agreed to in 1996 were real...................................................................39

    3.      After the 1996 negotiations, the Companies and the Unions negotiated over the SPDs to ensure that the cap agreement was accurately reflected in them................39

    4.      After the 1996 negotiations, Alcoa and the Unions prepared a letter to employees, providing a clear description of the written cap agreement. ..........................41

D.      THE WRITTEN PLAN DOCUMENTS IN 1996 UNAMBIGUOUSLY ALLOWED ALCOA TO IMPLEMENT A RETIREE HEALTH CARE CAP IN 2003................................................................................................41

    1.      The 1996 CBAs...............................................................41

    2.      The 1996-2002 SPDs......................................................42

E.     ALCOA'S ACTUARY VALUED A CAPPED PLAN IN EACH ACTUARIAL VALUATION FROM 1996 THROUGH 2001...........................................................................43

V.    2001 NEGOTIATIONS ................................................................44

    A.     MERGER OF THE PARTIES PRIOR TO 2001 NEGOTIATIONS ..........................................................44

    B.     ALCOA'S CONDUCT LEADING UP TO THE 2001 NEGOTIATIONS DEMONSTRATES THAT IT BELIEVED THAT THE CAP WAS REAL. ...............44

          1.     Internal presentations made to Alcoa's Industrial Relations Council show that Alcoa understood the cap to be real. ...................................44

          2.     Alcoa tasked its actuaries with calculating the impact of taking varying approaches to the cap in the 2001 negotiations, including immediate engagement of the cap. .....................................44

          3.     Alcoa understood that if it deferred the cap in the 2001 negotiations, the cap would have to be engaged at the following round of negotiations................45

    C.     THE 2001 NEGOTIATIONS ........................................45

          1.     The cap was a subject of bargaining in the May 2001 re-opener negotiations................................45

          2.     No Alcoa employee told the Union during the 2001 negotiations that the cap was not real. ...............46

          3.     Alcoa and the Union did not reach agreement at the 2001 re-opener negotiations due, in part, to a disagreement over the cap..................................48

          4.     The cap was a subject of bargaining in the September 2001 negotiations............................48

          5.     The parties did not negotiate an oral side agreement that the cap letter would never be enforced. ....................49

          6.     After negotiations, the Union disseminated highlights of the 2001 negotiation to its members explaining the cap letter, without reference to any

alleged side agreement that the cap would not go into effect. ..........................................................51

D.  THE WRITTEN PLAN DOCUMENTS IN 2001 UNAMBIGUOUSLY ALLOWED ALCOA TO IMPLEMENT A RETIREE HEALTH CARE CAP. ...................52

    1.  The 2001 CBA. .................................................................52

    2.  The SPDs issued after the 2001 CBA. ...............................52

E.  ALCOA'S ACTUARY VALUED A CAPPED PLAN IN EACH ACTUARIAL VALUATION FROM 2001 THROUGH 2006. ...................................................................53

VI.  2005-2006 NEGOTIATIONS ...................................................................53

A.  THE CONDUCT OF ALCOA AND THE UNION LEADING UP TO THE 2005-2006 NEGOTIATIONS DEMONSTRATES THAT THEY BELIEVED THAT THE CAP WAS REAL ....................................................................53

    1.  After the 2001 negotiations, Alcoa continued to monitor the rising costs of health care. ..............................53

    2.  Alcoa decided to implement the cap well in advance of the 2005-2006 negotiations. ...........................................56

B.  THE 2005-06 NEGOTIATIONS ....................................................56

    1.  Alcoa made clear in the 2005 re-opener negotiations that the cap would be implemented. ...................................56

    2.  While certain local union officials expressed to the Union's top table negotiators that they believed the cap was not intended to engage, this was not the Union's understanding. ......................................................58

    3.  While the Union did not believe the cap was never intended to engage, it still resisted the Company's efforts to implement the cap, and the 2005 re-opener negotiations failed again. .......................................60

    4.  After the 2005 negotiations, Alcoa began a comprehensive review of its 1993 negotiation files in an effort to dispel any rumors that the cap was not intended to engage. .......................................................60

5.  The Union's claims in the 2006 Miles case demonstrate that it understood that Alcoa had a right to implement the cap agreement according to its terms. ........................................................................61

6.  In advance of the 2006 negotiations, the parties continued to discuss health care and, in particular, the cap. ................................................................................62

7.  During the 2006 negotiations, Alcoa and the Union ultimately agreed to engage the cap. .................................63

    a.  The Union understood that Alcoa had the authority to engage the cap in 2006, subject to the requirement of mandatory bargaining. .............63

    b.  At the top table, the parties agreed to engage the cap but implement mechanisms to lessen the financial burden of the cap on retirees. ...........63

8.  Alcoa was not pressured by its auditor to engage the cap, nor did Alcoa engage the cap because it feared repercussions from the SEC. ...............................................65

9.  Following the 2006 negotiations, union members ratified the proposed CBA, including the cap agreement. .......................................................................66

C.  THE 2006 CAP WAS SET IN ACCORDANCE WITH THE 2001 CBA. ...............................................................68

D.  THE NOTIONAL ACCOUNT SHOULD BE VALUED AS PART OF THE RETIREE HEALTH CARE PLAN. ..............69

E.  THE 2006 CHANGES WERE MODEST AND COMMENSURATE WITH OTHER CHANGES THAT ALCOA HAD PUT INTO EFFECT IN EARLIER YEARS. ...................................................................69

1.  The plan design changes under the 2006 CBA are reasonable. ......................................................................70

2.  The premiums under the 2006 CBA are reasonable. .........70

ALCOA'S PROPOSED CONCLUSIONS OF LAW...............................................................73

I.      GOVERNING LAW..................................................................................73

        A.      PLAINTIFFS' CAUSES OF ACTION .........................................73

                1.      Relevant Statutes...................................................73

                2.      First Cause of Action (ERISA)..........................73

                3.      Second Cause of Action (LMRA)......................74

        B.      ALCOA'S GROUP BENEFITS PLAN.........................................74

                1.      The Written Terms of Alcoa's Plan..................74

                2.      Interpreting Alcoa's Plan ..................................74

II.     IF PLAINTIFFS' RETIREE MEDICAL BENEFITS VESTED AT
        ALL, THEY DID NOT VEST PRIOR TO RETIREMENT. ...................75

        A.      ALTHOUGH THE DETERMINATION OF THIS ISSUE
                IS UNNECESSARY, AS DISCUSSED BELOW, FOR A
                DECISION ON WHETHER PLAINTIFFS' BENEFITS
                VESTED UPON RETIREMENT, ALCOA'S POSITION
                IS THAT RETIREE MEDICAL BENEFITS DO NOT
                VEST........................................................................................75

                1.      Medical benefits vest as a matter of contract, not
                        statute. ...................................................................75

                2.      The Yard-Man inference does not apply to
                        Plaintiffs' claim of vesting..................................75

                3.      The evidence does not support Plaintiffs' contention
                        that retiree medical benefits are vested..............76

        B.      PLAINTIFFS' RETIREE MEDICAL BENEFITS
                CERTAINLY DID NOT VEST PRIOR TO
                RETIREMENT. ........................................................................77

                1.      Sixth Circuit law is clear that in the absence of
                        explicit contractual language demonstrating vesting,
                        retiree medical benefits do not vest prior to
                        retirement. ...........................................................77

-viii-

III.    EVEN IF PLAINTIFFS' BENEFITS VESTED UPON
        RETIREMENT, THE BENEFITS WOULD HAVE VESTED
        WITH THE CAP ALREADY IN PLACE................................................79

        A.    CBAS ARE INTERPRETED ACCORDING TO THEIR
              WRITTEN TERMS AND SO AS NOT TO CREATE AN
              ABSURD RESULT. ...............................................................79

        B.    THE WRITTEN TERMS OF THE AGREEMENT
              CLEARLY GAVE ALCOA THE RIGHT TO
              IMPLEMENT A CAP...............................................................80

        C.    THE EVIDENCE OVERWHELMINGLY SUPPORTS
              THE CONCLUSION THAT THE PARTIES
              UNDERSTOOD THE CAP TO BE REAL. ................................81

        D.    ALCOA PROPERLY IMPLEMENTED THE CAP
              AGREEMENT AS NEGOTIATED BY THE PARTIES IN
              1993, 1996 AND 2001...........................................................83

IV.     EVEN IF UNCAPPED BENEFITS HAD VESTED, ALCOA'S
        2006 PLAN DESIGN CHANGES CONSTITUTED A
        REASONABLE AND PERMISSIBLE MODIFICATION OF
        PLAINTIFFS' BENEFITS. ........................................................84

        A.    BENEFIT PLANS ARE SUBJECT TO REASONABLE
              MODIFICATIONS UNLESS EXPRESSLY PRECLUDED
              BY THE CBA. ....................................................................84

        B.    ACCEPTING AS TRUE PLAINTIFFS' INCORRECT
              UNDERSTANDING OF THE CAP LETTERS, THE
              CHANGES TO ALCOA'S BENEFITS PLAN WERE
              NONETHELESS REASONABLE. ..........................................85

              1.    Alcoa's benefits plan was subject to reasonable
                    modifications........................................................85

              2.    The plan design changes set forth in the 2006 CBA
                    did not reduce benefits below past levels. ........................86

              3.    The plan design changes set forth in the 2006 CBA
                    were negotiated by the Union. ...........................................86

              4.    The plan design changes set forth in the 2006 CBA
                    were reasonably commensurate with prior changes,
                    changes to active employees and changes made by
                    other companies. ..............................................................87

5.      The plan design changes set forth in the 2006 CBA
        will ensure that no further plan design changes will
        be necessary until 2017.....................................................88

Case 3:06-cv-00448-PLR-CCS     Document 507-2     Filed 11/16/09     Page 11 of 104
PageID #: 12121

# INDEX OF WITNESSES

The following is an alphabetical list of witnesses whose testimony was offered at trial, either live or through deposition designations.  Witnesses marked with an asterisk (*) testified in person at trial.

| | |
|---|---|
| Ian Altman* | Plaintiffs' actuarial expert witness |
| Stephen Barse | Former president of USW Local 412 in Massena, New York |
| Brickey Beasley* | Former president of USW Local 309 in Alcoa, Tennessee |
| Ron Bloom | Former Special Assistant to the President of the United Steelworkers Union |
| Paul Boutin | Former actuarial consultant at Hewitt Associates |
| Lawrence Fountaine* | Former president of USW Local in Massena, New York |
| Dan Henry* | Former president of USW Local 4880 in Bauxite, Arkansas |
| David Hilko* | Alcoa's actuarial expert witness |
| Ronald Hoffman | Former Alcoa Executive Vice President of Human Resources |
| Scott Kovaloski | Alcoa Manager of Health and Welfare Benefits Consulting |
| Ernie LaBaff* | Former President of the Aluminum, Brick and Glass Workers Union |
| Mary Ellen Lammel | Alcoa Director of Benefits |
| Duane Lee* | Principal and Consulting Actuary at Buck Consultants |
| Gary MacDonald | Former Director of Compensation and Benefits for Reynolds Metals Company |
| Dennis Macy | Former president of USW Local in Massena, New York |

-xi-

| Harvey Martin | Former Secretary/Treasurer of the Aluminum, Brick and Glass Workers Union |
| Lauren McCullough* | Alcoa Director of Global Finance Development and Human Resource Finance |
| James Michaud* | Former Alcoa Manager of Group Benefits |
| Thomas Moore* | Former president of USW Local 309 in Alcoa, Tennessee |
| Thomas Mordowanec | Former Alcoa Director of Employee Benefits for North America |
| John Murphy* | Former Special Assistant to the President of the Aluminum, Brick and Glass Workers Union; Former Director of the ABG Division of the United Steelworkers Union |
| Bob Newman | Former Vice President of Human Resources for Reynolds Metals Company |
| Paul O'Neill* | Former Alcoa Chairman and Chief Executive Officer |
| Kevin Oxley | Former Alcoa Benefits Specialist |
| Russell Porter* | Former Alcoa Director of Industrial Relations and Human Resources, Planning and Development |
| Russell Pruitt* | Former president of USW Local 4370 in Point Comfort, Texas |
| Joe Quaglia* | Former Alcoa Director of Industrial Relations |
| James Robinson | District Director for the United Steelworkers Union |
| Douglas Root | Former Alcoa Director of Industrial Relations |
| Nick Storm* | Alcoa Senior Counsel |

| | |
|---|---|
| Stephen Weidman | Former Director of Industrial Relations for Reynolds Metals Company |
| David Willett* | President of USW Local 104 in Warrick, Indiana |
| Gerald Wolfe | Alcoa Manager of Employee Benefits Accounting |
| Eugene Woloshyn* | Former Alcoa Director of Human Resources, North America |

Case 3:06-cv-00448-PLR-CCS    Document 507-2    Filed 11/16/09    Page 14 of 104
PageID #: 12124

Defendant Alcoa Inc. ("Alcoa" or "the Company") submits these proposed findings of fact and conclusions of law pursuant to the Court's Order of October 1, 2009.

ALCOA'S PROPOSED FINDINGS OF FACT

## I.    THE PARTIES

1.      Alcoa is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.  In the year 2000, Alcoa purchased Reynolds Metals Company ("Reynolds"), including all of Reynolds' plants.  As part of that purchase and merger, Alcoa adopted and assumed all of the retiree health care and welfare benefit-related duties and liabilities owed to former Reynolds employees, eligible dependants, spouses and retirees under the previous collective bargaining agreements ("CBAs") with Reynolds' unions and Summary Plan Descriptions ("SPDs") provided to Reynolds employees for their employee welfare benefit plan.  (Joint Pre-Trial Order, 8/25/09 (Dkt. No. 459) (hereinafter "JPTO") at 8.)

2.      Plaintiffs are a class of former hourly union-represented employees of Alcoa or Reynolds who retired between June 1, 1993, and June 1, 2006, from certain facilities, who are eligible to receive health care benefits from Alcoa and whose health benefits were subject to a cap on Alcoa's financial liability to be implemented on or before January 1, 2007, and the spouses, surviving spouses or dependents of such retirees.  (Consent Order of Class Certification, 12/19/07 (Dkt. No. 179) at 5-6.) Plaintiffs therefore all retired under CBAs negotiated and ratified in 1993, 1996, and 2001.  (DX 1; DX 2; DX 3; DX 4; DX 10; DX 12; DX 13; DX 14; DX 15; DX 16; DX 17; DX 18; DX 19.)

## II.    PROCEDURAL HISTORY

3.      On November 17, 2006, Plaintiffs commenced this action, seeking to enjoin Alcoa from giving effect to the cap agreement that it had negotiated with the United Steelworkers ("USW" or "Union") as part of the 2006 CBA between Alcoa and the Union.  Plaintiffs also sought compensatory damages, a declaratory judgment and attorneys' fees and costs.  (Plaintiffs' Complaint, 11/17/06 (Dkt. No. 1) at 23-24.)

4.      On December 22, 2006, Plaintiffs filed their First Amended Complaint. (Pls.' First Am. Compl., 12/22/06 (Dkt. No. 3).)

5.      On January 12, 2007, Plaintiffs filed their Second Amended Complaint. (Pls.' Second Am. Compl., 1/12/07 (Dkt. No. 8).)

6.      On January 16, 2007, Plaintiffs filed their Third Amended Complaint. (Pls.' Third Am. Compl., 1/16/07 (Dkt. No. 9).)

7.      On April 18, 2007, Plaintiffs filed their Fourth Amended Complaint. (Pls.' Fourth Am. Compl., 4/18/07 (Dkt. No. 43).)

8.	On October 30, 2007, Plaintiffs filed their Fifth Amended Complaint. (Pls.' Fifth Am. Compl., 10/30/07 (Dkt. No. 169).)

9.	On December 19, 2007, the Court certified a plaintiff class, as described above in paragraph (2).  (Consent Order of Class Certification, 12/19/07 (Dkt. No. 179) at 5-6.)

10.	From September 22 through October 1, 2009, a nonjury trial was held.  At the close of Plaintiffs' case, Alcoa moved for entry of judgment on partial findings to Federal Rule of Evidence 52(c), arguing that Plaintiffs failed to sustain their burden of proof.  (9/22/09-10/1/09 Curtis v. Alcoa Trial Transcript ("Tr.") 1054-73; 1077-78.)  The Court advised that it would rule on Alcoa's motion when it makes its written conclusions.  (Id. at 1078.)  Alcoa renewed that motion following the close of its defense.  (Id. at 2108-09.)  At the conclusion of the trial, the Court ordered that the parties submit proposed findings of fact and conclusions of law by November 16, 2009.  (Id. at 2114.)  The Court further ordered that the parties submit responses to the proposed findings of fact and conclusions of law by December 4, 2009.  (Id. at 2114-15.)

## III.	1992-1993 COLLECTIVE BARGAINING NEGOTIATIONS

### A.	THE COMPANIES' "TWO-PRONGED" HEALTH CARE PROBLEM

11.	In advance of the 1993 negotiations, Alcoa and Reynolds ("the Companies") were focused on their long-term health care costs, and they viewed those costs as presenting two related problems:

11.1	Long-Term Cash Flow Issue:  One problem upon which the Companies were focused was that health care costs were increasing rapidly and the Companies could not continue to bear the cost of health care inflation.  (DX 102, at ALC_CUR_00058023-33; DX 110, at ALC_CUR_00088417; DX 116, at P_ALC_CUR_00002943; DX 120, at ALC_CUR_00089601; Porter, Direct, Tr. 1097-98; Michaud, Direct, Tr. 1247-48, 1251-52, 1254.)

11.2	Balance Sheet Issue:  Another problem upon which the Companies were focused was that, because of a new accounting standard, Financial Accounting Standard 106 ("FAS-106"), the Companies could no longer account for health care costs on a pay-as-you-go basis and would be forced to record substantial charges against earnings unless the Companies modified their health care plans.  (DX 110, at ALC_CUR_00088417; DX 116, at P_ALC_CUR_00002943; DX 120, at ALC_CUR_00089601; Porter, Direct, Tr. 1098-99; Michaud, Direct, Tr. 1261.)

### 1.	Long-Term Cash Flow Issue

12.	The Companies' focus on health care costs leading up to the 1992-93 CBA negotiations was not new.  Beginning in the late 1980s, Alcoa, led by Chairman and CEO

-2-

Paul O'Neill, was concerned about and focused on the issue of health care costs. (DX 102; DX 105; O'Neill, Direct, Tr. 1677-79.)

12.1    Mr. O'Neill and other senior management officials had significant interest in the issue of health care costs. (Michaud, Direct, Tr. 1251.)

12.2    Mr. O'Neill was also concerned with the broader problem of national health care inflation. (DX 163; O'Neill, Direct, Tr. 1678-79.) Health care costs in the United States rose at an annual rate of 11% or more from 1979 to 1991, more than twice the inflation rate over the same period. (Id. at ALC_CUR_00053838.) In late 1990, Mr. O'Neill publicly expressed concern that the United States was on a course toward a federalized system within the following two decades. (DX 109, at USW025981.) Mr. O'Neill directed a team of Alcoa employees to develop a suggested approach to managing the national health care crisis which maintained a focus on individual responsibility. (DX 163, at ALC_CUR_00053836, ALC_CUR_00053842-51.)

12.3    Mr. O'Neill has devoted a large portion of his life to health care issues. (O'Neill, Direct, Tr. 1672-74, 1676-77.) Mr. O'Neill served on the General Motors board beginning in 1993 but resigned in May 1995 because he believed General Motors would go bankrupt unless it acknowledged and reined in its uncontrolled health care costs. (O'Neill, Direct, Tr. 1684-86.)

13.    Health care costs at Alcoa in the late 1980s and early 1990s were increasing at a rapid rate. (Porter, Direct, Tr. 1097-99; Michaud, Direct, Tr. 1247-48, 1251-52, 1254.)

13.1    Alcoa's per capita employee medical (including retiree medical), HMO and Medicare Part B reimbursement had risen from $3,669 in 1986 to $5,323 in 1989. (DX 102, at ALC_CUR_00058030; O'Neill, Direct, Tr. 1680-81.)

13.2    Health care was one of Alcoa's most rapidly rising costs of doing business during this period. (Michaud, Direct, Tr. 1254.)

13.3    Alcoa estimated that its health care costs would continue to rise between 12% and 15% annually if left unchecked. (Michaud, Direct, Tr. 1254.)

14.    Mr. O'Neill and others in Alcoa management were concerned with the escalation of health care costs because of its impact on employee compensation and its threat to Alcoa's competitive position. (DX 163, at ALC_CUR_00053839; O'Neill, Direct, Tr. 1681-82.)

15.    Jim Michaud began working for Alcoa as its Manager of Group Benefits in 1989 and quickly became involved in Alcoa's attempts to understand what was driving the increase in these health care costs for the four populations comprising Alcoa's workforce—active salaried, active hourly, retired salaried and retired hourly. (Michaud, Direct, Tr. 1249-50.)

15.1    Mr. Michaud's team determined that Alcoa's total projected retiree medical liability was $1.66 billion, with approximately two thirds of that liability coming from Alcoa's active and retired hourly employees, and nearly one third of the total liability coming from Alcoa's retired hourly employees. (DX 122, at CSM_BUCK00004449.)

15.2    Mr. Michaud and his team began to look at alternatives available to help mitigate expenses for those populations, including potential bargaining positions that Alcoa might take at labor negotiations for its hourly active and retired populations. (DX 122; DX 123; DX 124; Michaud, Direct, Tr. 1261.)

16.    In the late 1980s and early 1990s, Reynolds also was concerned with the growing costs associated with health care. (Newman Deposition Transcript (henceforth "__, Dep., Tr.") 35:18-23; Hoffman, Dep., Tr. 17:9-18.) In particular, Reynolds was concerned with the growing costs of retiree medical care and began to assess ways to mitigate these costs. Reynolds recognized a number of possible solutions to its cash flow problem: (1) reducing retiree medical benefits; (2) tightening eligibility restrictions for retiree medical benefits; (3) transferring the cost of retiree medical care to the retirees; (4) restricting choice through mechanisms like the establishment of managed care networks; and (5) getting out of the retiree health care business entirely. (DX 116, at P_ALC_CUR_00002943.)

## 2.    Balance Sheet Issue

17.    In February 1989, the Financial Accounting Standards Board ("FASB") issued a draft release of FAS-106. (DX 116, at P_ALC_CUR_00002949.) On December 21, 1990, FASB approved FAS-106, to go into effect on December 15, 1992. (Id.)

18.    FAS-106 required accrual accounting for postretirement benefits other than pensions. (DX 110, at ALC_CUR_00088417; DX 111.) This new requirement significantly increased the liability for which the Companies would have to account on their balance sheets.

18.1    For example, Reynolds estimated that the 1993 expense on its income statement would be approximately $1 billion, between four and seven times greater than its expense under the pay-as-you-go accounting rules. (DX 110, at ALC_CUR_00088417.)

18.2    In its December 1992 annual report, Alcoa informed shareholders that it reported a $1.139 billion loss in 1992, including a charge of $1.166 billion to comply with FAS-106. (DX 504, at 1; O'Neill, Direct, Tr. 1703-04.)

19.    FAS-106 brought the Companies' health care concerns into focus and made clear that the Companies needed to address the problem in the 1992-93 negotiations with the USW and the Aluminum, Brick and Glass Workers Union ("ABG") (collectively, "the Unions"). (Porter, Direct, Tr. 1098-99; Newman, Dep., Tr. 34:24-37:15.)

20.    However, Alcoa would have addressed the issue of rapidly increasing retiree medical expenses in the 1992-93 CBA negotiations regardless of whether FAS-106 had been enacted.  (Porter, Direct, Tr. 1114.)

**B.    THE CONDUCT OF THE COMPANIES AND THE UNIONS LEADING UP TO THE 1992-1993 NEGOTIATIONS DEMONSTRATES THAT THE PARTIES BELIEVED THAT THE CAP WAS REAL.**

**1.    The Companies took significant steps to prepare for their negotiations over health care in the 1992-1993 negotiations.**

**a.    Internally, the Companies analyzed the cash flow and balance sheet problems and considered possible approaches to mitigate those problems in the 1992-1993 negotiations.**

21.    Alcoa was determined to curb inflation in its health care expenditures during the upcoming negotiations.  (Porter, Direct, Tr. 1097.)

22.    In preparation for negotiations, Alcoa's benefits, finance and accounting staff projected the cost of various changes to the overall economic package, including potential changes to Alcoa's retiree health care plan.  (Porter, Direct, Tr. 1100-01; Michaud, Direct, Tr. 1254-55.)

23.    Alcoa analyzed how plan design changes and total health care liability reduction efforts worked together, how plan design changes could lower Alcoa's health care expenses and how imposing a cap on retiree medical expenses could mitigate those expenses even further.  (DX 128; Michaud, Direct, Tr. 1268-69.)

24.    At Reynolds, top human resources and benefits executives met with senior management on multiple occasions to discuss retiree health care liability and to review the impact of the new FASB regulation.  (DX 116, at P_ALC_CUR_00002949.)

25.    Shortly after the adoption of FAS-106, Reynolds' senior management, including CEO Dick Holder, requested that a postretirement welfare benefits committee, composed of Reynolds finance and human resources staff members, be formed.  (DX 116, at P_ALC_CUR_00002941, P_ALC_CUR_00002949.)

25.1    The committee was tasked with further defining and prioritizing issues and formulating potential solutions with respect to Reynolds' FASB and health care cost concerns.  (DX 116, at P_ALC_CUR_00002949.)

25.2    The committee met on multiple occasions following its formation, reviewing Reynolds' previous work and strategies and participating in meetings and presentations with outside parties. (Id. at P_ALC_CUR_00002941.)

-5-

26.     Alcoa informed employees of its rising health care costs.  (DX 138; DX 140, at ALC_CUR_00049198; Michaud, Direct, Tr. 1258-60; Porter, Direct, Tr. 1105-10.)

26.1     Representatives from Alcoa's Human Resources and Industrial Relations departments met with Alcoa's business unit presidents who managed USW or ABG plants to discuss Alcoa's options to limit the rise of retiree medical costs.  (DX 140; Porter, Direct, Tr. 1105-10.)  This presentation indicated Alcoa's intent to decrease its future medical cost increases through managed care and a cap.  (DX 140, at ALC_CUR_00049198, ALC_CUR_00049204; Porter, Direct, Tr. 1107.)

> **b.      The Companies also worked with consultants to determine the best approach to dealing with their two-pronged health care problem of rising health care costs and the issuance of FAS-106.**

27.     Before FAS-106 was enacted, but after it was proposed, Reynolds met with its accountants, actuarial experts and other consultants in an effort to better understand the anticipated FASB requirements for the accounting of postretirement welfare benefits, as well as possible approaches to deal with its health care liability.  (DX 104; DX 107; DX 112; DX 113 (attachment to DX 112); DX 114; DX 115; DX 116, at P_ALC_CUR_00002949; DX 117.)

28.     As early as February 1990, Alcoa began to receive advice from outside consultants regarding controlling costs through its hourly post-retirement medical plans.  (DX 101.)

29.     Alcoa actively sought advice from outside benefits consultants, auditors and accountants to better understand the requirements of FAS-106.  (Porter, Direct, Tr. 1100-01; Michaud, Direct, Tr. 1254.)

30.     Alcoa's actuarial firm, Buck Consultants, evaluated potential plan design changes and other approaches to reduce Alcoa's health care liability.  (DX 125; DX 126; DX 127; DX 128; DX 139; DX 142; DX 144; DX 146; Lee, Direct, Tr. 1609-15.)

30.1     Buck evaluated the impact of a cap with immediate engagement at 1991 levels, which would require increased out-of-pocket expenditures for retirees.  (DX 125; Lee, Direct, Tr. 1610.)

30.2     Buck also considered the impact of employing deferred caps on Alcoa's retiree health care liability while at the same time implementing immediate plan design changes that would have increased retirees' out-of-pocket expenditures.  (DX 126; DX 127; DX 128; Lee, Direct, Tr. 1610-13; Porter, Direct, Tr. 1104; Michaud, Direct, Tr. 1266-70.)  Deferred caps were relatively common in Buck's practice, as deferred caps allowed retirees to plan for the increased premiums that would eventually be required.  (Lee, Direct, Tr. 1611.)

-6-

30.3    Buck also looked at the possibility of implementing caps with indexing, meaning that the cap would increase gradually, at a rate less than the rate of health care inflation.  (DX 139; DX 142, at CSM_BUCK00003959; Lee, Direct, Tr. 1612-14.)  Such a plan would have also increased retirees' out-of-pocket costs.  (Lee, Direct, Tr. 1614.)

30.4    Buck considered other plan design approaches as well, such as benefits credits based on years of service for retirees.  (DX 146; Lee, Direct, Tr. 1614-15.)

31.    Alcoa determined that it could most effectively slow the increase in its health care expenditures by implementing plan design changes and imposing a cap.  (DX 128; Michaud, Direct, Tr. 1269.)

32.    Both Reynolds' and Alcoa's outside consultants advised the Companies that a cap would have to be real to reduce liability.  (DX 114, at ALC_CUR_00087517-23; DX 115, at ALC_CUR_00025313; DX 156, at ALC_CUR_00177067; DX 158; Root, Dep., Tr. 75:7-13.)

32.1    At Mr. O'Neill's request, Alcoa consulted with its auditor, Coopers & Lybrand, to confirm that its understanding of the requirements of FAS-106 was accurate.  (DX 156, at ALC_CUR_00177067).

32.2    Also at Mr. O'Neill's request, Alcoa confirmed with FASB representatives that a deferred cap that was intended to be implemented at a future time would reduce FAS-106 liability.  (DX 158.)

32.3    Not only did Alcoa understand that an artificial cap would not limit its FAS-106 liability, but it also understood that an artificial cap would not have addressed the problem of escalating health care costs in the long term, and thus would not have solved Alcoa's primary goal of curbing those expenses.  (Porter, Direct, Tr. 1114.)

c.    **The Companies also investigated what peer companies were doing with respect to health care costs for hourly collectively bargained employees.**

33.    In the early 1990s, many other companies dealt with the implementation of FAS-106 and the increase in expense and liability by changing plan designs and capping their plans.  (Hilko, Direct, Tr. 1787.)

34.    Alcoa and Reynolds learned in advance of the 1992-93 negotiations that other companies were negotiating caps on their retiree health benefits in their CBAs. (DX 110, at ALC_CUR_00088417; DX 121, at ALC_CUR_000438076; DX 137; DX 166, at CSM_BUCK00004023; DX 169, at P_ALC_CUR_00029256-57; DX 173, at ALC_CUR_00079263-64; Michaud, Direct, Tr. 1264; Porter, Direct, Tr. 1100-04.)

-7-

34.1    Alcoa contacted representatives from peer companies to discuss the success those companies had had negotiating caps with their unions. (Porter, Direct, Tr. 1102-04; Michaud, Direct, Tr. 1264-66.)

34.2    In June 1990, Reynolds met with labor executives from Bell Atlantic to learn about the cap agreement Bell Atlantic had crafted with its unions. (DX 103; DX 110, at ALC_CUR_00088417; DX 116, at P_ALC_CUR_0002949.)

34.3    Reynolds' actuarial consultants informed Reynolds that caps had been instituted by numerous other companies, including IBM, AT&T, Ameritech, BellSouth, Pillsbury, Kodak, American Airlines and Procter and Gamble. (DX 114, at ALC_CUR_00087547-51; DX 117, at ALC_CUR_00089217-29.) Other companies in the metals industry, including U.S. Steel and Mittal Steel, instituted caps as well. (Michaud, Direct, Tr. 1265-66.)

34.4    The Companies learned that the ABG and the USW had negotiated caps with other companies. (DX 166.) Despite the existence of cap agreements in CBAs between other companies and the ABG and USW, John Murphy told Reynolds in early 1991 that Reynolds was the only company that had presented the FASB problem to the ABG. (DX 116, at P_ALC_CUR_00002947.)

34.5    Alcoa also learned that some of the companies that had negotiated cap agreements with the USW had deferred caps. For instance, prior to negotiations Russ Porter learned through discussions with his counterpart at American National Can that American National Can's cap agreement with the USW provided for engagement of the cap subsequent to the term of the CBA. (DX 164; Porter, Direct, Tr. 1103.) Deferred caps were common among companies that chose to cap their plans. (Hilko, Direct, Tr. 1788-1789.)

34.6    Alcoa believed that the fact that the USW had negotiated a cap with other companies made it more likely that it would agree to a cap with Alcoa. (Michaud, Direct, Tr. 1265.)

### d.    The Companies worked together to develop a shared approach to their common problems of rising health care costs and FAS-106.

35.    The Companies met periodically in advance of the 1992-93 CBA negotiations to determine their joint position on the negotiation issues, including health care. Alcoa and Reynolds concluded that they would seek to implement a cap on their financial contributions to hourly retiree health care costs. (DX 129; Hoffman, Dep., Tr. 17:2-18; Newman, Dep., Tr. 47:24-49:4.)

36.    The Companies also decided that they would seek to negotiate a switch to a managed care plan for their retirees. (DX 504, at 1; Porter, Direct, Tr. 1098-1100; O'Neill, Direct, Tr. 1703-04; Robinson, 2007 Dep., Tr. 17:5-13; Hoffman, Dep., Tr. 12:2-13:6.)

-8-

36.1 Alcoa made similar changes to the health care plans of salaried employees by capping its contributions for salaried employees' health care costs and switching them to a managed care plan. (Porter, Direct, Tr. 1099; Michaud, Direct, Tr. 1273-74.)

37. On August 18, 1992, the Companies met to discuss the cap and agreed that they understood that the cap needed to be "real" if it was going to serve to limit the Companies' FAS-106 liability. (DX 154, at ALC_CUR_00192327; DX 155, at ALC_CUR_00130828; Porter, Direct, Tr. 1111-15.)

37.1 Alcoa's internal memorandum discussing the meeting states that both Companies agreed that "the cap will not be used as an artificial way to decrease the liability for financial accounting purposes". (DX 154, at ALC_CUR_00192329.)

37.2 Reynolds' internal memorandum discussing the meeting similarly states: "It is [the author's] understanding that we do not view caps as an artificial means to reduce the initial FAS-106 cost calculations and therefore would consider them in the initial cost calculations. Again Alcoa agreed with our position." (DX 155, at ALC_CUR_00130828.)

38. The Companies never considered having an artificial cap. (Newman, Dep., Tr. 54:13-57:10, 58:9-13, 62:7-63:3; Hoffman, Dep., Tr. 17:23-18:2.)

## 2. The Companies informed the Unions that they intended to negotiate for a cap during the upcoming negotiations.

39. The Companies and the Unions met several times leading up to the 1992-93 negotiations, during which time the Companies communicated to the Unions their concerns over rising health care costs and FAS-106, and the Companies' need to implement a cap on retiree health care costs to address those concerns. (DX 106; DX 110; DX 114, at ALC_CUR_00087562-72; DX 116, at P_ALC_CUR_00002949; DX 118; DX 119; DX 130; DX 132; DX 133; DX 134; DX 135; DX 136; DX 145; DX 165, at ALC_CUR_00189538-39.)

40. Reynolds and union representatives (including John Murphy and Harvey Martin for the ABG) met as early as the summer of 1990 and discussed both FASB and the problem of increasing health care cost. (DX 106, at ALC_CUR_00093311; DX 108; DX 110, at ALC_CUR_00088418; DX 114, at ALC_CUR_00087562-72; DX 116, at P_ALC_CUR_00002949; DX 165, at ALC_CUR_00189538-39; Martin, Dep., Tr. 49:22-50:8.)

41. Alcoa communicated with, and made presentations to, the Unions in advance of negotiations concerning its need to cap future liability for retiree medical costs. (DX 130, at USW000971.)

-9-

42.     In June 1991, representatives from Reynolds and the ABG met to continue ongoing communications regarding the problem of, and reasons for, escalating health care costs.  (DX 119.)

43.     Reynolds CEO Dick Holder met with Lynn Williams, President of the USW, in advance of the 1992 negotiations to discuss Reynolds' health care cost concerns.  (DX 118.)

 43.1     Mr. Holder informed Mr. Williams that health care was among the fastest rising costs at Reynolds.  (Id. at ALC_CUR_00087094.)

 43.2     Specifically, Mr. Holder noted that if the trend continued, by 2000, annual costs per employee would grow from $5,300 to nearly $16,000.  (Id. at ALC_CUR_00087095.)

 43.3     Mr. Holder also expressed his frustration that Reynolds had recognized the health care cost problem in prior years, but since 1983 had achieved "zero progress" with respect to the problem in negotiations with the USW and did not feel it had a receptive audience in the USW.  (Id.)

 43.4     Mr. Holder told Mr. Williams that Reynolds was aware that the USW had reached agreements regarding health care with other companies in the metal industry.  (Id. at ALC_CUR_00087095-96.)

 43.5     Mr. Holder continued to press for recognition from Mr. Williams and the USW that the health care problem was a joint problem, and Mr. Holder encouraged additional meetings between Reynolds and the Union.  (Id. at ALC_CUR_00087097.)

44.     In January 1992, Alcoa and Reynolds representatives met with John Murphy and Harvey Martin of the ABG and George Becker, Jim English and Joe Kiker of the USW.  (DX 132.)

 44.1     During the meeting, Reynolds summarized discussions with the Unions during the prior year and reiterated its focus on health care.  (DX 132, at ALC_CUR_00002930; DX 133, at ALC_CUR_00054828.)

 44.2     Alcoa confirmed that health care was the major issue for Alcoa as well, and reminded the Unions that "FASB is not the major problem—runaway costs are—and [the Company] only [has] so much money to spend for compensation".  (DX 133, at ALC_CUR_00054829; see also DX 132, at ALC_CUR_00002931.)

45.     During some of these pre-negotiation meetings, the Unions expressed that they would not agree to any health care proposal that shifted costs to employees.  (DX 132, at ALC_CUR_00002931, ALC_CUR_00002934; DX 133, at ALC_CUR_00054829; DX 134, at ALC_CUR_00037076; DX 147, at

-10-

ALC_CUR_00050856; DX 165, at ALC_CUR_00189542, ALC_CUR_00189547; Porter, Direct, Tr. 1118-19; Newman, Dep., Tr. 68:14-24; Hoffman, Dep., Tr. 51:4-53:2.)

46.     Reynolds provided a written proposal for a cap to the Unions in early 1992. (DX 132, at ALC_CUR_00002936-38; MacDonald, Dep., Tr. 67:24-69:19; Newman, Dep., Tr. 91:14-92:10.)

47.     The Companies and the Unions met again in February 1992. (DX 134.) The purpose of this meeting was to determine whether or not the parties should enter into early negotiations. (Id. at ALC_CUR_00037077.) The Companies' position was that any discussion of other issues and company concessions would be contingent on the Unions' acceptance of the health care proposal presented at the previous meeting. (Id.)

48.     On February 7, 1992, the Unions presented the Companies with a response to the Companies' health care proposal. (DX 135, at ALC_CUR_00056032.)

48.1    Alcoa responded to that proposal on February 11, 1992, and expressed frustration that the Unions' counterproposal did not address the Companies' need to reduce health care costs and in fact proposed increasing Alcoa's health care costs significantly. (Id.)

48.2    Alcoa also reiterated to the Unions that, while their counterproposal was silent on FASB, FAS-106 would increase Alcoa's liability for postretirement welfare benefits and have a negative effect on profit sharing. (Id. at ALC_CUR_00056035.)

48.3    Alcoa warned the Unions that unless the Unions were ready to deal realistically with health care costs, Alcoa would have to "turn down business" and would "not be able to share cost savings" with employees. (Id.)

48.4    The Companies reiterated their problems with the Unions' health care proposal in a February 18, 1992 meeting with the Unions. (DX 136, at ALC_CUR_00037114.)

49.     The Companies' communication efforts concerning rising health care costs extended to the local as well as the international unions. In August 1992, Mr. O'Neill distributed a memorandum to Alcoa's business unit presidents, requesting that the presidents communicate the health care issue to their employees and provide Mr. O'Neill with feedback on that communication. (DX 151, at ALC_CUR_00027997-99; O'Neill, Direct, Tr. 1695-96.)

49.1    Mr. O'Neill requested that the health care issue be communicated to employees because he believed that providing all the facts about a given issue to employees would allow them to make rational decisions. (O'Neill, Direct, Tr. 1696.)

-11-

49.2     The business unit presidents provided Mr. O'Neill's requested feedback in the weeks following the distribution of his memo.  (DX 152; DX 153; DX 157.)

49.3     The response from George Bergeron, the business unit president in charge of the Warrick and Tennessee operations, indicated that both Warrick and Tennessee union leadership and employees had been well educated on the subject of health care costs.  (DX 152, at ALC_CUR_00185511.)

50.     Reynolds' FAS-106 actuarial consultant, Mike Gulotta, also gave presentations to local unions concerning the requirements of FAS-106, including the requirement that the cap be real.  (DX 160; MacDonald, Dep., Tr. 91:6-92:13, 99:20-100:17.)

C.     **NEGOTIATIONS PRIOR TO MAY 1993 DID NOT YIELD A NEW CONTRACT, LARGELY BECAUSE OF THE PARTIES' INABILITY TO REACH AN AGREEMENT ON THE HOTLY CONTESTED ISSUE OF HEALTH CARE.**

51.     The 1988 CBA was set to expire on May 31, 1992.  (Porter, Direct, Tr. 1115.)

52.     A general economic recession during the early 1990s had hit Alcoa particularly hard, as Russian producers suddenly began to flood the market with aluminum, depressing prices.  (O'Neill, Direct, Tr. 1686-87.)  Mr. O'Neill was concerned with the effect this recession would have on the 1992 negotiations, so in the spring of 1992, he approached Lynn Williams, President of the USW, and convinced him to agree to a one-year extension of the existing CBA.  (O'Neill, Direct, Tr. 1687-88; Porter, Direct, Tr. 1115.)

53.     As part of the extension agreement, the parties established a joint committee to examine the issue of health care costs in advance of the next round of negotiations.  (DX 141; Porter, Direct, Tr. 1115-17.)

53.1     The joint committee met on multiple occasions over the course of the summer of 1992.  (DX 148; DX 150; Porter, Direct, Tr. 1117.)  Health care benefits consultants and field experts participated in those meetings.  (DX 148; DX 149; DX 150.)

53.2     During those meetings, union representatives acknowledged the Companies' health care cost management goals.  (DX 150.)

54.     Alcoa and the Unions met in August 1992, with Mr. O'Neill present.  (DX 147.)  During that meeting, the Unions expressed their belief that health care would be nationalized, thereby solving the health care cost problem.  (DX 147, at ALC_CUR_00050856; O'Neill, Direct, Tr. 1690-91.)

-12-

54.1    Mr. O'Neill stressed the FAS-106 problem as well.  (DX 147, at ALC_CUR_00050856; O'Neill, Direct, Tr. 1691-93.)

54.2    ABG negotiator John Murphy "reiterated [the ABG's] understanding that this was [Alcoa's] major issue".  (DX 147, at ALC_CUR_00050856; O'Neill, Direct, Tr. 1693-94.)

54.3    Alcoa again expressed that it needed to change fundamentally its health care program, including implementing caps.  (Porter, Direct, Tr. 1118-19; Hoffman, Dep., Tr. 51:4-53:2.)

55.    The Companies and the Unions met in Pittsburgh in September 1992 in an attempt to negotiate a new CBA.  (DX 159; Porter, Direct, Tr. 1119; LaBaff, Cross, Tr. 251-52.)

56.    Alcoa and Reynolds negotiated jointly.  (Porter, Direct, Tr. 1095-96.)  The USW and ABG also negotiated jointly.  (Robinson, 2007 Dep., Tr. 11:4-10.)  Ultimately, each company entered into a separate agreement with each union.  (Porter, Direct, Tr. 1096.)

57.    The primary decision-making authority for wage and benefit issues resided at the "top table".  (Moore, Cross, Tr. 520-21; Robinson, 2007 Dep., Tr. 12:20-13:24.)  The proposed cap agreement was only negotiated at the top table.  (Henry, Cross, Tr. 991; Beasley, Cross, Tr. 711; Michaud, Direct, Tr. 1276.)

58.    Russ Porter and Ron Hoffman were the Alcoa representatives at the top table.  Bob Newman, John McGill and Don Cowles were the Reynolds representatives at the top table.  (JPTO at 6.)

58.1    Mr. Porter was Alcoa's Corporate Director of Industrial Relations and Human Resources, Planning and Development from March 1, 1992, through May 31, 1994.  In that capacity, he served as the chief negotiator for Alcoa at the 1992 and 1993 negotiations.  (Porter, Direct, Tr. 1092-94.)

59.    George Becker, Joe Kiker and Jack Golden were the primary USW representatives at the top table.  (JPTO at 6.)  John Murphy and Harvey Martin were the ABG representatives at the top table.  (LaBaff, Direct, Tr. 231; Martin, Dep., Tr. 12:6-13:7.)

60.    At the opening assembly of the September 1992 negotiations, Mr. O'Neill announced that Alcoa was seeking substantial changes to employee health care in order to manage escalating costs and to comply with FAS-106.  (DX 159, at ALC_CUR_00018015-17.)

60.1    During the negotiations, the Companies again stressed the importance of changing the health care plan and instituting a cap on retiree medical benefits.  The Companies told the Unions that money saved by reducing

-13-

health care costs could be used to provide other economic benefits such as wage increases. (DX 161, at ALC_CUR_00055214-15; Porter, Direct, Tr. 1123-24.)

61. The negotiations were unsuccessful primarily because the parties could not agree on the health care issue. (DX 161, at ALC_CUR_00055234-36; Porter, Direct, Tr. 1124.)

62. Shortly after the failure of the September 1992 negotiations, Alcoa began to take steps to prepare for the possibility of a work stoppage. (Porter, Direct, Tr. 1126.)

62.1 Alcoa's—and Mr. O'Neill's—primary health care objectives going into the 1992-93 negotiations were to achieve (1) managed care and (2) a cap on retiree medical benefits. (Porter, Direct, Tr. 1099-1100; O'Neill, Direct, Tr. 1698.)

62.2 The USW obtained authorization for a strike if the parties had not reached agreement at the 1993 negotiations. (Robinson, 2007 Dep., Tr. 23:1-9.)

62.3 Alcoa was willing to accept a strike if the Unions would not agree to managed care and a cap on retiree health care costs. (Porter, Direct, Tr. 1126.)

62.4 Alcoa informed the Unions of its strike preparedness. (DX 172, at ALC_CUR_00037004; O'Neill, Direct, Tr. 1705-08.)

63. The Companies and the Unions met again in February 1993 in Miami in an attempt to reach an agreement on a new CBA. During those discussions, the Companies again proposed a cap on retiree medical benefits. (DX 170, at ALC_CUR_00002947; Porter, Direct, Tr. 1127-29.)

63.1 In earlier discussions, the Companies had proposed to implement the cap immediately. (Porter, Direct, Tr. 1130; Robinson, 2007 Dep., Tr. 21:3-18.)

63.2 However, as a concession to the Unions, the Companies proposed a cap that would not engage until after the expiration of the contract. (DX 170, at ALC_CUR_00002947; Porter, Direct, Tr. 1129-30.)

63.3 The Companies and the Unions remained unable to reach an agreement in the February 1993 meetings. (Porter, Direct, Tr. 1129-30.)

D.   **THE MAY 1993 NEGOTIATIONS**

1.   **The cap agreement was the product of hard-fought, arms-length bargaining between the Companies and the Unions.**

64. The negotiations in May 1993, were held in Cleveland, Ohio. (Porter, Direct, Tr. 1130.)

-14-

65.     Mr. Hoffman was the Executive Vice-President of Human Resources.  He attended each negotiating session in May 1993 and took copious notes of each session.  Once each session adjourned, Mr. Hoffman immediately transcribed the notes and sent them to Paul O'Neill, then Alcoa's Chairman and CEO, so that Mr. O'Neill would remain informed about the negotiations.  After the negotiations, the notes were maintained in Alcoa's files.  (DX 174; Porter, Direct, Tr. 1119-20; Hoffman, Dep., Tr. 21:3-22:9, 25:5-27:17.)

65.1    John Murphy later remarked that he had never seen notes as accurate and complete as Mr. Hoffman's notes from the May 1993 negotiations.  (Porter, Direct, Tr. 1153-54.)

66.     Throughout the May negotiations, the Companies continued to express to the Unions that they wanted the Unions to agree to a cap.  (Porter, Direct, Tr. 1131-32.)

67.     For the majority of the May negotiations, the Unions resisted the notion of a cap in its entirety.  (Michaud, Direct, Tr. 1276; Robinson, 2007 Dep., Tr. 23:20-23.)

67.1    During a meeting on the morning of May 30, the day before the CBA was to expire, George Becker, the chief negotiator for the Unions, proposed deleting the cap from the Companies' health care proposal.  (DX 174, at ALC_CUR_00003110-11; Porter, Direct, Tr. 1131-32; Hoffman, Dep., Tr. 32:22-33:3.)

67.2    After this meeting, the Companies linked the Unions' proposal of enhanced pensions with the Companies' proposal for managed care and a cap on retiree medical costs, and the Companies informed the Unions that they could not agree to one without the other.  (DX 174, at ALC_CUR_00003112, ALC_CUR_00003114-15; Porter, Direct, Tr. 1133-35; Michaud, Direct, Tr. 1272-73.)

68.     On the afternoon of May 31, the final day of the CBA, the Unions again refused to agree to the cap.  In response, Bob Newman, a Reynolds negotiator, emphatically stated that the Companies could not accept the Unions' position on caps.  As reported in Mr. Hoffman's notes, Mr. Newman stated regarding caps:  "WE MUST HAVE THEM."  (DX 174, at ALC_CUR_00003118-19; Porter, Direct, Tr. 1136-37; Hoffman, Dep., Tr. 33:19-35:12.)

69.     On May 31, at approximately 7:30 p.m. (hours before the midnight strike deadline), the Unions handed across the table a letter that contained a cap proposal.  (DX 5; DX 174, at ALC_CUR_00003122; Porter, Direct, Tr. 1140-41; Robinson, 2007 Dep., Tr. 23:24-24:17, 26:22-27:9.)

69.1    The Unions' proposed cap letter provided for a cap that would limit costs at 2000 levels and would not engage until January 1, 2001.  (DX 5.)

69.2    The Unions' proposed cap letter provided that the cap would be a mandatory subject of bargaining at all future negotiations.  (Id.)

-15-

69.3    It was important to the Unions that the cap be a mandatory subject of bargaining because the Unions wanted to have the opportunity to bargain over the cap again before the Companies implemented it. (LaBaff, Cross, Tr. 281-283; Martin, Dep., Tr. 23:13-24:10.)

69.4    Ernie LaBaff, the President of the ABG and a signatory to the cap letter, testified at trial that he was unable to explain why the parties would make the cap a mandatory subject of bargaining if the cap were not real. (LaBaff, Cross, Tr. 279-281.)

70.    During a caucus in the negotiations, the Companies discussed the Unions' proposed cap letter and decided to respond with a cap that would engage in 1998 at 1997 cost levels. At that caucus, Mr. Hoffman advised Mr. O'Neill of the status of the negotiations and Mr. O'Neill authorized a last, best and final offer which included a cap at 1997 levels. (DX 174, at ALC_CUR_00003124; Porter, Direct, Tr. 1142-43.)

70.1    At this point, Alcoa was prepared to accept a work stoppage if the Unions did not accept its version of the cap letter. (Porter, Direct, Tr. 1143-44; O'Neill, Direct, Tr. 1707-08.)

71.    The Companies returned to the top table and, at approximately 1:30 a.m., responded with their own proposed cap letter. (DX 7; DX 174, at ALC_CUR_00003124; Porter, Direct, Tr. 1145-47; Robinson, 2007 Dep., Tr. 24:18-25:2.).

71.1    The Companies' proposed cap letter called for a cap that would go into effect on January 1, 1998 at 1997 levels. (DX 7.)

71.2    The Companies' proposed cap letter provided that the cap would be a mandatory subject of bargaining at the next round of negotiations, as opposed to all future negotiations, as the Unions had proposed. (DX 7; Porter, Direct, Tr. 1145-47.)

72.    During the early morning hours of June 1, 1993, after the strike deadline passed, some workers began walking out of facilities while the negotiations were ongoing. (Murphy, Cross, Tr. 151; Martin, Dep., Tr. 36:6-17.)

73.    At approximately 1:55 a.m. on June 1, the Unions agreed to the Companies' version of the cap letter. (DX 174, at ALC_CUR_00003125; Porter, Direct, Tr. 1147; Hoffman, Dep., Tr. 40:16-23.)

73.1    In exchange for the Unions' agreement to the Companies' cap proposal, the Companies agreed to enhanced pensions. (DX 174, at ALC_CUR_00003127; Porter, Direct, Tr. 1154; Michaud, Direct, Tr. 1272-73.)

73.2    The Companies' version of the cap letter was memorialized in the 1993 CBAs. (Compare DX 7 with DX 1, at ALC_CUR_00000102.)

E.   **THERE WAS NO ORAL SIDE AGREEMENT BETWEEN THE COMPANIES AND THE UNIONS THAT THE CAP WOULD NEVER ENGAGE.**

74.   The parties understood that the 1993 cap letter provided for a real cap, and the parties did not enter into any "side deal" that the cap would never be implemented. (Porter, Direct, Tr. 1149-51; Hoffman, Dep., Tr. 38:10-21, 41:8-42:10; Newman, Dep., Tr. 94:4-95:12.)

75.   According to Jim Robinson, the Union's corporate designee, Alcoa would have had the right to engage the cap in 1996 if the Unions had been unsuccessful in bargaining for a movement of the cap in the 1996 negotiations.  (Robinson, 2007 Dep., Tr. 54:2-10.)

76.   Plaintiffs rely on the testimony of only one 1993 top table negotiator, John Murphy, as evidence that the Companies entered into a side agreement with the Unions that the caps would never engage.

77.   Mr. Murphy was unable to identify any explicit statement by either Company that the cap would never be implemented.  Rather, he testified that Mr. Porter told him that the cap was a "paper transaction" and that he should not "worry about it" and he further testified that Mr. McDonald referred to the cap as a "wink" letter. (Murphy, Direct, Tr. 87; Murphy, Cross, Tr. 180-81.)

F.   **JOHN MURPHY'S TESTIMONY WAS NOT CREDIBLE.**

1.   **John Murphy had limited recollection of the 1993 negotiations.**

78.   Mr. Murphy acknowledged that during his deposition, he could not even recall that Russ Porter was at the top table in 1993.  (Murphy, Cross, Tr. 166-69.)

79.   Mr. Murphy acknowledged that during his deposition, he believed that the 1993 negotiations occurred in Buffalo, rather than Cleveland.  (Murphy, Cross, Tr. 169-70.)

80.   Mr. Murphy acknowledged that he was mistaken when he testified during his deposition, and initially testified at trial, that Gene Woloshyn was at the top table during the 1993 negotiations.  (Murphy, Cross, Tr. 168-69.)

81.   Mr. Murphy acknowledged that although he testified during his deposition that Joe Quaglia was at the top table during the 1996 negotiations, Mr. Quaglia was in fact not at the top table in 1996.  (Murphy, Cross, Tr. 170-71.)

82.   Despite the clear references in Mr. Hoffman's notes to extensive negotiations over the cap letter on May 31, 1993, as well as the draft proposals that the parties exchanged, Mr. Murphy does not recall having any conversations about the cap letter on that date.  (Murphy, Cross, Tr. 141-42.)

-17-

### 2. Mr. Murphy's testimony was inconsistent with the overwhelming documentary evidence and the testimony of other witnesses.

83.     At his deposition, Mr. Murphy testified that Mr. Porter told him that the cap agreement was "a paper transaction". However, at trial, Mr. Murphy initially did not recall that phrase and only testified that Mr. Porter called the cap letter a "paper transaction" after being asked a leading question by Plaintiffs' counsel. (Murphy, Direct, Tr. 87.)

      83.1     Mr. Murphy testified that he never asked Mr. Porter what he meant when he allegedly used the phrase "paper transaction". (Murphy, Cross, Tr. 164-166.)

      83.2     Mr. Porter credibly testified that he never privately discussed the cap agreement with Mr. Murphy during the May 1993 negotiations; that he never told Mr. Murphy that the cap was never to be implemented; and that he never told Mr. Murphy that the cap was an "accounting gimmick", a "paper transaction" or a "paper shuffle". (Porter, Direct, Tr. 1149-50.)

      83.3     Mr. Porter credibly testified that he never referred to the cap as a "cap with a wink". Mr. Porter never heard that phrase outside of the context of this litigation. (Porter, Direct, Tr. 1150.)

      83.4     As Mr. Murphy conceded, Mr. Porter never told him that the cap would never be implemented. (Murphy, Cross, Tr. 216.)

84.     Mr. Murphy also testified that Gary MacDonald referred to the cap as a "cap with a wink". (Murphy, Cross, Tr. 180-81.) However, both Union and Company representatives (including Mr. MacDonald) have testified that the phrase "cap with a wink" referred to a cap that would not engage during the term of the current agreement. That interpretation is entirely consistent with the plain language of the cap letter and does not suggest that the cap was not real.

      84.1     Mr. MacDonald, of Reynolds, testified that he used the phrase "cap with a wink" to mean a cap that was "not likely to be energized during the term of the contract". (MacDonald, Dep., Tr. 140:9-14.)

      84.2     Moreover, Mr. MacDonald was on the benefits subcommittee in the 1993 negotiations and was not a top table negotiator. (MacDonald, Dep., Tr. 59:12-18.) As such, he was not capable of binding Reynolds (and certainly not Alcoa) through oral representations inconsistent with the parties' written agreements.

      84.3     Harvey Martin, who represented the ABG at the top table with Mr. Murphy in 1993 and whom Mr. Murphy called his "health care guru", testified that "caps with a wink" refers to a cap that "would not be implemented … during

-18-

the term of that agreement".  (Murphy, Cross, Tr. 184; Martin, Dep., Tr. 25:19-26:13.)

84.4    At his deposition, Mr. Murphy testified that he did not hear the word "wink" applied to the cap until after the 1993 negotiations; Mr. Murphy testified at trial that only after reviewing notes and conversing with union members did he recall Mr. MacDonald referring to the cap letter <u>in 1993</u> as a "cap with a wink".  (Murphy, Cross, Tr. 179-82.)

85.    The testimony of other union members indicates that the Companies and the Unions did not enter into any side agreement.

85.1    Harvey Martin, an ABG official who was at the top table in 1993, testified that no Company representative told him that the cap letter would never be implemented.  (Martin, Dep., Tr. 22:11-16.)

85.2    Brickey Beasley, a USW official who was at the benefits table in 1993, testified that the Unions historically required that any binding commitment from the Companies be reduced to writing.  (Beasley, Cross, Tr. 746-47.)

85.3    According to Jim Robinson, the Union's corporate designee, the Companies and the Unions did not agree in 1993 that the cap would never be implemented.  (Robinson, 2007 Dep., Tr. 34:9-15.)

86.    Mr. Murphy himself testified that despite the alleged side agreement, he did not believe that the cap was untrue, a fraud, an accounting gimmick or a trick. (Murphy, Cross, Tr. 210-214.)

87.    Mr. Murphy offered no plausible explanation as to why, if the cap were real, the Union later negotiated to delete it in the 1996 and 2001 negotiations.  The explanation he offered was that it was an attempt by the Union to assist Alcoa in reducing the printing costs associated with the one-page letter.  (Murphy, Direct, Tr. 110.)

88.    Mr. Murphy testified that he would not believe that the cap agreement could be implemented even if it were contained in "a thousand SPDs".  (Murphy, Direct, Tr. 112.)

89.    Neither the Companies nor the Unions would have accepted a key contractual provision that was not memorialized in writing.  (Robinson, 2007 Dep., Tr. 36:16-23; Michaud, Direct, Tr. 1276-77; Porter, Direct, Tr. 1116; Hoffman, Dep., Tr. 43:16-44:5.)

89.1    Mr. O'Neill, who was the Chairman and CEO at the time, would never have accepted a key contractual provision that was not memorialized in writing, and as he testified, neither would Lynn Williams, who was the USW's president at the time.  (O'Neill, Direct, Tr. 1715-16.)

-19-

3. **Allegations by Mr. Murphy that he and Mr. Porter entered into an oral agreement at the 1993 negotiations have previously been rejected.**

90. This case is not the first instance where Mr. Murphy has accused Mr. Porter of entering into an oral side agreement during the final day of the May 1993 negotiations.

    90.1    Under the 1993 CBA, employees were entitled to an additional $0.41/hour if their facility participated in a "90/70" managed care plan. (DX 500, at 11-12; Porter, Direct, Tr. 1151-52.)

    90.2    In 1995, the ABG filed a grievance against Alcoa, claiming that Warrick bargaining unit employees were entitled to an additional $0.41/hour based upon the Union's selection of what Warrick personnel referred to as "the Applause Plan". (DX 500, at 11-12; Porter, Direct, Tr. 1152.)

    90.3    During the subsequent arbitration proceeding, Mr. Murphy alleged that Mr. Porter provided him with an oral assurance at the 1993 negotiations that Warrick employees would receive the $0.41/hour if they chose the Applause Plan. Mr. Porter denied making any such statement. (DX 500, at 11-12; Porter, Direct, Tr. 1152-54.)

    90.4    In finding for Alcoa, the arbitrators found that it was "highly unlikely" that Mr. Porter made the statements attributed to him by Mr. Murphy. (DX 500, at 11-12; Porter, Direct, Tr. 1152-54; Murphy, Cross, Tr. 175-77.)

## G. THE TESTIMONY OF ERNIE LABAFF SHOULD BE GIVEN NO WEIGHT.

91. Ernie LaBaff, President of the ABG, was a signatory to the 1993 cap agreement. (DX 11.) Mr. LaBaff testified that he understood the cap was strictly for bookkeeping purposes. (LaBaff, Direct, Tr. 234.)

92. Mr. LaBaff, however, has no personal knowledge of any side agreement concerning the cap letter that he signed.

    92.1    Mr. LaBaff was not present at the top table in 1993. (LaBaff, Direct, Tr. 230; LaBaff, Cross, Tr. 243.)

    92.2    Mr. LaBaff never had a conversation with anyone from Reynolds or Alcoa about the cap letter. (LaBaff, Cross, Tr. 247.)

    92.3    Mr. LaBaff did not read the cap agreement when he signed it. In fact, he did not read the cap agreement until 2007, before his deposition in this case and after he submitted to the Court a sworn declaration about his understanding of the cap agreement. (LaBaff, Cross, Tr. 245-47.)

-20-

92.4    Mr. LaBaff was not aware that the Companies and the Unions traded proposed cap letters on the evening of May 31, 1993 and in the early morning of June 1, 1993.  He testified that, as President of the ABG, he would have liked to have known that.  (LaBaff, Cross, Tr. 248-49.)

92.5    By his own admission, Mr. LaBaff's knowledge of whatever was said at the top table in 1993 derives from Mr. Murphy and Mr. Martin.  (LaBaff, Cross, Tr. 243-44.)

92.6    Mr. LaBaff contacted Mr. Murphy to discuss the cap agreement after he was asked to prepare a declaration in this case.  Mr. LaBaff contacted Mr. Murphy again before Mr. LaBaff's deposition in this case.  (LaBaff, Cross, Tr. 241-44.)

92.7    Mr. LaBaff is concerned that many retirees blame him personally for the cap.  (LaBaff, Cross, Tr. 239-40.)

## H.    THE UNIONS DISCLOSED THE CAP AGREEMENTS TO THEIR LOCAL OFFICIALS AND MEMBERS AFTER NEGOTIATIONS.

93.    On June 1, 1993, the Unions informed their local representatives that the parties had agreed to a cap during negotiations.

94.    The USW and the ABG each held a meeting during the morning of June 1, 1993, to advise the local union officials of the agreements that had been reached at the top table during negotiations.  (Pruitt, Direct, Tr. 423-24; Fountaine, Direct, Tr. 328-29.)

95.    Three of Plaintiffs' witnesses (Russell Pruitt, Brickey Beasley and Larry Fountaine) testified that they learned about the cap agreement at an early-morning meeting on June 1, 1993.

95.1    Russ Pruitt testified that he first learned about the cap letter at this meeting.  He testified that Joe Kiker, the chief negotiatior for the USW, said that the cap letter was for bookkeeping purposes only.  He also testified that there were no company representatives present at this June 1 meeting.  However, Mr. Pruitt did not testify that anyone ever told him that the cap never would be implemented.   (Pruitt, Cross, Tr. 470-72.)

95.2    Brickey Beasley testified that he first learned about the cap letter at this meeting and that the cap letter was "something [the Unions] did for the company", but he did not testify that anyone ever told him that the cap never would be implemented.  He also testified that there were no company representatives present.  (Beasley, Direct, Tr. 688-90; Beasley, Cross, Tr. 718-20.)

96.    Larry Fountaine, a former local ABG president and a plaintiff in this lawsuit, was the only one of Plaintiffs' witnesses to testify that he learned from a meeting attended by a company representative that the cap never would be implemented. Specifically, he testified that in a meeting at 11:30 p.m. on May 31, 1993, Gene

-21-

Woloshyn or Ed Smith of Alcoa stated that the cap was for accounting purposes and that it would not be used against the workers. However, this testimony is not credible for the following reasons:

96.1    Mr. Fountaine's testimony is inconsistent with that of other union members who Mr. Fountaine testified were present at the alleged May 31 meeting.  (Fountaine, Direct, Tr. 324-26; Pruitt, Cross, Tr. 470-72; Beasley, Direct, Tr. 688-90; Beasley, Cross, Tr. 718-20.)

96.2    Mr. Fountaine acknowledged that he could not recall whether the alleged company representative was Gene Woloshyn or Ed Smith.  (Fountaine, Cross, Tr. 346-47.)  Mr. Woloshyn testified that he never discussed the cap with Mr. Fountaine and that he never read out the cap letter to personnel from either union.  (Woloshyn, Direct, Tr. 1502-04.)  And Mr. Smith testified at his deposition that he never spoke to anyone from the Unions about the cap letter. (Fountaine, Cross, Tr. 348-49.)

96.3    Mr. Fountaine is the only witness to testify that there were actually two meetings, aside from the top table, at which the cap was discussed:  one at 11:30 p.m. on May 31 and then another in the early morning of June 1. (Fountaine, Cross, 344-45.)

96.4    Mr. Fountaine testified that Mr. Sharber and Mr. Murphy were present at the 11:30 p.m. meeting in which either Mr. Woloshyn or Mr. Smith discussed the cap, but Mr. Sharber and Mr. Murphy both testified that they attended no such meeting.  (Fountaine, Cross, Tr. 349-54; Murphy, Cross, Tr. 209-10.)

96.5    Furthermore, the cap letter could not possibly have been read aloud at an 11:30 p.m. meeting because the Companies did not propose their version of the cap letter, which was ultimately accepted, until 1:30 a.m. on June 1.  (DX 7; DX 174, at ALC_CUR_00003124; Porter, Direct, Tr. 1145-46.)  It is not possible that anyone read the final cap letter to the Unions at a meeting two hours before the letter was even proposed to the Unions.  (DX 7.)

96.6    Mr. Fountaine admitted that he is biased against Alcoa. (Fountaine, Cross, Tr. 342-43.)  He has publicly espoused extreme views about Alcoa, including his belief that Alcoa uses slave labor and that Alcoa would do business with Osama bin Laden, and he stands by those views.  (Id. at 343-44.)

96.7    Finally, Mr. Fountaine's testimony that the cap was for "accounting purposes" is insufficient to support the conclusion that the cap was intended never to be implemented.  In a letter explaining the retiree medical cap negotiated with another company, Pechiney Rolled Products, the USW indicated both that the cap was "simply [to limit] the total amount of retiree health care liability the company must show on its books for accounting purposes", and that the cap would require no retiree payments "during the term of the new labor

-22-

agreement". The letter notes that the cap is a mandatory subject of bargaining, affording the USW "leverage" in case the company should "seek to implement the 'cap' during any future labor agreement". (PTE 66, at ALC_CUR_00032761.)

**I.      THE MEMORANDA OF SETTLEMENT AMONG THE COMPANIES AND THE UNIONS DISCLOSED THE CAP AGREEMENT.**

97.     At the conclusion of the negotiations, the Companies and the Unions entered into memoranda of settlement. (DX 177; DX 178; Porter, Direct, Tr. 1154-55.)

98.     Memoranda of settlement are designed to be a complete summary of the agreement reached by the parties. (Porter, Direct, Tr. 1155.)

99.     The memoranda of settlement related to the 1993 CBA disclosed the cap agreement: "Plan costs capped at expected 1997 levels." (DX 177, at USW019082; DX 178, at ALC_CUR_00090224.)

**J.      THE UNIONS MADE PRESENTATIONS TO THEIR MEMBERSHIP IN ADVANCE OF THE RATIFICATION VOTES THAT DISCLOSED THE CAP AND DID NOT MENTION ANY SIDE AGREEMENT OR UNDERSTANDING THAT THE CAP WOULD NEVER GO INTO EFFECT.**

100.    The Companies provided the Unions with informational materials so that the Unions could brief their members on the terms of the proposed CBA. (DX 181; DX 182; Murphy, Cross, Tr. 153-55.)

101.    The informational materials disclosed the cap agreement. (DX 181, at ALC_CUR_00003313; DX 182, at ALC_CUR_00003269.)

102.    The Unions had an opportunity to view the materials before the materials were distributed to the membership. (Murphy, Cross, Tr. 153-54.)

103.    John Murphy received the materials, specifically reviewed the portions which disclosed the cap, objected to certain parts of the materials and <u>did not object</u> that the terms of the cap appeared in the ratification materials.

103.1   In July 1993, Mr. Murphy contacted Mr. Michaud at Alcoa to inform Mr. Michaud that two slides in those materials contained errors. The two slides concerned retiree medical benefits and stated "costs capped at expected 1997 levels", but Mr. Murphy did not indicate that the cap language was erroneous. In response to Mr. Murphy's call, Mr. Michaud wrote a letter to Mr. Murphy, explaining the correction and attaching the page at issue. (DX 201; Murphy, Cross, Tr. 155-60; Michaud, Direct, Tr. 1278-81.)

104.    It is important to the Unions that the employees fully understand the proposed contract before they are asked to vote on it. (LaBaff, Cross, Tr. 263-64.)

-23-

105. It was the local president's job to read the informational materials and explain the proposed agreement to the membership. (LaBaff, Cross, Tr. 263-64.)

105.1 Larry Fountaine was the local president of the Massena, NY facility in 1993. He read the informational materials to the membership before the membership voted on the contract. (Fountaine, Cross, Tr. 367, 370-72.)

106. Ernie LaBaff, the President of the ABG in 1993, testified that union members "absolutely" should trust union representatives to give them an accurate description of the proposed agreement. (LaBaff, Cross, Tr. 266-67.)

107. Russ Pruitt, the former local president of the Point Comfort, TX facility, testified that when he reviewed the cap letter with the membership at the Point Comfort, Texas facility, he did not mention any side deal concerning the cap letter. (Pruitt, Direct, Tr. 432-33.)

### K. ALCOA DISCLOSED THE CAP AGREEMENT TO ITS DIRECTORS, AUDITORS AND PERSONNEL MANAGERS.

108. Senior management at Alcoa briefed the Alcoa Board of Directors about the terms of the 1993 CBA. The briefing materials explicitly provide that "[f]uture retiree plan costs capped at expected 1997 levels". (DX 202, at ALC_CUR_00189395; O'Neill, Direct, Tr. 1711-13.)

109. Alcoa disclosed the cap to its actuaries so that the actuaries could perform calculations based on the newly negotiated agreement to be included in its publicly disclosed financial statements. (DX 183, at ALC_CUR_00448070; Lee, Direct, Tr. 1615-17.)

109.1 Buck Consultants understood Alcoa's plan documents to create a valid cap, and Buck recognized Alcoa's health care plan as capped in its actuarial valuations of Alcoa from 1993 to 1996. (DX 167, at ALC_CUR_00438947; DX 168, at ALC_CUR_00448411; DX 203, at 00446539; DX 216, at ALC_CUR_00449179; DX 321, at ALC_CUR_00448514; Lee, Direct, Tr. 1616-17.)

109.2 Actuarial standards require actuaries to provide an independent assessment of the plan that they are valuing. (Hilko, Direct, Tr. 1801.)

110. On June 7, 1993, immediately after the 1993 negotiations, Alcoa sent a memorandum to personnel managers at ABG plants, explaining the terms of the newly negotiated medical plan. In describing certain plan design options available to the local ABG unions, Alcoa stated: "The settlement language regarding retiree caps and Medicare Part B freeze is clear. Therefore, the language on retiree caps engaging in 1997 and Medicare Part B frozen at $46.10 will apply to all locations, regardless of the medical plan selected by the local parties." (DX 180, at ALC_CUR_00133248.)

-24-

**L.    THE WRITTEN PLAN DOCUMENTS NEGOTIATED IN 1993
UNAMBIGUOUSLY ALLOWED ALCOA TO IMPLEMENT A
RETIREE HEALTH CARE CAP.**

**1.    The CBAs unambiguously allowed Alcoa to implement a cap.**

111.    Alcoa published the 1993 cap letter in its CBAs.  (DX 1, at
ALC_CUR_00000102; DX 2, at ALC_CUR_00039522.)

111.1   The 1993 cap letters provide:  "In the event that the average per
capita Company contribution exceeds the amount established [in the per capita
formula] above in any calendar year, the excess shall be allotted to and paid by
each covered person on a pro rata basis." (Id.)

111.2   The 1993 cap letters further provide:  "[T]he parties agree that the
subject of the limitation set forth in this letter shall be a mandatory subject of
bargaining in any negotiations between the parties occuring subsequent to May
31, 1993, and prior to October 31, 1996." (Id.)

112.    Reynolds and the Unions entered into the same signed, written cap
agreement as Alcoa did with the Unions.  (DX 10; DX 12.)

113.    This Court has already held that "the cap letters unambiguously allowed
Alcoa to implement health care caps as early as 1997, ten years before their actual
implementation".  (3/19/09 Order at 7.)

114.    Larry Fountaine and Tom Moore each testified that the cap letter was
unenforceable because it was a letter of understanding, or "love letter", that appeared
after the signature page of the CBA.  (Fountaine, Cross, Tr. 375-76; Moore, Direct, Tr.
508.)  However, neither Mr. Fountaine nor Mr. Moore could articulate a credible
explanation for that position.

114.1   Mr. Fountaine acknowledged that the Unions have the right to
strike over letters of understanding and that he personally had filed grievances
over letters of understanding.  (Fountaine, Cross, Tr. 376.)  Indeed, the USW sued
Alcoa to enforce against the Company the terms of the very cap letter that
Plaintiffs claim cannot now be enforced against them.  (DX 501; see infra ¶¶ 249-
51.)  Mr. Fountaine also conceded that he was aware of the 1995 arbitration in
Warrick where the Union and the Company arbitrated over the terms of another
letter of understanding in the 1993 CBA.  (DX 500; Fountaine, Cross, Tr. 380-
82.)

114.2   Mr. Moore acknowledged that he had no personal knowledge of
the negotiations surrounding the cap letter and that he was not present when the
parties agreed on the cap.  (Moore, Cross, Tr. 523-24.)

115.    Gene Woloshyn, who signed the cap letter on behalf of Alcoa in 2001,
testified that he understood that the cap letter was binding and that he never heard anyone

-25-

suggest that the letter was not binding. (DX 18, at ALC_CUR_00000525; Woloshyn, Direct, Tr. 1535-36.)

## 2. The SPDs clearly disclosed the cap agreement and unambiguously allowed Alcoa to implement a cap.

116. Following each set of negotiations, the Companies and the Unions negotiated SPDs, which reflected the agreements reached by the parties. (Michaud, Direct, Tr. 1281-82; Willett, Cross, Tr. 656.)

116.1 The SPDs were collectively bargained. (Beasley, Cross, Tr. 732-33; Robinson, 2007 Dep., Tr. 54:21-55:2.)

116.2 After the Companies completed a draft of the SPD, the Unions had the opportunity to review it. (JPTO at 7; Robinson, 2007 Dep., Tr. 55:3-6; see also DX 302.)

116.3 Alcoa did not distribute SPDs for collectively bargained populations until the Unions approved them. (Michaud, Direct, Tr. 1281-82; Willett, Cross, Tr. 656; Robinson, 2007 Dep., Tr. 55:7-11.)

116.4 If the terms of the SPD regarding the cap agreement conflicted with the CBA, the Unions would have objected during the negotiation of the SPD. (Robinson, 2007 Dep., Tr. 57:9-14.)

116.5 The Unions never objected, grieved or sued the Companies over the SPD language. (Robinson, 2007 Dep., Tr. 57:15-18.)

117. It was important to the Unions that statements in the SPDs were accurate, because the members read, and relied upon, the SPDs in order to understand their benefits. (Willett, Cross, Tr. 656.)

118. The SPDs distributed in connection with the 1993 CBA clearly and unambiguously provide that the Companies may cap retiree benefits after the expiration of the CBA. (DX 20, at ALC_CUR_00028312; DX 21, at ALC_CUR_00006564; DX 23, at USW014137; DX 24, at ALC_CUR_00086455; DX 25, at ALC_CUR_00106558; DX 26, at ALC_CUR_00127435; DX 27, at ALC_CUR_00021699; DX 28, at ALC_CUR_00022747; DX 29, at ALC_CUR_00134948; DX 30, at ALC_CUR_00085770; DX 31, at ALC_CUR_00135255; DX 32, at ALC_CUR_00022072; DX 33, at ALC_CUR_00001496; DX 34, at ALC_CUR_00135594; DX 35, at ALC_CUR_00087324; DX 36, at ALC_CUR_00001201; DX 38, at ALC_CUR_00043736; DX 39, at ALC_CUR_00136894; DX 40, at ALC_CUR_00001241; DX 47, at ALC_CUR_00013951; DX 69, at ALC_CUR_00101947.)

118.1 For example, one of the SPDs issued pursuant to the May 1993 CBA between Alcoa and the USW contains the following provision: "In 1997, Alcoa will cap the amount that the company pays for your retiree medical

coverage.  In future years, if medical costs increase above the 1997 level, you will be required to pay the difference."  (DX 20, at ALC_CUR_00028312.)

118.2   During a February 1991 meeting between Reynolds and Mike Gulotta, Reynolds' FAS-106 actuarial consultant, Mr. Gulotta cautioned that SPDs published during the term of an agreement for a deferred cap which merely specify that changes are likely to occur may not be sufficient to demonstrate that the plan is capped.  (DX 114, at ALC_CUR_00087510.)  Accordingly, Reynolds included in its SPDs language explaining that the cap will engage.  (See, e.g., DX 23, at USW014134; DX 24, at ALC_CUR_00086452; DX 25, at ALC_CUR_00106555.)

119.    The Alcoa SPDs issued after the 1993 negotiations are incorporated by reference into the 1993 Alcoa CBAs.  (Pruitt, Cross, Tr. 476-77; Altman, Cross, Tr. 879.)

119.1   Article XXII of the CBA between Alcoa and the USW provides that "[s]eparate booklets describing these benefits are incorporated herein and made a part of this Agreement".  (DX 1, at ALC_CUR_00000063.)

119.2   Article XXIII of the CBA between Alcoa and the ABG provides that "[s]eparate booklets describing these benefits are incorporated herein and made a part of this Agreement".  (DX 1, at ALC_CUR_00039488.)

119.3   The SPDs themselves all contain language incorporating them into the CBA. For example, one of the SPDs pursuant to the May 1993 CBA between Alcoa and the USW provides that "[t]he benefits described in this booklet are incorporated in and made part of Article XXII-Group Insurance of the Labor Agreement between [Alcoa] and the International Union, United Steelworkers of America, dated May 31, 1993".  (DX 20, at ALC_CUR_00028281.)

120.    The Reynolds SPDs issued after the 1993 negotiations are incorporated by reference into the 1993 Reynolds CBAs.

120.1   Article XXIX of the CBA between Reynolds and the USW provides:  "There is attached hereto as an exhibit an Insurance Plan which shall become effective as provided therein.  The parties agree that this Insurance Plan is hereby incorporated into this Agreement by reference and the parties agree to comply with and be bound by all of its terms and provisions."  (DX 3, at ALC_CUR_00002241.)

120.2   Article XXXVIII of the CBA between Reynolds and the ABG provides:  "There is attached hereto as an exhibit an Insurance Plan which shall become effective as provided therein and continue in effect for the life of this Agreement.  The parties agree that this Insurance Plan is hereby incorporated into this Agreement by reference and the parties agree to comply with and be bound by all of its terms and provisions."  (DX 4, at ALC_CUR_00001725.)

-27-

## M.    THE COMPANIES AND THE UNIONS UNDERSTOOD THAT THE 1993 CAP AGREEMENT WAS REAL.

121.    The Companies understood that the 1993 cap agreement was real.  (DX 154, at ALC_CUR_00192329; DX 155.)

121.1   Russ Porter, the lead negotiator for Alcoa, understood that the 1993 cap agreement was real.  (Porter, Direct, Tr. 1113-14, Cross, Tr. 1195-96.)

121.2   Bob Newman, a Reynolds negotiator, testified that Reynolds was not interested in having an artificial cap.  (Newman, Dep., Tr. 58:9-11.)

122.    The Unions understood that the 1993 cap agreement was real.

122.1   According to Jim Robinson, the Union's corporate designee, the Unions understood that the cap was real but believed that they had the bargaining power to defer implementation in the future.  (Robinson, 2007 Dep., Tr. 34:16-35:15.)

122.2   In subsequent communications to its membership in 2005, the Union acknowledged that it had agreed in 1993 to allow Alcoa to cap the cost of retiree medical benefits:  "In 1993, to address the company's accounting problems, we agreed to allow the company to cap the cost of retiree health care for people who retired after 1993."  (DX 331.)  Dave Willett, a current union official and a witness for the Plaintiffs, confirmed that the Union bulletin was accurate.  (Willett, Cross, Tr. 672-73.)

122.3   In an informational packet provided to the membership in advance of the 2006 CBA ratification vote, the Union again acknowledged that the cap negotiated in 1993 was real:  "The May 31, 1993 Labor Agreement placed a cap on the company's retiree health care costs for employees who retired after May 31, 1993."  (DX 346, at 000272.)  Harvey Martin, a former union official who participated at the top table in 1993, agreed with that language.  (Martin, Dep., Tr. 82:8-22.)

122.4   After the ratification of the 2006 CBA, the Union sent another letter to union members who retired after May 1993.  That letter stated that the Union agreed in 1993 to allow Alcoa to cap the cost of retiree medical benefits and that the Union had hoped to negotiate extensions of the cap letter at subsequent negotiations.  (DX 351, at ALC_CUR_00024634-35.)  Dave Willett, a current union official and a witness for the Plaintiffs, and Harvey Martin, a former union official who participated at the top table in 1993, each testified that the letter was accurate.  (Willett, Cross, Tr. 673-74; Martin, Dep., Tr. 84:16-86:19.)

**N.** **THE CAP LETTER CANNOT REASONABLY BE INTERPRETED TO COMPARE PER CAPITA COSTS AGAINST AN AGGREGATE CAP SUCH THAT PLAN COSTS WOULD NEVER EXCEED THE CAP.**

123. Mr. Altman interprets the cap letter to place a limit on Alcoa's retiree medical costs that could never be reached, relying on a provision in the cap letter that limits company costs to "an amount determined by multiplying the per capita cost . . . during calendar year 1997 by the number of retirees and surviving spouses" (an <u>aggregate</u> number) and a provision in the next paragraph requiring retirees to pay excess costs "[i]n the event that the average per capita company contribution exceeds the amount established above in any calendar year" (a <u>per capita</u> number). (DX 1, at ALC_CUR_00000102; Altman, Direct, Tr. 789-90.)

124. Alcoa's expert witness, David Hilko, testified that, from an actuarial perspective, an aggregate cap would never be compared to a per capita cap. (Hilko, Cross, Tr. 1909-10.) Mr. Hilko's understanding of the cap agreement was that the language in the second paragraph of the cap agreement, referring to "the amount established above", refers to the per capita cost during the measuring year rather than to an aggregate annual amount. (Hilko, Cross, Tr. 1910-16.)

125. Interpreting the cap letter to mean that the cap will not go into effect unless the cost to one individual retiree exceeds the aggregate costs of all the covered retirees is not a practical interpretation of the cap agreement. (McCullough, Redirect, Tr. 1484-85.)

126. Scott Kovaloski, Alcoa's Manager of Health and Welfare Benefits Consulting, testified that such an interpretation would not make any sense, and that he would not interpret the cap agreement that way. (Kovaloski, Dep., Tr. 99:10-22.)

**O.** **NEITHER THE COMPANIES NOR THE UNIONS BELIEVED THAT PLAINTIFFS' RETIREMENT BENEFITS WERE VESTED IN 1993.**

**1.** **The parties clearly understood that active employees were not vested in their retirement benefits.**

127. The conduct of the Companies and the Unions demonstrates that neither party believed that active employees were vested in their retirement benefits.

127.1 The parties negotiated a cap and a change to managed care during the 1993 negotiations, and there was no suggestion at the time that it was impermissible to do so for employees who had not yet retired. (Martin, Dep., Tr. 32:12-33:24.)

127.2 Harvey Martin, a senior ABG official and top-table negotiator in 1993, testified that he did not believe, nor did he hear from any other union representative at the time, that it was impermissible for the parties to change the

-29-

benefits of active employees, including changing co-pays and deductibles. (Martin, Dep., Tr. 34:2-25.)

128.    Plaintiffs' own witnesses testified that an employee's retirement benefits can change until the employee retires.

128.1   Ernie LaBaff, the former President of the ABG, understood that an employee's retirement benefits could go up or down as long as he was active. (LaBaff, Recross, Tr. 312-13, 316-17.) He further testified that he advised union members to retire before the next CBA negotiations because their benefits could change if they remained active. (LaBaff, Cross, Tr. 290-91.)

128.2   Russ Pruitt, a former union official and one of Plaintiffs' witnesses, testified that an employee's benefits are determined based on the plan in place at the time the employee retires. (Pruitt, Cross, Tr. 462-63.)

128.3   Larry Fountaine, a former union official and one of Plaintiffs' witnesses, testified that an employee's retiree benefits are determined based on the plan that is in effect at the time the employee retires. (Fountaine, Cross, Tr. 372-73.)

129.    Plaintiffs rely on the phrase "active vested employee" in certain SPDs to demonstrate that active employees can be vested in their retiree medical benefits.

129.1   However, Nick Storm, Senior Counsel for Alcoa, testified that the term "vested" in that context refers to vesting for <u>pension</u> purposes. (Storm, Cross, Tr. 1768-69; Storm, Redirect, Tr. 1773.)

129.2   Additionally, Joe Quaglia, Alcoa's former Director of Industrial Relations who sat at the top table in 2001 and 2006, similarly testified that the term "vested" in that context refers to vesting for <u>pension</u> purposes. (Quaglia, Direct, Tr. 2025-27.)

130.    Plaintiffs rely on a single document with an isolated reference to active employees who have "'vested' in the retiree medical and life benefit". (PTE 137, at ALC_CUR_00448703.) That language, however, is not evidence that active employees legally vested in retiree medical benefits.

130.1   PTE 137 is not a complete document and neither Alcoa nor Plaintiffs have been able to identify the remainder of the document. Without any context, it is unclear how, if at all, this reference to vesting relates to the type of <u>legal</u> vesting that Plaintiffs must demonstrate in order to prevail.

130.2   PTE 137 purports to describe various accounting methodologies and includes a list of "categories of employees", one of which consists of "active employees who meet the age and service requirements for retirement and who have 'vested' in the retiree medical and life benefit". (PTE 137, at ALC_CUR_00448703.)

130.3   FASB expressly provides that "vested" is a term of art under FAS-106 that refers to vesting in the "accounting sense, not the legal context".  In the accounting context, the term "vested" simply refers to "an employee's right to receive present or future benefits whether or not the employee remains in the service of the employer"; the term bears no relation to whether a company has the right to change employees' benefits in future negotiations.  (DX 111, at 186.)

130.4   A document which describes a benefit as "vested" in the accounting sense is not relevant to a determination of whether benefits are vested in the legal context.

131.   Plaintiffs interpret out of context language in Alcoa's CBAs stating that benefits will not be reduced as a result of future legislation concerning universal health care.

131.1   Alcoa's 1988 CBA provides:  "Notwithstanding the provisions in 2 and 4 above, when and if, during the term of this Agreement, any employee covered by this Agreement becomes entitled to apply for or to obtain health care or other medical, dental, vision or surgical benefits <u>by reason of the enactment by the United States or any state of the United States of a Governmental System of health security or medical service program</u> ('Governmental System') for active employees, the parties shall promptly meet and undertake to negotiate a modification of the benefits under this Article XXII of the type and character provided or available under such Governmental System in order to achieve or to assure the following results: (a) <u>No employee covered by this Article shall suffer any reduction in the level of any of the several health care benefits of this Article</u>. (b) The Company shall, without cost to the employee, provide a plan of benefits supplementary to those available under such Governmental System to the extent necessary to make each benefit comparable to the corresponding benefit provided under this Article."  (PTE 292, at page 101 (emphasis added).)

131.2   Plaintiffs improperly interpret the provision that "[n]o employee covered by this Article shall suffer any reduction in the level of any of the several health care benefits of this Article" as a general provision rather than one of the "results" to be assured in the event that a government health care program is enacted, as provided in the agreement.

131.3   The provision that the parties "shall promptly meet . . . in order to achieve or to assure the following results", including that no employee shall suffer any reduction in benefits, is clearly related to and contingent upon the enactment of a governmental health care program.  (<u>Id.</u>)

132.   Plaintiffs misguidedly rely on language in Alcoa's CBAs as evidence that health care benefits vested prior to retirement.

132.1   The 1986 Alcoa CBAs provide:  "In addition, the Company will provide the following coverages for retired employees (and eligible dependents)

-31-

and surviving spouses of active and retired employees (and eligible dependents) who are receiving a pension under the Pension Agreement." (PTE 287, at USW004887; PTE 78, at USW022339; Murphy, Direct, Tr. 71-73.) Alcoa CBAs from 1988 and 1993 also contain the same provision. (PTE 1, at page 66 (pages not Bates stamped); PTE 292, at page 98 (pages not Bates stamped); Murphy, Direct, Tr. 76-77, 98-99.)

132.2   Contrary to Plaintiffs' understanding that this language indicates that health care benefits vest at the same time that pension benefits vest, Alcoa retirees did not receive benefits under the plan that was in place at the time their pensions vested. (Quaglia, Direct, Tr. 2025-29.)

132.3   Instead, Alcoa retirees (or their surviving spouses) received benefits under the plan that was in place <u>at the time of their retirement</u> (or, in the case of a surviving spouse, at the time of the employee's death), and those benefits were subject to change based on future contract negotiations. (<u>Id.</u>)

133.   Plaintiffs interpret out of context language in Article XXII of the CBA that benefits will be provided "without cost to employees and retirees except as otherwise provided".

133.1   To demonstrate that Alcoa promised lifelong, cost-free benefits, Plaintiffs rely on language from Article XXII of the CBA which reads:  "All of the above benefits will be provided without cost to employees and retirees except as otherwise provided." (DX 1, at ALC_CUR_00000063.)

133.2   However, the cap agreement is one of a number of instances where the Companies and the Unions "otherwise provided", and made an exception to the general rule that Alcoa provides health benefits at no cost to employees. There are a number of other "otherwise provided" examples, including co-pays and deductibles that were in place prior to 1993 and thereafter. (Michaud, Direct, Tr. 1284.)

### 2.   <u>The parties also understood that retirement benefits were not vested, even for retired employees.</u>

134.   Alcoa does not provide for the vesting of retirement health care benefits, in contrast to pension benefits. (Storm, Cross, Tr. 1766-67; Storm, Redirect, Tr. 1773; Quaglia, Direct, Tr. 2026-29; Oxley, Dep., Tr. 73:13-24; Lammel, Dep., Tr. 132:15-23.)

135.   According to Jim Robinson, the Union's corporate designee, the Union understood that retirement benefits were not vested. (Robinson, 2007 Dep., Tr. 31:6-9.)

136.   The conduct of the Unions and the Companies demonstrates that benefits do not vest.

136.1   As a result of the 1993 negotiations, the Companies implemented a managed care program which applied to future retirees as well as persons who had <u>already retired</u>.  (Michaud, Direct, Tr. 1258; Beasley, Cross, Tr. 711-12.)

137.   Dan Henry, former president of the Bauxite, Arkansas local union, testified that it was permissible for Alcoa and the Unions to negotiate a change in retiree benefits that could apply to current retirees.  (Henry, Cross, Tr. 1004.)

## IV.   1996 NEGOTIATIONS

### A.   <u>THE CONDUCT OF THE COMPANIES AND THE UNIONS LEADING UP TO THE 1996 NEGOTIATIONS DEMONSTRATES THAT THE PARTIES BELIEVED THAT THE CAP WAS REAL.</u>

#### 1.   <u>Prior to the 1996 negotiations, the Companies communicated to the Unions the importance of the retiree health care issue.</u>

138.   Notes of a company caucus during a joint meeting with the Unions on October 11, 1995 in Birmingham, Alabama reflect that the Companies "agree[d] retiree medical is a costly item".  (DX 214, at ALC_CUR_00034220-21.)

139.   Notes of a company caucus during another joint meeting with the Unions on November 4, 1995 in Charlotte, North Carolina reflect a desire by the Companies to "get [their] issues on the table so they would not be a surprise [to the Unions] later (retiree health care cost, wage compression)".  (DX 215, at ALC_CUR_00034280.)

140.   A document setting out the function of Alcoa's Industrial Relations Council ("IR Council"), which included Alcoa's 1996 top table negotiators Doug Root, Gene Woloshyn and Ron Hoffman, emphasized the "high cost of retiree medical" and noted that "employees don't understand they need to prepare to accept financial responsibility".  (DX 217, at ALC_CUR_00028114.)

140.1   A function of the IR Council was to meet with the Unions and discuss general issues.  (<u>Id.</u> at ALC_CUR_00028111.)

140.2   The IR Council understood that retiree medical benefits for union employees were capped.  (DX 255, at ALC_CUR_00204120.)

140.3   As indicated in discussions at the outset of the 1996 CBA negotiations, the IR Council had been communicating with members of the Unions in the months leading up to the negotiations.  (DX 223, at ALC_CUR_00002925; DX 224, at ALC_CUR_00081495; DX 226, at ALC_CUR_00029143-44.)

141.    Alcoa held numerous pre-negotiation meetings, often jointly with Reynolds, in which the caps were a topic of repeated discussion.  (DX 207, at ALC_CUR_00034758; DX 209, at ALC_CUR_00031234; DX 210, at ALC_CUR_00031247; DX 211, at ALC_CUR_00051422; DX 212, at ALC_CUR_00177945.)

142.    In their joint pre-negotiations meetings, Alcoa and Reynolds recognized that the caps would be a subject of bargaining in the upcoming negotiations.  (Woloshyn, Direct, Tr. 1507-08.)

143.    Alcoa and Reynolds agreed that moving the cap to engage after the expiration of the 1996 CBA could be part of an overall economic package negotiated with the Unions, but the Companies did not agree before negotiations that they necessarily would move the cap.  (Woloshyn, Cross, Tr. 1560-61.)

143.1    Notes from a February 20, 1995 meeting between Alcoa and Reynolds indicate that Alcoa initially was unsure whether it wanted to agree to defer the caps in the 1996 negotiations.  (PTE 29, at ALC_CUR_00031197; Weidman, Dep., Tr. 32:20-33:2.)

143.2    Notes from an April 5, 1995 meeting recognize the caps as part of "the negotiated plan" and state that "moving the caps is a real cost that should be discussed with the unions".  (DX 207, at ALC_CUR_0034758.)

143.3    When the Companies engaged in pre-negotiation discussions, any potential positions to which both of the Companies determined they might be amenable were always subject to actual negotiations with the Unions.  (Woloshyn, Cross, Tr. 1560-61.)

144.    Plaintiffs rely heavily on the fact that certain handwritten notes of meetings between Alcoa and Reynolds refer to the caps as "caps with a wink".  (DX 209 (identical to PTE 30), at ALC_CUR_00031234; PTE 29, at ALC_CUR_00031197; PTE 31, at ALC_CUR_00031238.)  As discussed above (supra, ¶ 84), Plaintiffs misconstrue that phrase to mean that the caps would never engage, but Alcoa and Reynolds understood the phrase to mean that the caps would not engage during the life of a particular CBA:

144.1    No one who was present at the meetings memorialized in DX 209, PTE 29 or PTE 31 has testified that the phrase "caps with a wink" means what Plaintiffs contend.

144.2    In fact, Stephen Weidman, who authored the notes in DX 209, PTE 29 and PTE 31 (Weidman, Dep., Tr. 25:6-17, 37:24-38:3, 43:25-45:14), understood and used the phrase "caps with a wink" to refer to caps that "don't

-34-

energize or engage during the term of the contract". (Id. at 30:24-31:5.) As discussed above (supra, ¶ 84.3), this understanding of the phrase is consistent with that of Harvey Martin, a former ABG official. The phrase does not indicate, as Plaintiffs claim, that the cap was fake or would never be implemented. (Id. at 74:16-23.) To the contrary, Mr. Weidman understood that it was not Reynolds' position that the caps were intended never to engage. (Id. at 34:15-35:1.)

144.3   Bob Newman, former Reynolds Vice President of Human Resources, and Gary MacDonald, former Reynolds Director of Compensation and Benefits, were present on behalf of Reynolds at the February 20, 1995 meeting reflected in PTE 29, and they each understood the phrase "caps with a wink" to refer to caps that would not engage during the term of the contract. (Newman, Dep., Tr. 71:20-72:6; MacDonald, Dep., Tr. 140:9-14.)

144.4   Mr. Woloshyn, who was present at each of the meetings memorialized in DX 209, PTE 29 and PTE 31, understood "caps with a wink" to mean that the caps would not engage during the term of the current agreement. (Woloshyn, Direct, Tr. 1508-1509.)

144.5   Mr. Weidman, Mr. Newman, Mr. MacDonald, Mr. Hoffman and Mr. Root, all of whom were present at one or more of the meetings memorialized in DX 209, PTE 29 and PTE 31, do not recall the phrase "caps with a wink" ever actually being spoken in the pre-negotiation meetings between Alcoa and Reynolds. (Weidman, Dep., Tr. 45:7-11; Newman, Dep., Tr. 73:5-10; MacDonald, Dep., Tr. 141:9-17; Hoffman, Dep., Tr. 95:14-16; Root, Dep., Tr. 95:21-96:4.)

145.   The very fact that the Companies discussed the caps during at least five joint pre-negotiation meetings supports the conclusion that the Companies realized that the cap would be a subject of bargaining at the upcoming negotiations. (DX 207, at ALC_CUR_00034758; DX 209, at ALC_CUR_00031234; DX 210, at ALC_CUR_00031247; DX 211, at ALC_CUR_00051422; PTE 29, at ALC_CUR_00031197; PTE 31, at ALC_CUR_00031238.)

### 3.   The Companies recognized that the caps could be deferred, but only as part of the negotiation of the overall economic package.

146.   Alcoa compiled the various components of its employee costs incurred under a CBA into "Total Hourly Employee Cost" (or "THEC"), which Alcoa used as a parameter for the overall economic package that it could grant the Unions. (Woloshyn, Direct, Tr. 1510.)

147.   The Companies counted the potential movement of the cap as a component of THEC, meaning that the added expense of moving the cap would have to be offset by reducing Alcoa's expense for other THEC components. (DX 204, at ALC_CUR_00138782; DX 207, at ALC_CUR_0034758; DX 213, at

-35-

ALC_CUR_00092760; DX 219, at ALC_CUR_00077159 et seq.; Woloshyn, Direct, Tr. 1510-11.)

### 4.   The Companies clearly understood that the cap could not be rolled over indefinitely.

148.   Alcoa carefully considered whether or not to move the caps forward in 1996.  (Woloshyn, Direct, Tr. 1512; Lee, Direct, Tr. 1617-18.)  Alcoa had two concerns with rolling the caps forward:  first, that moving the caps would increase the amount the company was committed to pay; and second, that rolling the cap forward would not permit Alcoa to recognize a reduction in FAS-106 liability reflecting the cap. (Woloshyn, Direct, Tr. 1513.)

149.   Both Alcoa and Reynolds understood that if the caps were never intended to be implemented, the Companies would not be permitted to reduce their FAS-106 liability.  (DX 208, at ALC_CUR_00052923; Woloshyn, Cross, Tr. 1590-91; MacDonald, Dep., Tr. 143:6-144:3.)

150.   Alcoa never would have recognized a capped retiree medical liability on its books if Alcoa had believed that the caps would always roll over and would never be implemented.  (Woloshyn, Cross, Tr. 1590-91.)

### 5.   In analyses conducted at Alcoa's behest, Alcoa's actuaries recognized its plan as capped.

151.   In studies analyzing various scenarios concerning the caps, Alcoa's actuaries, Buck Consultants, recognized that Alcoa's current plan was capped and conducted its analyses on that basis.  (DX 205; DX 206; PTE 56; Lee, Direct, Tr. 1618-22.)

152.   Duane Lee of Buck Consultants advised Alcoa that it could defer the cap in the 1996 negotiations and still recognize its plan as capped.  (Lee, Direct, Tr. 1620.)

### B.   THE 1996 NEGOTIATIONS

### 1.   The cap was a subject of bargaining during the 1996 negotiations.

153.   The 1996 contract negotiations were held in Buffalo, New York.  (JPTO at 7.)

154.   Gene Woloshyn, Doug Root, George Bergeron and Ron Hoffman represented Alcoa at the top table, and Bob Newman and Steve Weidman represented Reynolds.  (JPTO at 7; Woloshyn, Direct, Tr. 1515.)

155.   Dick Davis, Joe Kiker and Jack Golden represented the USW at the top table, and John Murphy and Harvey Martin represented the ABG.  (JPTO at 7.)

156.     In his opening remarks at the start of the negotiations, George Bergeron, a member of Alcoa's IR Council, emphasized that efforts to "slow the escalation in the cost of medical benefits" must continue.  (DX 222, at ALC_CUR_00033083; see also DX 225, at ALC_CUR_00000017.)

157.     The Unions initially proposed to delete the caps.  (JPTO at 7; DX 227, at 000372; Michaud, Direct, Tr. 1285-86; Woloshyn, Direct, Tr. 1517-1518; Beasley, Cross, Tr. 720-21; Robinson, 2007 Dep., Tr. 42:10-13, 43:10-24; Martin, Dep., Tr. 68:4-14.) Plaintiffs cannot explain why the Unions proposed to delete the caps if they were not real.

157.1   As discussed above (supra, ¶ 87), when asked why the Unions had proposed deleting the cap, Mr. Murphy gave no credible explanation; he testified only that the Unions wanted to make the CBA shorter (by one page) in order to reduce the Companies' printing costs.  (Murphy, Direct, Tr. 110.)

157.2   A number of Plaintiffs' witnesses could not explain why the Unions proposed deleting the caps, but rather denied it ever happened, although the parties in this case have stipulated to that fact (JPTO at 7).  (Henry, Cross, Tr. 1017-18; Pruitt, Cross, Tr. 475; Beasley, Direct, Tr. 695; see also LaBaff, Direct, Tr. 237; LaBaff, Cross, Tr. 260-61.)

158.     Alcoa initially resisted movement or elimination of the caps.  (Michaud, Direct, Tr. 1285-86; Woloshyn, Direct, Tr. 1518; Robinson, 2007 Dep., Tr. 42:14-16.)

159.     Notes from the 1996 negotiations reflect discussion of the caps at the top table.

159.1   The Companies are quoted as saying in a May 21, 1996 top table meeting that "we have retiree medical cost issues to get on the table including caps".  (DX 221, at ALC_CUR_00059340.)

159.2   The same notes further reflect that the Companies recognized the extension of the caps as a genuine concession being given to the Unions through the bargaining process.  (DX 221, at ALC_CUR_00059373.)

159.3   Additionally, notes from a May 29, 1996 meeting between representatives of the Companies and the Unions show that the parties compared the cost of moving the caps for three years versus six years, as well as the cost of removal.  (DX 228, at ALC_CUR_00065600.)

160.     The parties ultimately agreed as a result of negotiations to defer implementation of the caps until January 1, 2003, after the term of the 1996 CBA.  (DX 13, at ALC_CUR_00041728-29; DX 14, at ALC_CUR_00040372; DX 17; Michaud, Direct, Tr. 1286; Woloshyn, Direct, Tr. 1518-19; Martin, Dep., Tr. 69:5-19; Robinson, 2007 Dep., Tr. 42:17-22, 43:25-44:13.)

160.1   Although Alcoa remained concerned about rising health care costs, the company could afford to move the caps because of record earnings in the mid-

nineties as well as some abatement in the escalation of health care costs after 1993. (O'Neill, Cross, Tr. 1725-26; Hoffman, Dep., Tr. 47:9-48:4.)

161.  Mr. Henry testified that in 1996 the Unions accepted lower wages in exchange for improvements in their insurance. (Henry, Cross, Tr. 1040-42.) Other than the movement of the caps, however, no significant change in the Unions' health insurance plan was negotiated in 1996. (Henry, Cross, Tr. 1042; compare DX 20, at ALC_CUR_00028297, with DX 48, at ALC_CUR_00001039; see also DDX 3.) If the parties had agreed in 1993 never to engage the caps, the Unions' willingness to give up wages in exchange for a movement of the caps would be inexplicable.

## 2. There was no side agreement between the parties in 1996 that the cap letter was not real.

162.  Plaintiffs have offered no evidence on which to conclude that the Companies and the Unions entered into any "side deal" beyond the language of the cap letter in the 1996 negotiations.

163.  The Companies' top table representatives understood the caps to be real and did not agree to any "side deal" beyond the language of the cap letters. (Woloshyn, Direct, Tr. 1521-22.)

164.  No one from the Companies told anyone from the Unions that the 1996 cap letters were not real or that the caps would never be implemented. (Michaud, Direct, Tr. 1286; Woloshyn, Direct, Tr. 1522; Lammel, Dep., Tr. 60:10-61:2, 106:7-17; Robinson, 2007 Dep., Tr. 49:7-50:3.)

164.1  Harvey Martin, a former ABG official, was present at the top table during the 1996 negotiations and does not recall anyone saying in those negotiations that the cap letter would never be implemented. (Martin, Dep., Tr. 73:5-7.)

## C. DISCLOSURE OF THE CAP AFTER THE 1996 NEGOTIATIONS

## 1. The Unions disclosed the cap agreements to their memberships prior to ratification of the 1996 CBA.

165.  The Memoranda of Settlement agreed to by the Companies and the Unions disclosed the cap agreements to the union members. (DX 218, at ALC_CUR_00062656, ALC_CUR_00062665.)

166.  A union presentation given to the membership prior to ratification of the CBA disclosed the cap agreements and indicated that the caps would "reflect actual costs in effect the year the bargaining agreement expires". (DX 229, at ALC_CUR_00064248; Woloshyn, Direct, Tr. 1524-26.)

-38-

167.    On June 10, 1996, Patti Seehafer, Assistant to the President of the USW and Director of the USW Research and Benefits Department, sent a fax with a copy of the cap letter to several union officers, including John Murphy, in which she wrote that the Unions "achieved the objectives of (1) achieving language to protect all retirees and surviving spouses <u>throughout the term of the Agreement</u>, including the re-opener period, and (2) allowing for favorable accounting treatment for the respective companies".  (DX 230 (emphasis added).)

167.1    Mr. Martin of the ABG testified that he agrees with Ms. Seehafer's statement and does not have a different view of the cap letters.  (Martin, Dep., Tr. 76:10-24.)

167.2    At trial, Mr. Murphy acknowledged that Ms. Seehafer's letter reflected the explicit language of the cap letters (i.e., that the cap would not engage until after the term of that CBA), and Mr. Murphy did not recall ever objecting to Ms. Seehafer's statement.  (Murphy, Cross, Tr. 188-191.)

168.    The June 10, 1996 letter from Ms. Seehafer attaches several iterations of the cap letter, reflecting changes to the dates contained in the letter.  (DX 230; Robinson, 2007 Dep., Tr. 51:10-53:1.)  That the parties took care to ensure that the cap language was accurate supports the fact that the parties understood the cap to be real.

3.    **After the 1996 negotiations, the Companies and the Unions negotiated over the SPDs to ensure that the cap agreement was accurately reflected in them.**

169.    A Joint Health Care Committee comprised of representatives from both the Unions and the Companies held meetings after the 1996 negotiations.  (Henry, Direct, Tr. 952-53; Oxley, Dep., Tr. 23:23-24.)

170.    In a Joint Health Care Committee meeting on October 30, 1996, a group of union representatives including Ms. Seehafer and David Willett, a local union president, met with Kevin Oxley, a benefits specialist at Alcoa, and the parties discussed the cap language contained in the SPD.  (PTE 203, at USW-10; PTE 206, at USW000968-69; Willett, Direct, Tr. 629-30; Willett, Cross, Tr. 655-56.)

170.1    Mr. Willett took notes of this meeting, and his notes state—consistent with the 1996 cap letter—that "Alcoa will cap the amount the Company pays for your retiree[] medical coverage in 2001, unless there is a mutual agreement reached prior to the year 2001".  (PTE 206, at USW000969.)

170.2    Mr. Willett's notes also state that "[a]ll the protection that [the union members] need is included in this letter".  (<u>Id.</u>)  Mr. Willett testified that "this letter" refers to the cap letter and that the "protection" to which he refers is

the right to mandatory bargaining, as set forth in the cap letter.  (Id.; Willett, Cross, Tr. 658.)

170.3   Mr. Willett's notes from this meeting refer to "page 28 of the Health Care Book", which is the page in the SPD that contains an explanation of the cap.  (PTE 206, at USW000969; Willett, Cross, Tr. 656.)  The parties modified the language of the SPD to reflect the "protection"—i.e., the mandatory bargaining provision—discussed in Mr. Willett's notes.  (PTE 5, at ALC_CUR_00001054; Willett, Cross, Tr. 659-61.)  Page 28 of the SPD contains the following language:  "On January 1, 2003, Alcoa will cap the amount it pays for retiree medical coverage unless the parties reach an agreement before this date, exclusive of interest arbitration."  (PTE 5, at ALC_CUR_00001054.)

170.4   Mr. Willett testified that the 1996 SPD language that Alcoa would cap retiree medical unless the parties agreed otherwise was accurate.  (Willett, Cross, Tr. 660.)

171.   In a Joint Health Care Committee meeting on December 3, 1996, Patti Seehafer, Dan Henry and other union members met with Kevin Oxley and Mary Ellen Lammel.  (Henry, Direct, Tr. 956.)  Plaintiffs claim that Mr. Oxley stated in this meeting that the cap letter was intended never to engage, but this conclusion is not supported by the evidence.

171.1   When asked in his deposition to state "exactly what Mr. Oxley said", Mr. Henry answered only that "Mr. Oxley was—Ms. Seehafer says, you know, here is the letter, and Mr. Oxley says, yep, he agreed".  (Henry, Cross, Tr. 1021-22.)  At trial, Mr. Henry testified that that statement was true and offered no account of any statement by Mr. Oxley other than his agreement with Ms. Seehafer's statement.  (Henry, Cross, Tr. 1021-22.)

171.2   Mr. Oxley recalled participating with Ms. Seehafer in meetings of the Joint Health Care Committee after the 1996 negotiations, and he remembered Ms. Seehafer assuring union members that the cap letter would not have an effect during the term of the contract and that the parties would be able to negotiate again before the cap engaged.  (Oxley, Dep., Tr. 22:23-24:12.)

171.3   In the Joint Health Care Committee meetings at which Mr. Oxley was present, Ms. Seehafer never said that the cap would never go into effect, never said it was "only for accounting purposes", and never said it was just a "paper transaction".  (Oxley, Dep., Tr. 24:13-15, 40:3-12, 79:1-4.)

171.4   Mr. Oxley understood that the cap would affect all retirees who retired after the 1993 CBA.  (Oxley, Dep., Tr. 25:2-15.)  Mr. Oxley believed that Ms. Seehafer understood that the cap would engage at some point, and Ms. Seehafer never would have accepted an oral agreement from Alcoa that the cap would never engage.  (Oxley, Dep., Tr. 79:5-80:16; see also Michaud, Direct, Tr. 1276-77.)

-40-

171.5   Ms. Lammel, who Mr. Henry testified was also present at the December 3, 1996 Joint Health Care Committee meeting (Henry, Direct, Tr. 956), understood that Alcoa intended to engage the caps, and Ms. Lammel never heard anyone indicate to the Unions that the caps would never engage.  (Lammel, Dep., Tr. 48:2-19, 106:7-17.)

### 4.   After the 1996 negotiations, Alcoa and the Unions prepared a letter to employees, providing a clear description of the written cap agreement.

172.    In the October 30, 1996 and the December 3, 1996 Joint Health Care Committee meetings, the parties discussed developing a letter further explaining the cap agreement.  (PTE 203, at USW-9, USW-10; PTE 206, at USW000969; Henry, Cross, Tr. 1023-25.)

173.    Alcoa and the Unions worked together to prepare a letter for employees explaining the terms of the cap agreement.  (DX 232; DX 251; Michaud, Direct, Tr. 1289-91.)  The letter reiterated to employees that "Alcoa will cap the amount it pays for retiree medical coverage on January 1, 2003, unless the parties reach an agreement before this date, exclusive of interest arbitration".  (DX 54; Michaud, Direct, Tr. 1290-91.)  The letter went on to explain that no retirees would be required to pay contributions "<u>during the term of this agreement</u> between the parties".  (DX 54 (emphasis added).)

174.    The language in the clarification letter was approved by union leaders before the letter was distributed to employees.  (Michaud, Direct, Tr. 1290-91.)

### D.   THE WRITTEN PLAN DOCUMENTS IN 1996 UNAMBIGUOUSLY ALLOWED ALCOA TO IMPLEMENT A RETIREE HEALTH CARE CAP IN 2003.

#### 1.   The 1996 CBAs

175.    Alcoa published the 1996 cap letter in its CBAs.  (DX 13, at ALC_CUR_00041728-29; DX 14, at ALC_CUR_00040372.)

175.1   The 1996 cap letters provide:  "In the event that the average per capita Company contribution exceeds the amount established [in the per capita formula] above in any calendar year, the excess shall be allotted to and paid by each covered person on a pro rata basis."  (DX 13, at ALC_CUR_00041728-29; DX 14, at ALC_CUR_00040372.)

175.2   The 1996 cap letters further provide:  "[T]he parties agree that the subject of the limitation set forth in this letter shall be a mandatory subject of bargaining in any negotiations prior to December 31, 2002, but no additional contributions shall be engaged before 2003."  (DX 13, at ALC_CUR_00041728-29; DX 14, at ALC_CUR_00040372.)

176.    Reynolds and the Unions entered into the same cap agreement as Alcoa did with its unions.  (DX 17; PTE 17, at 000378.)

## 2.    The 1996-2002 SPDs

177.    SPDs distributed in connection with the 1996 CBAs include clear and unambiguous language describing the cap that was negotiated in 1996.  (DX 41, at ALC_CUR_00006530; DX 42, at ALC_CUR_00000419; DX 44, at ALC_CUR_00098237; DX 45, at ALC_CUR_00070004; DX 48, at ALC_CUR_00001054; DX 49, at ALC_CUR_00028645; DX 50, at ALC_CUR_00097393; DX 51, at ALC_CUR_00069271; DX 52, at ALC_CUR_23078; DX 55, at ALC_CUR_00002646; DX 56, at ALC_CUR_00071147; DX 58, at ALC_CUR_00023415; DX 59, at ALC_CUR_00001282; DX 60, at ALC_CUR_00002598; DX 61, at ALC_CUR_00046006; DX 62, at ALC_CUR_00135905; DX 63, at ALC_CUR_00043087; DX 70, at ALC_CUR_00086119.)

177.1    For example, a 1996 insert to the Alcoa Total Compensation Binder provides:  "Alcoa will cap the amount it pays for retiree medical coverage on January 1, 2003, unless the parties reach an agreement before this date, exclusive of interest arbitration."  (DX 41, at ALC_CUR_00006530.)

178.    Prior to the next negotiations in 2001, the Union specifically requested "current medical plan documents, summary plan descriptions, and administrative manuals" for all Alcoa and Reynolds plans, demonstrating that the Union understood the importance of reviewing the SPDs.  (DX 262, at ALC_CUR_00032754.)

179.    The SPDs are incorporated by reference into the 1996 CBAs.

179.1    Article XXII of the CBA between Alcoa and the USW provides: "Separate booklets describing these benefits are incorporated herein and made a part of this Agreement".  (DX 13, at ALC_CUR_00041697.)

179.2    Article XXIII of the CBA between Alcoa and the ABG provides: "Separate booklets describing these benefits are incorporated herein and made a part of this Agreement".  (DX 14, at ALC_CUR_00040337.)

179.3    Article XXXVIII of the CBA between Reynolds and the USW provides:  "There is attached hereto as an exhibit an Insurance Plan which shall become effective as provided therein. The parties agree that this Insurance Plan is hereby incorporated into this Agreement by reference and the parties agree to comply with and be bound by all of its terms and provisions."  (DX 15, at ALC_CUR_00049053.)

179.4    Article XXIX of the CBA between Reynolds and the ABG provides:  "There is attached hereto as an exhibit an Insurance Plan which shall become effective as provided therein and continue in effect for the life of this Agreement. The parties agree that this Insurance Plan is hereby incorporated into

-42-

this Agreement by reference and the parties agree to comply with and be bound by all of Its terms and provisions." (DX 16, at ALC_CUR_00002292.)

179.5 The Alcoa SPDs provide that "[t]he benefits described in this booklet are incorporated in and made part of Article XXIII-Group Insurance of the Labor Agreement between [Alcoa] and the Aluminum, Brick and Glass Workers International Union, dated June 1, 1993". (See, e.g., DX 48, at ALC_CUR_00001023.)

180. Plaintiffs inappropriately rely on an SPD distributed in 1997 that does not contain a reference to the cap agreement. (DX 53.)

180.1 Unlike the other SPDs issued by Alcoa during this period, the 1997 SPD was sent both to union employees (who were subject to the cap) as well as non-union employees (who were not subject to the same cap negotiated between Alcoa and the Unions). (DX 53, at ALC_CUR_00000535.)

180.2 In addition, while the SPD does not state that a cap would go into effect after the term of the CBA, it has much stronger language: "Alcoa may change the level of benefits provided under the Employees' Group Benefits Plan of the Aluminum Company of America—Plan II at any time. If a change is made, benefits for claims incurred after the date the adjustment takes effect will be paid according to the revised plan provisions. In other words, once an adjustment is made, there are no vested rights to benefits based on earlier plan provisions. . . . The company expects that this plan will continue indefinitely. However, the Board of Directors or Inside Director Committee of the company can amend, modify, suspend, or terminate all or part of the plan at any time. Benefits under the plan are not vested." (Id. at ALC_CUR_00000624 (emphasis added).)

### E. ALCOA'S ACTUARY VALUED A CAPPED PLAN IN EACH ACTUARIAL VALUATION FROM 1996 THROUGH 2001.

181. Buck Consultants understood Alcoa's plan documents to create a valid cap, and Buck recognized Alcoa's health care plan as capped in Buck's actuarial valuations of Alcoa from 1996 to 2001. (DX 233; DX 252; DX 254; DX 258; Lee, Direct, Tr. 1623, 1630-31.)

182. After Alcoa acquired Reynolds, Buck also conducted actuarial valuations of the Reynolds plan and recognized that plan as capped. (DX 257; DX 259.)

183. Additionally, Duane Lee, an actuary at Buck, indicated to Alcoa Buck's understanding that the terms of the cap letter provided that the cap would be calculated on the basis of costs from June 1, 2001 to June 1, 2002. (DX 231.)

-43-

## V. 2001 NEGOTIATIONS

### A. MERGER OF THE PARTIES PRIOR TO 2001 NEGOTIATIONS

184. The USW and ABG unions merged into the USW effective January 20, 1997. (LaBaff, Cross, Tr. 284.)

185. In 2000, Alcoa purchased the Reynolds Metals Company, including all of Reynolds' plants. (JPTO at 8.)

### B. ALCOA'S CONDUCT LEADING UP TO THE 2001 NEGOTIATIONS DEMONSTRATES THAT IT BELIEVED THAT THE CAP WAS REAL.

#### 1. Internal presentations made to Alcoa's Industrial Relations Council show that Alcoa understood the cap to be real.

186. Alcoa's IR Council was comprised of a group of Alcoa business leaders who discussed what Alcoa's position should be in negotiating on economic issues. (McCullough, Direct, Tr. 1346-47.)

187. Lauren McCullough, Alcoa's Director of Global Finance Development and Human Resource Finance, made a presentation to the IR Council on March 6, 2001. (DX 261; McCullough, Direct, Tr. 1347-48.) In the presentation, Ms. McCullough presented several potential options as to how Alcoa would approach the cap in the upcoming negotiations, including the option to implement the cap in 2003. Each option was accompanied by an analysis as to the effect of that option on Alcoa's THEC. (DX 261, at ALC_CUR_00297605-06; McCullough, Direct, Tr. 1347-52.)

187.1 One of the options considered in the IR Council presentation was to "maintain 2002 cap", meaning to negotiate no movement of the cap in the 2001 CBA negotiations and instead to engage the cap as provided in the 1996 cap letter. (DX 261, at ALC_CUR_00297605-06; McCullough, Direct, Tr. 1350-52.)

188. In an April 11, 2000 memorandum summarizing the strategies developed by the IR Council for communicating with hourly employees prior to the 2001 CBA negotiations, Mr. Quaglia noted that the escalation of retiree medical costs was a "very serious problem" and that "[e]mployee contributions are part of competitive compensation packages". (DX 256, at ALC_CUR_00177864.)

#### 2. Alcoa tasked its actuaries with calculating the impact of taking varying approaches to the cap in the 2001 negotiations, including immediate engagement of the cap.

189. Prior to the 2001 negotiations, Alcoa tasked Buck Consultants with analyzing various scenarios of health care plan design changes, including projections of what potential retiree contributions would be if the cap was implemented in 2003, as anticipated by the 1996 cap agreement. (DX 260; DX 263A; DX 263B; DX 264; DX

-44-

268; DX 269 (attachment to DX 268); Lee, Direct, Tr. 1625-29.)  Alcoa determined which scenarios Buck would consider.  (McCullough, Direct, Tr. 1350-51.)

189.1   For example, Buck provided analyses of the impact of the following scenarios that would require retirees to make immediate contributions to their health care:  (1) engaging the cap in 2003; (2) instituting $10/$30 contributions for retirees and dependents; and (3) requiring retirees to pay 50 percent of cost increases above the 2002 cap.  (DX 260; DX 264, at ALC_CUR_00203620-22; Lee, Direct, Tr. 1628-29.)

190.   In a March 5, 2001 email to Ms. McCullough and Mr. Quaglia, Duane Lee of Buck Consultants stated that under the 1996 CBA, Alcoa retirees were required to "pay for all increases in excess of the 2002 cap".  (DX 260; Lee, Direct, Tr. 1626.)  Buck estimated that if the cap were engaged pursuant to the 1996 CBA, the level for Alcoa employees would be $4,928 for pre-65 retirees and $1,794 for post-65 retirees.  (DX 260.)

191.   Buck's explanation of FAS-106 and analyses of various cap scenarios do not indicate, as Plaintiffs claim, that Buck believed Alcoa's substantive plan to be uncapped.

191.1   Buck understood that where the "substantive plan" differed from the "written plan", the substantive plan was to be valued under FAS-106.  (PTE 59, at ALC_CUR_00078928-29; Lee, Direct, Tr. 1624-25.)

191.2   Buck did not express the opinion that Alcoa's written plan differed from its substantive plan.  (Lee, Direct, Tr. 1625.)

191.3   Mr. Lee did not believe that Alcoa's retiree medical cap was intended never to engage, and he had no reason at any time to doubt that the cap was real.  (Lee, Direct, Tr. 1634-35.)

### 3.   Alcoa understood that if it deferred the cap in the 2001 negotiations, the cap would have to be engaged at the following round of negotiations.

192.   Alcoa's auditors, PricewaterhouseCoopers, advised Alcoa that it could defer the cap a second time in 2001 and still recognize its plan as capped under FAS-106, but that a third deferral of the cap in the next round of negotiations would result in Alcoa's substantive plan being viewed as uncapped.  (McCullough, Direct, Tr. 1345-46.)

### C.   THE 2001 NEGOTIATIONS

### 1.   The cap was a subject of bargaining in the May 2001 re-opener negotiations.

193.   In May 2001, the parties met in Nashville, Tennessee to engage in re-opener negotiations, meaning that the parties would attempt to negotiate a new contract

-45-

one year prior to the termination of the 1996 CBA.  (JPTO at 8; Woloshyn, Direct, Tr. 1526-27; Quaglia, Direct, Tr. 1968; Storm, Direct, Tr. 1750-51.)

194.    Gene Woloshyn and Joe Quaglia represented Alcoa at the top table in the 2001 re-opener negotiations.  (JPTO at 8.)  Dick Davis and John Murphy represented the USW at the top table in 2001.  (Id.)

195.    The cap was a subject of bargaining at the top table in 2001.  (Woloshyn, Direct, Tr. 1527-28; Quaglia, Direct, Tr. 1958; Robinson, 2007 Dep., Tr. 58:5-12.)

196.    Alcoa's initial proposal in the 2001 re-opener negotiations was to implement the cap immediately in accordance with the language of the 1996 cap agreement.  (Willett, Direct, Tr. 639-40; Henry, Direct, Tr. 962; Woloshyn, Direct, Tr. 1528, 1530; Robinson, 2007 Dep., Tr. 59:4-12.)

196.1   At no time before or during the 2001 re-opener negotiations was there any discussion among Alcoa representatives that the cap was intended not to engage.  (Quaglia, Direct, Tr. 1966-67; Woloshyn, Direct, Tr. 1536-37.)

197.    The Union's initial proposal during the 2001 negotiations was to eliminate the cap.  (DX 266, at USW009007; DX 267, at USW000468; Woloshyn, Direct, Tr. 1529-31; Quaglia, Direct, Tr. 1964; Robinson, 2007 Dep., Tr. 59:13-15; Robinson, 2008 Dep., Tr. 120:19-121:14.)

198.    Alcoa refused to eliminate the cap, but responded that it would be willing to move the cap if the Union agreed to institute premiums for retiree health care benefits. (DX 270, at USW009044; Woloshyn, Direct, Tr. 1530-32; Quaglia, Direct, Tr. 1964-65; Robinson, 2008 Dep., Tr. 122:10-123:7.)

199.    Alcoa prepared presentations explaining to the Union the proposal to institute premiums in order to address the problems caused by increasing retiree health care costs.  (DX 271, at ALC_CUR_00054275; DX 272, at ALC_CUR_00065501; DX 273, at USW009020.)

200.    As the May 2001 re-opener negotiations drew to an end, the issue of Alcoa's proposal to move the cap only in exchange for premiums remained one of the major controversies preventing the parties from reaching a final agreement.  (DX 265, at ALC_CUR_0025083-84; DX 274; Quaglia, Direct, Tr. 1962-64.)

### 2.    **No Alcoa employee told the Union during the 2001 negotiations that the cap was not real.**

201.    Several of Plaintiffs' witnesses testified that they understood Tom Mordowanec, Alcoa's representative at the benefits table, to have conveyed to them that he agreed with their understanding of the cap—that it would never take effect.

201.1   In particular, those witnesses testified that after Mr. Mordowanec relayed Alcoa's proposal for an immediate implementation of the cap letter at the

-46-

benefits table in 2001, the local union officials expressed concern about that proposal and argued that the cap letter was intended never to engage, and walked out. (Henry, Direct, Tr. 961-63; Beasley, Direct, Tr. 702-03; Willett, Direct, Tr. 639-40.)

       201.2   Those witnesses further testified that Mr. Mordowanec said at the next meeting of the benefits table "you're right, I'm wrong" about the cap letter. (Henry, Cross, Tr. 1029; Beasley, Direct, Tr. 703; Willett, Direct, Tr. 640.)

202.    The evidence does not support a conclusion that Mr. Mordowanec informed union officials that the cap would never take effect.

       202.1   First, the testimony of Plaintiffs' witnesses that they walked out of the meeting in which Mr. Mordowanec proposed implementing the cap is inconsistent with a May 31, 2001 executive summary of the benefits committee negotiations. That summary indicates that the walk-out in fact occurred on May 29, 2001, near the end of the May 2001 bargaining session, in response to Alcoa's proposal to instute a "Flex" plan that involved retiree premiums rather than in response to the initial company proposal simply to implement the cap immediately. (PTE 68, at ALC_CUR_00020404.)

       202.2   According to Plaintiffs' witnesses, Mr. Mordowanec never said that the cap would not engage, only that the union officials were "right" and he was "wrong", with no explanation of that alleged statement. (Henry, Cross, Tr. 1029-30; Beasley, Cross, Tr. 726-27; Willett, Cross, Tr. 668-69.) In fact, Mr. Willett testified that Mr. Mordowanec said only that the cap "would not be implemented <u>at this time</u>". (Willett, Cross, Tr. 668-69 (emphasis added).)

       202.3   Furthermore, Mr. Mordowanec testified that he made no statement that the union members were right and he was wrong with respect to the cap letter and that he did not agree with the position that the cap was never to engage. (Mordowanec, 2007 Dep., Tr. 39:15-40:14.)

       202.4   Mr. Mordowanec understood that all decision-making authority was held by Alcoa's top table negotiators, and Mr. Mordowanec was never involved in top table negotiations. (Mordowanec, Dep., Tr. 44:17-45:9, 100:12-101:1.) Mr. Woloshyn, who handed down instructions from the top table to Mr. Mordowanec, never indicated to Mr. Mordowanec that the cap was only to help with accounting or that the cap would never engage. (Woloshyn, Direct, Tr. 1529; Mordowanec, 2007 Dep., Tr. 42:11-20, 101:2-11.)

       202.5   Mr. Mordowanec's understanding of the union members' position on the cap letter was informed by the fact that "they're negotiating" and "they're going to take a position that they believe gives them the greatest leverage in an attempt to soften the company's position". (Mordowanec, 2007 Dep., Tr. 68:21-69:1.)

-47-

202.6   Mr. Mordowanec weighed the union members' statements in light of the fact that "they were really not part of the negotiation over the cap in the first place."  (Id. at 69:3-10.)

202.7   Mr. Mordowanec raised the cap issue again in bargaining sessions later that same year and then yet again in bargaining sessions in 2005 and 2006. (Henry, Cross, Tr. 1031-32; Beasley, Cross, Tr. 727.)  In addition, in May 2002 Mr. Mordowanec circulated a slide presentation to the IR Council and others at Alcoa which noted that Alcoa caps would require "significant cost shifting to retirees in subsequent years".  (DX 305, at ALC_CUR_00344762.)  It is not plausible that Mr. Mordowanec would recognize that the caps would shift costs and would propose engaging the cap in subsequent negotiations if he had previously acknowledged that the cap could never take effect.

### 3.   Alcoa and the Union did not reach agreement at the 2001 re-opener negotiations due, in part, to a disagreement over the cap.

203.   As a result of disagreement over the cap and other issues, Alcoa and the Union did not reach a final agreement in May of 2001.  (Woloshyn, Direct, Tr. 1533-1534; Quaglia, Direct, Tr. 1965.)

204.   In the event that the parties did not reach a long-term agreement, the parties were obligated to negotiate a one-year agreement on economics.  (Quaglia, Direct, Tr. 1968; Storm, Direct, Tr. 1750-51.)  Because the parties could not even reach agreement on a one-year economic contract in May of 2001, the dispute went to arbitration.  (Quaglia, Direct, Tr. 1968-69; Storm, Direct, Tr. 1751.)

### 4.   The cap was a subject of bargaining in the September 2001 negotiations.

205.   After the parties failed to reach an agreement in May, the parties continued to negotiate during the arbitration process.  (Woloshyn, Direct, Tr. 1534-35.)

206.   The parties met in Pittsburgh in the fall of 2001 to attempt to reach an agreement before the arbitrator issued a decision.  (Quaglia, Direct, Tr. 1969-70.)  Initially, a small group of lead negotiators met to develop a framework for a potential long-term agreement.  (Quaglia, Direct, Tr. 1970.)  After that meeting, the larger group gathered to resume full-scale negotiations.  (Quaglia, Direct, Tr. 1970-71.)

207.   The cap was a subject of bargaining during the September 2001 negotiations.  The Union maintained its proposal to eliminate the cap, while Alcoa maintained its position that it would move the cap only in exchange for premiums.  (DX 275, at USW008995; DX 276, at ALC_CUR_00153602; DX 277, at ALC_CUR_00032550; Beasley, Cross, Tr. 727; Quaglia, Direct, Tr. 1971.)

208.   Plaintiffs rely on notes dated September 27, 2001, purporting to memorialize a meeting in which Nick Storm, Alcoa's Senior Counsel, discussed the cap.

-48-

(PTE 174.)  The evidence does not support a conclusion that Mr. Storm either believed that the cap was not real or reported that to others at Alcoa.

208.1   The 1996 cap letter stated that the cap would be a mandatory subject of bargaining "[i]f the special arbitration procedures are not invoked in 2001 by either party".  (DX 13, at ALC_CUR_00041729.)  Mr. Storm recalls having a conversation regarding whether the cap should remain a mandatory subject of bargaining after the parties had entered interest arbitration, as they did in 2001.  (Storm, Direct, Tr. 1751-52.)

208.2   Mr. Storm's advice in that conversation was that the cap should remain a mandatory subject of bargaining, even though arbitration proceedings had commenced.  (Storm, Direct, Tr. 1754-56.)  Mr. Storm's advice was based on his reading and understanding of the cap letter, as he was not involved in the negotiation of the 1993 or 1996 cap letters.  (Storm, Direct, Tr. 1748-49, 1754.)

208.3   Plaintiffs cite the paragraph at the top of PTE 174 which states "[i]ntention not to trigger Cap and direct 100% of the excess cost to retirees", but that phrase expresses Mr. Storm's view only in part.  A full expression of Mr. Storm's understanding of the cap letter is reflected in the discussion notes immediately below the paragraph on which Plaintiffs rely:  "the intent was probably not to trigger the Cap and transfer 100% of the excess cost to the retirees but to <u>negotiate</u> a lower retiree contribution".  (PTE 174 (emphasis added).)

208.4   The notes further state, consistent with the 1996 cap letter, that "[i]f don't reach settlement, the Cap will trigger based on the letter" and describe possible implementation of the cap.  (PTE 174.)

208.5   When viewed in context and read in full, the notes contained in PTE 174 reflect exactly the understanding of the cap that Alcoa propounds:  that the cap would trigger unless the parties negotiated a movement of the cap exclusive of interest arbitration.  (<u>Id</u>.)

208.6   The statement that Alcoa probably intended "to negotiate a lower contribution" was later borne out by the 2006 negotiations, in which Alcoa did precisely that.  (<u>See</u> <u>infra</u>, ¶ 260.)

209.    At the conclusion of the September 2001 negotiations, the parties were able to reach a new long-term agreement only after Alcoa agreed to withdraw its proposal of retiree premiums and to extend the cap letter to 2006, with an additional round of mandatory bargaining in the period before the cap would engage.  (DX 18, at ALC_CUR_00000525; Quaglia, Direct, Tr. 1982-83.)

### 5.    <u>The parties did not negotiate an oral side agreement that the cap letter would never be enforced.</u>

210.    Alcoa never told the Union that the cap letter was not real or never would go into effect.  (Woloshyn, Direct, Tr. 1536-37.)  In fact, not a single Plaintiffs' witness,

including John Murphy, has testified that Alcoa made any such assurance in 2001. (Murphy, Cross, Tr. 216; Fountaine, Cross, Tr. 375; Henry, Cross, Tr. 1029-30; Beasley, Cross, Tr. 726-27; Willett, Cross, Tr. 668-69.)

211. Plaintiffs claim that notes taken by Mr. Murphy of a conversation with Mr. Quaglia on September 23, 2001, serve as evidence that Mr. Quaglia indicated to Mr. Murphy that the cap would never engage. (PTE 16, at page 69 (pages not Bates stamped).) In particular, the notes state "FASBY not intended as a $ issue but a 'paper transaction' not to transfer the cost or shift any of it". (Id.) Several observations show that Plaintiffs' claim based on these notes is unfounded:

211.1 Plaintiffs' suggestion that Mr. Quaglia indicated that the cap would never engage is based on their amended version of the notes (PTE 16, at page 69 (pages not numbered)), which cuts off the date separator in the left column to erroneously suggest that the conversation with Mr. Quaglia included a discussion of FASB. An accurate copy of those notes makes clear that there were two separate conversations, one with Mr. Quaglia on September 20, 2001, about a topic other than the cap, and one without Mr. Quaglia on September 23, 2001, about the cap. (DX 502, at page 72 (pages not numbered).)

211.2 Another copy of these notes is contained in PTE 26. In that document, the date "9-23-01" is inserted above Mr. Murphy's notes of his conversation with Mr. Quaglia (this insertion does not appear in the original version of Mr. Murphy's notes reflected in PTE 16 and in DX 502), while entirely cutting off the "9/23" date that appears in the original notes below the conversation with Mr. Quaglia and above the note concerning FASB. (PTE 26, at page 1 (pages not numbered).)

211.3 Mr. Murphy himself testified that he did not know on which date he wrote each part of the notes on page 69 of PTE 16. (Murphy, Cross, Tr. 196-97.)

211.4 Mr. Murphy testified that Mr. Quaglia did not state in this conversation that the cap letter was not intended to engage; Mr. Murphy testified instead that he read the statement in his notes to Mr. Quaglia. (Murphy, Cross, Tr. 194-95.)

211.5 Mr. Quaglia testified that he had no conversation with Mr. Murphy relating to the cap or to FASB on or around September 23, 2001. (Quaglia, Direct, Tr. 1976; Quaglia, Cross, Tr. 2056-57; Quaglia, Redirect, Tr. 2098.)

211.6 Mr. Quaglia testified that he never said or suggested to Mr. Murphy that the cap would never engage. (Quaglia, Direct, Tr. 1966.)

211.7 Mr. Quaglia testified that he would not have had the authority to talk with Mr. Murphy about when the cap would engage. (Quaglia, Direct, Tr. 1977.)

212.     On October 2, 2001, Mr. Quaglia sent a fax of the 2001 cap letter to Mr. Murphy.  Plaintiffs have introduced <u>two</u> copies of this fax, <u>each with a different handwritten note by Mr. Murphy</u>.  (PTE 16, at page 4 (pages not Bates stamped); PTE 299.)  Plaintiffs rely on one of these notes to indicate that Mr. Quaglia "knew [Mr. Murphy's] understanding of the 'wink' letter", but that reliance is unwarranted.  (PTE 299.)

212.1   Mr. Quaglia testified, and the notes themselves reflect, that while he did indeed have a conversation with Mr. Murphy about the corrected dates in the faxed cap letter, that conversation involved no discussion of when the cap letter would be implemented.  (Quaglia, Direct, Tr. 1979-80; <u>see also</u> PTE 299.)

212.2   Mr. Quaglia testified that he had "absolutely no discussion about a wink with John Murphy" and that he does not even recall hearing the phrase "caps with a wink" prior to 2005.  (Quaglia, Direct, Tr. 1981-82; Quaglia, Cross, Tr. 2032.)

212.3   Mr. Murphy testified that he wrote the note contained in PTE 16 before writing the note contained in PTE 299.  (Murphy, Cross, Tr. 202-204.)

212.4   The version of the notes contained in PTE 16 has a fax line at the bottom of the page that appears to indicate the document was faxed in 2007, after Alcoa had implemented the cap and during the span of this litigation.  (PTE 16, at 4.)  Mr. Murphy testified that he probably faxed the letter to someone in 2007, but he did not recall whom.  (Murphy, Cross, Tr. 203.)

### 6.     **After negotiations, the Union disseminated highlights of the 2001 negotiation to its members explaining the cap letter, without reference to any alleged side agreement that the cap would not go into effect.**

213.     The Union prepared a document, which it disseminated to the local unions at each plant, containing highlights of the 2001 contract settlement but containing no mention of any side deal beyond the language of the cap agreement.  (DX 301; Woloshyn, Direct, Tr. 1547; Robinson, 2007 Dep., Tr. 66:11-68:12.)  To the contrary, the Union expressed the very understanding of the cap that Alcoa propounds—i.e., that the cap was moved to the year following expiration of the 2001 agreement and that "current and future retirees will not be required to make any premium contributions towards their medical coverage until at least the year 2007".  (DX 301, at USW003584.)

**D. THE WRITTEN PLAN DOCUMENTS IN 2001 UNAMBIGUOUSLY ALLOWED ALCOA TO IMPLEMENT A RETIREE HEALTH CARE CAP.**

### 1. The 2001 CBA

214. Alcoa published the 2001 cap letter in its CBA. (DX 18, at ALC_CUR_00000525.)

214.1 The 2001 cap letter provides: "In the event that the average per capita Company contribution exceeds the amount established [in the per capita formula] above in any calendar year, the excess shall be allotted to and paid by each covered person on a pro rata basis." (Id.)

214.2 The 2001 cap letter further provides: "[T]he parties agree that the subject of the limitation set forth in this letter shall be a mandatory subject of bargaining in any negotiations prior to December 31, 2006, but no additional contributions shall be engaged before 2007." (Id.)

### 2. The SPDs issued after the 2001 CBA

215. At least three SPDs distributed by Alcoa to its employees following the 2001 CBAs include clear and unambiguous language describing the cap that was negotiated in 2001. (DX 64, at ALC_CUR_00000733; DX 66, at ALC_CUR_00070553; DX 67, at ALC_CUR_00027377.)

215.1 For example, a Health Care Benefits Agreement effective April 1, 2002, provides: "On January 1, 2007, Alcoa will cap the amount it pays for retiree health care coverage unless the parties reach an agreement before this date, exclusive of interest arbitration." (DX 64, at ALC_CUR_00000733.)

215.2 The cap language in these SPDs is consistent with the Union's understanding of the meaning and effect of the 2001 cap agreement. (Robinson, 2007 Dep., Tr. 70:13-71:3; Bloom, Dep., Tr. 33:19-34:8.)

216. The SPDs are incorporated by reference into the 2001 CBA.

216.1 Article XXII of the 2001 CBA between Alcoa and the USW provides: "Separate booklets describing these benefits are incorporated herein and made a part of this Agreement. Effective April 1, 2002, the agreed-upon modifications to all Group Insurance benefits will become effective and incorporated into plan booklets." (DX 18, at ALC_CUR_00000480.)

216.2 The SPDs provide: "The health care benefits described in this booklet are incorporated in and made part of the collective bargaining agreements between Alcoa Inc. and the unions listed under 'Participating Unions' on pages 44-45 of this booklet." (DX 64, at ALC_CUR_00000693.) The list of participating unions includes the USW. (Id. at ALC_CUR_00000737.)

-52-

217.    Plaintiffs inappropriately rely on an SPD distributed in 2001, which does not contain a reference to the cap agreement.

217.1    As an initial matter, unlike the other SPDs issued during this period, the 2001 SPD was sent both to union employees (who were subject to a cap) as well as non-union employees (who were not all subject to the cap that Alcoa negotiated with the Union).  (DX 71, at ALC_CUR_00128452.)

217.2    In addition, while the SPD does not state that a cap would go into effect after the term of the CBA, it has much stronger language concerning vesting:  "Alcoa may change the level of benefits provided under the Employees' Group Benefits Plan of Alcoa Inc., Plan II, at any time.  If a change is made, benefits for claims incurred after the date the adjustment takes effect will be paid according to the revised plan provisions.  In other words, once an adjustment is made, there are no vested rights to benefits based on earlier plan provisions. . . . The company expects that the plan described in this booklet will continue indefinitely.  However, the Board of Directors or Inside Director Committee of the company can amend, modify, suspend, or terminate all or part of the plan at any time. In any event, all cash investments must be devoted to the purposes of the plan, including payment of expenses of the plan."  (Id. at ALC_CUR_00128495 (emphasis added).)

## E.    ALCOA'S ACTUARY VALUED A CAPPED PLAN IN EACH ACTUARIAL VALUATION FROM 2001 THROUGH 2006.

218.    Buck Consultants understood Alcoa's plan documents to create a valid cap, and Buck recognized Alcoa's health care plan as capped in Buck's actuarial valuations of Alcoa from 2001 to 2005.  (DX 303; DX 304; DX 309; DX 310; DX 317; DX 318; DX 322; DX 323; Lee, Direct, Tr. 1623, 1630-31.)

## VI.    2005-2006 NEGOTIATIONS

### A.    THE CONDUCT OF ALCOA AND THE UNION LEADING UP TO THE 2005-2006 NEGOTIATIONS DEMONSTRATES THAT THEY BELIEVED THAT THE CAP WAS REAL.

#### 1.    After the 2001 negotiations, Alcoa continued to monitor the rising costs of health care.

219.    Shortly after the 2001 negotiations, health care costs began to escalate sharply.  (McCullough, Direct, Tr. 1359.).

219.1    While the national rate of health care cost increases was only 4% for actives and pre-65 retirees in 1994, the rate was projected to reach 13% in 2002 and to remain above 11% until 2006.  (DX 305, at ALC_CUR_00344723; McCullough, Direct, Tr. 1354-56; see also DX 308, at ALC_CUR_00294040.)

219.2   Alcoa projected that its own health care costs would increase from $577 million in 2002 to over $867 million by 2006.  (DX 305, at ALC_CUR_00344726.)

219.3   Alcoa's movement of the cap in 2001 increased the Company's annual expense by approximately $10 million.  (DX 307, at ALC_CUR_00197933.)

220.    By early 2002 it became clear to Alcoa that it had not gone far enough in the 2001 negotiations with respect to curbing its health care liability.  (Quaglia, Direct, Tr. 1983-85.)

220.1   Employees' health care costs at Alcoa were charged back to each business unit, and spikes in costs led to huge expenses on the ledgers of the various business units.  (Quaglia, Direct, Tr. 1984.)

220.2   The IR Council, which in 2002 was renamed the Employee Relations Council ("ERC"), met with business unit presidents, who complained that the Company's failure to control the rising health care costs in the 2001 negotiations was making the U.S. operations noncompetitive.  (Quaglia, Direct, Tr. 1984-85.)

221.    Paul Thomas, Alcoa's President of North American Fabricated Products, expressed concern that Alcoa was underestimating the impact of escalating health care costs.  (DX 314; McCullough, Direct, Tr. 1360-61.)  Mr. Thomas cautioned that, at least with respect to Alcoa's North American Fabricators division, Alcoa had to address these escalating costs, either through capping health care expenses or reducing employment drastically.  (DX 314; McCullough, Direct, Tr. 1363.)

221.1   Lauren McCullough, Alcoa's Director of Global Finance Development and Human Resource Finance, agreed with Mr. Thomas that Alcoa could not afford to defer the cap again.  (McCullough, Direct, Tr. 1364-67; DX 315, at ALC_CUR_00203326; DX 316, at ALC_CUR_00203300.)

222.    From 1995 to 2005, health care as a component of total hourly employment compensation increased from 16 percent to 28 percent.  (Quaglia, Direct, Tr. 1985-86.)  Of that 28 percent, approximately half was due to retiree health care costs.  (Id. at 1986.)

223.    Alcoa undertook comprehensive preparations for the 2005 negotiations.  (Mordowanec, 2007 Dep., Tr. 47:4-14.)

223.1   Internally, those preparations primarily involved Joe Quaglia, Alcoa's Director of Industrial Relations, Ms. McCullough, Tom Mordowanec, Alcoa's Director of Employee Benefits for North America, and Nick Storm, Senior Counsel for Alcoa.  (Mordowanec, 2007 Dep., Tr. 47:15-48:12, 48:23-49:9.)

-54-

224.    Alcoa's negotiators continued to communicate to the Union the need for drastic measures to curb Alcoa's health care expenses, including implementation of premiums of some sort.  (DX 306; DX 311, DX 312, at ALC_CUR_0026485-89; DX 313; Quaglia, Direct, Tr. 1990)

> 224.1   Alcoa's communication efforts included presentations detailing Alcoa smelters' worldwide competitive position.  (DX 312; Quaglia, Direct, Tr. 1991.)  Figures in one presentation demonstrated that (1) Alcoa's U.S. smelters were among the highest cost smelters in the world (DX 312, at ALC_CUR_00264977; Quaglia, Direct, Tr. 1991); (2) total hourly employment costs had risen drastically (DX 312, at ALC_CUR_00264985; Quaglia, Direct, Tr. 1992); and (3) Alcoa's retiree medical costs were projected to increase by 24% in 2003 (DX 312, at ALC_CUR_00264987; Quaglia, Direct, Tr. 1992).

> 224.2   Mr. Quaglia conveyed to union negotiator Andrew "Lefty" Palm that Mr. Thomas, who was also head of the ERC, wanted to save the U.S. operations.  (Quaglia, Direct, Tr. 1989-90.)  But Alcoa expressed to the Union that if the parties did not negotiate changes before 2006, more plants would become vulnerable.  (Id. at 1990.)

225.    As part of negotiations between Alcoa and the USW involving a non-Master Agreement smelter in Washington in 2004, the Union promised Alcoa in writing that it would agree to cost-sharing during the next master negotiations.  (DX 320.)

> 225.1   Alcoa had shut down its smelter in Wenatchee, Washington around 2002 due to depressed aluminum prices and rising energy costs.  (Quaglia, Direct, Tr. 1996-97.)  By 2004, aluminum prices had risen and energy prices had dropped, so Alcoa considered restarting the plant.  (Id. at 1997.)

> 225.2   Alcoa approached the Union about the possibility of restarting the smelter and expressed reluctance to restart in the absence of certainty that the agreement with the Union would allow Alcoa to continue running the smelter in the long-term; to ensure that, Alcoa requested that the Union accept a health care plan that included employee contributions.  (Quaglia, Direct, Tr. 1997-99.)  John Murphy was involved in these discussions.  (Id. at 1998.)

> 225.3   Alcoa negotiated with the Union for a long period of time without making real progress and eventually talks broke off.  (Quaglia, Direct, Tr. 1998-99.)

> 225.4   However, at the last minute, the parties negotiated an agreement to allow the smelter to restart.  (Quaglia, Direct, Tr. 1999.)  As part of the deal, the Union agreed to put into writing its promise that in the upcoming Master Agreement negotiations the Union would "address[] the Company's concerns in [the health care] area, including the more efficient delivery of health care services, plan re-design and cost-sharing".  (DX 320; Quaglia, Direct, Tr. 1999-2000.)

225.5   The negotiations between Alcoa and the Union over this smelter demonstrate that the Union understood that Alcoa had the right to engage the cap during the 2006 negotiations.

## 2.    Alcoa decided to implement the cap well in advance of the 2005-2006 negotiations.

226.    As early as 2002, Alcoa began to make plans to implement the cap during the next negotiations.  (DX 305, at ALC_CUR_000344762; McCullough, Direct, Tr. 1356-59.)  In fact, Alcoa never seriously discussed moving the cap a third time.  (Mordowanec, 2007 Dep., Tr. 52:11-53:6, 67:4-6.)

227.    By 2004, Alcoa's position was unequivocal that the cap had to be engaged during the 2005-06 negotiations.  (Quaglia, Direct, Tr. 1995; see also DX 319, at ALC_CUR_000263621-22.)

227.1   The ERC evaluated the effect of certain assumptions on what would happen to THEC during the next round of collective bargaining.  (DX 319; Quaglia, Direct, Tr. 1994-95.)  All scenarios contemplated by the Company assumed the implementation of the cap.  (DX 319, at ALC_CUR_000263622; Quaglia, Direct, Tr. 1995.)

228.    Going into the 2005 negotiations, Alcoa determined that its "target" was to engage the retiree medical cap according to the terms of the 2001 agreement and eliminate retiree medical for new hires.  (DX 328, at ALC_CUR_00064743; McCullough, Direct, Tr. 1370-71.)  Alcoa's "resistance point"—the point at which it would take a strike if the Union did not agree—was engagement of the cap on retiree medical.  (DX 328, at ALC_CUR_00064743; McCullough, Direct, Tr. 1370-71.)

## B.    THE 2005-06 NEGOTIATIONS

## 1.    Alcoa made clear in the 2005 re-opener negotiations that the cap would be implemented.

229.    The parties met for re-opener negotiations in May 2005 and again in August 2005.  (Quaglia, Direct, Tr. 2000-01.)

229.1   The 2001 agreement provided for a five-year term, but the economics for the fifth year of the agreement were left open.  The parties expected that, in 2005, they would bargain in an attempt to reach a successor agreement to the 2001 CBA.  If the parties failed to reach a successor agreement, they would attempt to reach a deal on the economic terms for the fifth year.  If the parties failed to agree on economic terms for that year, they would arbitrate over the economic terms.  (Robinson, 2008 Dep., Tr. 21:16-22:3.)

229.2   The 2001 cap was to be implemented in 2007 in accordance with the 2001 cap agreement unless the parties agreed otherwise.  (Quaglia, Cross, Tr. 2078.)

-56-

230. The top table negotiators in 2005 were Joe Quaglia, Alan Cransberg and Paul Thomas for Alcoa, and Jim Robinson, Terry Bonds and Connie Entrekin for the Union. (JPTO at 9.)

231. From the outset of the 2005 negotiations, the Company made clear to the Union that the cap had to be engaged in 2007. (Quaglia, Direct, Tr. 2001; see also Robinson, 2007 Dep., Tr. 71:13-22.) The Union understood that Alcoa was intent on engaging the cap. (Robinson, 2007 Dep., Tr. 74:6-9.)

232. The Union took the position that the cap letter needed to be addressed and expected that it could defer implementation as it had in the past. (Robinson, 2008 Dep., Tr. 22:3-9.)

    232.1 During the 2005 negotiations, the Union proposed that the cap be deferred. (Quaglia, Direct, Tr. 2002.)

233. During the 2005 negotiations, Tom Mordowanec was present at the benefits table on behalf of Alcoa, and he informed the union officials at the benefits table that it was the Company's intent to engage the cap. (Willett, Direct, Tr. 646; Mordowanec, 2007 Dep., Tr. 63:3-64:5.)

    233.1 Following Mr. Mordowanec's statement that the Company intended to engage the cap, the union representatives stood in unison and walked out of the meeting. (Willett, Direct, Tr. 647-48; Mordowanec, 2007 Dep., Tr. 74:8-14.)

234. Dan Henry, a local union official who was present at the May 2005 negotiations, testified that Mr. Mordowanec acknowledged to the benefits table in May 2005 that Alcoa had made a commitment never to implement the cap letter but that Alcoa was "not interested in honoring that commitment". (Henry, Direct, Tr. 964-66; Henry, Cross, Tr. 1031-32, 1040.) That testimony is not credible.

    234.1 Mr. Henry's testimony conflicts with that of Brickey Beasley, another local union president at the time, who was present at the May 2005 negotiations and testified that no Alcoa representative ever told him that the Company and the Union had agreed the cap would never be implemented. (Beasley, Cross, Tr. 746.)

    234.2 Mr. Henry denied participating in the August 2005 negotiations (Henry, Cross, Tr. 1034), despite the fact that Mr. Willett testified (and his notes reflect) that Mr. Henry was present at benefits table discussions concerning the cap letter in August 2005. (PTE 13; Willett, Direct, Tr. 642.) Mr. Henry eventually acknowledged that he had shown up late to the August 2005 negotiations. (Henry, Cross, Tr. 1036-37.)

    234.3 Mr. Mordowanec himself testified that he disagreed with the representations made by union officials that the cap was intended never to be implemented. Mr. Mordowanec believed that those representations were a

-57-

negotiation tactic to gain leverage against the Company, and he recognized that none of the union officials were present at the top table in 1993 when the cap was negotiated. (Mordowanec, 2007 Dep., Tr. 68:10-69:10.)

234.4   Plaintiffs' own witnesses testified that Mr. Mordowanec responded to claims that the cap was negotiated with an intent never to engage by saying that he "was not there in 1993" and that the cap letter "speaks for itself". (PTE 13; Willett, Direct, Tr. 642-43; Willett, Cross, Tr. 670.)

234.5   It is not plausible that Mr. Mordowanec would acknowledge a prior commitment by Alcoa while at the same time presenting a proposal in direct contravention of that commitment.

235.    The Union distributed a leaflet to its membership during the May 2005 negotiations shortly before the June 1 bargaining deadline. (DX 350; Robinson, 2008 Dep., Tr. 114:4-7.) This leaflet conveyed the Union's position that simply shifting costs would not solve the problem. (DX 350; Robinson, 2008 Dep., Tr. 114:8-22.) The Union believed that national health care was the solution to the health care cost problem. (Robinson, 2008 Dep., Tr. 114:18-22.)

236.    During closing remarks at the May 2005 negotiations, Mr. Thomas told the Union that while Alcoa's contributions toward retiree medical were capped at the end of 2006, Alcoa was willing to discuss plan changes to help limit or delay retiree contributions. (DX 329, at 000048.)

237.    The parties were unable to reach an agreement in the 2005 negotiations, partly due to the Company's insistence on immediate engagement of the cap. (Quaglia, Direct, Tr. 2017; Mordowanec, 2007 Dep., Tr. 65:19-21; Robinson, 2007 Dep., Tr. 71:23-72:7.)

## 2.   While certain local union officials expressed to the Union's top table negotiators that they believed the cap was not intended to engage, this was not the Union's understanding.

238.    During the August 2005 negotiations, USW top table negotiators Jim Robinson and Terry Bonds expressed to Alcoa that certain local union committee members had relayed to them their belief that the cap was a "cap with a wink", merely an "accounting gimmick", and was not intended to engage. (DX 330, at ALC_CUR_00062846-49; Quaglia, Direct, Tr. 2004-09; Quaglia, Redirect, Tr. 2098-2101; see also Robinson, 2008 Dep., Tr. 19:15-20:7.) Mr. Robinson and Mr. Bonds also conveyed that some union members told them that these statements were made during a company presentation. (DX 330, at ALC_CUR_00062849; Robinson, 2008 Dep., Tr. 98:5-13.)

239.    Mr. Robinson, the Union's corporate designee, explained that union representatives at the benefits table did make the argument that the cap was never intended to be implemented. (Robinson, 2008 Dep., Tr. 18:22-19:7.)

-58-

240. Mr. Quaglia responded that in the 2001 top table negotiations, at which he was present, the parties clearly had negotiated over the cap, with Alcoa seeking premiums in exchange for moving the cap to 2006. (Quaglia, Direct, Tr. 2004-05.) He told the USW negotiators that he would review the 1993 negotiation files to confirm that the local representatives' assertions were incorrect. (Id. at 2009-10; see infra, ¶¶ 246-48.)

241. While certain local union representatives made the argument at the benefits table that the cap was not intended to engage, and while Mr. Robinson relayed their argument to Alcoa at the top table, this argument was not the Union's actual belief. (Robinson, 2008 Dep., Tr. 25:2-18.)

241.1 Mr. Robinson testified that neither the Union's nor his personal understanding was that the cap was intended never to be implemented. (Robinson, 2008 Dep., Tr. 19:8-14.)

241.2 Mr. Robinson believed that union members may have expected the cap to move and somehow that expectation had morphed into a belief or claim that the Company had made a commitment not to engage the cap, when in fact that was not the case. (Robinson, 2008 Dep., Tr. 109:1-8.) Mr. Robinson also suspected that union members probably had an expectation in 1993 that national health care would solve the health care cost problem at some point. (Robinson, 2008 Dep., Tr. 104:4-105:18.)

241.3 Mr. Robinson did not believe Alcoa made a presentation in which it had promised the cap would not engage. (Robinson, 2008 Dep., Tr. 98:14-17.)

241.4 Mr. Robinson did not believe the top table negotiators from 1993—on either the Company or Union side—ever would have entered into an agreement based on an unprovable oral commitment that the consequences of the written agreement would never occur. (Robinson, 2008 Dep., Tr. 99:1-100:22.)

241.5 In fact, Mr. Robinson testified that the Union believed the cap letter gave the Company the right to engage the cap if the Union was unsuccessful in bargaining something different. (Robinson, 2008 Dep., Tr. 23:23-24:9.)

242. The Union's understanding was that the cap letter gave Alcoa the right to engage the cap subject to its mandatory bargaining provisions. (Robinson, 2008 Dep., Tr. 27:8-16, 96:18-97:3.) The Union's protection from implementation was its bargaining power under the mandatory bargaining provisions of the cap agreement. (Robinson, 2008 Dep., Tr. 28:1-5.) However, in 2005 the Union no longer believed it had the bargaining power either to force the Company to defer implementation of the cap or to eliminate the cap altogether. (Robinson, 2008 Dep., Tr. 107:8-108:10.)

243. At some point around the time of the 2005 negotiations, Mr. Murphy claimed that the cap was not intended to engage. (Robinson, 2008 Dep., Tr. 19:15-20:4.)

243.1 Mr. Robinson did not believe Mr. Murphy. (Robinson, 2008 Dep., Tr. 137:13-138:9.)

-59-

243.2   Still, the Union investigated Mr. Murphy's claims by reviewing documents, talking to negotiators and asking its legal department to investigate. (Robinson, 2007 Dep., Tr. 75:12-23.)

243.3   The Union also pressed Mr. Murphy and other union representatives for details or evidence of the alleged side agreement they claimed existed, but no one ever was able to offer any such details or evidence. (Robinson, 2008 Dep., Tr. 108:13-25, 137:13-138:9.)  Even if they had offered evidence of an oral side agreement, the Union would not have been persuaded that such a side agreement could overcome the clear language of the cap agreement. (Robinson, 2008 Dep., Tr. 109:9-23.)

244.    The Union concluded that, as it had previously understood, the cap letter was a real agreement that was enforceable on the parties.  (Robinson, 2007 Dep., Tr. 76:1-5.)  The Union did not believe the cap was an accounting gimmick.  (Robinson, 2008 Dep., Tr. 25:2-12.)

### 3.      While the Union did not believe the cap was never intended to engage, it still resisted the Company's efforts to implement the cap, and the 2005 re-opener negotiations failed again.

245.    The Union distributed a newsletter to its members after the failed 2005 negotiations.  (DX 331; Bloom, Dep., Tr. 35:19-36:7.)  The Union also prepared a bargaining report following the negotiations with content similar to the newsletter.  (DX 332.)  These documents conveyed that the Union agreed to allow the Companies to cap retiree health care in 1993, that the cap was addressed in 1996 and 2001, but that Alcoa had refused to defer the cap again during the 2005 negotiations.  (DX 331; DX 332, at 000042.)  These statements were consistent with the Union's understanding that during the re-opener, Alcoa expressed an unwillingness to move the dates in the cap letter. (Bloom, Dep., Tr. 36:8-37:14.)

### 4.      After the 2005 negotiations, Alcoa began a comprehensive review of its 1993 negotiation files in an effort to dispel any rumors that the cap was not intended to engage.

246.    Following the conclusion of the 2005 negotiations, Mr. Quaglia began to undertake his review of the 1993 negotiation files.  (Quaglia, Direct, Tr. 2010.)

246.1   Alcoa was concerned about local union officials creating anxiety at the plants regarding rumors about the cap and hoped to put those rumors to rest. (Quaglia, Direct, Tr. 2012; Mordowanec, 2007 Dep., Tr. 74:19-75:10.)

246.2   Mr. Quaglia reviewed Mr. Hoffman's comprehensive notes from the 1993 negotiations.  (Quaglia, Direct, Tr. 2010-11; see also DX 174.)

246.3   Mr. Quaglia also reviewed the Unions' May 31, 1993, 7:30 p.m. proposal for a deferred cap and the Companies' June 1, 1993, 1:30 a.m. response to the Unions' proposal.  (DX 5; DX 7; Quaglia, Direct, Tr. 2011-12.)

-60-

247.     In addition to personally reviewing the 1993 negotiation files, Mr. Quaglia asked certain other Alcoa employees, including Tom Mordowanec, to review files regarding the 1993 negotiations.  (Quaglia, Direct, Tr. 2012-13.)  Mr. Mordowanec confirmed that his review indicated that the cap plainly was real.  (DX 503; Quaglia, Direct, Tr. 2013.)

247.1   Mr. Mordowanec never told Mr. Quaglia in words or in substance that he understood the cap never was intended to engage.  (Quaglia, Direct, Tr. 2013.)  Mr. Quaglia agreed that the cap was not an accounting scheme.  (Quaglia, Redirect, Tr. 2101-02.)

248.     Mr. Quaglia informed HR directors and business unit presidents at Alcoa that the 1993 negotiation files, specifically Ron Hoffman's notes, demonstrated clear bargaining over and agreement by the Unions to the cap.  (DX 335; Quaglia, Direct, Tr. 2013-14.)  Mr. Quaglia sent this particular communication as part of an effort to dispel rumors by the local union members.  (Quaglia, Direct, Tr. 2014; see also DX 335.)

248.1   Minutes after sending the email to HR directors and business unit presidents, Mr. Quaglia emailed Mr. Robinson, Mr. Bonds and Mr. Entreken and reported that the 1993 files in fact demonstrated the cap was real and not an "accounting scheme".  (DX 334; Quaglia, Direct, Tr. 2014-15.)  Mr. Quaglia also sent a copy of his email to the Union to Alcoa's HR directors and business unit presidents.  (DX 333.)

248.2   Following Mr. Quaglia's confirmation to the Union that his review of the 1993 files demonstrated the cap was real, no one from the Union ever told Mr. Quaglia that they did not believe him or take his word for what he reported.  (Quaglia, Direct, Tr. 2016.)

248.3   Three days after confirming to the Union, as well as to business unit presidents and HR directors, that the cap was real, Alcoa sent retirees and surviving spouses a letter explaining the cap as well as how engagement of the cap would impact them.  (DX 336; Quaglia, Direct, Tr. 2016.)

**5.       The Union's claims in the 2006 Miles case demonstrate that it understood that Alcoa had a right to implement the cap agreement according to its terms.**

249.     On January 1, 2006, Alcoa implemented a cap for locations closed and sold during a previous CBA.  (DX 501, at 8.)

250.     Claiming that the closed and sold locations were covered under the 2001 cap letter, the Union sued to enforce the terms of the 2001 cap letter against Alcoa.  (Id. at 8-9.)

251.     The Union argued that, based on the binding language of the cap letter, the cap could not be implemented prior to January 1, 2007, and that implementation of the cap could not be done unilaterally, as it was a mandatory subject of bargaining.  (Id.)

-61-

6.   **In advance of the 2006 negotiations, the parties continued to discuss health care and, in particular, the cap.**

252.   By early 2006, senior leaders from both Alcoa and the Union were concerned that the 2006 negotiations would fail. (Quaglia, Direct, Tr. 2017.) As a result of this concern, additional union leaders became involved in the negotiations. (Id.) Tom Conway and Ron Bloom became negotiators for the USW and Mr. Thomas, Mr. Quaglia and Mr. Cransberg continued to negotiate on behalf of Alcoa. (Quaglia, Direct, Tr. 2018; Bloom, Dep., Tr. 13:3-14:11, 37:17-25.) Jim Robinson was also involved in the bargaining. (Bloom, Dep., Tr. 13:12-16, 37:17-21.) This group met in Pittsburgh informally before the 2006 negotiations began in St. Louis, Missouri. (Bloom, Dep., Tr. 38:19-24.)

252.1   In addition to these principal negotiators, Cary Burnell, a union technician, and Mr. Mordowanec and Ms. McCullough from Alcoa, participated in discussions over the cap. (Bloom, Dep., Tr. 38:1-18; Quaglia, Direct, Tr. 2020.)

252.2   Alcoa opened its books to the Union and the parties' actuaries in order to facilitate an accurate understanding of Alcoa's numbers. (Quaglia, Direct, Tr. 2020.)

252.3   The Union consulted with actuaries at the Segal Firm. (Bloom, Dep., Tr. 51:5-24; Quaglia, Direct, Tr. 2020.)

252.4   Alcoa worked with Hewitt Associates, an actuarial consulting firm. (Quaglia, Direct, Tr. 2020.) Hewitt consultant Paul Boutin projected what the 2006 cap would be, based on the definition of the cap, and what the contributions would be, based on the costs of the plan. (Boutin, Dep., Tr. 18:14-19:6.) Hewitt also projected the per capita costs based on data Alcoa provided it going into the 2006 negotiations. (DX 340; DX 342; Boutin, Dep., Tr. 29:15-31:23.) Hewitt calculated Alcoa's per capita contributions at $7,767 per year for pre-Medicare retirees and $3,389 for post-Medicare retirees based on Alcoa's projected costs as of 5/31/06. (DX 345; Boutin, Dep., Tr. 98:8-101:18.)

253.   During these pre-2006 discussions, Alcoa remained insistent that the cap be implemented. (Bloom, Dep., Tr. 38:25-39:5.) Alcoa also made clear that it believed it was contractually entitled to implement the cap as of January 1, 2007. (Bloom, Dep., Tr. 39:10-17.) No one at the Union suggested to Mr. Bloom that Alcoa did not have the right to engage the cap. (Bloom, Dep., Tr. 40:18-21.)

254.   By this time, Mr. Bloom had concluded that the parties would not be able to reach an agreement to alter the implementation date. (Bloom, Dep., Tr. 41:1-6.) Mr. Bloom also had concluded that the Union was not in a position to successfully strike over the issue of the implementation date of the cap. (Bloom, Dep., Tr. 41:7-9, 74:13-75:1.) Because of those conclusions, the Union decided to focus on working towards a modification of the cap agreement. (Bloom, Dep., Tr. 41:10-42:15, 75:2-11.)

-62-

### 7. **During the 2006 negotiations, Alcoa and the Union ultimately agreed to engage the cap.**

#### a. **The Union understood that Alcoa had the authority to engage the cap in 2006, subject to the requirement of mandatory bargaining.**

255.    The Union did not understand the prior cap letters to be shams, accounting gimmicks, tricks, or fraudulent.  (Bloom, Dep., Tr. 53:2-6, 53:10-14, 53:17-20.)  The Union similarly understood that there is nothing in the collectively bargained SPDs regarding the cap that suggested the cap letter was an accounting gimmick, a trick, or that it could never be implemented.  (Robinson, 2007 Dep., Tr. 56:23-57:3.)

256.    Mr. Bloom's understanding going into the 2006 negotiations was that the parties had negotiated a cap in prior negotiations, that the Company's obligation to provide retiree medical benefits to those employees who had retired during those prior negotiations would be limited to the amount of money Alcoa spent on a per capita basis, and that the cap would engage on January 1, 2007, subject to mandatory bargaining. (Bloom, Dep., Tr. 16:14-17:18.)

256.1   Mr. Bloom derived this understanding by reading the cap agreement and discussing the cap with union colleagues.  (Bloom, Dep., Tr. 19:5-20:18.)  He was also familiar with caps because of his work with other union contracts with similar agreements and his personal experience in negotiating and renegotiating cap agreements.  (Bloom, Dep., Tr. 19:5-19, 22:17-25:14.)

256.2   Mr. Bloom understood that if the parties did not bargain something different, the 2001 cap would be implemented according to its terms.  (Bloom, Dep., Tr. 20:19-23, 21:5-9.)  No one at the Union or elsewhere conveyed a different understanding to Mr. Bloom.  (Bloom, Dep., Tr. 21:11-17.)

256.3   Mr. Bloom understood that this likely meant Alcoa would increase retirees' premiums to reflect its capped obligation.  (Bloom, Dep., Tr. 42:20-43:8.)

#### b. **At the top table, the parties agreed to engage the cap but implement mechanisms to lessen the financial burden of the cap on retirees.**

257.    Mr. Bloom understood Alcoa's position going into the 2006 negotiations was that it felt strongly that it needed to implement the cap but was prepared to bargain over the mechanics of implementation.  (Bloom, Dep., Tr. 25:17-25, 38:25-39:8.)

258.    During the 2006 negotiations, the cap was discussed only at the top table. (Mordowanec, 2007 Dep., Tr. 75:11-76:1.)

-63-

259. The parties bargained extensively over how the cap would be implemented. (Bloom, Dep., Tr. 26:1-3.) The negotiations were extremely hard-fought. (Bloom, Dep., Tr. 43:9-16.)

260. While initially in 2005, the Union had taken the position that it would not accept cost-shifting, ultimately it agreed to a compromise which involved implementation of the cap along with other mechanisms put into place, such as a notional account, that minimized the financial burden on retirees over time. (McCullough, Direct, Tr. 1382; McCullough, Cross, Tr. 1438-39; Robinson, 2008 Dep., Tr. 126:20-127:4, Bloom, Dep., Tr. 26:4-19.)

260.1 The parties agreed to institute premiums for retirees, varying in amount based on whether the retiree was Medicare-eligible or not, and single or not. (Bloom, Dep., Tr. 44:17-21.) The Union requested that these premiums remain flat over the course of the collective bargaining agreement. (McCullough, Direct, Tr. 1391-92; McCullough, Redirect, Tr. 1488.) Non-Medicare-eligible participants would pay $75 each, or $150 for the retiree and his or her spouse, per month. (DX 346, at 000274; DX 68, at ALC_CUR_00229146.) Medicare-eligible participants would pay $40 each, or $80 for the retiree and his or her spouse, per month. (DX 346, at 000274; DX 68, at ALC_CUR_00229146.)

260.2 The parties agreed that retirees would continue to receive the benefit of the government's Medicare Part D reimbursement of Alcoa. (Bloom, Dep., Tr. 44:22-45:8.)

260.3 The parties also agreed to create a special "notional" account to help relieve the burden on retirees. (DX 346, at 000275-76; DX 347, at ALC_CUR_00112056; Beasley, Cross, Tr. 735; McCullough, Direct, Tr. 1380-81.)

260.4 The notional account was Ron Bloom's brainchild. (Quaglia, Direct, Tr. 2022.) Each year the Company notionally contributed the capped amount into the account. Medicare Part D reimbursements and retiree premiums were also added to the account. This notional account would include a one-time fixed contribution from Alcoa to help offset the cost of the plan. Additionally, Alcoa agreed to contribute a variable amount to the notional account dependent on the price of aluminum on the London Metal Exchange. The account was to be used to pay for health care costs. (Bloom, Dep., Tr. 45:9-21, 47:24-48:13.)

260.5 The Union concluded to a very high degree of certainty that inflows into the notional account would exceed outflows. (Bloom, Dep., Tr. 48:18-22, 49:9-50:6.) Alcoa's calculations demonstrated that there would be money remaining in the notional account at the end of 2010 and that amount would be carried forward. (McCullough, Direct, Tr. 1385, 1390-91.) The Union expects to use its credit balance during bargaining and persuade Alcoa to put more money into the account. (Bloom, Dep., Tr. 48:23-49:8.)

-64-

260.6   Buck valued Alcoa's retiree health care account and determined that it increased Alcoa's liability.  (DX 337, at ALC_CUR_00478377; DX 338, at ALC_CUR_00478402; DX 353, at ALC_CUR_00478252; DX 354, at ALC_CUR_00478279; Lee, Direct, Tr. 1633.)  Buck also determined, after performing calculations and examining data and assumptions, that the notional account would likely be exhausted on or after 2020.  (Lee, Direct, Tr. 1633-34.)  A more recent estimate by Buck is that the notional account will be exhausted in 2017.  (Lee, Direct, Tr. 1634.)

260.7   Alcoa also agreed to make two special payments of $1,500 each to surviving spouses.  (DX 346, at 000277; DX 351, at ALC_CUR_00024647; Beasley, Cross, Tr. 735; Bloom, Dep., Tr. 62:10-63:25.)

260.8   None of those concessions would have been made if the 2001 cap agreement had simply been implemented according to its terms.  (Bloom, Dep., Tr. 45:24-46:19.)

261.    The new cap letter, dated June 1, 2006, details the limitations on contributions by the Company as well as the notional account.  (DX 347, at ALC_CUR_00112054-56; Bloom, Dep., Tr. 54:10-55:19.)

261.1   Under the 2006 cap agreement, Alcoa's per capita contributions were set at $7,767 per year for pre-Medicare retirees.  (DX 347, at ALC_CUR_00112054; McCullough, Direct, Tr. 1380.)  Under no scenario would Alcoa pay less than this per capita amount.  (McCullough, Direct, Tr. 1383-84.)

261.2   The 2006 cap letter also specifies the date of implementation and sets forth a method for calculating what the dollar amount of the cap would be.  (DX 347, at ALC_CUR_00112056-57; Bloom, Dep., Tr. 108:18-109:3.)

### 8.    Alcoa was not pressured by its auditor to engage the cap, nor did Alcoa engage the cap because it feared repercussions from the SEC.

262.    Plaintiffs misconstrue language in PTE 115 in which Doug Dean from PricewaterhouseCoopers, Alcoa's auditor, stated that further information was needed "to conclude on whether the medical caps can continue to be considered to reduce Alcoa's liability for the period after 2010".  (PTE 115, at ALC_CUR_00191701.)

262.1   PricewaterhouseCoopers needed sufficient information to demonstrate that the cap would in fact be implemented.  (McCullough, Direct, Tr. 1392-93.)

262.2   Alcoa provided PricewaterhouseCoopers with further information, and PricewaterhouseCoopers agreed that Alcoa's retiree medical cap would continue to reduce Alcoa's liability after 2010, ultimately valuing the plan accordingly.  (DX 343; DX 344; DX 355; DX 356, at PWC 01871; DX 357; McCullough, Direct, Tr. 1392-93; Hilko, Direct, Tr. 1801-02.)

-65-

263.    Plaintiffs also misconstrue language in PTE 115 regarding whether Alcoa or the Union would pay additional costs if the notional account was depleted prior to December 31, 2010.

263.1    Alcoa initially considered bearing costs in excess of the cap plus retiree premiums (i.e., the sum being drawn from the notional account under the 2006 agreement) in the event that the notional account were depleted before December 31, 2010, although Alcoa had no belief that the notional account would be depleted.  (McCullough, Direct, Tr. 1384-85.)

263.2    During the May 2005 negotiations, Alcoa's auditor, PricewaterhouseCoopers, requested that Alcoa modify the language of the notional account provision so that the Company would not pay any excess costs in the event that the notional account were depleted, and Alcoa changed the provision accordingly.  (PTE 115; McCullough, Direct, Tr. 1386-89.)

263.3    Alcoa's decision to implement the cap and to require retiree contributions for health care costs was made independently of, and was entirely unrelated to, the issue of whether Alcoa or the Union would bear unanticipated costs <u>above</u> the negotiated retiree contributions and the negotiated notional account subsidy.  (McCullough, Direct, Tr. 1388-91.)

264.    The emails reflected in PTE 115 were sent during the latter period of the May 2006 negotiations, long after Alcoa had informed the Union of its decision to implement the cap and far too late to lend any credence to Plaintiffs' claim that the emails somehow influenced Alcoa's decision to implement the cap.  (PTE 115; McCullough, Direct, 1393.)

9.    **Following the 2006 negotiations, union members ratified the proposed CBA, including the cap agreement.**

265.    In June 2006, after the parties had reached a tentative agreement, the Union prepared a summary and distributed it to the union membership.  (DX 346; Beasley, Cross, Tr. 738; Bloom, Dep., Tr. 69:18-70:7.)

265.1    The summary provided:  "The May 31, 1993 Labor Agreement placed a cap on the Company's retiree health care costs for employees who retired after May 31, 1993. . . .  The Union fully expected to move the effective date of the cap back in each subsequent set of negotiations.  In fact, the cap was adjusted in negotiations in 1996 and again in 2001. . . .  However, during the 2005 negotiations the Company took the position that it could not adjust the effective date of the retiree cost cap and that retirees would be required to pay the cost of all health care cost increases beginning in 2007. . . .  The retiree cost cap was first negotiated as a way to lower the Company's long-term obligation for retiree health care, while preserving benefits. . . .  The Union's top bargainers were initially undeterred, but after months of discussions ultimately concluded that the Company would not adjust the cap without a long and bruising labor dispute.

-66-

Instead of a high-stakes, all-or-nothing strategy, the Union sought an alternative approach which would allow the Company to retain its cost cap without requiring retirees to bear the brunt of health care inflation. . . . These changes will not be painless, but together they enabled your Bargaining Committee to maintain high-quality retiree health care benefits at premiums that retirees could afford." (DX 346, at 000272-73)

265.2  Mr. Bloom, the Union's corporate representative for 2006, confirmed that the summary "absolutely" accurately reflected the Union's understanding of the situation at the time. (Bloom, Tr. 69:18-70:4.)

265.3  The Union, including local union presidents, had an opportunity to review a draft of the summary before it was distributed. (Beasley, Cross, Tr. 738.)

265.4  Mr. Beasley reviewed the summary but did not submit any changes pertaining to the cap. (Beasley, Cross, Tr. 740-41.) In fact, Mr. Beasley believes the summary regarding the cap was accurate. (Beasley, Cross, Tr. 742-45.)

265.5  Harvey Martin, an ABG official who was present at the top table during the 1993 negotiations, testified he agreed that the summary regarding the cap was accurate. (Martin, Dep., Tr. 81:1-5, 81:24-82:22.)

266.    In July 2006, the Union distributed a letter to post-May 31, 1993 Master Agreement retirees, explaining why the Union agreed to engagement of the cap. (DX 351, at ALC_CUR_00025634-38; Robinson, 2007 Dep., Tr. 77:16-78:24.) The Union's corporate representatives confirmed that this letter also accurately reflected the Union's understanding of the history of the cap agreement and the results of the 2006 negotiations. (Robinson, 2007 Dep., Tr. 78:25-79:6; Bloom, Dep., Tr. 56:6-57:7, 57:22-58:14, 59:5-20, 59:23-60:16, 61:2-62:9.)

267.    The union members ratified the proposed 2006 agreement. (Bloom, Dep., Tr. 65:3-14.)

268.    Alcoa continues to communicate with the Union regarding the status of the notional account as well as Alcoa's per capita claims determinations. (DX 362; DX 363; DX 364; DX 365; DX 367; DX 368.)

269.    As of January 2009, Alcoa's total contribution into the notional account is over $45 million and the total available balance credited to the notional account was $80 million. (DX 366; McCullough, Direct, Tr. 1395-96.)

270.    The terms of the 2006 agreement apply through May 31, 2010. (Bloom, Dep., Tr. 26:21-23.) In 2010, the cap agreement will again be a mandatory subject of bargaining. (Bloom, Dep., Tr. 26:24-27:14.)

-67-

## C.    THE 2006 CAP WAS SET IN ACCORDANCE WITH THE 2001 CBA.

271.    The 2006 cap was set at $7,767 for pre-65/non-Medicare eligible retirees, which were the expected 2006 costs, by agreement of the parties.  (DX 347, at ALC_CUR_00112054; Hilko, Direct, Tr. 1806.)

272.    Mr. Altman's opinion—that the cap was set too low and should have been set at $8,282 to reflect 2006 costs—is not credible.  (Altman, Direct, Tr. 853-54.)

272.1    First, that opinion is not contained in either his original expert report or in his supplemental expert report.  (Hilko, Direct, Tr. 1807.)

272.2    Second, the "measuring year" specified in the 2001 CBA is June 1, 2006.  (DX 18, at ALC_CUR_00000525.)  As a result, Alcoa used the measuring period of June 1, 2005 to May 31, 2006 in order to calculate expected 2006 costs of $7,787.  (Hilko, Direct, Tr. 1808.)  Mr. Altman's opinion that Alcoa should have used the measuring period of January 1, 2006 to December 31, 2006 to calculate a cap of $8,282 improperly uses a later period that increases the cap level.  (Hilko, Direct, Tr. 1808-09.)

272.3    Third, Mr. Altman testified he used the information in Alcoa's 2007 actuarial valuation report to determine that the cap should be set at $8,282.  (Altman, Cross, Tr. 853-54.)  However, that report was not published by Alcoa's actuary until January 2008, and would not have been available for Alcoa to use in setting the cap level in 2006.  (Hilko, Direct, Tr. 1809.)

272.4    Fourth, the 2007 valuation report explicitly states that the $8,282 figure is a 2007 per capita cost, not a 2006 per capita cost.  (DX 353, at ALC_CUR_00478251; Hilko, Direct, Tr. 1809-11.)

272.5    Fifth, even if Mr. Altman's reliance on the 2007 valuation report to determine 2006 costs is correct, which it is not, $8,282 represents the expected cost for only pre-65 Alcoa retirees, when in fact the cap should be a weighted average of Alcoa and Reynolds retirees.  (Hilko, Direct, Tr. 1811-13.)  Because the Reynolds retirees' expected cost is $7,454, a cap based on the 2007 report should be a weighted average between $8,282 and $7,454.  (PTE 215, at 4; Hilko, Direct, Tr. 1811-13.)

272.6    Sixth, even if Mr. Altman's reliance on the 2007 valuation report to determine 2006 costs is correct, which it is not, the 2007 valuation report shows that of the four groups subject to the cap (the pre-65 Alcoa retirees, the post-65 Alcoa retirees, the pre-65 Reynolds retirees and the post-65 Reynolds retirees), only the actual costs for the pre-65 Alcoa retirees exceeded the cap level set in the 2006 CBA.  (PTE 215, at 4; Hilko, Direct, Tr. 1812-13.)  The costs for the three other groups remained below the cap.  (PTE 215, at 4.)

D.  **THE NOTIONAL ACCOUNT SHOULD BE VALUED AS PART OF THE RETIREE HEALTH CARE PLAN.**

273.    Under the 2006 CBA, if plan costs exceed the cap during the period of the 2006 CBA, the excess cost is to be borne by the plan participants, and participant premiums will be increased to cover the excess cost.  (DX 347, at ALC_CUR_00112056.)

274.    The notional account is structured to reduce retiree contributions when plan costs rise above the cap set in the 2006 CBA, so that retirees will not have to pay additional costs during the period of the 2006 CBA and their contributions remain at the level set in the CBA.  (Hilko, Direct, Tr. 1826-27; DX 347, at ALC_CUR_00112057.)

275.    If the plan costs are below the cap, Alcoa still pays up to the per capita cost set in the 2006 CBA.  The excess over the plan costs is put into the notional account to offset any future costs of the plan and thereby to reduce retiree contributions.  (DX 347, at ALC_CUR_00112057; Hilko, Direct, Tr. 1827-28.)

276.    The balance of the notional account is to be applied toward participant plan costs until it is exhausted.  (DX 347, at ALC_CUR_00112056.)

277.    Mr. Altman's opinion that the notional account should not be valued because it is an unfunded account should not be credited.  (Altman, Direct, Tr. 813-14.)

277.1    Whether it is funded or not, the notional account is part of Alcoa's written plan, and therefore must be valued as a part of it, and is in fact valued as part of Alcoa's liability by its auditors.  (DX 356, at PWC 01871; Hilko, Direct, Tr. 1829-30.)

277.2    Alcoa is self-insured, and the benefits that Alcoa has provided to its retirees since 1993 are likewise unfunded benefits, but are nonetheless valued.  (Id.; Quaglia, Direct, Tr. 2023-24.)

277.3    Mr. Hilko has valued similar unfunded accounts for other clients, and he has never heard any actuary express the opinion that the account should not be valued because it is unfunded.  (Hilko, Direct, Tr. 1830.)

E.  **THE 2006 CHANGES WERE MODEST AND COMMENSURATE WITH OTHER CHANGES THAT ALCOA HAD PUT INTO EFFECT IN EARLIER YEARS.**

278.    The 2006 package was much more favorable to the retirees than a package that simply implemented the 2001 cap would have been.  (DX 346, at 000274; Beasley, Cross, Tr. 734-35; Quaglia, Direct, Tr. 2022.)  Locals and the International Union believed the 2006 package was more favorable to the retirees.  (Beasley, Cross, Tr. 734.)

1. **The plan design changes under the 2006 CBA are reasonable.**

279.    Alcoa and the Union negotiated a plan design that reduced overall health care costs and kept retiree contributions consistent with past levels.

279.1   Plan design changes agreed to during the 2006 negotiations reduced the overall costs of the plan.  (DX 346, at 000272-73; Beasley, Cross, Tr. 744-45.)  Specifically, the Union estimated that absent the 2006 negotiated agreement, a non-Medicare retiree and spouse would have to pay over $500 per month in five years and as much as $1,000 per month in eight years, with premiums increasing every year.  (DX 346, at 000272, 000275.)

279.2   Plan design changes included a change to a 90/10 co-insurance plan, with out-of-pocket maximums and deductibles.  (Hilko, Direct, Tr. 1830-31.)  The 2006 deductibles are $250 per person/$500 per family, compared to $75/$150 before 1993.  (Hilko, Direct, Tr. 1831.)  Co-pays for prescription drugs have reverted to pre-1993 levels to 80/20 co-insurance, with maximum and minimum payments.  (Hilko, Direct, Tr. 1831-32.)

279.3   Alcoa's plan is consistent with the plans that other employers who negotiate with the United Steelworkers have negotiated (i.e., 90/10 co-insurance plans).  (Hilko, Direct, Tr. 1840-41.)

279.4   The Union communicated to its members that Alcoa's plan would require employees to contribute about 12%-14% of the plan costs, which Mr. Hilko found is better than what other comparable employers' plans require, which on average is 39% of plan costs.  (DX 351, at ALC_CUR_00024636; Hilko, Direct,  Tr. 1841-43.)

279.5   Plan design changes agreed to during the 2006 negotiations are commensurate with other plan design changes Alcoa made to the benefits of current employees.  (DX 346, at 000273.)  The Union's proposed agreement informed members that certain proposed changes to the health care plan were the same changes being made to the health care plan covering active employees.  (Id.)

2. **The premiums under the 2006 CBA are reasonable.**

280.    Alcoa and the Union negotiated modest premiums that would remain stable from year to year.

280.1   Mr. Altman testified that the Union believed that the plan design changes permitted retirees to maintain high quality benefits at affordable premiums.  (Altman, Cross, Tr. 905-06.)

280.2   Mr. Hilko testified that in his experience in union negotiations, unions typically prefer premiums to stay constant over a period of the contract and will negotiate to have retirees pay more than the cost of the plan in earlier

-70-

years and pay less in later years to keep contributions flat. (Hilko, Direct, Tr. 1835; Hilko, Cross, Tr. 1898-1900.)

      280.3   Alcoa agreed as part of the 2006 CBA to contribute at least $50 million to the notional account, which will be used to pay for retiree health care costs until the balance of the account is exhausted. (DX 347, at ALC_CUR_00112055-56.)

      280.4   Buck subsequently stated in its actuarial report for 2008 that the notional account could be expected to keep retiree contributions constant through 2020. (DX 370, at ALC_CUR_00478356; Hilko, Direct, Tr. 1834-1835; DX 369, at ALC_CUR_00478316.) Buck currently predicts that the notional account could be expected to keep retiree contributions constant through 2017. (Lee, Direct, Tr. 1634.)

      280.5   When the cap was negotiated in 1993, Alcoa and the Unions also negotiated higher pension and 401(k) benefits for employees. (See supra, ¶¶ 67.2, 73.1.)

    281.   Alcoa continues to pay at least as much as it paid on a per capita basis prior to the 2006 CBA.

      281.1   Alcoa currently pays an average per capita amount of $7,767 per pre-Medicare retiree, which is significantly more than Alcoa paid previously. (DX 345; DX 203, at ALC_CUR_00446535; DX 233, at ALC_CUR_00447602; DX 258, at ALC_CUR_00440006.)

    282.   Plaintiffs always had some level of cost-sharing; in fact, they paid deductibles and copays under pre-1993 CBAs. (DX 177, at USW019078; DDX 3 (summarizing DX 177, DX 178); Henry, Cross, Tr. 1012-13, Hilko, Direct, Tr. 1802-03.) Co-pays and deductibles were also required in the years preceding the 2006 CBA. (DX 20, at ALC_CUR_00028297; DDX 3 (summarizing DX 1, DX 2, DX 20, DX 21, DX 13, DX 14, DX 48, DX 49, PTE 7, DX 18); Mordowanec, 2007 Dep., Tr. 103:22-104:4.)

      282.1   For example, with respect to co-insurance, prior to 1993, the plan paid 80 percent of any non-hospital related costs. In 1993, with the change to managed care, employees paid co-insurance if they went out of network, with the plan paying 80 percent. (DX 177, at USW019078; DDX 3 (summarizing DX 177, DX 178); Hilko, Direct, Tr. 1804-05.)

      282.2   With respect to deductibles, prior to 1993, employees paid the first $75. After 1993, employees paid deductibles for out-of-network visits. (DX 177, at USW019078; DDX 3 (summarizing DX 177, DX 178); Hilko, Direct, Tr. 1805.)

      282.3   With respect to prescription drugs, prior to 1993, employees paid a $75 deductible. After 1993, the deductible changed to $50, and additional

charges for drugs have increased over time. (DX 177, at USW019084; DDX 3 (summarizing DX 177, DX 178); Hilko, Direct, Tr. 1805.)

282.4   With respect to office visits, prior to 1993, the plan paid 80 percent. After 1993, employees paid a co-pay, which has increased over time. (DX 177, at USW019078; DDX 3 (summarizing DX 177, DX 178); Hilko, Direct, Tr. 1805.)

283.   Premiums under the 2006 agreement are lower than the premiums that would have been imposed had Alcoa implemented the 2001 agreement. (Bloom, Dep., Tr. 61:17-62:9.)

# I.  GOVERNING LAW

## A.  PLAINTIFFS' CAUSES OF ACTION

### 1.  Relevant Statutes

284.  Plaintiffs contend that when Alcoa implemented a cap on retiree health care benefits on January 1, 2007, it violated two federal laws.

284.1  The first law that Plaintiffs claim Alcoa violated is the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. (2006) ("ERISA").  (Pls.' Fifth Am. Compl. (Dkt. No. 169) at 22; JPTO at 1.)  Plaintiffs claim that Alcoa violated Section 502(a) of ERISA, which provides, in relevant part, as follows:

> "A civil action may be brought–(1) by a participant or beneficiary–(A) for the relief provided in subsection (c) of this section, or (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a).

284.2  The second law that Plaintiffs claim Alcoa violated is the National Labor Management Relations Act of 1947, 29 U.S.C. § 141, et seq. ("LMRA").  (Pls.' Fifth Am. Compl. (Dkt. No. 169) at 23; JPTO at 1.)  Plaintiffs claim that Alcoa violated Section 301 of the LMRA, 29 U.S.C. § 185.

### 2.  First Cause of Action (ERISA)

285.  Under ERISA, participants in an employee welfare benefit plan can bring a lawsuit to recover benefits they are due under that plan and to enforce their rights as to future benefits under the plan.  29 U.S.C. § 1132(a).  The plan at issue in this case is the Employees' Group Benefits Plan of Alcoa, Group II (the "Plan"), and the Plaintiffs are all members of the Plan.  (Pls.' Fifth Am. Compl. (Dkt. No. 169) at 2.)  Plaintiffs claim that in 2007, Alcoa unlawfully modified the Plan by implementing a cap on the amount that it would pay in health care for its retirees.  (Id. at 22-23.)

285.1  To win on their ERISA claim, Plaintiffs must prove, by a preponderance of the evidence, that it was a term of the Plan that Plaintiffs would, for the rest of their lives, receive health benefits without a requirement that they pay any premium or other costs associated with Alcoa's implementation of a cap on January 1, 2007.

285.2  To win on their ERISA claim, Plaintiffs must prove, by a preponderance of the evidence, that by implementing a cap on retiree health benefits on January 1, 2007, Alcoa violated Plaintiffs' rights under the Plan.

### 3.  Second Cause of Action (LMRA)

286.    Plaintiffs also claim that by implementing a retiree health care cap in 2007, Alcoa breached its collective bargaining agreement with the USW, in violation of the LMRA.  (Pls.' Fifth Am. Compl. (Dkt. No. 169) at 23-25.)  Alcoa and the Unions in which Plaintiffs were members until retirement entered into CBAs in 1993, 1996, 2001 and 2006.  (JPTO at 6-9.)  Reynolds and the Unions in which Plaintiffs were members until retirement entered into CBAs in 1993 and 1996.  (Id. at 6-7.)

286.1    To win on their LMRA claim, Plaintiffs must prove, by a preponderance of the evidence, that it was a term of the collective bargaining agreements under which Plaintiffs retired that Alcoa would provide them with health benefits without a requirement that they pay health premiums or other costs associated with Alcoa's implementation of a cap on January 1, 2007.

286.2    To win on their LMRA claim, Plaintiffs must prove, by a preponderance of the evidence, that by implementing a cap on retiree health benefits on January 1, 2007, Alcoa violated its collective bargaining agreements with the Unions.

## B.  ALCOA'S GROUP BENEFITS PLAN

### 1.  The Written Terms of Alcoa's Plan

287.    Plaintiffs contend that the retiree health care cap that Alcoa implemented in 2007 violated the welfare benefits plan that was part of the CBAs negotiated by Alcoa, Reynolds and the Unions in 1993, 1996 and 2001.  The written terms of those CBAs are contained in: (1) the CBAs themselves; (2) the letters of understanding negotiated and agreed upon at the same time as the CBAs; and (3) the Summary Plan Descriptions, which are incorporated by reference into the CBAs.

288.    ERISA requires that the welfare benefit plan negotiated by an employer and the union representing its employees be in writing.  29 U.S.C. § 1102(a)(1).  Under ERISA, and contract law generally, the clear written terms of the plan supersede all oral negotiations or agreements concerning the plan that preceded or accompanied its execution.  Sprague v. Gen. Motors Corp., 133 F.3d 388, 402-03 (6th Cir. 1998); Musto v. Am. Gen. Corp., 861 F.2d 897, 910 (6th Cir. 1988).

### 2.  Interpreting Alcoa's Plan

289.    Where, as here, a contract (here, the Plan) is reduced to writing, and the writing is itself clear, the intention of the parties is to be ascertained from the writing alone.  Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co., 210 F.3d 672, 683-84 (6th Cir. 2000); Schachner v. Blue Cross & Blue Shield of Ohio, 77 F.3d 889, 893 (6th Cir. 1996).  The whole of the contract—including the CBA, the letters of understanding, and the SPDs—is taken together so as to give effect to every part.  Int'l Union, UAW v. Yard-Man, Inc., 716 F.2d 1476, 1480 (6th Cir. 1983).

290.    Parties are presumed not to insert meaningless phrases into their contracts, and therefore no part of a contract should be interpreted as meaningless or empty language.  See id. at 1480.  Likewise, parties are presumed not to insert language in their contracts that have absurd results, and no part of a contract should be interpreted in an absurd fashion.  See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 545 (6th Cir. 2007).

## II.    IF PLAINTIFFS' RETIREE MEDICAL BENEFITS VESTED AT ALL, THEY DID NOT VEST PRIOR TO RETIREMENT.

### A.    ALTHOUGH THE ISSUE IS UNNECESSARY, AS DISCUSSED BELOW, FOR A DECISION ON WHETHER PLAINTIFFS' BENEFITS VESTED UPON RETIREMENT, ALCOA'S POSITION IS THAT RETIREE MEDICAL BENEFITS DO NOT VEST.

#### 1.    Medical benefits vest as a matter of contract, not statute.

291.    Medical benefits, unlike pension benefits, are not subject to mandatory vesting under ERISA.  Noe v. Polyone Corp., 520 F.3d 548, 552 (6th Cir. 2008).  Accordingly, "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans".  Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995); see also Yolton v. El Paso Tenn. Pipeline Co., 435 F.3d 571, 578 (6th Cir. 2006) ("If a welfare benefit has not vested, 'after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA.'").

292.    "[W]hether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties."  Yard-Man, 716 F.2d at 1479.

#### 2.    The Yard-Man inference does not apply to Plaintiffs' claim of vesting.

293.    Under Yard-Man, there is an inference of vesting where contract language links pension benefits to retiree medical benefits.  716 F.2d at 1482.

293.1    However, the Sixth Circuit has made clear that the Yard-Man inference is just that—an inference, not a presumption.  Williams v. WCI Steel Co., 170 F.3d 598, 605 (6th Cir. 1999).

294.    The Yard-Man court's reasoning for ruling in favor of the plaintiffs was based on two principles:  (1) that retiree benefits are "status" benefits, and continue to apply so long as the beneficiaries are retirees, and (2) that because retiree benefits are "permissive" subjects of bargaining, meaning that the union had no obligation to retirees to negotiate over such benefits, parties to a CBA likely would not intend to leave these benefits open to future modification.  Yard-Man, 716 F.2d at 1482.

-75-

295.    Because the two rationales for the <u>Yard-Man</u> inference are inapplicable in this case, the inference does not apply to Plaintiffs.

      295.1    Plaintiffs here were all active employees when the Unions agreed to a cap, and thus were all represented by one of the Unions at the time the Companies and the Unions agreed to include the cap in each of the CBAs under which Plaintiffs retired.  (See <u>supra</u>, ¶ 2.)  In each of those CBAs, the Companies and the Unions further agreed to make the cap a mandatory subject of bargaining in the next negotiations.  (See <u>supra</u>, ¶¶ 111.2, 175.2, 215.2.)

      295.2    The Sixth Circuit has specifically refused to extend the <u>Yard-Man</u> inference to plaintiffs who were active employees under the CBA that allegedly created the vested rights, holding that there is a "fundamental difference between future retirees and actual retirees that flows from the fact that active employees are represented by a union, while retired workers are usually not" and that "it makes little sense to apply <u>Yard-Man</u> to a contract that expired while workers were still represented by their union".  <u>Winnett v. Caterpillar, Inc.</u>, 553 F.3d 1000, 1010-11 (6th Cir. 2009).

### 3.    The evidence does not support Plaintiffs' contention that retiree medical benefits are vested.

296.    Where plan documents contain "reservation of rights" clauses, health benefits do not vest, since the employer has the explicit right to modify those benefits in the future.  <u>Int'l Union, UAW v. BVR Liquidating, Inc.</u>, 190 F.3d 768, 773 (6th Cir. 1999).

297.    The Court concludes that Plaintiffs' health care benefits are not vested because the written agreements between Alcoa and the Union give Alcoa the right to modify health care benefits in the future.

      297.1    The Sixth Circuit in <u>Winnett</u> found that an SPD with language providing that "[s]ubject to the applicable collective bargaining agreements, the company reserves the right to terminate the employee benefit Plans" was sufficient to put future retirees on notice that their rights might be modified before retirement, and thus precluded an inference of vesting.  553 F.3d at 1010.

      297.2    The Companies' SPDs contain reservation of rights clauses similar to (and in some cases stronger than) those in <u>Winnett</u>; for example, a 1995 SPD states that "the Plan may be changed or terminated in the future, subject to the provisions of any collective bargaining agreement then in effect".  (See, e.g., DX 33, at ALC_CUR_00001493.)

      297.3    Some of Alcoa's SPDs explicitly say there are no vested rights to the benefits set forth therein.  (See <u>supra</u>, ¶¶ 180.2, 217.2.)

-76-

297.4    The cap is itself a reservation of rights, as the cap letters "unambiguously allowed Alcoa to implement health care caps as early as 1997, ten years before their actual implementation". (3/19/09 Order (Dkt. No. 392) at 7.)

297.5    Alcoa's CBAs expressly stated that employees would pay no costs for benefits "except as otherwise provided", indicating that the parties understood that Alcoa could require employees to pay costs in the future. (See supra, ¶ 133.)

297.6    Although Plaintiffs assert that the CBAs place no durational limit on the benefits granted, the cap letters in fact make clear that the caps would be implemented, absent bargaining to the contrary, on a set date during the following CBA period. (See supra, ¶¶ 111-12, 175-76, 214.)

298.    The Court concludes that the understanding of the Unions and the Companies was that retiree health benefits do not vest.

298.1    Alcoa executives and negotiators understood that medical benefits were not vested. (See supra, ¶ 134.)

298.2    The Union understood that medical benefits were not vested. (See supra, ¶ 135.)

298.3    In 1993, the Companies and the Unions negotiated an agreement that, as Plaintiffs' witnesses themselves recalled, imposed managed care on employees who had already retired from the Companies. (See supra, ¶ 136.)

**B.    PLAINTIFFS' RETIREE MEDICAL BENEFITS CERTAINLY DID NOT VEST PRIOR TO RETIREMENT.**

**1.    Sixth Circuit law is clear that in the absence of explicit contractual language demonstrating vesting, retiree medical benefits do not vest prior to retirement.**

299.    In Winnett, the Sixth Circuit held that in order to find vesting prior to retirement, there must be "explicit contractual language" to that effect. Winnett, 553 F.3d at 1008-09.

299.1    Plaintiffs in Winnett, like Plaintiffs here, retired after their former company adopted a cap on retiree medical benefits but before that cap went into effect. Id. at 1003.

299.2    Plaintiffs in Winnett, like Plaintiffs here, argued that statements in plan documents that benefits are to be provided "without cost" indicated that their medical benefits vested prior to employment. Id. at 1009.

300.    Winnett further clarified the Yard-Man inference, holding that such an inference does not result in the vesting of retiree health benefits at the point of retirement eligibility or at any point before retirement. Id. at 1011.

-77-

301.     The <u>Winnett</u> court observed that "in each of [the Sixth Circuit's prior] cases [applying the <u>Yard-Man</u> inference], we found the link between pension and welfare benefits to support the conclusion that retiree medical benefits vested upon <u>actual</u> retirement, not when a worker attains retirement eligibility". <u>Id.</u> at 1010 (emphasis in original).

302.     The cases on which Plaintiffs have relied for their argument that health benefits vested at the same time as pension benefits are not on point, as they all involved attempts by an employer to modify health benefits of retirees <u>after</u> the point of retirement. (<u>See</u> Pls.' Br. in Supp. of Mot. for Partial Summ. J. at 26-44 (citing cases).)  Here, on the other hand, the cap was included in each of the CBAs under which Plaintiffs retired, so Plaintiffs all retired with the cap agreement <u>already</u> in place.  (<u>See</u> <u>supra</u>, ¶ 2.)

303.     The Court concludes that the CBAs and SPDs do not support Plaintiffs' contention that their retiree medical benefits vested with their pension benefits.

303.1     Plaintiffs cannot offer any support for their suggestion that "active vested employees"—a phrase contained in several SPDs—refers to active employees who are vested in <u>retiree medical benefits</u>, versus active employees who are vested in their <u>pensions</u>, as Alcoa argues.  (<u>See</u> <u>supra</u>, ¶ 129.)

303.2     Indeed, all of the SPDs containing the "active vested" language to which Plaintiffs have pointed <u>also</u> either explicitly disclose the cap or explicitly provide that benefits do not vest.  (<u>See</u> <u>supra</u>, ¶¶ 118, 177, 180, 215, 217.)

303.3     The CBAs at issue explain that those who are <u>receiving</u> a pension will be <u>eligible</u> for retiree health benefits.  The CBAs do not provide, as Plaintiffs suggest, that those who are "eligible" for pension benefits will also be "eligible" for retiree health benefits.  (<u>See</u> <u>supra</u>, ¶ 132.)

304.     The Court concludes that Plaintiffs did not sustain their burden of proving that the parties intended that health care benefits vest prior to retirement.

304.1     Testimony by Plaintiffs' own witnesses contradicts Plaintiffs' argument that retiree medical benefits vested with pension benefits.  (<u>See</u> <u>supra</u>, ¶ 128.)  Those witnesses testified that a retiree vested with the benefit package he had on the date of his retirement, not an earlier date.  (<u>Id.</u>)

304.2     The Companies understood that health care benefits did not vest prior to retirement.  (<u>See</u> <u>supra</u>, ¶¶ 132.2-132.3.)

304.3     The Unions and the Companies negotiated over health care benefits during each successive round of collective bargaining.  If those benefits were already vested, such bargaining inherently could result in the reduction of "vested" rights, which both parties to the CBAs are adamant did not happen.  (<u>See</u> <u>supra</u>, ¶¶ 127, 157-61, 195-200, 203, 209, 231-32, 236-40, 252-54, 259-60.)

-78-

304.4 Pension plans are easily defined in dollar terms, whereas medical plans are defined by numerous terms which necessarily change over time. Requiring an employer to provide retirees with the exact same medical benefits it provided at the time an employee's pension vested, often decades earlier, would result in requiring the employer to provide a retiree medical plan the terms of which are entirely outdated. Put simply, it would not make sense to vest medical benefits at the same time as pension benefits vested.

304.5 No witness testified that Alcoa did not have the right to put the cap into effect in 2007 for post-2007 retirees—none of whom have been included in this class—further suggesting that none of the parties believes those retirees vested before 2007.

305. The Court has already framed the issue in this case as "whether employees vested in their health benefits upon retirement, such that those benefits could not be reduced". (3/19/09 Order (Dkt. No. 392) at 7 (emphasis added).)

## III. EVEN IF PLAINTIFFS' BENEFITS VESTED UPON RETIREMENT, THE BENEFITS WOULD HAVE VESTED WITH THE CAP ALREADY IN PLACE.

### A. CBAS ARE INTERPRETED ACCORDING TO THEIR WRITTEN TERMS AND SO AS NOT TO CREATE AN ABSURD RESULT.

306. Contracts are interpreted according to their written terms; only if the written language of a contract is ambiguous may courts consider parol evidence to resolve that ambiguity. Schachner, 77 F.3d at 893 ("Courts may not . . . use extrinsic evidence to create an ambiguity. Rather, the ambiguity must be patent; that is, apparent on the face of the contract. . . . Thus, in this circuit, before a district court can consider extrinsic evidence of the parties' intent, it must find an ambiguity on the face of the contract.").

307. Evidence of oral agreements is inadmissible to interpret clear and explicit written terms to the contrary. See Burlison v. U.S., No. 04-2597, 2006 WL 2546564, at *6 (W.D. Tenn. Aug. 31, 2006) (under Tennessee law, "all evidence of verbal negotiations and stipulations anterior to or contemporaneous with the execution of a written instrument which contradict, alter or vary the terms of the written instrument is barred by the parol evidence rule" (internal citation and quotation marks omitted)); Astor v. Int'l Bus. Mach. Corp., 7 F.3d 533, 539 (6th Cir. 1993) (under Ohio law, "[w]here the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions. . . . Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." (emphasis in original) (internal citation omitted)).

308. Contracts are not to be interpreted in a manner that creates absurd results. See Tenke Corp., 511 F.3d at 545 ("[C]ontracts must be construed consistent with

-79-

common sense and in a manner that avoids absurd results". (internal citation and quotation marks omitted)).

309.     As with interpretation of written contracts generally, interpretation of a CBA requires that "the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent".  <u>Yard-Man</u>, 716 F.2d at 1479.

310.     The written language of a CBA is to be understood "in light of the context which gave rise to its inclusion", and the written terms must "be construed so as to render none nugatory".  <u>Id.</u> at 1479-80.

311.     The "letters of understanding" that often go along with a CBA are fully enforceable contractual provisions.  <u>See</u> <u>Reese v. CNH Am. LLC</u>, 574 F.3d 315, 319 (6th Cir. 2009) (construing a letter of understanding concerning the "[c]ost of [h]ealth care [c]overage" to be binding on the parties); <u>United Steelworkers of Am. v. Cooper Tire & Rubber Co.</u>, 474 F.3d 271, 273-76 (6th Cir. 2007) (implementing a cap agreement memorialized in a letter of understanding appended to the parties' collective bargaining agreement); <u>Cent. States Se. & Sw. Areas Pension Fund v. Kraftco, Inc.</u>, 799 F.2d 1098, 1112-14 (6th Cir. 1986) (deeming a letter of understanding to be a binding part of the CBA, even though the letter was not included in the CBA package).

### B.     <u>THE WRITTEN TERMS OF THE AGREEMENT CLEARLY GAVE ALCOA THE RIGHT TO IMPLEMENT A CAP.</u>

312.     The Court concludes that the clear terms of the written cap agreements indicate that the parties intended to create a real cap.

312.1     Alcoa's authority to cap the Plaintiffs' retiree health care benefits is clearly set forth in the cap agreements of 1993, 1996 and 2001.  (<u>See</u> <u>supra</u>, ¶¶ 111-15, 175-76, 214.)

312.2     The cap was disclosed in numerous summary plan descriptions since 1993, each of which is incorporated by reference into the CBA.  (<u>See</u> <u>supra</u>, ¶¶ 116-20, 177-80, 215-17.)

312.3     This Court has previously held that "the cap letters unambiguously allowed Alcoa to implement health care caps as early as 1997, ten years before their actual implementation".  (3/19/09 Order (Dkt. No. 392) at 7.)  <u>See also</u> <u>Curtis v. Alcoa</u>, No. 3:06-cv-448, 2007 WL 3047123, at *5 (E.D. Tenn. Oct. 17, 2007) ("[A]ll of the FAS-106 letters attached to the collective bargaining agreements beginning with the 1993 agreement appear to clearly permit Alcoa to put a cap on its contribution as early as 1997".).

313.     The Court concludes that the cap letters should be interpreted to cap the Companies' health care costs at the per capita levels described in the letters.

313.1    Plaintiffs argue that the cap agreement, read literally, provides for a cap of millions of dollars—set at the aggregate cost for <u>all</u> covered retirees—<u>per covered individual</u> each year.  (<u>See</u> <u>supra</u>, ¶¶ 123-26.)

313.2    Plaintiffs' proffered interpretation of the cap letters creates an absurd result and renders the cap letters nugatory, thus running afoul of well-established principles of contract interpretation.  <u>See</u> <u>Yard-Man</u>, 716 F.2d at 1479-80; <u>Tenke Corp.</u>, 511 F.3d at 545.

313.3    The SPDs, which are incorporated by reference into the CBAs, clearly state (in far less technical and more plain-spoken language than the cap letters themselves) that Alcoa will implement a cap.  That language belies Plaintiffs' interpretation of the cap letter, which renders implementation of the cap mathematically impossible.  (<u>See</u> <u>supra</u>, ¶¶ 116-20, 177-80, 215-17.)

## C.    <u>THE EVIDENCE OVERWHELMINGLY SUPPORTS THE CONCLUSION THAT THE PARTIES UNDERSTOOD THE CAP TO BE REAL.</u>

314.    The Sixth Circuit has explained that "the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBAs".  <u>Yolton</u>, 435 F.3d at 581.  Even if retiree health benefits are vested, then, the vested plan is the one applicable at the time of an employee's retirement.

315.    There are three separate negotiated cap agreements at issue before this Court.  (<u>See</u> <u>supra</u>, ¶¶ 111-15, 175-76, 214.)  Accordingly, the Court must consider the enforceability of <u>each</u> of the 1993, 1996 and 2001 cap agreements.

316.    The Court concludes that Plaintiffs did not sustain their burden of proving that the 1993 cap agreement was not intended to be enforced.

316.1    As discussed above, the clear language of the written agreements supports the conclusion that the parties understood the 1993 cap letters to be real.  (<u>See</u> <u>supra</u>, ¶¶ 111-15.)

316.2    There is no dispute between the parties to the 1993 cap agreements—Alcoa and the Union—that the cap agreements were real.  Union communications, as well as deposition testimony by union negotiators, express an understanding that the cap agreements were genuine agreements and were binding on the parties.  (<u>See</u> <u>supra</u>, ¶¶ 85.3, 89, 213, 238-45, 255-56, 266.)

316.3    Entering the 1993 negotiations, Alcoa understood that it needed a real cap on retiree health care costs, which were sharply increasing and were soon to be subject to new accounting treatment under FAS-106.  (<u>See</u> <u>supra</u>, ¶¶ 11-20, 35-38.)

316.4    The parties engaged in hard-fought negotiations over the 1993 cap agreements and ultimately agreed to the 1993 cap letters during the last hours of

-81-

CBA negotiations and only after exchanging conflicting proposals for the cap language.  (See supra, ¶¶ 66-73.)

316.5    Plaintiffs rely on the testimony of a single top-table union negotiator—John Murphy of the ABG—who merely alleges (implausibly) that Alcoa and Reynolds representatives used certain opaque terminology to refer to the cap letter during the 1993 negotiations.  (See supra, ¶¶ 83-84.)  Mr. Murphy points to no statement that could support the existence of an actual agreement—his testimony, even if accepted as true, does not describe an offer, an acceptance, or any consideration between the parties to establish that the cap was never to be implemented in accordance with the explicit terms of the cap letter.  (See supra, ¶ 77.)

316.6    The parties understood that the 1993 cap letter provided for a real cap, and the parties did not enter into any "side deal" that the cap would never be implemented.  (See supra, ¶¶ 74-75.)

317.    The Court concludes that Plaintiffs did not sustain their burden of proving that the 1996 cap agreement was not intended to be enforced.

317.1    As discussed above, the clear language of the written agreements supports the conclusion that the parties understood the 1996 cap letters to be real. (See supra, ¶¶ 175-80.)

317.2    In advance of the 1996 negotiations, the Companies knew that the caps would be a subject of bargaining and determined that they would be willing to move the caps if negotiated with the Unions.  (See supra, ¶¶ 141-45.)

317.3    Alcoa viewed movement of the cap as a real cost to be counted as part of the overall economic package that it was able to offer to the Unions.  (See supra, ¶¶ 146-47.)

317.4    The Companies and the Unions negotiated over the caps in the May 1996 collective bargaining session, ultimately agreeing to defer the cap until 2003, with mandatory bargaining over the cap in the 2001 CBA negotiations.  (See supra, ¶¶ 157-60.)

317.5    The parties understood that the 1996 cap letter provided for a real cap, and the parties did not enter into any "side deal" that the cap would never be implemented.  (See supra, ¶¶ 162-64, 167-74.)

317.6    Alcoa's actuary valued the 1996 plan as capped.  (See supra, ¶¶ 181-83.)

318.    The Court concludes that Plaintiffs did not sustain their burden of proving that the 2001 cap agreement was not intended to be enforced.

-82-

318.1　Alcoa and the Union negotiated over the cap in the May 2001 collective bargaining session, and the parties were unable to reach an agreement in part because of Alcoa's insistence that the Union accept premiums on retiree medical benefits in exchange for Alcoa agreeing to defer implementation of the cap.  (See supra, ¶¶ 195-200, 203.)

318.2　Alcoa and the Union continued to negotiate over the cap in the September 2001 negotiations, and the parties were able to reach an agreement only after Alcoa granted the Union a deferral of the cap.  (See supra, ¶¶ 205-09.)

318.3　The parties understood that the 2001 cap letter provided for a real cap, and the parties did not enter into any "side deal" that the cap would never be implemented.  (See supra, ¶¶ 210-13.)

318.4　Alcoa's actuaries valued the 2001 plan as capped.  (See supra, ¶ 218.)

### D.　ALCOA PROPERLY IMPLEMENTED THE CAP AGREEMENT AS NEGOTIATED BY THE PARTIES IN 1993, 1996 AND 2001.

319.　The Court concludes that the 2006 CBA properly implemented the 2001 cap at $7,767 for pre-65/non-Medicare eligible retirees and at $3,389 for post-65/Medicare eligible retirees.

319.1　Though Plaintiffs claim that Alcoa should have set the cap at costs for calendar year 2006, that claim conflicts with language in the 2001 cap letter providing that the cap should be set at costs "as of June 1, 2006 (measuring year)".  (See supra, ¶ 272.2.)

319.2　The amount at which Plaintiffs claim that Alcoa should have implemented the cap—$8,282—is not only based on an incorrect measuring year (January 1, 2006 to December 31, 2006), but is also an inaccurate reflection of costs in the year Plaintiffs purport to measure.  (See supra, ¶ 272.)

320.　The Court concludes that pursuant to the 1993, 1996 and 2001 cap agreements, Alcoa's 2006 plan design was negotiated to benefit retirees and to mitigate the effects of the implementation of the cap.

320.1　The 1993, 1996 and 2001 cap agreements required that there be mandatory collective bargaining before any actual implementation of a cap.  (See supra, ¶¶ 111, 175, 214.)

320.2　Alcoa negotiated the 1993, 1996 and 2001 cap agreements with the intention of shifting costs to retirees in such a way that retirees would not face sudden or sharp increases in their payments.  (See supra, ¶¶ 208.5-208.6.)

320.3　As a concession to the Union, Alcoa negotiated a plan design that would ensure that retiree premiums remained constant from year to year rather

-83-

than fluctuating with the cost of health care. (See supra, ¶¶ 260, 280.)
Accordingly, any premiums paid while annual costs are below the cap will boost
the notional account and will prevent premiums from rising sporadically when
costs exceed the cap by greater margins in the future. (See supra, ¶¶ 273-77.)

320.4   As a concession to the Union, Alcoa negotiated two $1,500
payments to widows covered under Alcoa's benefits plan. (See supra, ¶ 260.7.)

321.    The Court concludes that in light of the 2006 plan design features
negotiated by the parties for the benefit of retirees, Alcoa's 2006 plan design was
reasonable and permissible.

321.1   Plaintiffs claim that Alcoa's implementation of the cap in 2006
departed from the terms of the 2001 cap letter, but this claim is belied by the fact
that the 2001 cap letter required that the parties bargain over the cap prior to its
implementation. (See supra, ¶ 214.)

321.2   As discussed above, the Union negotiated with Alcoa in 2006 to
soften the impact of implementing the cap by providing retirees with benefits that
the cap letter did not obligate Alcoa to provide, such as keeping retiree premiums
constant from year to year and providing additional payments to widows covered
under Alcoa's benefits plan. (See supra, ¶ 260.)

321.3   The 2006 plan design changes imposed additional costs on Alcoa
that Alcoa was not required to pay under the 2001 cap agreement, including the
tens of millions of dollars set aside for the notional account and the lump sum
payments to surviving spouses. (See supra, ¶ 260, 269.)

321.4   Thus, to the extent that the plan design negotiated by Alcoa and the
Union in 2006 differs from the 2001 cap agreement, those variations are clearly
reasonable under Reese v. CNH America LLC, 574 F.3d 315 (6th Cir. 2009).
(See infra, ¶¶ 322-25.)

## IV.    EVEN IF UNCAPPED BENEFITS HAD VESTED, ALCOA'S 2006 PLAN DESIGN CHANGES CONSTITUTED A REASONABLE AND PERMISSIBLE MODIFICATION OF PLAINTIFFS' BENEFITS.

### A.    BENEFIT PLANS ARE SUBJECT TO REASONABLE MODIFICATIONS UNLESS EXPRESSLY PRECLUDED BY THE CBA.

322.    "[H]ealth-care benefits are not akin to black-and-white pension benefits
that cannot be diminished by one cent once they have vested." Reese, 574 F.3d at 324.

323.    Instead, "the CBA—unless it says otherwise—should be construed to
permit modifications to benefits plans that are 'reasonably commensurate' with the
benefits provided in the [] CBA [under which plaintiffs vested], 'reasonable in light of
changes in health care' and roughly consistent with the kinds of benefits provided to

current employees". Id. at 326 (quoting Zielinksi v. Pabst Brewing Co., 463 F.3d 615, 619-20 (7th Cir. 2006)).

**B.    ACCEPTING AS TRUE PLAINTIFFS' INCORRECT UNDERSTANDING OF THE CAP LETTERS, THE CHANGES TO ALCOA'S BENEFITS PLAN WERE NONETHELESS REASONABLE.**

**1.    Alcoa's benefits plan was subject to reasonable modifications.**

324.    The Court concludes that similar to the CBA at issue in Reese, Alcoa's CBAs did not preclude reasonable modifications to health care benefits because Alcoa's CBAs did not state that those benefits were "fixed and irreducible into perpetuity for all employees who retired under [those CBAs]". Id. at 325.

324.1    In fact, the language of Alcoa's CBAs actually contemplated possible changes:  "benefits will be provided without cost to employees and retirees except as otherwise provided".  (DX 1, at ALC_CUR_00000063 (emphasis added); see supra, ¶ 133.)  In Reese, the CBA at issue provided that "[n]o contributions are required" for retiree benefits—language that lacks Alcoa's "except as otherwise provided" stipulation—and the court nonetheless interpreted that agreement to allow for reasonable modifications.  574 F.3d at 318, 326.  If a CBA provision that "[n]o contributions are required" does not preclude reasonable modifications in the future, Alcoa's CBA provision that benefits will be provided without cost to employees and retirees "except as otherwise provided" certainly cannot preclude reasonable modifications in the future.

324.2    Additionally, the language of the cap agreements reflected the parties' understanding that, even before the cap is engaged, some level of contributions could be required:  "[N]o covered person shall be required, solely by reason of this limitation, to make any additional contribution toward the costs of the program coverage until January 1, 1998".  (DX 9 (emphasis added).)  There is no reason to specify that no "additional" contributions would be required if the level of contributions were not subject to change.  Reese, 574 F.3d at 325 ("Why ensure that no 'additional' contributions would be required if the retirees' benefits were locked in by the [relevant] CBA [under which plaintiffs vested] or an earlier CBA?").

325.    The Court concludes that prior changes to the health care benefits of former Alcoa employees demonstrate that the parties understood that Plaintiffs' health care benefits were subject to reasonable modifications.

325.1    The Companies moved from a first dollar plan design to a managed care system under the 1993 CBA for both active employees and retirees. (See supra, ¶ 136.)

325.2    As the Sixth Circuit observed in Reese, the imposition of managed care "represented a reduction in the effective choices of coverage available for all

retirees and the coverage actually provided to many, if not most, of them. . . . [The plaintiffs] thus saw their coverage downgraded in at least one respect: Unlike the prior plan, under which they could choose any doctor without suffering a financial penalty, they generally had to pay more for choosing an out-of-plan doctor." <u>Reese</u>, 574 F.3d at 325 (citation omitted).

325.3    As the <u>Reese</u> court further noted, "[g]iven the realities of managed care, in which a new plan may fail to cover providers or services that an old plan had covered, the retirees had no basis for assuming that each replacement plan would at best improve, or at worst precisely maintain, the level of care provided to each individual retiree. A plan that permits the substitution of managed care providers is one that envisions making tradeoffs in the future that may negatively impact some retirees, if not all retirees, and one that is inconsistent with unalterable and irreducible health benefits—particularly those analogized to vested pension benefits." <u>Id.</u> at 325-26.

### 2.    <u>The plan design changes set forth in the 2006 CBA did not reduce benefits below past levels.</u>

326.    The Court concludes that the benefits Plaintiffs receive under the 2006 CBA are reasonably commensurate with the benefits they received before.

326.1    Alcoa currently pays an average per capita amount of $7,767 per pre-Medicare retiree, which is significantly more than Alcoa has paid previously. (See <u>supra</u>, ¶ 281.)

326.2    Thus, there is no reduction in the benefits provided by Alcoa to the Plaintiffs because Alcoa's retiree medical costs under the new plan design remain above the per capita dollar amount that Alcoa has paid for Plaintiffs' retiree medical benefits since 1993.

### 3.    <u>The plan design changes set forth in the 2006 CBA were negotiated by the Union.</u>

327.    The Court concludes that Alcoa and the Union agreed to the reasonable modifications put in place in the 2006 CBA.

327.1    Alcoa and the Union worked together in 2006 to reduce the overall cost of Alcoa's health care plan while also minimizing the burden placed on Alcoa's retirees. The parties were able to agree to plan design changes that, like the switch to managed care in 1993, reduced the overall cost of the health care plan. (See <u>supra</u>, ¶ 279.)

-86-

## 4. The plan design changes set forth in the 2006 CBA were reasonably commensurate with prior changes, changes to active employees and changes made by other companies.

328.    The Court concludes that the changes that Alcoa implemented in 2007 to its managed care program are reasonably commensurate with the benefits provided in prior Alcoa CBAs, reasonable in light of changes in health care and roughly consistent with the benefits of active Alcoa employees.

328.1    Plaintiffs continue to pay modest co-pays and deductibles, as they have since 1993 and as is expected in any managed care program.  (See supra, ¶¶ 133.2, 279-80, 282.)

328.2    Like the change to managed care in Reese and in this case, the changes set forth in the 2006 CBA do not simply shift costs to the retirees but reduce the overall cost of the plan.  (See supra, ¶ 279.)

328.3    The changes set forth in the 2006 CBA are consistent with changes in health care benefits that other companies have put in place.  (See supra, ¶ 279.3.)

328.4    The changes set forth in the 2006 CBA are consistent with changes that Alcoa has made in its benefits program for current active employees; indeed, Plaintiffs' benefits are more generous than those of Alcoa's active employees. (See supra, ¶ 279.5.)

329.    The Court concludes that the premiums that Alcoa implemented in 2007 are reasonable in light of the negotiated changes made in prior Alcoa CBAs, the health care benefits provided by other employers and the benefits that Alcoa provides to active employees.

329.1    Under the negotiated 2006 CBA, a pre-Medicare retiree pays $150 per month for himself and his spouse ($75 per person), a post-Medicare retiree—which Alcoa expects that the majority of Plaintiffs are—pays $80 per month for himself and his spouse ($40 per person), and those premiums are expected to stay flat until 2017.  (See supra, ¶¶ 260, 280.4.)

329.2    Plaintiffs' health care premiums were linked to the enhanced pensions that they received in the 1993 negotiations.  (See supra, ¶ 67.2.) Precisely because a cap was to be implemented at some point in the future, Plaintiffs have since 1993 received higher pensions from Alcoa than they otherwise would.  (See supra, ¶ 73.1.)  In light of the fact that Plaintiffs continue to receive enhanced pension benefits, as negotiated in 1993, in conjunction with their health care premiums, those premiums are eminently reasonable.

329.3    Companies generally require retirees to pay significantly higher premiums for their health care than those paid by Alcoa's retirees since January 1, 2007.  (See supra, ¶ 279.4.)

-87-

329.4   Alcoa's current active employees also pay premiums for their health care benefits.  (See supra, ¶ 279.5.)

## 5.   The plan design changes set forth in the 2006 CBA will ensure that no further plan design changes will be necessary until 2017.

330.    Under the 2006 CBA, Alcoa has agreed to contribute at least $50 million to a Retiree Health Care Account, which will be used to pay for retiree health care costs until the balance of the Account is exhausted.  (See supra, ¶ 280.3.)

331.    According to the periodic updates sent by Alcoa to the Union, there was approximately $80 million in the Retiree Health Care Account as of January 2009.  (See supra, ¶ 269.)

332.    Alcoa's actuaries currently estimate that the Retiree Health Care Account should allow retiree premiums to remain constant until 2017, at which point Alcoa expects that virtually all of Plaintiffs will be eligible for Medicare and subject only to very modest supplementary plan costs.  (See supra, ¶¶ 260.6, 280.4.)


November 16, 2009                              Respectfully Submitted,

                                               **ALCOA INC.**


                                               By:  _____/s/  Daniel Slifkin_____
                                                              Counsel


                                               *Evan R. Chesler (N.Y. Bar No. 1475722)
                                               *Daniel Slifkin (N.Y. Bar No. 2439768)
                                               CRAVATH, SWAINE & MOORE LLP
                                               825 Eighth Avenue
                                               New York, New York 10019
                                               212.474.1000 (telephone)
                                               212.474.3700 (facsimile)
                                               echesler@cravath.com
                                               dslifkin@cravath.com

-88-

John A. Lucas (Tenn. Bar No. 011198)
MERCHANT & GOULD, P.C.
Suite 203
110 McGhee Tyson Boulevard
Alcoa, Tennessee 37701
865.380.5978 (telephone)
865.380.5999 (facsimile)
jlucas@merchantgould.com

*James P. Naughton (Va. Bar No. 25923)
HUNTON & WILLIAMS LLP
500 East Main, Suite 1000
Norfolk, Virginia 23510
757.640.5300 (telephone)
757.625.7720 (facsimile)
jnaughton@hunton.com

(*Admitted pro hac vice)

Counsel for Defendant Alcoa Inc.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2009, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

Parties may access this filing through the Court's electronic filing system.

_____/s/  Daniel Slifkin_____
Counsel